Case No. 23-1664

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

**BOY SCOUTS OF AMERICA and DELAWARE BSA, LLC**

**Debtors.**

**LUJAN CLAIMANTS;**

**Appellants,**

**v.**

**BOY SCOUTS OF AMERICA, et al.**
**Appellees.**

Appeal from the United States
District Court, District of Delaware, Case No. 22-cv-01237-RGA[1]

## APPELLANTS LUJAN CLAIMANTS' OPENING BRIEF

LOIZIDES, P.A.                    LUJAN & WOLFF LLP
Christopher D. Loizides           Delia Lujan Wolff
1225 King Street, Suite 800       238 Archbishop Flores St., Suite 300
Wilmington, DE 19801              Hagatna, Guam 96910
Telephone: (302) 654-0248         Telephone: (671) 477-8064/5

*Attorneys for Lujan Claimants*

---

[1]    Case number 22-cv-01237-RGA is a lead case consolidated with District Court cases 22-cv-01237, 22-cv-01238, 22-cv-01239, 22-cv-01240, 22-cv-01241, 22-cv-01242, 22-cv-01243, 22-cv-01244, 22-cv-01245, 22-cv-01246, 22-cv-01247, 22-cv-01249, 22-cv-01250, 22-cv-01251, 22-cv-01252, 22-cv-01258, and 22-cv-01263. Lujan Claimants' appeal is docketed in the District Court at 22-cv-01258-RGA.

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Appellants Lujan Claimants are 75 individual creditors and not a corporation.

Thus, the disclosure required by Federal Rule of Appellate Procedure 26.1 does not

apply to them.

DATED:  July 24, 2023                                    Respectfully submitted,

/s/ Christopher D. Loizides
Christopher D. Loizides
LOIZIDES, P.A.
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 654-0248
Facsimile: (302) 654-0728
Email: loizides@loizides.com


and

LUJAN & WOLFF LLP

/s/ Delia Lujan Wolff
Delia Lujan Wolff
Suite 300, DNA Bldg.
238 Archbishop Flores St.
Hagatna, Guam 96910
Telephone: (671) 477-8064/5
Facsimile: (671) 477-5297
Email:  dslwolff@lawguam.com

*Attorneys for Lujan Claimants*

# TABLE OF CONTENTS

INTRODUCTION                                                    1

STATEMENT OF JURISDICTION                                       2

STATEMENT OF ISSUES PRESENTED FOR REVIEW                        2

STATEMENT OF RELATED CASES

     PURSUANT TO L.A.R. 28.1(a)(2)                             4

STATEMENT OF CASE

  I.    Pre-Bankruptcy                                        4

  II.   Post-Petition                                         5

SUMMARY OF ARGUMENT                                            7

ARGUMENT                                                      7

  A. The Bankruptcy Court Erred in Confirming the Plan with

    Nonconsensual Third-Party Releases and Injunctions        7

    1. Debtors Failed to Prove Subject Matter Jurisdiction Exists

      over Survivors' Claims against Nondebtors                8

      a. No "Arising In" or "Arising Under" Jurisdiction      9

      b. No "Related to" Jurisdiction                        10

        i.  Mere Precursors to Separate Lawsuits            10

        ii.  Direct Claims Against Nondebtors               13

        iii. No Unity of Interest Among Nondebtors           19

        iv. Limited Shared Insurance                        22

        v. No Automatic Liability                           23

        vi. Contingent Interest in Local Council Property    26

    2. The Bankruptcy Code Does Not Authorize Nondebtor Releases   28

    3. Assuming Statutory Authority Exists, the Releases and Injunctions

      Fail under Hallmarks of Sister Circuits and Master Mortgage   29

      a. Hallmarks from Sister Circuits                      30

        i. Fairness                                        30

        ii. Necessity to Reorganization                    32

      b. Master Mortgage                                    35

        i. Identity of Interest                            35

        ii. Contribution of Substantial Assets             36

        iii. Essential to Reorganization                    37

i

iv. Overwhelming Creditor Acceptance 37

v. Payment of All Claims 39

B. The Bankruptcy Court Erred in Confirming a Plan with the
Insurance Settlements and which Invalidates, Impairs, and Supersedes
Lujan Claimants' Direct Action Rights 41

1. The Plan invalidates, impairs, and supersedes direct action rights
in violation of the McCarran-Ferguson Act 41

a. Bankruptcy Code Does Not Specifically Relate to Business of
Insurance 44

b. Guam Direct Action Statute Regulates Business of Insurance 47

2. The proceeds of liability insurance policies are not property of
the Bankruptcy Estate and cannot be released or enjoined 53

3. The Hartford and Century and Chubb Companies insurance
settlements for policy buybacks free and clear of others' interests
in the policies are for payment grossly below policy limits and
should have been denied 57

4. The Plan impermissibly modified Lujan Claimants' rights 58

5. The Plan fails to adequately protect and compensate direct
Action claimants for their interests in insurance policies 61

6. The Court lacks jurisdiction over the 1976 and 1977 Hartford
Policies for coverage of child sexual abuse claims, since BSA
previously released its rights to such coverage 64

7. The sale and settlement of nondebtors' separate insurance policies
should have been denied 65

C. The Bankruptcy Court Erred in Confirming a Plan that Violates the
Automatic Stay Imposed in the Archbishop of Agana's Bankruptcy
Case 68

D. The Bankruptcy Court Erred in Confirming a Plan that Fails the
Best Interest of Creditors Test 70

E. The Plan Fails to Properly Classify the Claims of Lujan Claimants 74

F. The Plan Treats Survivors, Including Lujan Claimants, Unequally 75

G. The Bankruptcy Court Erred in Granting Debtors' Motion to
Amend and Supplement and Confirming the Plan which Materially
Differs from the Solicited Plan 77

JOINDER 82

CONCLUSION                                                                 82

# TABLE OF AUTHORITIES

**Cases**

ACandS, Inc. v. Travelers Casualty & Surety Co., 435 F.3d 252 (3d Cir. 2006) ...53

Am. Bankers Ins. Co. of Fla. v. Inman, 436 F.3d 490 (5th Cir. 2006) ....................48

Atkinson v. Kettler, 372 S.W.2d 704 (Tex. Civ. App. 704 1963) ...........................27

AOV Indus., Inc., 792 F.2d 1140 (D.C. Cir. 1986) ...............................................30

Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25 (1996) ...................44

Billing v. Ravin, Greenberg & Zackin, P.A., 22 F.3d 1242 (3d Cir. 1996) ...........29

Decade's Monthly Income & App. Fund v. Whyte & Hirschbeck, S.C.,
    173 Wis.2d 665 (1993) ...................................................................................59

Evans v. TIN, Inc., Civil Action Nos. 11-2067, 11-2068, 11-2069, 11-2182, 11-
    2348, 11-2351, 11-2417, 11-2949, 11-2985, 11-2987, 11-3018, 11-3021, 11-
    3048, 11-3049, 12-18, 11-3050, 2012 WL 2343162 (E.D. La. June 20, 2012)
    ......................................................................................................................48,49

First Fidelity Bank v. McAteer, 985 F.2d 114 (3d Cir. 1993) ..........................53,57

Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins,
    926 S.W.2d 287 (Tex. 1996) ....................................................................... 17,18

Hayes v. New Orleans Archdiocesan Cemeteries, 805 So.2d 320, 323
    (La. Ct. App. 2001)..........................................................................................61

Highmark Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 167-68 (3d Cir. 2001) .52

Houston v. Edgeworth (In re Edgeworth), 993 F.2d 51 (5th Cir. 1993) ................53

Humana, Inc. v. Forsyth, 525 U.S. 299 (1999).....................................................52

In re Advanced Cellular Systems, 235 B.R. 713 (1999) .......................................44

In re Archbishop of Agana, Bankruptcy Case No. 19-00010 (D. Guam) .... 12,25,26

In re Archbishop of St. Paul & Minneapolis, 579 B.R. 188
    (Bankr. D. Minn. 2017)...................................................................................54

In re Billing, 150 B.R. 563 (D.N.J. 1993)...........................................................29

In re Charles Street African Methodist Episcopal Church of Boston,
    499 B.R. 66 (Bankr. D. Mass. 2013)...............................................................36

In re Combustion Eng'g, Inc., 391 F.3d 190 (3d Cir. 2005) ............. 7,8,10,11,13,45

In re Continental Airlines, 203 F.3d 203 (3d Cir. 2000) ............... 28,29,30,38,45,56

In re Estate of Gardinier, 40 N.J. 261 (1963) .....................................................59

In re Ferandos, 402 F.3d 147, 150 (3d Cir. 2005) ................................................8

In re Grabill Corp., 967 F.2d 1152 (7th Cir. 1992) ............................................29

In re Heron, Burchette, Ruckert & Rothwell, 148 B.R. 660
    (Bankr. D.D.C. 1992) ......................................................................................38

In re Jet Fla. Sys., Inc., 883 F.2d 970 (11th Cir. 1989) ......................................57

In re La. World Exposition, Inc., 832 F.2d 1391 (5th Cir. 1987)...................... 53)
    ......................................................................................................................53

In re Master Mortgage Investment Fund, Inc., 168 B.R. 930
    (Bankr. W.D. Mo. 1994) .......................................................................... 35,38,

In re Nutraquest, Inc., 434 F.3d 639 (3d Cir. 2006) ...........................................53

In re Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984)..........................9,11

In re PRS Ins. Group, Inc., 294 B.R. 609 (Bankr. D. Del. 2003) ..................... 43,44

In re Quigley Co., 437 B.R. 102 (Bankr. S.D.N.Y. 2010).....................................40

In re Scott, 607 B.R. 211, 220 (W.D. Pa. 2019).....................................................8

In re SportStuff, Inc., 430 B.R. 170, 178 n.15 (B.A.P. 8th Cir. 2010) ...................54

In re W.R. Grace & Co., 591 F.3d 164 (3d Cir. 2009) ...........................................8,11
In re W.R. Grace & Co., 475 B.R. 34, 83 (D. Del. 2012) ........................................58
In re Wool Growers Cent. Storage Co., 371 B.R. 768
  (Bankr. N.D. Tex. 2007) ................................................................................. 38,40
Infant C. v. Boy Scouts of America, Inc., 391 S.E.2d 322 (Va. 1990) ...................17
Juarez v. Boy Scouts of America, Inc., 81 Cal. App. 4th 377 (2000) .....................14
Kahaulelio v. Ihihi, 24 Haw. 292 (1918) ...............................................................27
Kahn v. Rockhill, 28 A.2d 34 (N.J. Ch. 1942) .......................................................27
Landry v. Exxon Pipeline Co., 260 B.R. 769, 786 (Bankr. M.D. La. 2001) ..........53
Lebron v. Mechem Fin. Inc., 27 F.3d 937, 942 (3d Cir. 1994) ................................7
Litton v. Ford Motor Co., 554 So.2d 99, 103 (La. Ct. App. 1989) ........................61
L.P. v. Oubre, 547 So.2d 1320 (La. Ct. App. 1989) ......................................... 14,15
Malpeli v. Beneficial Fin. Co. (In re Malpeli), 7 B.R. 508
  (Bankr. N.D. Ill. 1980) .....................................................................................60
Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith
  Brown, P.C., 692 F. 3d 283, 293 (3d Cir. 2012) ..................................................8
Mission Prod. Holdings, Inc. v. Tempnology, LLC, 139 S. Ct. 1652 (2019) .........54
N.K. v. Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints,
  175 Wash. App. 517 (2013) ...............................................................................16
Parker v. Jordan, 632 S.W.3d 108 (Tex. App. 2021) .............................................27
Pepper v. Litton, 60 S. Ct. 238 (1939) ...................................................................12
Pepper v. Litton, 60 S. Ct. 238 (1939) ...................................................................61
Prudential Ins. Co. v. Benjamin, 328 U.S. 408 (1946) ..................................... 42,43
Rauch v. Am. Fam. Ins. Co., 115 Wis.2d 257, 267 (1983) .....................................59
Reis v. OOIDA Risk Retention Group, Inc., 303 Ga. 659, 665-66 (2018) .............50
Roe No. 1 v. Boy Scouts of America Corp., 147 Conn. App. 622 (2014) ...............16
SEC v. Nat'l Securities, Inc., 393 U.S. 453 (1969) ................................................47
Shipman v. Kenosha Unified Sch. Dist., 57 Wis.2d 697, 704-05 (1973) ...............60
Society Ins. v. Capitol Indem. Corp., 260 Wis.2d 549 (Ct. App. 2003) .................59
Todd v. Steamship Mut. Underwriting Ass'n (Bermuda) Ltd.,
  601 F.3d 329 (5th Cir. 201) ...............................................................................48
Torkelsen v. Maggio (In re Guild & Gallery Plus, Inc.),
72 F.3d 1171, 1178 (3d Cir. 1996) .....................................................................8, 9
Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119 (1982) ....................................48
United States v. Del. Dep't of Ins., No. 20-829-MN-CJB,
  2021 WL 3012728 (D. Del. July 16, 2021) ........................................................43
United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533 (1944) .............42
United States Dep't of Treasury v. Fabe, 508 U.S. 491 (1993) ......................... 42,47
United States Fidelity & Guaranty Co. v. Bray, 225 U.S. 205 (1912) ...................12
United States v. Security Ind. Bank, 103 S. Ct. 407, 413-14 (1982) ......................60
United States Trustee v. Gryphon at the Stone Mansion, Inc.,
  166 F.3d 552 (3d Cir. 1999) ................................................................................9
Wadsworth v. Allied Professionals Ins. Co.,
  748 F.3d 100 (2d Cir. 2014) ..............................................................................50

**Statutes**

22 GCA § 18305 ................................................................................................ 41,49
La. Rev. Stat. Ann. § 22:1269 ...............................................................................49

11 U.S.C. § 105 ....................................................................................... 29,44,45,52
11 U.S.C. § 109 ....................................................................................................44

11 U.S.C. § 363 ................................................................................ 55,61
11 U.S.C. § 1123 ........................................ 29,44,45,47,52,55,59,60
11 U.S.C. § 1129 .................................................................................. 55
11 U.S.C. § 524 ........................................................ 28,29,46,47,55
15 U.S.C. § 1011 .................................................................................. 42
15 U.S.C. § 1012 .................................................................................. 43
15 U.S.C. § 1015 .................................................................................. 43
28 U.S.C. § 157 .......................................................................... 2,7,10,
28 U.S.C. § 158 ...................................................................................... 2
28 U.S.C. § 1291 .................................................................................... 2
28 U.S.C. § 1334 ................................................................................ 2, 8

**Rules**

Black's Law Dictionary 1236, 1286 (6th ed. 1990) ............................... 47

46A C.J.S. Insurance § 1986 (2007 ....................................................... 57

## **INTRODUCTION**

Debtors Boy Scouts of America ("BSA") and Delaware BSA, LLC (collectively "Debtors") filed for chapter 11 bankruptcy because BSA was sued for child sexual abuse in hundreds of civil lawsuits across the United States, including Guam. Lujan Claimants are 75 individuals[1] who suffered childhood sexual abuse in Guam in relation to scouting from approximately 1955 to 1981, and who each filed timely sexual abuse proofs of claim. Most Lujan Claimants are survivors of abuse perpetrated by one of the most prolific abusers in scouting history. Each has claims against the Boy Scouts of America Aloha Council ("Aloha Council"), a local council, and chartered organizations, and direct action rights against insurers for their abuse. Some have claims against religious orders, including the Capuchin Franciscans, who are not chartered organizations. Except for at least three, all are creditors for scouting-related abuse in the bankruptcy of the Archbishop of Agana ("AOA"), an opt-out chartered organization. The claims of two Lujan Claimants do not implicate AOA but other chartered organizations. More than 25% of the 275 prepetition cases against BSA were brought by Lujan Claimants, and are subject to an open civil statute of limitations. No Lujan Claimant consents to releasing their claims against nondebtors. All object to and now appeal Debtors' confirmed Plan of Reorganization.

