# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

_____

BOY SCOUTS OF AMERICA and DELAWARE BSA, LLC

Debtors.

LUJAN CLAIMANTS, DUMAS & VAUGHN CLAIMANTS,

Appellants,

v.

BOY SCOUTS OF AMERICA, et al

Appellees

Case Nos. 23-1664 & 23-1666

_____
—

Appeal from Order dated March 28, 2023, entered by the United States District Court, District of Delaware Case No. 22-cv-01237 (RGA)
_____

### JOINT BRIEF OF APPELLANTS DUMAS & VAUGHN CLAIMANTS AND LUJAN CLAIMANTS REGARDING COURT'S C.A.V. INQUIRY
_____

Gilion C. Dumas
DUMAS & VAUGHN, LLC
3835 NE Hancock Street, Suite GLB
Portland, OR 97212
Telephone: (503) 616-5007
Email: gilion@dumasandvaughn.com

Charles J. Brown, III, Esquire
GELLERT SCALI BUSENKELL & BROWN LLC
1201 N. Orange St., 3rd Floor
Wilmington, DE 19801
Phone: (302) 425-5813
Email: cbrown@gsbblaw.com

*Counsel for Dumas & Vaughn Claimants*

Delia Lujan Wolff
LUJAN & WOLFF, LLP
Suite 300, DNA Bldg.
238 Archbishop Flores St.
Hagatna, Guam 96910
Telephone: (671) 477-8064/5
Email: dslwolff@lawguam.com

Christopher D. Loizides
LOIZIDES, P.A.
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 654-0248
Email: loizides@loizides.com

*Counsel for Lujan Claimants*

INTRODUCTION

On February 26, 2024, the Clerk directed the parties to submit briefing on "whether the Court should hold this case C.A.V. pending the issuance of the Supreme Court's decision in *Harrington v. Purdue Pharma LP*, No. 23-124." Appellants Dumas & Vaughn ("D&V") Claimants and Lujan Claimants (collectively "Abuse Claimants") submit the following:

The Court's request highlights the key conflict in the posture of this case. On the one hand, it only makes sense to put this appeal on hold until the Supreme Court rules on the identical issue of nonconsensual third-party releases in *Purdue*. Regardless of how the Supreme Court rules, that decision will provide the applicable law in this appeal, either by holding that nonconsensual third-party releases are unlawful, or establishing guidelines for such releases that are not exactly the guidelines used by the bankruptcy court. On the other hand, the longer this Court takes to rule on the appeal, the further along is plan implementation, which could strengthen Appellees' equitable mootness arguments.

The tension between these two considerations drove Appellants to seek a stay of the plan. Abuse Claimants, along with other Appellants, sought a stay of the plan from the district court and this Court immediately after the district court affirmed the plan. After the Supreme Court granted a writ of certiorari in *Purdue*, Abuse Claimants again sought to stay the plan and the appeals in order to benefit from the Supreme Court's ruling in *Purdue*. All these stay motions argued that the plan should be stayed until a ruling on nonconsensual third-party releases, specifically to avoid strengthening Appellees' mootness arguments. The district court and this Court denied all motions for a stay of the plan. However, the district court, in denying Abuse Claimants' recent motions, expressly acknowledged that the grant of certiorari in *Purdue* "signals *at least* a reasonable chance that Claimants may succeed on their challenge [to the third-party releases]." Civ. No. 22-1237-RGA, Dkt. 254, p. 14 (emphasis added). Abuse Claimants also asked Circuit Justice Samuel A. Alito, Jr., to stay the plan, for the same reasons. After Justice Alito took the extraordinary measure of granting a temporary administrative stay, the Supreme

Court ultimately denied the request without opinion. Case No. 23A741, Dkt. Orders February 16 and 22, 2024.

Throughout the time Appellants sought to stay the plan, Appellees and other plan supporters have done everything possible to accelerate implementation of the plan with the goal of "substantial consummation" and dismissal of the appeals as moot. On December 14, 2023, this Court referred Appellees' Motions to Dismiss to the merits panel, stating, "The Appellees' arguments leave us unpersuaded at this preliminary stage that equitable or statutory mootness apply in the particular circumstances of this case." In response, on January 31, 2024, the "Settlement Trustee" set a May 31, 2024, deadline for more than 70,000 abuse claimants to submit their claims to the Trust.[1] The Trustee set the May 31 deadline, despite the fact that a decision in *Purdue* is expected by the end of June 2024.[2] Doubling down on expediting payments, on February 12, 2024, while Abuse Claimants' stay application was pending with Justice Alito, the Trustee brazenly

---

[1] https://www.scoutingsettlementtrust.com/s/news-and-key-links (January News).
[2] https://www.cbsnews.com/news/supreme-court-purdue-pharma-sackler-family-bankruptcy/