---

[1] A10177-10183.

## STATEMENT OF JURISDICTION

The United States Bankruptcy Court for the District of Delaware had subject matter jurisdiction over the chapter 11 bankruptcy case of Debtors under 28 U.S.C. §§ 1334 and 157, except as argued later, and jurisdiction to hear non-core proceedings related to a case under title 11 and to submit proposed findings of fact and conclusions of law to the district court, pursuant to 28 U.S.C. § 157(b)(3).

On September 22, 2022, Lujan Claimants timely filed a Notice of Appeal, A14655-14689, from the Confirmation Order, A00788-1354, which is a final order except as to non-core proceedings, the Confirmation Opinion, A00507-787, and Chubb Order, A14129-14131. The United States District Court for the District of Delaware had jurisdiction over the appeal under 28 U.S.C. § 158(a), and jurisdiction to enter a final order or judgment as to non-core proceedings related to a chapter 11 case under 28 U.S.C. § 157(c)(1).

On April 10, 2023, Lujan Claimants filed a timely appeal, A00198-220, from the District Court judgment affirming confirmation of Debtors' plan of reorganization, A00042-197. This Court has jurisdiction over this appeal under 28 U.S.C. §§ 158(d) and 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Did the Bankruptcy Court err in confirming the Plan with nonconsensual third-party releases and injunctions?

2

**Raised:** A10666-10683, 11932-11936, 5585-5586, 5690, 5714-5715, 6110-6159, 6167-6171; Letter [Bankr. D.I. 9693]; A13252, 13473-13476, 14857-14885, 19677-19682, 19983-19995, 20043-20050, 20115-20116.
**Ruled:** A00626-684; A00066-113.

2. Did the Bankruptcy Court err in confirming the Plan with the insurance settlements and injunctions and which impairs and impedes Lujan Claimants' direct action rights against insurers?

**Raised:** A10687-10702, 10704-10705, 11936-11942, 5566-5593, 5687-5688, 6159-6167, 13252, 13476, 14062-14102, 14885-14915, 19683-19698, 19705-19709, 20055-20069, 20108-20112.
**Ruled:** A00586-606, 615-626; A13476-13477; A00120-124, 127-137.

3. Did the Bankruptcy Court err in confirming the Plan which violates the automatic stay imposed in the Archbishop of Agana's bankruptcy case in Guam?

**Raised:** A10703-10704, 5558-5566, 5573-5581, 5558-5566, 5573-5581, 13420-13421, 14062-14102, 14915-14917, 19698-19705, 20069-20071, 20112-20115.
**Ruled:** A00606-615; A14096-14097; A00125-127.

4. Did the Bankruptcy Court err in confirming the Plan which fails to meet the best interest of creditors test?

**Raised:** A10683-10687, 5629-5660, 5688-5692, 6167, 14917-14922, 19709-19711, 20071-20073.
**Ruled:** A00752-761; A00137-142.

5. Did the Bankruptcy Court err in confirming a Plan that improperly classifies the claims of Lujan Claimants?

**Raised:** A10707, 5707-5708, 14922-14923, 19711, 20073-20074.
**Ruled:** A00703-706; A00142-145.

6. Did the Bankruptcy Court err in confirming the Plan which provides unequal treatment?

**Raised:** A10702-10703, 10708, 5708-5713, 13252, 13477, 14923-14925, 19711-19712, 20073-20074, 20106-20107-20108.
**Ruled:** A00711; A13477-13478; A00145-147.

7. Did the Bankruptcy Court err in granting Debtors' motion to amend and supplement the plan and confirming the Plan which materially and adversely differs from the solicitation plan?

**Raised:**    A13250-13254,  13468-13473,  13478-13479,  14062-14102, 14925-14929, 19712-19716, 20075-20076.
**Ruled:** A00150-156; A13478-13479; A14101-14102.

## STATEMENT OF RELATED CASES
## PURUANT TO L.A.R. 28.1(a)(2)

This case has not been before this Court previously, and is not related in any way to any other case completed, pending, or about to be presented before this court or any other court or agency, state or federal.

## STATEMENT OF THE CASE

## I.    PRE-BANKRUPTCY

Despite a storied past, BSA faced child sexual abuse allegations for decades. In lawsuits against BSA, local councils, and chartered organizations, BSA would sometimes be found liable but not the local council and/or chartered organization, or BSA would be found not liable but the local council and/or chartered organization would be found liable.

4

Less than four years before BSA filed for bankruptcy, BSA began to coordinate its approach to abuse lawsuits. Sometimes BSA defended and settled on behalf of itself, local councils, and chartered organizations. Guam was the admitted exception, as BSA entered into settlements on behalf of itself and local councils but not on behalf of chartered organization AOA who had its own counsel. These were confidential settlements. After AOA filed for chapter 11 bankruptcy on January 16, 2019, Jtx. 2651, BSA, on behalf of itself and local councils, filed a proof of claim against AOA for contribution for the settlements BSA had reached and for claims against BSA that had not settled. Six months after making a claim against AOA, BSA filed its own chapter 11 bankruptcy case.

## II.    POST-PETITION

Debtors petitioned for bankruptcy on February 18, 2020. A07002-7018. By the Bar Date, 82,209 unique claims were timely filed by individuals alleging child sexual abuse ("Survivors"). A00536. After filing a series of plans (some of which provided no releases of local councils, chartered organizations, or insurers), a disclosure statement was approved and votes were solicited on a plan. A00537-565. Of the voting Survivors (Class 8 Direct Abuse Claimants), only 85.72% voted to accept the solicitation plan. A00565. Of the 75 Lujan Claimants, 72 voted to reject, 1 voted to accept, and 2 did not vote. A23777-23783. The one accepting Lujan Claimant elected the Expedited Distribution on the ballot, and also has claims

5

against religious orders.  A23778, 26929-26984.  As accept votes totaled 48,463, only 58.95% of the 82,209 Class 8 Survivors voted to accept the plan.  A00565, 12170.

Several parties objected to plan confirmation, including all Lujan Claimants. After the confirmation hearing, the Bankruptcy Court issued an Opinion, which did not confirm the plan.  After Debtors filed modified plans and a motion to amend and supplement the Opinion, to which Lujan Claimants objected, the modified Plan was confirmed on September 8, 2022.

The Plan provides for Survivors and other unsecured creditors to be compensated through a Settlement Trust that would receive noncontingent funding of $2,484,200,000, and contingent funding of another $200,000,000.  A00583.  All other funding is speculative.  A00583-584.  In addition to contributions by Debtors, money is being contributed by local councils, the United Methodists, and four settling insurers, pursuant to settlement agreements.  A00583.  The Plan releases entirely these contributing entities—including 250 local councils—from child sexual abuse liability, and releases well over 100,000 non-contributing chartered organizations and an untold number (most likely in the tens of thousands) of religious entities from liability for abuse that first occurred after 1975 and abuse covered by settling insurers policies.

Lujan Claimants and others timely appealed the Confirmation Order and Confirmation Opinion to the District Court of Delaware. The District Court affirmed confirmation of the plan and denied appellants' motions for stay pending appeal.

## SUMMARY OF ARGUMENT

Confirmation of the Plan must be reversed because (1) no jurisdiction and authority exist to grant nonconsensual releases and injunctions of Survivors' claims against nondebtors, (2) the insurance Plan provisions and settlements should not have been approved and they violate the McCarran-Ferguson Act and direct action rights, (3) the Plan violates the automatic stay imposed in the AOA bankruptcy, (4) the Plan fails the best interest of creditors test, (5) the Plan improperly classifies direct action claimants, (6) the Plan provides unequal treatment, and (7) the Plan is a material and adverse modification of the solicitation plan.

## ARGUMENT

As creditors of the bankruptcy estate, Lujan Claimants' interests are directly and pecuniarily affected by the orders confirming the Plan and they, therefore, have appellate standing to challenge Plan confirmation and related orders. In re Combustion Eng'g, Inc., 391 F.3d 190, 223-24 (3d Cir. 2005).

### A. The Bankruptcy Court Erred in Confirming the Plan with Nonconsensual Third-Party Releases and Injunctions.

Standard of Review: Conclusions of law are reviewed *de novo* and findings of fact are reviewed for clear error. Lebron v. Mechem Fin. Inc., 27 F.3d 937, 942 (3d Cir. 1994). However, in the absence of "arising in"

7

or "arising under" jurisdiction, the Bankruptcy Court's factual findings are reviewed *de novo*. 28 U.S.C. § 157(c)(1). Whether subject matter jurisdiction exists is a question of law reviewed *de novo*. In re W.R. Grace & Co., 591 F.3d 164, 170 n.7 (3d Cir. 2009) ("W.R. Grace I"). The standard of review is plenary for issues involving statutory interpretation. In re Ferandos, 402 F.3d 147, 150 (3d Cir. 2005).

   1. Debtors Failed to Prove Subject Matter Jurisdiction Exists over Survivors' Claims against Nondebtors.

Federal courts have limited jurisdiction, as they exercise only the authority conferred on them by Article III and by congressional enactments pursuant thereto. WR. Grace I, 591 F.3d at 174. Federal courts are presumed to lack jurisdiction without affirmative evidence of this fact. In re Scott, 607 B.R. 211, 220 (W.D. Pa. 2019) (citing Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C., 692 F. 3d 283, 293 (3d Cir. 2012)). The party asserting that a court has subject matter jurisdiction bears the burden of proving that such jurisdiction exists. Id.

Federal bankruptcy jurisdiction is set forth in 28 U.S.C. § 1334, which provides district courts "original and exclusive jurisdiction of all cases under title 11" and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(a), (b). Cases "under" title 11 "refers merely to the bankruptcy petition itself." Combustion Eng'g, 391 F.3d at 225. A case "arises under" title 11 "if it invokes a substantive right provided by title 11." Torkelsen v. Maggio (In re Guild & Gallery Plus, Inc.),

72 F.3d 1171, 1178 (3d Cir. 1996).  Proceedings "arise in" a bankruptcy case "if they have no existence outside of the bankruptcy." <u>United States Trustee v. Gryphon at the Stone Mansion, Inc.</u>, 166 F.3d 552, 556 (3d Cir. 1999).  A proceeding is "related to" a bankruptcy case if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." <u>In re Pacor, Inc. v. Higgins</u>, 743 F.2d 984, 994 (3d Cir. 1984).

a. No "Arising In" or "Arising Under" Jurisdiction

As Survivors' claims are child sexual abuse claims that first arose prepetition, often decades ago, these claims are not cases or proceedings under title 11 because they are not the title 11 petition, they do not invoke a substantive right provided by title 11, and they exist outside of bankruptcy.  These claims do not exist only because Debtors filed for bankruptcy.  All but two Lujan Claimants brought child sexual abuse lawsuits against BSA years before BSA filed for bankruptcy.  <u>See, e.g.</u>, A26219-26326, 26851-27084.

The Bankruptcy Court erroneously found subject matter jurisdiction exists because "this is a confirmation hearing" which is "a proceeding that 'by its nature, and not the particular factual circumstance, could arise only in the context of a bankruptcy case.'" A00631-632.  "Bankruptcy jurisdiction exists here, therefore, as this proceeding 'arises in' this bankruptcy case." A00632.  This is error because parties cannot create subject matter jurisdiction on their own or by agreement even

9

in a plan of reorganization.  Combustion Eng'g, 391 F.3d at 228.  A debtor cannot create subject matter jurisdiction over any nondebtor third-party by structuring a plan in such a way that it depended upon third-party contributions.  Id.

The District Court itself made no express finding of "arising in" or "arising under" jurisdiction over third party claims against nondebtors and the release and injunction of such claims.  A00081-82.  The District Court decided that it need not weigh in on this issue since it concluded that the Bankruptcy Court had, at a minimum, "related to" jurisdiction over Survivors' claims against nondebtors.  A00082.

As the Bankruptcy Court lacked "arising in" or "arising under" jurisdiction over Survivors' claims against nondebtors, the Bankruptcy Court was only authorized by statute to submit proposed findings of fact and conclusions of law to the District Court, and the District Court was required to review both the factual findings and conclusions of law *de novo*.  28 U.S.C. § 157(c)(1).  However, the District Court incorrectly reviewed the Bankruptcy Court's factual findings and legal conclusions for "clear error."  A00113, A00154.

### b. No "Related to" Jurisdiction

#### i. Mere Precursors to Separate Lawsuits

Bankruptcy courts may have jurisdiction over suits between third parties that conceivably may have an effect on the bankruptcy estate.  Combustion Eng'g, 391

F.3d at 226.  These suits between third parties may qualify as "proceedings 'related to' a title 11 case."

In Pacor, the Third Circuit "set forth what has become the seminal test for determining 'related to' jurisdiction over third party claims." Combustion Eng'g, 391 F.3d at 226.  The Third Circuit held that "the primary action between Higgins and Pacor would have no effect on the Manville bankruptcy estate, and therefore [cannot establish] 'related to' [jurisdiction over that suit]...." Id. at 995.  "At best, [the Higgins-Pacor lawsuit] is a mere precursor to the potential third party claim for indemnification by Pacor against Manville.  Yet the outcome of the Higgins-Pacor action would in no way bind Manville, in that it could not determine any rights, liabilities, or course of action of the debtor." Id.

Here, the Bankruptcy Court lacks subject matter jurisdiction over Survivors' claims against nondebtors local councils, chartered organizations, religious orders, and insurers.  The outcome of any prepetition case against these nondebtors cannot bind BSA and therefore cannot determine any rights, liabilities, or course of action of BSA.  Those suits, at most, are mere precursors to potential third-party claims for indemnification against BSA.  Moreover, common law indemnification claims do not establish a bankruptcy court's subject matter jurisdiction over third-party claims if there would need to be another lawsuit before the third-party claim could have any impact on the bankruptcy proceedings.  W.R. Grace I, 591 F.3d at 172.

There is no subject matter jurisdiction over Lujan Claimants' claims against AOA for the additional reason that AOA is a debtor in its own bankruptcy case, In re Archbishop of Agana, Bankruptcy Case No. 19-00010 (D. Guam), and the District Court of Guam has exclusive jurisdiction to determine whether to permit Lujan Claimants to recover against AOA.  "Among the granted powers [to bankruptcy courts] are the allowance and disallowance of claims; the collection and distribution of the estates of the bankrupts and the determination of controversies in relation thereto; the rejection in whole or in part 'according to the equities of the case' of claims previously allowed; and the entering of such judgments 'as may be necessary for the enforcement of the [Bankruptcy Act].  In such respects the jurisdiction of the bankruptcy court is exclusive of all other courts."  Pepper v. Litton, 60 S. Ct. 238, 244 (1939) (citing United States Fidelity & Guaranty Co. v. Bray, 225 U.S. 205, 217 (1912)).  Thus, the District Court of Guam has exclusive jurisdiction over the allowance and disallowance of Lujan Claimants' claims against AOA, the collection and distribution of AOA's estate, and the determination of controversies in relation thereto.