3

announced the creation of the "Advance Payment Program" or "APP," to "accelerate partial payments to eligible Claimants."[3] Under the APP, "eligible claimants will be able to receive payments of $1,000 before their allowed claim is finally determined."[4] The APP is nowhere mentioned in the plan and appears to violate it.[5] The Trustee's bold move to pay claimants $1,000 each before a final determination of their claim is made, is a clear attempt to disburse as much money to as many people as possible before this Court addresses the merits of the appeals.[6]

Appellants' failed attempts to get the plan stayed, balanced by Appellees' failed attempts to get the appeals dismissed, leave us in this

---

[3] https://www.scoutingsettlementtrust.com/s/
[4] https://scoutingsettlementtrust.my.salesforce.com/sfc/p/#Dp0000016pkB/a/Uu0000002afJ/.exZUlSnzfdvW7OqHcXNBrYtHq96M0Ic4suIbGaVUo4 (Trustee's press release).
[5] A01030 (Plan Ex. A (Trust Distribution Procedures) Art. IX.A at 21 (requiring a Final Determination of an Abuse Claim before a Claimant will receive a payment, unless the Claimant has exercised the Independent Review Option, in which case payment will be withheld until that determination is complete)).
[6] See Trustee's press release, last accessed March 4, 2024: https://scoutingsettlementtrust.my.salesforce.com/sfc/p/#Dp0000016pkB/a/Uu0000002afJ/.exZUlSnzfdvW7OqHcXNBrYtHq96M0Ic4suIbGaVUo4

4

current position. The bottom line is that Abuse Claimants agree that this Court should hold these appeals in abeyance and wait to rule on the merits of these appeals until after the Supreme Court issues its ruling in *Purdue*, but that the delay should not prejudice Appellants by strengthening the case for equitable or statutory mootness.

## ARGUMENT

### I. PURDUE WILL PROVIDE THE APPLICABLE LAW IN THIS CASE.

This case presents the exact same question before the Supreme Court in *Purdue*: Does the Bankruptcy Code authorize the judicial approval of nonconsensual third-party releases for nondebtors? The Supreme Court likely will answer this question by the end of its current term, sometime within the next three months. "[W]hether a bankruptcy court can approve nonconsensual third-party releases" is "the great unsettled question" of bankruptcy law today. *In re Purdue Pharma, L.P.,* 635 B.R. 26, 37 (S.D.N.Y. 2021). The Supreme Court will likely prohibit nonconsensual third-party releases or set standards different than those used by the bankruptcy court, either of which will require remand of this case.

Contrary to Appellees' prior arguments, *Purdue* will apply in this case. Both cases involve nonconsensual third-party releases. Any distinction between the cases does not exist or is immaterial to the central issue of the legality of these releases. For example:

- The releases in both cases discharge both nondebtor individuals and entities of liability. The releases in *Purdue* discharge individual Sackler family members and related entities such as trusts. <u>In re Purdue Pharma L.P.</u>, 633 B.R. 53, 83 (Bankr. S.D.N.Y. 2021) (settlements release "the Sacklers and their related entities"). The releases here discharge the liabilities of Protected Parties, which includes BSA, over 250 Local Councils (separate entities operating the Scout program), over 300,000 Chartered Organizations (Scouting sponsors) and non-chartered organization Roman Catholic Entities, Settling Insurers, and each of their individual representatives.[7] Both plans discharge

---

[7] A00991 ("all holders of Abuse Claims shall … forever discharge and release … each and all of the Protected Parties … from all Abuse Claims …, whether … derivative or direct, … whether for tort, fraud, contract, veil piercing or alter-ego theories of liability …"); A00903 ("Protected Parties" includes protected entities' (BSA, local councils,

6

individuals from liability for fraud and malicious conduct which they could not discharge in their own bankruptcies.

- The releases in both cases discharge direct claims against nondebtor third-parties for their own liability. The BSA plan expressly "discharges" both derivative and direct claims. The BSA releases are not limited to derivative claims or claims involving "the same liability" as BSA.

- That the BSA plan supposedly offers "full payment" (a hotly contested issue), and the *Purdue* plan offers "fair payment" is not a distinction with any difference. Relying on *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930 (Bankr. W.D. Mo. 1994), payment in full was only one factor the bankruptcy court used to determine that nonconsensual third-party releases were appropriate in this case, after already finding jurisdiction and statutory authority to

---

chartered organizations, Settling Insurers, etc.) Representatives); A00905 ("Representatives" includes current and former officers, directors, principals, equity holders, trustees, members, partners, managers, officials, board members, advisory board members, employees, agents, volunteers, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, etc.).