As for the two Lujan Claimants who have filed no civil lawsuits, A26450-26507, 27085-27102, no jurisdiction exists over their claims against nondebtors since, without any lawsuit, any resolution of their claims against these nondebtors

would be a mere precursor to a separate lawsuit against BSA for any contribution or indemnification claims.

ii. Direct Claims Against Nondebtors

No "related to" jurisdiction exists over Survivors' direct claims against nondebtors. In <u>Combustion Eng'g</u>, the Third Circuit found that there was no "related to" jurisdiction over independent, non-derivative claims against nondebtors Basic and Lummus despite arguments that there was a "unity of interest" between Combustion Engineering, Basic, and Lummus, based in part on "joint operations at single sites leading to the asbestos personal injury at issue," and "extensive financial inter-dependence." 391 F.3d at 230-32. Unity of exposure created by asbestos contained in a common product was insufficient to give rise to "related to" jurisdiction when the third-party claim would not directly result in liability for the debtor. <u>Id.</u> at 232. No "related to" jurisdiction existed where the debtor and third-parties are independent corporate entities, with separate and distinct management and operations, the debtor did not own or control the third-parties, and there was no evidence that a suit against the third-parties would deplete the estate or affect its administration. <u>Id.</u> at 227-28. There was no "related to" jurisdiction even though there were shared insurance policies and a large majority of Lummus claimants had also asserted claims against Combustion Engineering. <u>Id.</u> at 230, 232-33. The Third Circuit noted that courts finding "related to" jurisdiction over claims against

nondebtors based in part on shared insurance policies have relied not only on extensive record findings regarding the terms and operation of the subject policies, but also on additional evidence of automatic liability against the debtor.  Id. at 232-33.

Survivors have direct claims against nondebtors based on the independent liability of these nondebtors and which do not depend on a finding of either Debtor's liability.  Courts have found BSA to be potentially liable for child sexual abuse but the chartered organization was not found liable.  Juarez v. Boy Scouts of America, Inc., 81 Cal. App. 4th 377 (2000); L.P. v. Oubre, 547 So.2d 1320 (La. Ct. App. 1989).  In Juarez, the court described the tortious liability of a defendant:

> A tort … involves a violation of a legal duty, imposed by statute, contract or otherwise, owed by the defendant to the person injured. Without such duty, an injury is "damnum absque injuria"—injury without wrong.  Thus, in order to prove facts sufficient to support a finding of negligence, a plaintiff must show that defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.  ….
>     … [Courts have adopted a] multi-element duty assessment in determining whether a particular defendant owed a tort duty to a given plaintiff.  These factors include:  (1) the foreseeability of harm to the injured party; (2) the degree of certainty that the injured party suffered harm; (3) the closeness of the connection between the defendant's conduct and the injury suffered; (4) the moral blame attached to the defendant's conduct; (5) the policy of preventing future harm; (6) the extent of the burden to the defendant; and (7) the consequences to the community of imposing a duty to exercise care, with resulting potential liability.

14

81 Cal. App. 4th at 401 (citations omitted).  The particular defendant's above-described duty and liability is not dependent on anyone else's misconduct, negligence, or other liability.  In fact, the court held that the pretrial record did not conclusively eliminate the possibility of the BSA's liability, but it did show that there were no triable issues of fact with respect to the Church's liability stemming from the Scouts' use of Church property to hold troop meetings.  Id. at 413.  The court further held that the plaintiff failed to proffer material facts to support his claim against the Church alleging premises liability, as the plaintiff failed to claim that there were facts that put or should have put the Church on notice of the molestation, nor did the plaintiff claim the Church could have taken effective steps to prevent the sexual molestation.  Id.

In L.P, the court held that the plaintiffs, parents of a child sexually abused in scouting, adequately pleaded a cause of action for negligence against BSA and local council.  547 So.2d at 1323-24.  The court found that the plaintiffs adequately pleaded a duty owed by BSA and the local council, alleging that, under the auspices of BSA, the local council undertook to promote, administer, and supervise the boy scout program in their community; that the local council know or should have known that the scoutmaster had sexually molested troop members; that the defendants failed to investigate the scoutmaster's background, failed to supervise him and the scouts

15

themselves and failed to inform the parents of the scoutmaster's sexual abuse of troop members.  Id. at 1323-24.

Courts have found the chartered organization to be potentially liable for child sexual abuse, while BSA was found not liable.  Roe No. 1 v. Boy Scouts of America Corp., 147 Conn. App. 622 (2014); N.K. v. Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints, 175 Wash. App. 517 (2013).  In Roe No. 1, the plaintiff sued BSA and local council for child sexual abuse he suffered by his stepfather who was also the assistant scoutmaster for his troop.  147 Conn. App. at 631.  The appellate court affirmed the trial court's grant of a summary judgment motion in favor of BSA and local council, finding no genuine issue of material fact since the plaintiff failed to present evidence to counter the defendants' evidence that, under the organizational structure of the Boy Scouts, the local chartered organization is responsible for the selection and supervision of troop leaders.  Id. at 642.  The court reached this conclusion based on its finding that BSA and local council were not in control of the situation and that it was the local chartered organization that was responsible for selecting and supervising its adult volunteers.  Id. at 644.

In N.K., 175 Wash. App. at 530, the court held that for the plaintiff, a former scout, to show that the church had a duty, based on a special relationship, to protect him from sexual molestation, he did not need to prove that the church had prior specific knowledge that the scout leader posed a threat.  After considering

allegations that the church selected the scoutmasters and adult volunteers for the troop, the church chapel was the registered meeting place for the troop, the church actively encouraged children of the congregation to participate in scouting and it paid for the boys' participation in the troop, the church held out the abusive scoutmaster as a youth leader who could be safely trusted with children, the church owned a scouting cabin where the boys participated in meetings and scouting activities away from the custody and protection of their parents, the scoutmaster sometimes took the plaintiff to the cabin outside of meeting times and molested him there, and the scoutmaster also molested the plaintiff after scout meetings, the court found that the church had a protective relationship with the former scout that gave rise to a duty to protect him from foreseeable harm.  Id. at 532-33.  In contrast, the court found that BSA and the local council did not have a protective relationship with the former scout that gave rise to a duty to protect him from foreseeable harm. Id. at 534-35.

Also, a local council can be held liable for negligence involving child sexual abuse while BSA has been held not liable for the same abuse.  Infant C. v. Boy Scouts of America, Inc., 391 S.E.2d 322 (Va. 1990); Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins, 926 S.W.2d 287 (Tex. 1996).  In Infant C., 391 S.E.2d at 322, the court affirmed a jury verdict exonerating BSA of negligence

for child sexual abuse since it did not select and/or retain the scoutmaster abuser, while finding the local council liable for negligence.

In <u>Golden Spread Council</u>, 926 S.W.2d at 287, the court reversed the judgment of the appellate court and rendered judgment for BSA based on its finding that BSA could not be liable for the acts of the local council. The court also affirmed the judgment of the appellate court which found that summary judgment for the local council was improper since the local council had a duty to use reasonable care to prevent child sexual abuse.

The above prepetition litigation history of BSA demonstrates that there are liabilities of a local council, chartered organization, or other entities such as religious orders that do not derive from or depend upon the liability of BSA, but are based on the tortious conduct of the nondebtor.

BSA National Coordinating Counsel Bruce Griggs admitted that, in cases where BSA was sued, along with a local council or chartered organization, he would look at whether BSA owed a duty of care to protect the plaintiff when it came to BSA's liability. A01809. For local council liability, he would look at whether the local council owed a duty of care to protect the plaintiff. A01809-1810. For chartered organization liability, he would look at whether the chartered organization owed a duty of care to protect the plaintiff. A.1810. In response to complaints, BSA consistently raised the defense that there was no legal duty on BSA's behalf since

"the local level is where the troop leaders were selected and what not, and that Boy Scouts national didn't have a legal duty to the individual Scouts in the troop." A01724-1725. "The Boy Scouts' defense was that the Boy Scouts was not responsible to alleged abuse that occurred at a local troop level." A01778.

Even Hartford believes that it is "highly dubious" that providing local councils, certain contributing chartered organizations, and other nondebtors with a channeling injunction that would effectively discharge those entities from their own liability for abuse claims would be appropriate "because the liabilities appear to be direct, not derivative of the Debtors' liability." A23327.

As Survivors have claims against nondebtors based on nondebtors' direct and individual liability, the Bankruptcy Court lacked "related to" jurisdiction to release and permanently enjoin Survivors' direct claims against nondebtors.

### iii. No Unity of Interest Among Nondebtors

Here, BSA, local councils, and chartered organizations are "three entirely separate legal entities," "none has control over the other," "each local council raises and disburses its own funds and has its own board of directors," and BSA and local councils "do not administer the Scouting Program directly but rather offer the program to community organizations that wish to use the Scouting Program as a vehicle to reach their own goals and objectives with the youth of that particular community." A08222-8223. BSA states that the more than 100,000 locally

sponsored scouting units "are created, organized, supervised and run by approximately 1.3 million community volunteers who have absolutely no employment or agency relationship with The Boy Scouts of America." A08223. BSA states: "The troops or units do not belong to The Boy Scouts of America or to the Local Council but rather are owned and operated by the chartered local community organization," and "BSA does not supervise or control the manner in which the troop committee governs its troop." A08224. Also, BSA has no unity of interest in running houses of worship, providing government services, or accomplishing any of the specific missions of chartered organizations, or even of undisclosed religious entities. Despite their work in scouting, there is no evidence that a claim against any of them would render the others automatically liable or deplete Debtors' estate.

The Bankruptcy Court's reliance on the "most recent history" of scouting defense—a brief period of 3 years 6 months, A00532—is insufficient to establish a unity of interest. The Court wrongly disregarded much of BSA's prepetition history, considering only "[t]he more recent history … that BSA defends its Local Councils and Chartered Organizations, settles its cases, and settles for all BSA parties." A00637. There is a lengthy history of BSA defending itself and not others, leading to differing outcomes for each. As noted above, BSA's prepetition history shows that a court may find a nondebtor such as a local council or chartered organization

liable for child sexual abuse, and, at the same time, find that BSA is not liable for the same child sexual abuse. The Courts' understanding of a unified scouting defense is also contrary to the evidence as to Lujan Claimants, as Griggs testified that "Guam was an exception" to the typical practice of BSA settling on behalf of BSA, local councils, and chartered organizations. A01813. Griggs further testified that, in the Guam cases including Lujan Claimants' cases, BSA had separate counsel and AOA had its own counsel. A01811. BSA's filing and prosecution of a proof of claim against AOA for contribution destroys the fiction of a unified defense where BSA indemnifies chartered organizations.

The Bankruptcy Court's reliance on an "interconnectedness" between BSA, local councils, and chartered organizations, and that it takes these three entities to carry out scouting, is not enough to create a unity of interest. The evidence showed that the current model is not necessary to carry out the scouting program. Debtors' witness, Devang Desai, testified that BSA is looking to potentially streamline the model of carrying out the scouting program by preemptively consolidating local councils and by altering BSA's relationship with chartered organizations. A01434-1440, 1455-1458. Particularly, BSA's relationship with chartered organizations are "frayed" so that the current scouting model faces "uncertainty" and BSA is looking at other models that do not rely on chartered organizations. A01600-1601. Desai testified that a problem with the current model is "[t]oo much collaboration, slow

decision making." A01440.  He further testified that, in deciding to file for bankruptcy, it was not the role of local councils or chartered organizations to provide input and that it was a decision for only BSA to make.  A01548-1549.

There was also no evidence, and the Court made no finding, that non-chartered organization Roman Catholic Entities have an identity of interest with Debtors. They are not a part of the so-called tripartite—BSA, local council, chartered organization—allegedly required to carry out the scouting program.

### iv. Limited Shared Insurance

There are three categories of insurance:  (1) BSA's insurance policies; (2) local councils' separate insurance policies; and (3) Participating Chartered Organizations' separate insurance policies with Settling Insurers.  Only the first category of insurance is shared between BSA, local councils, and chartered organizations.  "'[F]rom at least 1976 forward, Debtors provided insurance to both Local Councils and Chartered Organizations.'"  A00092-93.  But such shared insurance cannot support jurisdiction over Survivors' claims against local councils and chartered organizations for abuse before 1976, i.e., before Debtors shared insurance with these nondebtors.  Such shared insurance does not support a release and injunction of claims (including direct action claims) against local councils' or chartered organizations' separate insurance, which are not shared with Debtors. Also, there is no evidence that Debtors share any insurance with Roman Catholic

Entities that are not chartered organizations, and, thus, there is no jurisdiction to release and enjoin Survivors' claims against these Entities.

### v. No Automatic Liability

Survivors' claims against nondebtors do not result in automatic liability against Debtors. Debtors proved no prepetition written indemnification agreements. Griggs testified he was aware of no written indemnification agreements between BSA and chartered organizations, A01813, and he oversaw approximately 350 prepetition claims, including Lujan Claimants' lawsuits covering every year from 1955 to 1981, A01813, 1842-1843. William Sugden, counsel to the Atlanta Area Council and the designated Rule 30(b)(6) witness of the Ad Hoc Committee of Local Councils, A06703-6704, testified that there was no written indemnification agreement between BSA and local councils, A02612.

In fact, Debtors openly denied indemnification liability. Regarding chartered organizations who asserted contractual indemnity rights against BSA for Scouting-related Abuse Claims, Debtors disclosed to creditors: "The Debtors dispute the validity of such purported indemnification Claims. While the Debtors do not believe any such valid indemnification Claims exist, any such purported indemnification Claims would be channeled to the Settlement Trust on the Effective Date." A20593.

The lower courts erroneously found automatic indemnification of "all Abuse Claims" based on a board resolution BSA adopted on October 30, 2013, A23592-

23593, and an Annual Unit Charter Agreement, A23284-23285, each local council has purportedly entered with chartered organizations every year since 2014, A00095-96. The resolution is a unilateral document signed only by BSA, A23593; it is not a contract with the essential elements of offer, acceptance, and consideration. Further, any purported indemnification by BSA is limited to chartered organizations "who act in good faith." A23592. "Good Faith" is defined as requiring that the chartered organization take certain actions, such as take steps to remove from any involvement in the scouting program anyone known or suspected of engaging in conduct that poses a risk of harm to others. Id. The resolution does not require BSA to indemnify any chartered organization for acts intended or expected to result in harm or actions which are not in Good Faith. A23593. The resolution becomes effective after financial institutions to whom BSA is obligated agree that the indemnification requirements do not violate any loan covenants or other agreements. Id. There was no evidence at trial of any agreement by financial institutions to the indemnification. Thus, the resolution is not a binding contract. Even if it is, it is conditioned on the chartered organization acting in good faith and on financial institutions' agreement.

The Annual Unit Charter Agreement entered between local councils and chartered organizations since 2014 also does not result in BSA's automatic indemnification of chartered organizations. These annual agreements are between

24

chartered organizations and local councils, not BSA.  A00095-96, 23284.  Assuming

that they require BSA to indemnify chartered organizations, there was no evidence

that, since 2014, all 100,000-plus chartered organizations were parties to these

agreements at any time beginning in 2014.  For example, a chartered organization

may have sponsored troops only in the 1970s, and never signed the Annual Unit

Charter Agreement after 2013, yet lower courts reached the unsupported, blanket

conclusion that BSA is automatically liable for indemnification of all 100,000-plus

chartered organizations simply because the form agreement existed beginning in

2014.