7

approve such releases. The legality and constitutionality of nonconsensual third-party releases does not turn on the amount of compensation nonconsenting parties may receive for their channeled claims.

- Further, like the plan in *Purdue*, the BSA plan does not promise or guarantee full payment of claims. A00582 ("Direct Abuse Claims will more likely than not be paid in full"); Bankr. No. 20-10343, Doc.6445 at 29 (approved Disclosure Statement disclosing Estimated Percentage Recovery of 31-63% if aggregate value of abuse claims is $2.4 billion and Estimated Percentage Recovery of 10-21% if aggregate value of claims is $7.1 billion, plus additional insurance rights expected to yield up to 100% recovery). Indeed, the Settlement Trust's own website, in the Frequently Asked Questions, expressly does not guarantee full payment:

    > 7.10 Will I receive payment of my full allowed amount if my claim is determined to be an Allowed Abuse Claim?
    >
    > Answer

> If you submitted your claim as a Trust Claim Submission or you elected the Independent Review Option, you may not receive payment of the full value that the Trustee assigns to your Abuse Claim. This is because the settlement documents require that all Claimants receive the same percentage recovery on their Allowed Abuse Claims. In turn, the percentage of each Allowed Abuse Claim that will be paid depends on the amount of available funds in the Trust and the aggregate amount of all Allowed Abuse Claims.[8]

- The differing misconduct of the released nondebtors in *Purdue* (opioid crisis) and in this case (child sexual abuse) does not justify disparate treatment of this case. Also, setting aside settling insurers, this case does not only involve the release of nondebtor nonprofit corporations. The released entities here would include also "business organization[s], governmental entit[ies] or organization[s]."[9] More importantly, nonprofit corporations are liable for their own tortious conduct just as are for-profit corporations, other entities, or individuals. This "distinction" lacks substance.

---

[8] https://www.scoutingsettlementtrust.com/s/article/Will-I-receive-payment-of-my-full-allowed-amount-if-my-claim-is-determined-to-be-an-Allowed-Abuse-Claim

[9] A00875 ("Chartered Organizations" defined).

- The BSA plan raises the same constitutional concerns voiced by the Supreme Court during *Purdue* oral argument. https://www.supremecourt.gov/oral_arguments/argument_transcripts/2023/23-124_h315.pdf, at 42-44.  Those concerns are not ameliorated by the "Tort System Alternative" in the BSA plan because that alternative does not come close to replicating the civil action and jury trial rights the plan takes away.
- The sale of insurance policies here does not take this case outside the reach of *Purdue*.  This Court was unpersuaded that statutory mootness, based on the "buyback" of policies, applies to the circumstances of this case.  Further, the policy buybacks are sales <u>inside</u> the plan, Bankr. D.I. 8907-1 §§ 4b, 5a, 32, and not section 363 sales, which are sales outside a plan of reorganization, *In re ICL Holding Co.*, 802 F.3d 547, 549 (3d Cir. 2015) (§363 sale is "outside a plan of reorganization"); *In re PWS Holding Corp.*, 228 F.3d 224, 229-30 (3d Cir. 2000) ("§ 363 … governs the sale of assets outside of the reorganization plan").  Since section 363(m)

only applies to section 363 sales and not plan sales, the policy buybacks are not protected by section 363(m). Additionally, the only section of the Bankruptcy Code that allows the injunction of claims against insurers is 11 U.S.C. § 524(g), which applies only to asbestos bankruptcies, which this case is not.

- Finally, the idea that the BSA plan has "gone effective" (which Abuse Claimants dispute) does not distinguish this case from *Purdue*. Going effective does not render an appeal moot, especially if doing so shields unlawful third-party releases from appellate review. The standard for equitable mootness requires much more than merely going effective. *See In re Semcrude, LP*, 728 F.3d 314, 320 (3d Cir. 2013) (equitable mootness requires substantial consummation of the plan and other factors). For all the reasons argued in earlier briefs, these appeals are not moot.

There is no practical difference between the nonconsensual third-party releases in the *Purdue* plan and the BSA plan. The US Trustee as petitioner in *Purdue* explicitly cited this case in its stay

11

application to argue that the issue was of nationwide importance and one on which it was likely to prevail. No. 23A87 at 16 (citing *In re Boy Scouts*, 650 B.R. at 135-43).

Significantly, at least one other court facing litigation related to the BSA plan has already stayed proceedings pending the outcome of *Purdue*. The Trustee is currently suing 91 non-settling insurers for payment of abuse claims in *The Hon. Barbara J. Houser (Ret.) v. Allianz Global Risk Ins. Co.*, No. 23-cv-1592, Doc. 1 (N.D. Tex.). On December 12, 2023, the district court in that case stayed all proceedings pending the Supreme Court's ruling in *Purdue*, thus recognizing the importance of waiting for *Purdue* to resolve the matter. *Id.* Doc.339. More recently, on February 16, 2024, the court denied the Trustee's motion to reconsider the stay. *Id.* Doc.373.