    Instead of BSA indemnifying all chartered organizations unconditionally and

automatically, BSA has actively sought indemnification from a chartered

organization for child sexual abuse claims.  On August 13, 2019, BSA filed a proof

of claim against AOA in its bankruptcy case, asserting claims for contribution,

indemnification and/or reimbursement for losses BSA incurs as a result of sexual

abuse claims filed in Guam.  In re Archbishop of Agana, Case No. 19-00010, BSA

Proof of Claim No. 210-1 at Addendum ¶ 4 (D. Guam Aug. 13, 2019) ("BSA Proof

of Claim").  AOA is acknowledged by Debtors to be a bankrupt chartered

organization.  A01170.  On September 26, 2022, BSA amended its proof of claim

against AOA, continuing to assert a claim against AOA for contribution,

indemnification and/or reimbursement for losses it incurs arising from sexual abuse

claims, and also asserting aggregate non-contingent claims against AOA for up to $3.9 million for subrogation, contribution, and/or reimbursement relating to BSA's previous settlements with certain sexual abuse claimants.  Id., Proof of Claim No. 210-2 at Addendum ¶¶ 4-5 ("BSA Amended Proof of Claim").  BSA made the claim and amended claim on behalf of itself and its local councils.  BSA Proof of Claim at Addendum ¶ 1; BSA Amended Proof of Claim at Addendum ¶ 1.  Clearly, BSA would not be filing in the District Court of Guam, under penalty of perjury, a proof of claim and amended proof of claim against chartered organization AOA for indemnification, contribution, and/or reimbursement if BSA (or even the local councils) is automatically liable for indemnification of chartered organizations. BSA also settled some prepetition Guam claims involving AOA while specifically excluding chartered organizations/sponsors from the settlement and release.  Id., Decl. of Bruce A. Griggs ¶ 4 (Apr. 18, 2023).

Additionally, there was no evidence that BSA is automatically liable for indemnification of Roman Catholic Entities that are not chartered organizations; there are no resolutions or agreements by BSA or local councils to indemnify these Entities.

## vi. Contingent Interest in Local Council Property

BSA's "residual interest in Local Council property" also is not enough to establish jurisdiction over third party claims since BSA's interest is only in what

remains after payment of valid claims against the local council, A00517-518, 634, and therefore it has no interest in local council property used to pay claims. At most, BSA has a contingent remainder in local council property since BSA takes the property upon the occurrence of uncertain events, i.e., termination of a local council charter or dissolution of a local council and that property remains after payment of local council debts. <u>Kahaulelio v. Ihihi</u>, 24 Haw. 292, 295-96 (1918); <u>Kahn v. Rockhill</u>, 28 A.2d 34, 36 (N.J. Ch. 1942); <u>Parker v. Jordan</u>, 632 S.W.3d 108, 119 (Tex. App. 2021). Contingent remainders are subject to the Rule Against Perpetuities, meaning the interest must vest not later than 21 years after some life in being at the time of the creation of the interest. <u>Atkinson v. Kettler</u>, 372 S.W.2d 704, 710-11 (Tex. Civ. App. 704 1963). Any BSA interest in local council property violates such rule, and is therefore an invalid interest, because the interest is not required to vest within 21 years after a life in being at the time of creation of the interest.

Even if BSA's interest is valid, it is junior to the interests of the local councils' creditors; such other creditors, like Lujan Claimants and other Survivors, must be paid first before BSA. BSA is not empowered by bankruptcy to take a greater, superior interest in property than it had prepetition. That is exactly what is happening here, as the Plan forces Survivors to release their claims against local councils, all in the name of preserving scouting, even though BSA's interest in local

council property is only triggered when the local council dissolves and property remains after payment of creditors.

Moreover, BSA recognizes that local council assets are the property of local councils and not BSA.  A01569.

## 2.  The Bankruptcy Code Does Not Authorize Nondebtor Releases.

This Court has never decided whether there is statutory authority to grant nonconsensual third-party releases in a non-asbestos bankruptcy case.  Instead, in In re Continental Airlines, 203 F.3d 203, 211 (3d Cir. 2000), the Third Circuit recognized that "[s]ection 524(e) of the Bankruptcy Code makes clear that the bankruptcy discharge of a debtor, by itself, does not operate to relieve non-debtors of their liabilities."  Nowhere in the Code is there express statutory authority to enjoin a third-party's claim against a nondebtor outside the context of asbestos.  Id. And no statute authorizes nonconsensual releases of creditors' direct claims against nondebtors.  As Survivors have claims against nondebtors based on their direct, individual liability, the Bankruptcy Court lacked statutory authority to release and enjoin Survivors' direct claims without Survivors' consent.

The Bankruptcy Court erred in finding statutory authority to grant nonconsensual releases, as it could not point to a single Code section that explicitly authorizes releases.  A00641.  What was more persuasive to the Court was that there was no Code section that prohibits third-party releases.  Id.  However, "unlike Article

III courts, bankruptcy courts, as Article I courts, are strictly creatures of statute." <u>In re Billing</u>, 150 B.R. 563, 568 (D.N.J. 1993), rev'd on other grounds in <u>Billing v. Ravin, Greenberg & Zackin, P.A.</u>, 22 F.3d 1242 (3d Cir. 1996).  Bankruptcy courts derive their authority solely from Congress, while district courts are accorded their inherent powers in Article III.  <u>In re Grabill Corp.</u>, 967 F.2d 1152, 1156 (7th Cir. 1992).  Code sections 105(a), 1123(a), and 1123(b)(6) confer no authority to grant nonconsensual third-party releases and injunctions.  <u>See</u> 11 U.S.C. §§ 105(a), 1123(a), (b)(6).  Neither does section 524(g).  <u>See</u> 11 U.S.C. § 524(g).

Even if this were an asbestos bankruptcy, nonconsensual third-party releases would not be allowed for failure to meet all section 524(g) requirements.  For instance, Debtors will not continue to fund the Trust and the Trust does not receive a majority of voting rights of either Debtor.  A03262-3264.  Debtors must not receive the benefits of section 524(g) without having met its burdens.

      3.  <u>Assuming Statutory Authority Exists, the Releases and Injunctions Fail under Hallmarks of Sister Circuits and Master Mortgage</u>.

In <u>Continental</u>, the Third Circuit declined to establish its own rule regarding whether nondebtor releases and permanent injunctions are appropriate or permissible.  203 F.3d at 213-14.  There, the nonconsensual third-party releases in the plan failed to pass the tests established by sister circuits that authorize such releases and injunctions.  <u>Id.</u> at 214.  The Third Circuit described these tests as the hallmarks of permissible nonconsenual releases—fairness, necessity to the

reorganization, and specific factual findings to support these conclusions, id. at 214—and reasonable consideration given in exchange for the release and permanent injunction, id. at 215.

      a.  Hallmarks from Sister Circuits

        i. Fairness

A plan provision is unfair if it releases the liabilities of nondebtors without providing additional compensation to a creditor being forced to release claims against nondebtors. Continental, 203 F.3d at 213 (citing AOV Indus., Inc., 792 F.2d 1140, 1154 (D.C. Cir. 1986)).   Here, the Plan is unfair and gives unreasonable consideration for third-party releases and permanently enjoins Survivors' claims against local councils, chartered organizations, insurers, and other entities, without providing additional or fair compensation to Survivors who have claims against them.  Although the 250 local councils may contribute funds to the Settlement Trust, there is no allocation or reserve of specific local council funds to Survivors who have claims against such local council; instead, the funds from all local councils are simply provided to the Settlement Trust for general disposition. For example, Aloha Council may contribute approximately $1.3 million to the Settlement Trust, yet none of that money is being allocated to the almost 200 Survivors (including Lujan Claimants) who have claims against the Aloha Council.  Even if the $1.3 million is allocated only to Survivors with claims against Aloha Council, the average payout

to the Survivor is less than $7,000, a meager sum to compensate for child sexual abuse.   Debtors' valuation of local council properties is also unreliable and incomplete, as it fails to account for all properties owned by local councils and the valuation does not include fair market values.  Except for United Methodist Entities, chartered organizations are paying nothing for release of liabilities for post-1975 claims and claims insured by Settling Insurance Companies.  They are instead being compensated for the loss of their insurance rights (even as to non-BSA insurance policies) with the nonconsensual release of Survivors' claims.   This is unfair, especially since, outside of bankruptcy, Survivors would be able to pursue chartered organizations' non-insurance assets, including if their claims were not fully paid from insurance proceeds.   Further, no analysis was done of their chartered organizations' assets or liability exposure.  Regarding insurers, any release and injunction of claims to collect from non-settling insurers, including direct action claims (such as Lujan Claimants' direct action claims), are unfair as these insurers are providing no compensation and may never provide compensation in the future, despite the best efforts of the Settlement Trustee.  Even with settling insurers, the releases are unfair as the implicated coverage limits and liabilities greatly exceed the actual settlement amounts contributed by these settling insurers, and there was no evidence that any settling insurer is paying up to a policy limit.  Except for Century, there was no mention of the assets or ability to pay of a settling insurer.  The release

of Roman Catholic Entities and other religious entities is also unfair since there is no evidence that they are paying anything at all in exchange for the release. Debtors failed to meet their burden of demonstrating fairness and reasonable consideration.

ii. Necessity to Reorganization

The release and permanent injunction of Survivors' claims against nondebtors are unnecessary to Debtors' successful reorganization. Debtors have admitted multiple times that a plan that discharges BSA only is feasible. Debtors proposed such a plan—the BSA Toggle Plan—in their Second Amended and Third Amended Plans. A02507. BSA's financial advisor and feasibility expert, Brian Whittman, testified that, as late as December 7, 2021, some form of a BSA-only plan could be feasible. A02509. Devang Desai, of the National Executive Committee and Bankruptcy Task Force, testified that a BSA-only plan remains an option for BSA to successfully reorganize. A01560-1563.

Debtors have also proposed plans that do not include the release of Century and Chubb Companies, Clarendon, Zurich, and Roman Catholic Entities (including the Solicitation Version of the Plan). A00543, 585.

Debtors' argument that the local councils' contribution depended on the release of claims against chartered organizations is contrary to the evidence. In the Restructuring Support Agreement, the local councils committed to contributing to the Settlement Trust $500 million plus a $100 million note, and transfer of their

insurance rights.  A20461-20462.  In the RSA, the local councils' locked-in contribution did not depend on the release of chartered organizations of liability.  Id. The RSA only required, in a section titled "Contributing Chartered Organization Settlement Contribution," that the parties "work in good faith to develop a protocol for addressing participation by Chartered Organizations in the benefits of the Channeling Injunction.  Such settlements may occur prior to the Effective Date with the consent of all Parties."  A20462.  Clearly, the RSA was concerned only with a protocol for chartered organizations to become Contributing Chartered Organizations through settlements; it did not require, as a condition of the Local Council's Settlement Contribution, that any chartered organization receive limited protected party status by passively "assigning" insurance rights to the Trust.  Sugden testified that the local councils had committed to contributing to the Settlement Trust $500 million plus a transfer of their insurance rights, even though the treatment of the chartered organizations was an open term; Sugden testified that the local councils' contribution was not an open term.  A02614-2619.  The claim that local councils need the release of chartered organizations is also not credible since chartered organizations are not getting a release for pre-1976 abuse unless the claim against the chartered organization is covered by a Settling Insurers policy.  Survivors can sue these chartered organizations for abuse that occurred before 1976—a period of about 58 years—if the claim is not covered by a Settling Insurer.  A03905.

Notably, Jesse Lopez of Aloha Council testified on behalf of Aloha Council that it had not communicated with any chartered organization about releases or injunctions, and never received notice from any that it no longer wishes to sponsor Boy Scouts troops. A20358. Further, FCR Patton testified that the terms of the Century and Chubb Companies insurance settlement agreement contemplated and included the possibility of bankrupt chartered organizations not receiving the benefits and protections of the agreements, A03305-3308, showing that reorganization did not require releases and injunctions in favor of AOA especially since it opted out of Plan protections and is providing no compensation to the Trust. This Century provision, A11601, 11681, also is a term of the Hartford, Clarendon, and Zurich settlements, A11752, 11821-11822, 20952, 20964-20966.

Further, there was no evidence that Chubb issued insurance policies to BSA or any other entity, yet Chubb appears to be getting a release under the Century and Chubb Companies Agreement. A11591, 11593-11594, 11617-11618.

There was also no evidence and no Court determination that successful reorganization required the release of Roman Catholic Entities. In fact, the confirmation hearing was well under way before Roman Catholic Entities were added to the growing list of releasees.

As Debtors admittedly can successfully reorganize without nonconsensual releases and permanent injunctions of Survivors' claims against nondebtors, the Court erred in confirming the Plan.

### b.  Master Mortgage

The factors established in In re Master Mortgage Investment Fund, Inc., 168 B.R. 930 (Bankr. W.D. Mo. 1994), to determine whether nonconsensual releases and injunctions should be granted, are not met here.

### i. Identity of Interest

As discussed earlier, there is no unity or identity of interest between Debtors and local councils, chartered organizations, insurers, and other entities such as religious orders.

The Bankruptcy Court wrongly justified nonconsensual releases based on identity of interest by selectively focusing on allegations in survivor complaints that allege agency relationships between BSA, local councils, and chartered organizations.  BSA itself asserts there is no agency relationship.  Also, the Court ignored the claims against BSA in survivor complaints that do not depend on agency relationships, but which allege each entity's duty and personal failures.  See, e.g., A24657-24663.  At the very least, the Court should have carved out Survivors' direct claims against nondebtors, as BSA's prepetition litigation history clearly evidences that these nondebtors can have their own direct liability.

ii. Contribution of Substantial Assets

Under the Plan, no nondebtor is contributing substantial assets to compensate Survivors, who are clearly not receiving something of "indubitably equivalent value" to replace their released and enjoined claims.  In re Charles Street African Methodist Episcopal Church of Boston, 499 B.R. 66, 102 (Bankr. D. Mass. 2013) (objection of "sole affected creditor" to plan weighs in favor of rejecting a nondebtor release where the plan does not replace the nonconsensual release with something of "indubitably equivalent value to the affected creditor"). Debtors' valuation of local council assets is inaccurate and incomplete, as they do not include fair market values of local council assets, include properties not owned by local councils, and fail to include properties owned by local councils.  A20362-20365, 20367-20371. Without having to meet the transparency requirements of a debtor in bankruptcy, the local councils lack an accurate understanding of what they own and what they owe. A20361, 20346-20348, 20371-20378 (Aloha Council designated representative lacks knowledge and refuses to acknowledge that the Council owns land in Guam, lacks knowledge of 70 lawsuits filed in Guam against Aloha Council).  They have not participated in the valuation of claims against them or of their assets such as insurance policies.  A20350-20352, A20381-20382.  They are simply making a payment requested by the Ad Hoc Committee of Local Councils, according to a formula set by the committee, and they have not been asked to pay more.  A20356-

20357.  They have never tried to determine whether people with claims against them will be fully paid in this bankruptcy.  A20387-20391, 20395-20397.

Debtors' attempt to disclose the value of local council assets is a recognition by them that this information is needed to determine whether a substantial contribution is being made.  Yet, they completely failed to provide any information regarding the assets of 100,000-plus chartered organizations and an unknown number of Roman Catholic Entities to demonstrate a substantial contribution by any of them.  Similarly, Debtors failed to disclose any information on insurers' assets to prove a substantial contribution justifying release and permanent injunction of claims, including direct action claims not only against settling insurers but also non-settling insurers who may never contribute to the Settlement Trust.  As Lujan Claimants are not being adequately protected or compensated for release and injunction of their direct action claims against insurers, they clearly are not receiving anything of indubitably equal value to replace their direct action rights.  This factor weighs heavily against release and injunction.