*Purdue* will govern the outcome in this case. In the interest of judicial efficiency, this Court should wait to decide this case until after the Supreme Court rules in *Purdue*.

/ / /

## II. THE APPEALS ARE NOT MOOT, BUT ANY DELAY IN DECIDING THIS CASE SHOULD NOT PREJUDICE APPELLANTS BY STRENGTHENING MOOTNESS ARGUMENTS.

Although waiting for *Purdue* makes sense, Appellants should not be prejudiced by the wait. Appellants have gone to extraordinary lengths to stay implementation of the BSA plan. Through no fault of Appellants, plan supporters have rushed to implement the plan with the goal of shielding nonconsensual third-party releases from appellate scrutiny.

For now, this Court has declined to grant dismissal, instead referring the matter to the merits panel. But the danger to Appellants remains, as the bankruptcy plan continues to be implemented. Although disbursements to abuse claimants have barely begun, and Appellants dispute that the plan is effective or substantially consummated, or that equitable mootness applies, the longer the plan continues to move forward, the more the scale could tip in Appellees' favor on the mootness issue.

Such an outcome would be unfairly prejudicial to Appellants. The timing of oral argument and a decision in this case should not prejudice any party – neither side should bear the burden of the timing of a

decision. It is up to this Court to decide if protecting Appellants from this prejudice requires staying further implementation of the plan (as argued in Abuse Claimants' most recent Motions for Stay, No. 23-1664, Dkt. 105, 133; No. 23-1666, Dkt. 96, 127) or merely not penalizing Appellants for any delay occasioned by waiting for the guiding decision in *Purdue*.

## CONCLUSION

For the reasons discussed above and in prior briefs filed by Abuse Claimants, this Court should wait to decide this appeal until after the Supreme Court rules in *Purdue*, but should protect Appellants from prejudice caused by any delay by staying further implementation of the plan or otherwise not holding the delay against Appellants when it comes to deciding equitable or statutory mootness.

Dated: March 8, 2024 Respectfully submitted,

**DUMAS & VAUGHN, LLC**
*/s/ Gilion C. Dumas*
Dumas & Vaughn, LLC
3835 NE Hancock Street, Suite GLB
Portland, OR 97212
Telephone: (503) 616-5007
Email: gilion@dumasandvaughn.com

**GELLERT SCALI BUSENKELL & BROWN LLC**
*/s/ Charles J. Brown, III*
Charles J. Brown, III, Esquire
1201 N. Orange St., 3rd Floor
Wilmington, DE 19801
Phone: (302) 425-5813
Email: cbrown@gsbblaw.com

*Counsel for D&V Claimants*

- and -

**LUJAN & WOLFF, LLP**
*/s/ Delia Lujan Wolff*
Delia Lujan Wolff
Suite 300, DNA Bldg.
238 Archbishop Flores St.
Hagatna, Guam 96910
Telephone: (671) 477-8064/5
Email: dslwolff@lawguam.com

**LOIZIDES, P.A.**
*/s/ Christopher D. Loizides*
Christopher D. Loizides
1225 King Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 654-0248
Email: loizides@loizides.com

*Counsel for Lujan Claimants*

# CERTIFICATE OF COMPLIANCE

I hereby certify this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32. This brief contains 2370 words, excluding the items set forth in Federal Rule of Appellate Procedure 32(f).

I further certify that this brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5) and Federal Rule of Appellate Procedure 32(a)(6). A proportionally spaced typeface was used, as follows:

> Name of typeface: Century
> Point size: 14
> Line spacing: Double

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of the electronic brief is identical to the text of paper copies and because MalwareBytes was run on the file containing the electronic version of this brief and no viruses were detected.

Dated: March 8, 2024          */s/ Gilion C. Dumas*
                              Gilion C. Dumas

<u>**CERTIFICATE OF SERVICE**</u>

I, Gilion C. Dumas, hereby certify that on March 8, 2024, I caused a copy of the forgoing **JOINT BRIEF OF APPELLANTS DUMAS & VAUGHN CLAIMANTS AND LUJAN CLAIMANTS REGARDING COURT'S C.A.V. INQUIRY** to be served on all registered users of the Court's Case Management/Electronic Case File ("CM/ECF") in this case via CM/ECF.

DATED: March 8, 2024          DUMAS & VAUGHN, LLC

/s/ *Gilion C. Dumas*
Gilion C. Dumas
3835 NE Hancock St., Ste. GL-B
Portland, OR 97212
Phone: (503) 616-5007
Email: gilion@dumasandvaughn.com

*Counsel for D&V Claimants*