### iii. Essential to Reorganization

As explained earlier, third-party releases and injunctions are not necessary to Debtors' successful reorganization.

### iv. Overwhelming Creditor Acceptance

The fourth factor is "the single most important factor." <u>Master Mortgage</u>, 168 B.R. at 938. The Third Circuit has identified as a "key consideration[]" "whether affected parties overwhelmingly have agreed to accept the proposed treatment." <u>Continental</u>, 203 F.3d at 217 n.17. In chapter 11 non-asbestos cases where third party releases have been approved, courts have interpreted overwhelming creditor support to mean that at least 90% of affected voting creditors accept the plan. <u>In re Wool Growers Cent. Storage Co.</u>, 371 B.R. 768, 777 (Bankr. N.D. Tex. 2007); <u>In re Heron, Burchette, Ruckert & Rothwell</u>, 148 B.R. 660, 674 (Bankr. D.D.C. 1992). Here, only 85.72% of voting Survivors (Class 8 Direct Abuse Clams holders) voted to accept the Plan. Worse, only 48,463, or 58.95%, of the total 82,209 Survivors voted to accept the plan. Thus, Debtors lost the vote of Survivors since fewer than 90% voted to accept. Even if the overall voter acceptance by Survivors was overwhelming, the Bankruptcy Court was required to consider the vote by the Survivors affected by particular third-party releases. For instance, of the 182 Survivors who have claims against Aloha Council, 81 voted to accept and 101 voted to reject, resulting in only 44.5% voter acceptance, A12171-12192, and showing that there was not overwhelming support for the plan by Survivors who would be affected release of claims against Aloha Council.

The "global" nature of the plan is undercut by the fact that only a tiny fraction of Survivors share claims in common against a particular local council or chartered

organization. For instance, only 196 (including 75 Lujan Claimants) Survivors have claims against the Aloha Council. A20881. Yet, the plan places the fate of these claims in the hands of 82,013 Survivors whose claims have nothing to do with the Aloha Council. Likewise, Lujan Claimants make up nearly the entire body of Survivors with claims against AOA and the Capuchin Franciscans, but the votes of thousands of others who have no connection to scouting in Guam are determinative under the Plan. Unlike as to BSA, tens of thousands of Survivors are not having to share limited assets of particular local councils, chartered organizations, or Roman Catholic Entities. The same is true as to non-aggregate insurance policies. Imposing a "global settlement" on Survivors' claims against these nondebtors makes little sense and is unfair.

v. Payment of All Claims

The fifth factor is not met. Relying on the valuation by Dr. Charles Bates, Debtors estimate that all Direct Abuse Claims—both current and future—are valued between $2.4 billion to $7.1 billion. A00574-575, 577. But the valuation is unreliable since it was not in accordance with the Trust Distribution Procedures. The Bankruptcy Court and Dr. Bates recognized that, notwithstanding his valuation, only a claim-by-claim analysis as contemplated by the TDP will establish the aggregate amount of Direct Abuse Claims. A00578. As Debtors performed no analysis

running Survivors' claims through the TDP, they failed to prove the aggregate value of Survivors' claims and that Survivors would be paid in full.

Dr. Bates' valuation also does not account for Survivors' claims against new releasees Roman Catholic Entities who are not chartered organizations. His valuation could not have included claims against these Entities, as they did not become releasees until after the confirmation trial began. Additionally, Dr. Bates did not consider the value of claims held by Survivors who did not file timely proofs of claim and who do not qualify as future claimants. Under the Plan, these Survivors, unknown in number, receive payment from the Trust.

Even if Debtors' valuation is correct, the Plan fails to provide for payment of all or substantially all of Survivors' claims since recovery up to 100% is dependent on hypothetical future insurance settlements the Settlement Trust may never enter with non-settling insurers. Wool Growers, 371 B.R. at 778 (finding the fifth factor, full or almost full payment of the affected claims, not satisfied where affected creditors will recover, at best, 60 to 70% of their claims); In re Quigley Co., 437 B.R. 102, 142 (Bankr. S.D.N.Y. 2010) (plan was not feasible where funding source was "speculative at best and visionary at worst"). Debtors also failed to show that Survivors who choose the Independent Review Option will be paid in full. The IRO is for claims valued above $1 million. There is currently no money to fund the IRO. The Excess Award Fund is to be funded from non-settling excess insurers, who may

never pay anything to the Trust, and so the promise of payment from the Excess Award Fund is illusory.

Debtors' value range is also contradicted by their own witness, FCR Patton, who testified that he believes there will be 11,040 future claimants, that the value of BSA's liability for future claims that would be allowed under the TDP is $5 billion, that the $5 billion future claims value is 11,000/93,000 of the total value of all allowed claims (which provides a total claims value of over $42 billion). A03265-3266. He was only concerned with the payment percentage that would be set aside for future claimants, and acknowledged that no additional money was coming into the Trust and earmarked for future claims. A03246-3247. As the current Plan pays less than $2.5 billion and payments from non-settling insurers may never happen, the Plan fails to pay for all or substantially all of the Direct Abuse Claims.

Thus, it was error to confirm the Plan with nonconsensual third-party releases.

B.    **The Bankruptcy Court Erred in Confirming a Plan with the Insurance Settlements and which Invalidates, Impairs, and Supersedes Lujan Claimants' Direct Action Rights.**

> Standard of Review:    *De novo* for whether jurisdiction exists, conclusions of law, and for statutory interpretation.

1.    The Plan invalidates, impairs, and supersedes direct action rights in violation of the McCarran-Ferguson Act.

Under Guam law, 22 GCA § 18305, Lujan Claimants have a right of direct action against insurers of persons or entities liable for personal injury, including

BSA, local councils, chartered organizations, and religious orders. Yet, the Court confirmed a Plan that impairs Lujan Claimants' statutory right to sue insurers, in contravention of the McCarran-Ferguson Act ("MFA").

In 1945, Congress passed the MFA "to restore the supremacy of the States in the realm of insurance regulation." United States Dep't of Treasury v. Fabe, 508 U.S. 491, 500 (1993). This federal statute was enacted in response to the United States Supreme Court's decision in United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533 (1944), which held that an insurance company that conducted a substantial part of its business across state lines was engaged in interstate commerce and thereby was subject to the antitrust laws. Id. at 499. The holding in South-Eastern Underwriters was widely viewed as a threat to state power to tax and regulate the insurance industry. Id. at 499-500. To allay these fears, Congress moved quickly to enact the MFA which "makes its mission very clear: 'Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.'" Id. at 500 (quoting 15 U.S.C. § 1011). The Supreme Court observed of the MFA: "Obviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance.'" Id. at 500 (quoting Prudential Ins. Co. v. Benjamin, 328

U.S. 408, 429 (1946)).   Congress achieved this purpose, first, "'by removing

obstructions which might be thought to flow from [Congress'] own power, whether

dormant or exercised, except as otherwise expressly provided in the Act itself or in

future legislation,'" and, second, "'by declaring expressly and affirmatively that

continued state regulation and taxation of this business is in the public interest and

that the business and all who engage in it "shall be subject to" the laws of the several

states in these respects.'"  Id. (quoting Prudential Ins., 328 U.S. at 429-30).

The MFA provides:  "No Act of Congress shall be construed to invalidate,

impair, or supersede any law enacted by any State for the purpose of regulating the

business of insurance … unless such Act specifically relates to the business of

insurance."  15 U.S.C. § 1012(b).  As used in the Act, the term "State" includes

**Guam**.  15 U.S.C. § 1015.  A federal statute is reverse preempted under the Act if

(1) the federal statute does not specifically relate to the business of insurance, (2) the

state statute was enacted for the purpose of regulating the business of insurance, and

(3) the federal statute would invalidate, impair, or supersede the state statute.  In re

PRS Ins. Group, Inc., 294 B.R. 609, 612 (Bankr. D. Del. 2003).  Federal jurisdiction

is barred if all three of these factors are satisfied.  United States v. Del. Dep't of Ins.,

No. 20-829-MN-CJB, 2021 WL 3012728, at *9 (D. Del. July 16, 2021).   To the

extent the Plan prohibits or impedes Lujan Claimants from directly suing insurers,

the Plan violates the MFA and the Bankruptcy Court lacked jurisdiction to confirm it.

> a. Bankruptcy Codes Does Not Specifically Relate to Business of Insurance

The first factor is met, as "there is no question that the Bankruptcy Code does not specifically relate to the business of insurance." In re Advanced Cellular Systems, 235 B.R. 713, 719 (1999). "Many federal statutes with potentially pre-emptive effect, such as the bankruptcy statutes, use general language that does not appear to 'specifically relate' to insurance." Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, 42 (1996). The Bankruptcy Code expressly states that a domestic insurance company is not eligible for relief as a debtor. PRS Ins. Group, 294 B.R. at 612 (citing 11 U.S.C. § 109(b)(2)). In PRS Ins. Group, the Delaware Bankruptcy Court concluded that "the Bankruptcy Code does not specifically relate to the business of insurance." Id.

The Plan cites sections 105(a) and 1123(b) of the Bankruptcy Code as providing authority to prohibit survivors' direct action rights against insurers. A.474, 480, 485. However, neither section specifically relates to the business of insurance. Debtors cite the equitable jurisdiction and power of the Bankruptcy Court and District Court under 11 U.S.C. § 105(a) as authorizing the Insurance Entity Injunction and Channeling Injunction, which both prohibit creditors from bringing actions or claims against insurers of Protected Parties. However, the Third Circuit

held in Combustion Eng'g, Inc., that section 105(a) does not give the court the power to create substantive rights that would otherwise be unavailable under the Bankruptcy Code, and vacated the channeling injunction.  391 F.3d at 238.  In Continental, the Third Circuit rejected as extra-statutory the provision in a plan of reorganization that released claims against former and current directors of debtor Continental, and that permanently enjoined shareholder actions against them, finding that the Bankruptcy Code "does not explicitly authorize the release and permanent injunction of claims against non-debtors, except in one instance not applicable here."  203 F.3d at 211.  That one instance is asbestos cases.  As noted earlier, the Third Circuit has never identified any section of the Bankruptcy Code that authorizes nondebtor releases in non-asbestos cases.  Since section 105(a) clearly does not specifically relate to the business of insurance, the Third Circuit has held that section 105(a) does not allow for the creation of substantive rights not otherwise available under the Bankruptcy Code, and the Third Circuit has acknowledged that the Code only explicitly authorizes the release and permanent injunction of claims against nondebtors in asbestos cases, the only reasonable conclusion is that section 105(a) is not a federal statute that specifically relates to the business of insurance, including allowing the release and permanent injunction of claims against insurers in non-asbestos cases.

45

Turning to section 1123(b), that statute contains no express reference to insurance, including any provision allowing a release and permanent injunction of claims against insurers. Section 1123(b) simply details what a plan of reorganization may contain. It does not specifically relate to the business of insurance.

While Debtors rely only upon sections 105(a) and 1123(b) as authority for the release and permanent injunction of claims against insurers, it should be noted that 11 U.S.C. § 1123(a)(5) also does not provide such authority. Section 1123(a) lists what a plan can include in order to make sure that resources are available to implement the plan. Insurance is nowhere mentioned in the statute. As there is no statutory authority in the Bankruptcy Code allowing the release and permanent injunction of third-party claims against insurers outside the asbestos context, section 1123(a) standing alone cannot be construed as specifically relating to the business of insurance.

Congress knows how to craft legislation that specifically references insurance, as it did in enacting section 524(g), which provides that, notwithstanding the provisions of section 524(e), the bankruptcy court may order an injunction barring claims against third parties that arise by reason of "the third party's provision of insurance to the debtor or a related party." 11 U.S.C. § 524(g). Congress has never enacted a bankruptcy statute similar to section 524(g), permitting an injunction of claims against insurers in non-asbestos bankruptcy cases. Rather, the rule governing

all non-asbestos bankruptcy cases is section 524(e) which provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity, for such debt." Therefore, considering 1123(a) in a non-asbestos case subject to the rule in section 524(e), these Bankruptcy Code provisions cannot be construed as specifically relating to the business of insurance.

### b. Guam Direct Action Statute Regulates Business of Insurance

Regarding the second factor, the Supreme Court has stated that "[t]he broad category of laws enacted 'for the purpose of regulating the business of insurance' consists of laws that possess the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance." Fabe, 508 U.S. at 505 (quoting Black's Law Dictionary 1236, 1286 (6th ed. 1990), and holding that an Ohio statute reverse preempted the federal statute under the MFA to the extent that it protected policyholders). "Statutes aimed at protecting or regulating this relationship [between insurer and insured], directly or indirectly are laws regulating the 'business of insurance.'" SEC v. Nat'l Securities, Inc., 393 U.S. 453, 460 (1969). There are three criteria to determine whether a state law regulates the business of insurance: (1) "whether the practice has the effect of transferring or spreading a policyholder's risk"; (2) "whether the practice is an integral part of the policy relationship between the insurer and the insured"; and (3) "whether the practice is limited to entities within the insurance industry." Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119, 129

(1982).   Although none of the <u>Pireno</u> factors are necessarily determinative, an examination of the factors may lead to a finding that state law regulates the business of insurance.  <u>Am. Bankers Ins. Co. of Fla. v. Inman</u>, 436 F.3d 490, 493 (5th Cir. 2006).

In <u>Evans v. TIN, Inc.</u>, Civil Action Nos. 11-2067, 11-2068, 11-2069, 11-2182, 11-2348, 11-2351, 11-2417, 11-2949, 11-2985, 11-2987, 11-3018, 11-3021, 11-3048, 11-3049, 12-18, 11-3050, 2012 WL 2343162, at *10 (E.D. La. June 20, 2012), the Eastern District of Louisiana court held that the Louisiana Direct Action Statute ("LDAS") is a statute that was enacted for the purpose of regulating the business of insurance:

> First, the LDAS regulates risk by subjecting all policy disputes regarding [insurance] coverage to the possibility of a jury trial.  Second, the LDAS forms an integral part of the insurer-insured relationship because it controls how disputes regarding [insurance] coverage will be resolved.   Finally, the LDAS only applies with respect to claims asserted under polic[ies] or contract[s] of liability insurance and it is, therefore, limited to entities within the insurance industry.

<u>Id.</u> (internal quotations omitted).  The Fifth Circuit has recognized that "Louisiana's direct action statute is arguably a state law regulating insurance, [and that] the McCarran Ferguson Act may allow it to trump federal law …."  <u>Todd v. Steamship Mut. Underwriting Ass'n (Bermuda) Ltd.</u>, 601 F.3d 329, 335 n.13 (5th Cir. 2010).

Guam's Direct Action Statute is virtually identical to the LDAS[2], stating:

_____

[2] The LDAS provides in part:

On any policy of liability insurance the injured person or his heirs or representatives shall have a right of direct action against the insurer within the terms and limits of the policy, whether or not the policy of insurance sued upon was written or delivered in Guam, and whether or not such policy contains a provision forbidding such direct action, provided that the cause of action arose in Guam. Such action may be brought against the insurer alone, or against both the insured and insurer.

22 GCA § 18305. Like the LDAS, Guam's Direct Action Statute regulates risk by subjecting all policy disputes regarding insurance coverage to the possibility of a jury trial, Guam's Direct Action Statute forms an integral part of the insurer-insured relationship because it controls how disputes regarding insurance will be resolved, and Guam's Direct Action Statute only applies with respect to claims asserted under policies or contracts of liability insurance and it is, therefore, limited to entities within the insurance industry. Guam's statute also protects policyholders because it permits suit against the insurer alone, thereby restricting recovery to up to the policy limits or from the insurer and leaving untouched the policyholder's non-insurance assets.

---

The injured person or his survivors or heirs …, at their option, shall have a right of direct action against the insurer within the terms and limits of the policy … This right of direct action shall exist whether or not the policy of insurance sued upon was written or delivered in the state of Louisiana and whether or not such policy contains a provision forbidding such direct action, provided the accident or injury occurred within the state of Louisiana ….

Evans, 2012 WL 2343162, at *6 (quoting La. Rev. Stat. Ann. § 22:1269).

Other courts considering direct action statutes have held that they clearly were enacted to regulate the business of insurance.  The Second Circuit in <u>Wadsworth v. Allied Professionals Ins. Co.</u> found that New York's direct action statute ("NYDAS"), which requires any insurance policy issued in New York to contain a provision permitting a direct action against a tortfeasor's insurer, was "undoubtedly" a state statute enacted to regulate the business of insurance, under the MFA.  748 F.3d 100, 109 (2d Cir. 2014).  The NYDAS authorizes an injured party with an unsatisfied judgment against an insured party to sue the insurer for satisfaction of the judgment in some circumstances.  <u>Id.</u> at 108.  Application of the statute to insurers would "undoubtedly" regulate insurers by subjecting them to lawsuits filed in New York by claimants who are not parties to insurance contracts.  <u>Id.</u>  The court noted that the cost of litigation might result in higher attorney fees, costs, and potential recoveries.  <u>Id.</u>  The court found that NYDAS specifically governed the content of insurance policies, requiring insurers to place in their New York contracts a provision that is not required in other states.  <u>Id.</u>

In <u>Reis v. OOIDA Risk Retention Group, Inc.</u>, the Georgia Supreme Court held that direct actions statutes were laws governing the insurance business.  303 Ga. 659, 665-66 (2018).  There, the court faced the question of whether provisions in the federal Liability Risk Retention Act of 1986 ("LRRA") preempt Georgia's motor carrier and insurance carrier direct action statutes, in regard to risk retention

groups.  Id. at 659.  Preemption would occur if the Georgia statutes would regulate directly or indirectly the operation of the risk retention group as prohibited by the LRRA.  Id. at 662-63.  The court stated:  "It has been held that whether a practice is part of 'the business of insurance' can be determined by consideration of three characteristics:  whether the practice effectively transfers or spreads a policyholders risk; whether it is an integral part of the contractual relationship between the insurer and the insured; and whether the practice is limited to entities within the insurance industry."  Id. (citing Pireno, 458 U.S. at 129).  The court found that "[t]he direct action statutes would impact operation of the business of insurance of a risk retention group inasmuch as application of the statutes would result in the spreading of risk and associated increases in costs due to the additional financial burden of defending unanticipated lawsuits in which they are directly named as parties, in affecting the relationship between an insurer and insured by creating possible conflicts of interests between the insurer and the policyholder, and in limiting their application to insurers of motor carriers.  Therefore, the direct action statutes would regulate the operation of risk retention groups."  Id. at 665-666.

As Guam's Direct Action Statute regulates the business of insurance, the second factor is met.

### c.  Federal Law and Plan Impair Guam's Direct Action Statute

The third factor—whether the federal law invalidates, impairs, or supersedes the state law— is also met.  "The term 'invalidate' ordinarily means 'to render ineffective, generally without providing a replacement rule or law.' … And the term 'supersede' ordinarily means 'to displace (and thus render ineffective) while providing a substitute rule.'"  <u>Humana, Inc. v. Forsyth</u>, 525 U.S. 299, 311 (1999). A federal law impairs state law if it directly conflicts with state law, applying federal law would frustrate any declared state policy, or applying federal law would interfere with a state's administrative regime.  <u>Highmark Inc. v. UPMC Health Plan, Inc.</u>, 276 F.3d 160, 167-68 (3d Cir. 2001).  Here, Debtors are applying sections 105(a) and 1123(b), and the Plan provisions, to prohibit Survivors from directly suing insurers of Debtors, local councils, chartered organizations, and any other entity that receives a form of protected party status.  Permitting this application of the Bankruptcy Code will surely invalidate, impair, and/or supersede Guam's Direct Action Statute as it is applied to survivors of child sexual abuse in Guam.  If Debtors are granted their requested injunction, then Lujan Claimants will be prevented from enjoying direct action rights conferred by the Guam Legislature, which Congress has charged with regulating the business of insurance.  They will no longer be allowed to sue insurers for the abuse they suffered, even though there is coverage to pay for their abuse.  The third factor is undisputedly met.

Thus, the Court erred and lacked jurisdiction to confirm the Plan with provisions that contravene the MFA.

2. <u>The proceeds of liability insurance policies are not property of the Bankruptcy Estate and cannot be released or enjoined</u>.

The bankruptcy estate only includes property to which the debtor would have had a right if the debtor were solvent. <u>First Fidelity Bank v. McAteer</u>, 985 F.2d 114, 116 (3d Cir. 1993) (citing <u>In re La. World Exposition, Inc.</u>, 832 F.2d 1391, 1401 (5th Cir. 1987)). Insurance policies are considered part of the property of a bankruptcy estate. <u>ACandS, Inc. v. Travelers Casualty & Surety Co.</u>, 435 F.3d 252, 260 (3d Cir. 2006). The debtor's right to its insurance proceeds is property of the estate, except where the debtor does not own the insurance proceeds but just owns the policy. <u>In re Nutraquest, Inc.</u>, 434 F.3d 639, 647 n.4 (3d Cir. 2006). For example, when the debtor corporation's liability policy insured only the corporation's directors and officers (and would only pay them), the liability proceeds were not property of the bankruptcy estate. <u>Id.</u> (citing <u>La. World Exposition</u>, 832 F. 2d at 1399-401). "The overriding question when determining whether insurance proceeds are property of the estate is whether the debtor would have a right to receive and keep those proceeds when the insurer paid on a claim." <u>Houston v. Edgeworth (In re Edgeworth)</u>, 993 F.2d 51, 55-56 (5th Cir. 1993). The debtor has no cognizable claim to liability insurance proceeds paid by an insurer on account of a covered claim. <u>Landry v. Exxon Pipeline Co.</u>, 260 B.R. 769, 786 (Bankr. M.D. La. 2001).

A bankruptcy court lacks jurisdiction over property rights outside of the estate, and, accordingly, lacks jurisdiction over a nondebtor's rights to insurance proceeds.  Filing for bankruptcy does not give a debtor greater property rights than it would have had outside of bankruptcy.  Mission Prod. Holdings, Inc. v. Tempnology, LLC, 139 S. Ct. 1652, 1663 (2019).  Regarding insurance, where there are multiple insureds under a policy, "the bankruptcy estate owns only the debtor's interest, and not the co-insured's interest."  In re Archbishop of St. Paul & Minneapolis, 579 B.R. 188, 202 (Bankr. D. Minn. 2017); see also In re SportStuff, Inc., 430 B.R. 170, 178 n.15 (B.A.P. 8th Cir. 2010) (citing authority that "[w]hile the bankruptcy court may exercise jurisdiction over (a liability insurance) policy, the interests of the co-insured, a nondebtor, are not property of the estate.  To hold otherwise would allow the court to impair a third party's contract and property rights.").  Thus, the Court only has jurisdiction over Debtors' rights to insurance proceeds, and lacks jurisdiction over Lujan Claimants' rights to insurance proceeds of policies that cover BSA and/or other liable insureds, including AOA's interests in policies.

Here, while the bankruptcy estate includes BSA's interest in BSA insurance policies, the bankruptcy estate does not include the proceeds of BSA liability insurance policies since injured persons, including Survivors, have a right to receive and keep those proceeds when the insurer pays on the claim.  Not being part of the

bankruptcy estate, the disposition of the liability insurance proceeds cannot be allowed free and clear of Lujan Claimants' interests under sections 363(f), 1123(a)(5)(D), or 1129(b)(2)(A)(ii) of the Bankruptcy Code. Instead, Lujan Claimants' interests in the insurance proceeds and direct action rights against insurers cannot be released pursuant to 11 U.S.C. § 524(e).

The Bankruptcy Court erred in concluding that the proceeds are a part of the bankruptcy estate since they are payable to BSA. There was no evidence to support this, especially since the Court acknowledged that Lujan Claimants can pursue direct action claims against non-settling insurers. A00626. Obviously, any award on a direct action claim would be paid to Lujan Claimants and not BSA or other insureds.

At trial, the evidence showed overwhelmingly that insurance money was paid for Survivors. Griggs testified that insurance money was sometimes used to settle abuse claims. A01706-1707. As an example, some insurers paid for a portion of the $89.1 million Hacker settlements in 2019. A01746. If insurance money was paid to Survivors to settle their claims, BSA would ask insurers for their consent to settle. A01782. According to Griggs, Guam cases settled "with full carrier participation." A01838. Guam was also an "exception" because, although excess carriers were not involved very often in the 350 prepetition cases, at least one excess carrier, AIG, attended the mediation in Guam. A01845.

Even if nondebtor releases are permitted here, the release of Lujan Claimants' claims against insurers to recover payment of proceeds must satisfy the requirements for third party releases: fairness, necessity to the reorganization, specific factual findings to support these conclusions, and reasonable consideration given in exchange for the release and permanent injunction. <u>Continental</u>, 203 F.3d at 214-15. But these requirements are not met. These releases are certainly not necessary to Debtors' successful reorganization since Debtors admit that they can successfully reorganize under a BSA Toggle Plan which includes no insurance policy buybacks or insurer releases. They certainly are not necessary as Debtors have proposed other plans which do not include a Century and Chubb settlement agreement or even a Hartford settlement agreement. There is simply no need for Debtors to sell their policies back to insurers. The releases should have been denied.

The Bankruptcy Court undisputedly did not make specific findings of fact as to whether the proceeds of each of the known and unknown bought-back insurance polices are property of the estate. As Debtors are the parties claiming subject matter jurisdiction over the insurance policies proceeds, it was their burden to prove that the Court has subject matter jurisdiction over the proceeds. Debtors utterly failed to meet their burden as they failed to point out and analyze language in each of the bought-back insurance policies which would support the existence of subject matter jurisdiction, leading to the Court's lack of specific findings on the issue.

3. <u>The Hartford and Century and Chubb Companies insurance settlements for policy buybacks free and clear of others' interests in the policies are for payment grossly below policy limits and should have been denied.</u>

The Bankruptcy Code's protection of the debtor from liability does not affect the liability of the debtor's insurers. <u>First Fidelity Bank</u>, 985 F.2d at 114. Courts, relying on 11 U.S.C. § 524(e), have permitted claimants to proceed with tort claims against the debtor for the purpose of collecting from the debtor's liability insurer. <u>Id.</u> (citing <u>Green v. Welsh</u>, 956 F.2d 30 (2d Cir. 1992); <u>In re Jet Fla. Sys., Inc.</u>, 883 F.2d 970 (11th Cir. 1989)). Thus, the creditor remains free to recover the full amount of the original obligation from any nondebtor party including an insurer. <u>Id.</u>

The general rule is that, when an insurer pays proceeds of the insurance to the person who is the proper recipient under the policy, such payment is a discharge of the liability of the insurer where the entire amount due is paid. 46A C.J.S. Insurance § 1986 (2007). Where only a partial payment of the proceeds is made to the person designated by the policy, the insurer is discharged from liability to the extent of the amount paid. <u>Id.</u>

Here, no insurance settlement involves payment up to the limits. Without full payment, Survivors should be free to recover the remaining payment owed under the policies from the insurers, which include nonaggregate policies with combined limits of millions of dollars per occurrence. As the settlement agreements seek the total release of insurers, including Hartford and Century, of all liability under the

policies without payment of the entire amount due, they should not have been approved.

### 4. The Plan impermissibly modifies Lujan Claimants' rights.

The Plan includes settlements with insurers for the sale of BSA's rights to insurance policies pursuant to section 363 of the Bankruptcy Code, and the transfer of insurance rights of Debtors, local councils and chartered organizations, and related injunctions, all of which impermissibly modify Lujan Claimants' rights to insurance proceeds.

In *In re W.R. Grace & Co.*, the District Court of Delaware held that, in order for Libby Claimants—who were injured creditors not named as insureds or intended beneficiaries under any policies and there was no evidence on the record indicating the policies were purchased for their benefit—to be able to obtain any portion of insurance proceeds, they needed to establish that they have a legal right to collection. 475 B.R. 34, 83 (D. Del. 2012). "Such a legal right could be established pursuant to, inter alia: (1) a state statute crafted by the legislature conferring a right upon the parties to pursue a direct action for the proceeds, ...." *Id.* As discussed earlier, Guam's Direct Action Statute gives Lujan Claimants a right of direct action against insurers. Therefore, Lujan Claimants have rights to the insurance proceeds of policies covering their injuries.

The insurer and insured cannot agree to modify the rights of the injured person against the insurer, including by cancelling the provision in the contract giving the injured person a right of action against the insurer, because the terms of Guam's Direct Action Statute are deemed to be part of every liability insurance policy governed by Guam law whether or not the parties expressly agree to its terms. Decade's Monthly Income & App. Fund v. Whyte & Hirschbeck, S.C., 173 Wis.2d 665, 676 (1993) (interpreting Wisconsin direct action statute similar to Guam's). An insurer and insured may not rescind a liability policy after a known loss. Society Ins. v. Capitol Indem. Corp., 260 Wis.2d 549, 555-56 (Ct. App. 2003); In re Estate of Gardinier, 40 N.J. 261 (1963); Rauch v. Am. Fam. Ins. Co., 115 Wis.2d 257, 267 (1983) ("[U]pon the happening of an accident, the injured party acquires an interest in the policy that cannot be foreclosed by litigation or agreement between the insurer and insured alone.").

The buyback of insurance policies is not saved by section 363 because the Bankruptcy Code cannot preempt Guam's Direct Action Statute. It is not saved by section 1123(a)(5), which authorizes a "sale" that might not otherwise be permitted under applicable bankruptcy law, because Guam law is not anti-sale; it is anti-rescission. Any modification of policy terms among Debtors and insurers cannot rescind the policies or eliminate Lujan Claimants' and other direct action Survivors' statutorily fixed rights.

Additionally, the requirements of 11 U.S.C. § 1123(a)(5)(D) were not met. Section 1123(a)(5)(D) requires that a plan provide adequate means for its implementation, including a sale of estate property. This clause prohibits the violation of Guam law barring insurance policy buybacks for at least four reasons. First, the sale frustrates Guam's Direct Action Statute, which preempts section 1123 under the MFA. Second, Guam law prohibiting the post-occurrence modification of an injured person's rights is not anti-sale; it is anti-rescission. Third, section 1123(a)(5)(D), which was enacted in 1980, cannot apply to preenactment claims because retroactive application violates Lujan Claimants' Fifth Amendment property rights. More than 70 Lujan Claimants have direct action claims that accrued prior to 1980, when section 1123(a) was amended to add the phrase, "[n]otwithstanding any otherwise applicable nonbankruptcy law." Shipman v. Kenosha Unified Sch. Dist., 57 Wis.2d 697, 704-05 (1973). The application of this phrase retroactively to preempt Guam's Direct Action Statute abrogates Lujan Claimants' "substantive" causes of action against settling insurers in violation of Lujan Claimants' Fifth Amendment due process rights. United States v. Security Ind. Bank, 103 S. Ct. 407, 413-14 (1982); Malpeli v. Beneficial Fin. Co. (In re Malpeli), 7 B.R. 508, 511 (Bankr. N.D. Ill. 1980). Fourth, the insurance buyback settlements could not be approved under section 1123(a)(5)(D) because its free and clear provision is limited to sales free of "liens." 11 U.S.C. § 1123(a)(5)(D). Lujan

Claimants' interests in the insurance policies, while similar to liens, are not technically liens as they do not secure payment of a debt.

### 5. The Plan fails to adequately protect and compensate direct action claimants for their interests in insurance policies.

Assuming the insurance policy buybacks are lawful sales under section 363(f), the Court erred in confirming a Plan that fails to provide Lujan Claimants with adequate protection and compensation for their interests in the insurance policies. 11 U.S.C. § 363(e). The word "interest," as used in section 363(f), is to be interpreted broadly. Precision Indus., Inc. v. Qualitech Steel SBQ, LLC (In re Qualitech Steel Corp.), 327 F.3d 537, 545 (7th Cir. 2003)). Lujan Claimants have an interest in BSA's (and other tortfeasors') insurance policies since they have prejudgment direct action rights against insurers under Guam law. Prejudgment direct action claimants, like Lujan Claimants, are third party beneficiaries to insurance policies, Litton v. Ford Motor Co., 554 So.2d 99, 103 (La. Ct. App. 1989), with rights in the policies that vest "at the time of the tort," Hayes v. New Orleans Archdiocesan Cemeteries, 805 So.2d 320, 323 (La. Ct. App. 2001) ("The Direct Action Statute vests the injured party with rights at the time of the tort to institute an action directly against the insurer within the terms and limits of the policy.").[3] An

---

[3] In cases brought under Guam's Direct Action Statute, the Supreme Court of Guam has relied upon Louisiana court decisions in cases brought under its similar LDAS. See, e.g., Reyes v. First Net Ins. Co., 2009 Guam 17 ¶ 29 (citing Welch v. Crown Zellerbach Corp., 359 So. 2d 154, 156 (La. 1978), and Hannie v. Wall, 569 So. 2d

accrued cause of action, such as for negligence, is a vested property interest entitled to due process protection that accrues on the date of the plaintiff's injury. <u>Matthies v. Positive Safety Mfg. Co.</u>, No. 99-0431, 2000 WL 892825, at *3 (Wis. Ct. App. July 5, 2000).

If the debtor's property is subject to an interest of another party, the debtor must provide adequate protection to the creditor. <u>In re Lee</u>, 25 B.R. 135, 139 (Bankr. E.D. Pa. 1982). The interest of the creditor must be adequately protected before the bankruptcy court will order turnover of these funds to the debtor. <u>Id.</u> The debtor bears the burden of proving the existence of adequate protection for the creditor's interest. <u>Id.</u> The court has the authority to condition or prohibit any sale of property as is necessary to provide adequate protection to the secured creditor's interest. <u>In re Collins</u>, 180 B.R. 447, 452 (E.D. Va. 1995). The commonly accepted method for adequately protected a secured creditor when a sale is authorized under section 363(f) is to order the liens or interest to attach to the proceeds of the sale. <u>Id.</u>

Here, the Plan provides Lujan Claimants no compensation or protection for their interests in the insurance policies. The Plan treats Lujan Claimants the same as all other Survivors who lack prejudgment direct action rights, as all insurance proceeds will be paid to all Survivors with allowed claims. Since the insurance proceeds will be shared among all Survivors, regardless of whether they have direct

1044, 1050 (La. Ct. App. 1990)).

action rights, then, at the very least, prejudgment direct action Survivors, including Lujan Claimants, should be granted a priority right to proceeds of insurance policy buybacks. A priority right to the insurance proceeds is consistent with Guam's Direct Action Statute, as the Guam Legislature, in enacting its direct action statute, prioritized the ability of injured persons to recover payment from insurers by allowing them to directly sue insurers. The Bankruptcy Court reasoned that Lujan Claimants were not entitled to a priority right to insurance proceeds because Guam's Direct Action Statute was enacted to protect the public at large and other claimants would look to the policy albeit after a judgment. A00625-626. This analysis is flawed. Guam's Direct Action Statute protects only "the injured person or his heirs or representatives…provided that the cause of action arose in Guam," 22 GCA § 18305, and therefore protects those injured in Guam and not the public at large in California, Ohio, or any other jurisdiction. Also, it is irrelevant whether other claimants would look to the policies after judgment, as there is no evidence that such other claimants who lack direct action rights have an interest in the policies; what is relevant is that Lujan Claimants have an interest in the polices being sold that is not adequately protected or compensated in the Plan. The Court also erred in finding adequate protection since the Plan allows Lujan Claimants to process their claims against the Settlement Trust and receive their share of Trust assets including sale proceeds, and that Lujan Claimants may choose the Independent Review Option and

seek recoveries from Non-Settling Insurers, or can pursue their claims directly against any Non-Settling Insurance Companies, even outside the Settlement Trust. A00626.  This is not adequate protection or compensation since it pays no compensation to Lujan Claimants for their interests in the policies or, conversely, pays every allowed claimant compensation who has no interest in the policies. Likewise, any payment from Non-Settling Insurers is speculative and not on account of Lujan Claimants' interests in the settling insurer policies.  As the Plan fails to provide Lujan Claimants with adequate protection and compensation for their interests in the policies, the Court erred in confirming the Plan with the insurance settlements and any future insurance settlements between presently non-settling insurers with Debtors or the Settlement Trust.

6. <u>The Court lacks jurisdiction over the 1976 and 1977 Hartford Policies for coverage of child sexual abuse claims, since BSA previously released its rights to such coverage</u>.

In Debtors' own words, "Debtors admit that BSA entered into a settlement agreement that released BSA's rights to coverage for sexual abuse claims under the 1976 Hartford Policy and 1977 Hartford Policy." A23767-23768.  As BSA released its rights to coverage for sexual abuse claims under these policies, and so is not entitled to coverage for sexual abuse claims, these policies as to and any proceeds for coverage of sexual abuse claims cannot be part of the bankruptcy estate in this case since Debtors have no legal or equitable interests in these policies.  11 U.S.C.

64

§ 541.  Accordingly, the Court lacks jurisdiction over these policies as to and proceeds for coverage of sexual abuse claims and erred in confirming a Plan which includes sales free and clear of others' (including any covered local councils, chartered organizations including the Archbishop of Agana[4], and direct action Survivors including Lujan Claimants) interest in and injunctions as to these policies.

      7.  <u>The sale and settlement of nondebtors' separate insurance policies should have been denied.</u>

A bankruptcy court lacks authority to dispose of property of a nondebtor.  <u>In re Aegean Marine Petroleum Network, Inc.</u>, 599 B.R. 717, 723 (Bankr. S.D.N.Y. 2019).  Despite this, the insurance settlements attempt to release insurers of their obligation to provide coverage to nondebtor Protected Parties under their own separate non-BSA insurance policies and the 1976 and 1977 Hartford insurance policies which were released by BSA.  Like liability insurance proceeds, non-BSA insurance policies and released BSA insurance policies are not property of the bankruptcy estate and therefore may not be disposed of free and clear under sections 363(f), 1123(a)(5)(D), or 1129(b)(2)(A)(ii) of the Bankruptcy Code.

The Bankruptcy Court erroneously found that nondebtors' insurance policies become property of Debtors' estates once they are assigned.  The Court relied on 11

---

[4] It is the undisputed record that "Debtors admit that it is the Debtors' position that the Archbishop of Agana is an additional insured under the BSA's general liability policies incepting after January 1, 1976 and to the Petition Date."  A23766-23767.

U.S.C. § 541(a)(7), which provides that the debtor's bankruptcy estate includes "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(7). Debtors contend that, since nondebtors will be assigning their insurance policies to BSA in connection with the Plan, Debtors will then have an interest in these policies as they acquire this interest after commencement of the bankruptcy case. However, it's not as easy as Debtors think.

Section 541(a)(7) was enacted by Congress "'to clarify its intention that § 541 be an all-embracing definition and to ensure that property interests created with or by property of the estate are themselves property of the estate.'" In re Porrett, 564 B.R. 57, 68 (Bankr. D. Idaho 2016) (quoting In re Neidorf, 534 B.R. 369, 371 (9th Cir. BAP 2015)). Section 541(a)(7) "'presupposes … that the estate has an interest in the property. This section does not expand the debtor's interest in the property merely because it was delivered postpetition. [T]his section is not intended to expand the property rights that a debtor would possess under 541(a)(1).'" In re Porrett, 564 B.R. 57, 68-69 (Bankr. D. Idaho 2016) (quoting In re Pettit Oil Co., No. 13-47285, 2016 WL 4132473, at *4 (Bankr. W.D. Wash. July 29, 2016) (internal citation omitted)); see also In re Patterson, 2008 WL 2276961, at *6 (Bankr. N.D. Ohio June 3, 2008) (stating that section 541(a)(7) does not provide an independent basis for the creation of estate property and "only operates when property is encompassed within the estate in the first instance"). "Thus, some 'property' of the

bankruptcy estate within the meaning of § 541(a)(1) must be used to acquire the 'interest in property' post-petition for § 541(a)(7) to bring that after-acquired 'interest' into the bankruptcy estate." Id. at 69.    In Neidorf, the Bankruptcy Appellate Panel of the Ninth Circuit explained that, for the after-acquired interest to be property of the estate under section 541(a)(7), "the interest (1) must be created with or by property of the estate; (2) acquired in the estate's normal course of business; or (3) otherwise be traceable to or arise out of any prepetition interest included in the bankruptcy estate."  534 B.R. at 371-72.

Debtors failed to meet their burden in proving that nondebtor insurance policies are after-acquired property of the estates.  First of all, there is no evidence that these policies were ever assigned or transferred to Debtors and so they clearly are not currently property of the estates.  Second, unless the Confirmation Order is reversed or vacated on appeal, these policies are anticipated to be assigned or transferred upon Debtors' reorganization, so at that point there is no bankruptcy estate.  Third, even if these policies were assigned to Debtors and there was a bankruptcy estate, Debtors have failed to prove that estate property was used to bring nondebtor insurance policies into the estates.  Instead, Debtors have the audacity to use nondebtor property to acquire nondebtor insurance policies.  In other words, Debtors plan to acquire Local Councils' and Chartered Organizations' separate insurance policies and interests in BSA insurance policies in exchange for the

nonconsensual release of Survivors' claims against these insureds.  Debtors have no

ownership of Survivors' claims for child sexual abuse against tortfeasors, such as

BSA, local councils, and chartered organizations, and their insurers.  Debtors never

owned Survivors' most intimate personal injury claims prior to bankruptcy and the

filing of bankruptcy does not give them power to take ownership or control of

Survivors' claims.  As Debtors are not giving any of their property to acquire, post-

petition, nondebtors' insurance policies and interests in insurance policies, any

interest that Debtors may acquire in these nondebtor insurance policies and interests

in BSA insurance policies is not property of the estate under section 541(a)(7).  They

are not a part of the bankruptcy estates and the Court lacks subject matter jurisdiction

over them.

### C. The Bankruptcy Court Erred in Confirming a Plan that Violates the Automatic Stay Imposed in the Archbishop of Agana's Bankruptcy Case.

Standard of Review:  Whether an automatic stay is violated is a legal question reviewed de novo.  In re Linear Elec. Co., 852 F.3d 313, 320 (3d Cir. 2017).  *De novo* for questions of law and standing.

The confirmed Plan violates the automatic stay provided for by 11 U.S.C. §

362 in the AOA bankruptcy case through the exercise of control of AOA's estate

property including AOA's rights and interest as a coinsured of BSA insurance

policies.  The automatic stay protecting AOA's estate property went into effect on

January 16, 2019, when AOA filed for bankruptcy.  A00567.  AOA's rights and

interest in BSA insurance policies are part of AOA's bankruptcy estate pursuant to 28 U.S.C. § 541, subject to the exclusive jurisdiction of the District Court of Guam, 28 U.S.C. § 1134. The Court agreed with Lujan Claimants that AOA's interests in the policies are protected by the automatic stay imposed in the Guam bankruptcy, that the automatic stay prevents the Court from approving the sale of the Abuse Insurance Policies free and clear of whatever interests the AOA has, and that permission of the Guam bankruptcy court is required to lift the automatic stay. A00609-614. Yet, the Court confirmed a Plan and issued a Confirmation Order which exercises control over AOA's interest in the policies by enjoining and barring all AOA, its estate, and its creditors (including Lujan Claimants) "from asserting any claims or causes of action against the Settling Insurance Companies (and the Hartford Protected Parties) or their respective Representatives based upon, attributable to, arising out of, or in any way connected with any Abuse Insurance Policies or other insurance policy issued by a Settling Insurance Company covering Abuse Claims[.]" A00799. At the September 7, 2022, hearing, the Court reiterated from her Opinion that "there was a violation of the automatic stay, so I could not permit a sale free and clear of the archbishop's interests." A14092. As to paragraph M.1. of the (at that time, proposed) Confirmation Order, A14067; A00799, the Court acknowledged that "I think paragraph one is a paragraph that affects the Archbishop[] … But as to paragraph 1, it's with respect to enjoining the

Archbishop," A14096.  Yet the Court issued the Confirmation Order with this paragraph anyway, since AOA was not present at the hearing.  Id. ("The Archbishop isn't here, okay.").  The Court also stated that Lujan Claimants lack standing to raise an objection to paragraph M.1.  Id.  It is incorrect that AOA needed to be present at the hearing to raise an objection on the basis of the automatic stay since the stay is automatic and does not require any action by AOA to make it apply to a particular proceeding, and AOA could not waive the stay.  ACandS, 435 F.3d at 259.  The Court also incorrectly found Lujan Claimants lack standing to raise an objection, since M.1. enjoins and bars "all Persons" from asserting claims and causes of action against Settling Insurance Companies, Lujan Claimants are creditors of the AOA and its bankruptcy estate and the automatic stay serves the interests of debtors and creditors.  Id.  Clearly, the injunctions violate the automatic stay since they are acts "to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).   The Court erred in ordering confirmation of a Plan that violates the automatic stay of another bankruptcy action.

D.    **The Bankruptcy Court Erred in Confirming a Plan that Fails the Best Interest of Creditors Test.**

Standard of Review:  *De novo* for conclusions of law and statutory interpretation.

Under section 1129(a)(7), a Chapter 11 plan cannot be confirmed unless each dissenting creditor "will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 … on such date." 11 U.S.C. § 1129(a)(7). This means the plan must provide that each dissenting, impaired creditor receive or retain at least as much as the creditor would receive or retain if the debtor liquidated under Chapter 7. In a Chapter 7 liquidation, nondebtor releases are not permitted. See In re Mrs. Weinberg's Kosher Foods, 278 B.R. 358, 365-66 (Bankr. S.D.N.Y. 2002) (holding in this chapter 7 case that bankruptcy courts may not use a channeling injunction to enjoin a creditor from prosecuting direct claims against a nondebtor); In re Optical Tech., Inc., 216 B.R. 989, 990-94 (M.D. Fla. 1997) (adopting Master Mortgage but striking the actual releases contained in the debtors' liquidating plan because "where … a plan of reorganization provides for the total liquidation of the debtor, the factors of Master Mortgage cannot be met"). A plan of reorganization is unconfirmable for violating the best interests of creditors test, where the plan requires that creditors who are entitled to a Chapter 7 liquidation distribution must release nondebtors in order to receive any payment under the Chapter 11 plan. In re Conseco, Inc., 301 B.R. 525, 527-28 (Bankr. N.D. Ill. 2003). The plan proponent bears the burden of

showing by a preponderance of the evidence that its plan passes the best interest of creditors test.  W.R. Grace, 475 B.R. at 142.

The record shows that the Plan fails the best interest of creditors test because it releases Survivors' claims against and enjoins them from suing nondebtors and requires that, in order to receive a distribution under the Plan, the Survivor must sign a release of all Protected Parties (such as local councils, contributing chartered organizations, and settling insurers) and chartered organizations. A01018, 1021, 1031.  As Survivors can only receive payment under the Plan if they sign a release of their claims against local councils, chartered organizations, and settling insurers, the Plan deprives them of their claims against these nondebtors, which they would still be able to retain in a chapter 7 liquidation.  Furthermore, the Plan prohibits Survivors from recovering payment under insurance policies issued by insurers, thereby precluding Lujan Claimants from exercising their statutory rights to file direct actions against insurers.  Since, in a Chapter 7 liquidation, Survivors would be able to pursue their claims against local councils, chartered organizations, and insurers of such nondebtors and Debtors, the Plan clearly fails to pay Lujan Claimants at least as much as they would be paid if Debtors liquidated under Chapter 7.

The Plan also fails to meet the best interest of creditors test because it releases Lujan Claimants' claims against local councils (such as Aloha Council), who are

directly liable for the abuse claims and have their own assets and separate insurance rights and policies to compensate Lujan Claimants.

Additionally, the Plan fails the best interest of creditors test because it releases and enjoins each Lujan Claimant's statutory right of direct action against all insurers who provide general liability insurance coverage to BSA, AOA, and local councils such as Aloha Council. Guam's Direct Action Statute provides injured persons a right of direct action against the insurer up to the limits of the policy. Debtors admit in the Plan that the BSA insurance policies from 1955 to 1981 are non-aggregate, meaning that the limits are per-occurrence or per person. Debtors admit that local councils and chartered organizations, including Aloha Council and AOA, are covered under BSA insurance policies beginning in January 1976 to the Petition Date. The Plan also releases and enjoins Lujan Claimants' direct action claims against Aloha Council's separate insurers. A01208.

Although Century and Hartford are paying a combined $1.587 billion, that provides an average of about $19,300 per Survivor, an absolutely minuscule fraction of the direct action claims Lujan Claimants would retain in a Chapter 7 liquidation. The other insurers covering abuse years against whom Lujan Claimants have rights of direct action are paying absolutely nothing as part of the Plan and may never pay anything despite the best efforts of the Settlement Trustee.

Further, Lujan Claimants' arguments are not defeated by Dr. Bates' valuation, whose estimate was not meant to value any single Survivor claim.  A02974-2975, and which did not include the value of claims against Roman Catholic Entities, especially who are not chartered organizations, and the claims of unknown claimants who will be compensated from the Trust.   The claims against non-chartered organization Roman Catholic Entities have value, see, e.g., A26851-26928 (Guam scouting-related abuse claim against Capuchin Franciscans Province of St. Mary settled for $200,000), which was never analyzed by Debtors.

The Plan should have been denied confirmation for failure to meet the best interests of creditors test as to Lujan Claimants.

**E.** **The Plan Fails to Properly Classify the Claims of Lujan Claimants.**

Standard of Review:   *De novo* for whether jurisdiction exists, conclusions of law, and for statutory interpretation.

"[A] plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a).  The focus of classification is the legal character of the claim as it relates to the assets of the debtor.  In re AOV Indus., Inc., 792 F.2d 1140, 1150 (D.C. Cir. 1986).   Here, the Plan places prejudgment direct action Survivors, including Lujan Claimants, within the same class as Survivors who lack the statutory right to sue insurers without first obtaining a judgment and without having to name the insured.  These direct action claimants have interests in insurance policies and

74

so are not substantially similar to other Survivors who have no interests in insurance policies and are not entitled to adequate protection or compensation from sales of insurance policies.

Direct action claims are treated as distinct claims.  For example, the Hartford Settlement Agreement defines "Direct Action Claim," A11218, and lists Direct Action Claims among the "Released Claims," separate and distinct from Abuse Claims, A11225.  Most jurisdictions do not allow direct action claims.  A03906. Even fewer allow direct action claims without first winning a judgment against the tortfeasor.  A03906-3907.

Lujan Claimants should have been separately classified.

## F.    The Plan Treats Survivors, Including Lujan Claimants, Unequally.

Standard of Review:  Whether chapter 11 plan provides equal treatment is a question of law reviewed *de novo*.  In re New Power Co., 438 F.3d 1113, 1122 (11th Cir. 2006).

"[A] plan shall— … provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4). Equal treatment requires that (1) all class members must receive equal value and (2) each class member must pay the same consideration in exchange for its distribution. In re Quigley Co., 437 B.R. at 146.  Here, Lujan Claimants are not being provided equal treatment compared to Survivors who lack direct action rights.   Lujan

75

Claimants are being forcibly deprived of their direct action claims without any compensation or protection. Yet, Survivors without direct action claims give up no such rights and then are treated the same as Lujan Claimants under the Plan. As Lujan Claimants are giving up more rights, and therefore paying more consideration, in exchange for the same treatment as Survivors who lack such rights, the Plan treats them unequally and the Court should have denied confirmation.

Also, the Plan treats Survivors unequally as some Survivors are forced to release and enjoined from pursuing their claims against chartered organizations and related religious entities, while other Survivors retain their claims against such nondebtors, and all Survivors share in the same pot of money (except for contributing chartered organization funds). In other words, Survivors who lose their claims against chartered organizations and related religious entities are giving up more claims, and therefore paying more consideration, in exchange for their distribution and while not being compensated for the loss of their claims. The Survivors who are being compelled to surrender their claims include those who were first abused after 1975 and those whose claims are released and enjoined under settling insurer injunctions. For example, one Lujan Claimant who was first abused in 1980 is forced to release his chartered organization claim. A027085-27102.

This is similar to the treatment in <u>Quigley</u>, which was found to be unequal, leading in part to denial of plan confirmation. There, the plan placed Non-Settling Claimants and Settling Claimants in the same class. The Non-Settling Claimants as a group were being compelled to give up their valuable derivative claims— which the Settling Claimants had already surrendered—to get the same 7.5% distribution. As the Non-Settling Claimants were being forced to pay greater consideration for their 7.5% distribution than the Settling Claimants, the court found that there was unequal treatment under section 1123(a)(4), and denied confirmation. <u>Quigley</u>, 437 B.R. at 148.

The Plan provides for unequal treatment and should not have been confirmed.

### G. The Bankruptcy Court Erred in Granting Debtors' Motion to Amend and Supplement and Confirming the Plan which Materially Differs from the Solicited Plan.

<u>Standard of Review</u>: Whether chapter 11 plan modifications are "material" and "adverse" is a mixed question of law and fact, reviewed *de novo*. <u>New Power Co.</u>, 438 F.3d at 1117.

Pursuant to Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52, Debtors moved to amend and supplement the Confirmation Opinion (Bankr. D.I. 10136), which rejected material aspects of Debtors' Third Modified Fifth Amended Chapter 11 Plan of Reorganization for Boy Scouts of America and Delaware BSA, LLC (Bankr. D.I. 8813), and sought an order

confirming a materially modified plan of reorganization. A12797-12900. But neither Rule 7052 nor Rule 52 permit confirmation of an alternative plan of reorganization, especially one that is materially and adversely different from a previously accepted plan.

Although a plan may be modified after its acceptance and before confirmation, the plan shall not be deemed accepted by all creditors who have previously accepted the plan unless the court, after hearing on notice to certain entities, finds that the proposed modification does not adversely change the treatment of the claim of any creditor. FED. R. BANKR. P. 3019(a). Material and adverse plan modifications require resolicitation. In re Federal-Mogul Global, Inc., No. 01-10578, 2007 WL 4180545, at *39 (Bankr. D. Del. 2007)). If the modifications and material and adversely affect the way creditors are treated, 11 U.S.C. § 1127 requires a new disclosure statement and balloting of the amended plan. In re G-I Holdings Inc., 420 B.R. 216, 255-56 (D.N.J. 2009) (citing In re New Power Co., 438 F.3d 1113 (11th Cir. 2006)). "'The best test is whether the modification so affects any creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance.'" Id. at 256 (quoting 9 Collier on Bankruptcy ¶ 3019.01 (15th ed. rev. 2009)).

The Plan is materially and adversely different from the plan solicited and denied confirmation. First, the Plan now includes third-party releases and

injunctions of Survivors' claims which were not in the earlier plan, namely, the releases and injunctions in favor of Roman Catholic Entities, which also extend to other chartered organizations (including faith-based institutions) and their related entities. A00907. The Plan now treats these undisclosed, unexamined entities as Participating Chartered Organizations, even where they are not chartered organizations. A00802-803. There was no proof, and the Bankruptcy Court made no findings, that any of these new and unknown releasees share insurance with Debtors or a unity of interest, or that any are making contributions to receive the protections under the Plan. They just were not a part of the equation. These protections are a result of the settlement between plan proponents and the Roman Catholic Ad Hoc Committee ("RCAHC") which resolved RCAHC's objection to plan confirmation, but which was never presented or justified by Debtors in any disclosure statement or motion to approve compromise under Bankruptcy Rule 9019, prior to or even after the Court's Opinion. The RCAHC Settlement was simply filed during trial, as part of the Twelfth Mediator's Report. A12195-12221. The Court's Opinion expressly gave no approval of the compromise. A00585. Not until after the trial ended were settlement terms incorporated into an amended plan. Even though the world of releasees expanded by most likely thousands, and which now most likely includes religious orders against whom Lujan Claimants have claims (including the one who voted to accept the plan and the two who did not

vote), Debtors failed to adequately disclose these non-chartered organization releasees as protected parties and never solicited votes on a plan with these entities as releasees. Debtors failed to explain why these entities should receive protections while making no contribution for their release and injunction of claims.

The Plan is also now materially modified to include an undisclosed and unsolicited "audit program" involving "procedures to … identify fraudulent claims" which the Settlement Trustee must present to the Court for approval after the Effective Date, and which include in addition to disallowance of a claim, penalties such as prosecution of the claimant or claimant's counsel for presenting a fraudulent claim and sanctions from the Court. A00812-813. The Bankruptcy Court in its Confirmation Opinion required in a future plan "the implementation of strong fraud prevention measures in connection with review of Direct Abuse Claims." A00723. "If the Plan is confirmed, the Confirmation Order will provide that the Settlement Trustee will propose procedures to suss out fraudulent claims taking into account factors she deems appropriate, which can include a cost/benefit analysis." A00724. The solicited plan lacked these strong fraud prevention measures. While these procedures theoretically benefit meritorious claimants, Debtors still needed to adequately disclose such strong fraud prevention measures to Survivors, such as what responses or lack of responses in a proof of claim will be considered fraudulent. Given the Court's finding that BSA worked so closely with local councils and

chartered organizations, will a claim that fails to identify a local council or chartered organization be considered fraudulent?  Will a claim be considered fraudulent if a Survivor cannot identify the perpetrator or pinpoint a specific enough abuse date or location?  Survivors lack answers to these and other questions about the strong measures.  Debtors needed to disclose these procedures just as the Court required Debtors to disclose the Trust Distribution Procedures.  A07681-7684 (Court moving the disclosure statement hearing since "I don't see some very necessary information and documents, quite frankly, that I would want to see at a disclosure statement, including the TDPs.  Those who are involved in Imerys know that I did not send out that disclosure statement until we had TDPs. … [T]his plan has that gap in it, where parties don't know what, in fact, the treatment is going to be.").  Disclosure was especially critical for Survivors to decide whether to elect the Expedited Distribution, where $3,500 total is paid with minimal level of claim review, except the Survivor must have timely submitted a "substantially completed" proof of claim signed by the claimant under penalty of perjury and must have elected the Expedited Distribution on his ballot.  A00550.  Without knowledge of the strong fraud prevention procedures, 7381 Survivors, including one Lujan Claimant, made the Expedited Distribution election.  Id.  Survivors might not have elected to receive only $3,500 if they know their claims would be subject to a more rigorous and invasive review, as minimal review sparing Survivors from reliving the horrors of

81

the abuse would have been seen as a benefit to making the election. As the Plan provides undisclosed adverse treatment, it needed to be resolicited.

The one Lujan Claimant who voted to accept the plan has a claim against a Roman Catholic Entity that is not a chartered organization, that is now being released under the modified plan, and he elected the Expedited Distribution. A26929-26984, 23778.

Accordingly, the Court erred in granting the motion and confirming a materially and adversely modified Plan.

## JOINDER

Lujan Claimants join in the brief of the D&V Claimants and incorporate it as if fully stated herein.

## CONCLUSION

The lower courts' orders confirming Debtors' Plan must be reversed.

Dated: July 24, 2023.           Respectfully submitted,

/s/ Christopher D. Loizides
LOIZIDES, P.A.
1225 North King Street, Suite 800
Wilmington, DE 19801
Phone: 302.654.0248
Email: Loizides@loizides.com

and

LUJAN & WOLFF LLP

/s/ Delia Lujan Wolff

82

Delia Lujan Wolff
Suite 300, DNA Bldg.
238 Archbishop Flores St.
Hagatna, Guam 96910
Phone: (671) 477-8064/5
Facsimile: (671) 477-5297
Email:  dslwolff@lawguam.com

*Attorneys for Lujan Claimants*

**CERTIFICATE OF COMPLIANCE**

Subject to the Court granting enlargement of the length limitation, I certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B).  This brief contains 19,437 words.

I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman.

Dated:  July 24, 2023.                           Respectfully submitted,

 /s/ Christopher D. Loizides
LOIZIDES, P.A.
1225 North King Street, Suite 800
Wilmington, DE 19801
Phone: 302.654.0248
Email: Loizides@loizides.com

and

LUJAN & WOLFF LLP

 /s/ Delia Lujan Wolff
Delia Lujan Wolff
Suite 300, DNA Bldg.
238 Archbishop Flores St.
Hagatna, Guam 96910
Phone: (671) 477-8064/5
Facsimile: (671) 477-5297
Email:  dslwolff@lawguam.com

*Attorneys for Lujan Claimants*

84

## CERTIFICATION OF BAR MEMBERSHIP

I certify, pursuant to L.A.R. 46.1(e) that all of the attorneys whose names appear on this brief are members of the bar of this Court.

/s/ Christopher D. Loizides

## CERTIFICATION OF IDENTICAL COMPLIANCE TO BRIEFS

I hereby certify that the text of the PDF filed and hard copies of this brief are identical.

/s/ Christopher D. Loizides

## CERTIFICATION OF VIRUS CHECK

I hereby certify that a virus check was performed on the electronic copy of this brief, using Norton 360, and that no virus was indicated.

/s/ Christopher D. Loizides