1

2    UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

3    - - - - - - - - - - - - - - - - - - - -x

4

5    In the Matter of:

6    BOY SCOUTS OF AMERICA

7              Debtor.

8

9    - - - - - - - - - - - - - - - - - - - -x

10

11    In the Matter of:

12    DELAWARE BSA LLC

13              Debtor.

14

15    - - - - - - - - - - - - - - - - - - - -x   Case Nos.

16    23-1664, 23-1665, 23-1666, 23-1667, 23-1668, 23-1669, 23-1670,

17    23-1671, 23-1672, 23-1673, 23-1674, 23-1675, 23-1676, 23-1677,

18    23-1678, 23-1780

19

20

21

22

23

24

25

United States Court of Appeals

for the Third Circuit

601 Market Street

Philadelphia, Pennsylvania

November 6, 2024

10:00 AM

B E F O R E:

HON. KRAUSE, SCIRICA, and RENDELL

CIRCUIT JUDGES

Transcribed by:  Jennifer Ritchie and Valerie Baxter

eScribers LLC

7227 North 16th Street, Suite #207

Phoenix, AZ 85020

(800) 257-0885

operations@escribers.net

1

2

3    A P P E A R A N C E S:

4    Dumas & Vaughn

5         Attorneys for Appellants

6         3835 NW Hancock Street

7         Suite GLB

8         Portland, OR 97212

9

10   BY:   GILION C. DUMAS, ESQ.

11

12

13   Lujan & Wolff LLP

14        Attorneys for Appellants

15        238 Archbishop Flores Street

16        Suite 300, DNA Building

17        Hagatna, GU 96910

18

19   BY:   DELIA S. LUJAN WOLFF, ESQ.

20

21

22   Willkie Farr & Gallagher LLP

23        Attorneys for Appellants

24        787 Seventh Avenue

25        New York, NY 10019

BY:    JOSEPH T. BAIO, ESQ.


Parker Hudson Rainer & Dobbs
        Attorneys for Appellants
        303 Peachtree Street NE
        Suite 3600
        Atlanta, GA 30308

BY:    HARRIS B. WINSBERG, ESQ.


Perkins Coie
        Attorneys for Appellee
        2525 E. Camelback Road
        Suite 500
        Phoenix, AZ 85016

BY:    MICHAEL R. HUSTON, ESQ.


Morris Nichols Arsht & Tunnell
        Attorneys for Appellee

1

2          1201 N. Market Street

3          16th Floor

4          Wilmington, DE 19899

5

6     BY:   SOPHIE ROGERS CHURCHILL, ESQ.

7

8

9     WilmerHale

10          Attorneys for Appellee

11          7 World Trade Center

12          250 Greenwich Street

13          New York, NY 10007

14

15    BY:   Phillip D. ANKER, ESQ.

16

17

18    O'Melveny

19          Attorneys for Appellee

20          1625 Eye Street NW

21          Washington, DC 20006

22

23    BY:   JONATHAN D. HACKER, ESQ.

24

25

1

2    Gilbert LLP

3            Attorneys for Appellee

4            700 Pennsylvania Avenue SE

5            Suite 400

6            Washington, DC 20003

7

8    BY:   KAMI QUINN, ESQ.

9

10

11   Hurley McKenna & Mertz, P.C.

12            Attorneys for Appellee

13            20 S Clark Street

14            Suite 2250

15            Chicago, IL 60603

16

17   BY:   EVAN M. SMOLA, ESQ.

18

19

20   White & Case LLP

21            Attorneys for Appellee

22            1221 Avenue of the Americas

23            New York, NY 10020

24

25   BY:   GLENN M. KURTZ, ESQ.

1

2

P R O C E E D I N G S

JUDGE KRAUSE:  Good morning.  We will now proceed with our second case In Re: Boy Scouts of America and Delaware BSA. And we will begin, I believe, with Dumas.

MS. DUMAS:  Thank you.  May it please the Court, my name is Gilion Dumas, and I am here for the appellants, Dumas and Vaughn Claimants.  And I'd like to reserve two minutes for rebuttal.

JUDGE KRAUSE:  Granted.

MS. DUMAS:  Okay.  The most important point I want to make today is that Purdue makes nonconsensual third-party releases, per se impermissible.  Now, nonetheless, appellees argue that the appeal should be dismissed as statutorily or equitably moot.  But neither of those theories applies in this case, and more important, under Supreme Court and this Court's decisions, an appeal is not moot unless effective relief is impossible.  And appellees have not shown that relief is actually impossible.  And on the other hand, we have suggested possible relief for this tiny number of abuse claimant appellants.

JUDGE KRAUSE:  Counsel, let me ask you, with those two different doctrines --

MS. DUMAS:  Yes.

1          JUDGE KRAUSE:  -- Neither of which really goes to

2     federal court jurisdiction in the technical sense.

3          MS. DUMAS:  Yes.

4          JUDGE KRAUSE:  Nonetheless, where we have a statutory

5     mootness provision and an equitable one, is there a proper

6     order for us to even conduct that analysis?

7          MS. DUMAS:  Well, I think that the Court's analysis

8     has to first decide if there are jurisdictional or

9     Constitutional problems with the plan, which I believe there

10    are.  And then after that, if either of those two flaws exist

11    in the plan, then it -- mootness becomes irrelevant.  Because

12    you can't -- those things trump mootness.

13         JUDGE KRAUSE:  It sounded like you wanted to focus on

14    equitable and statutory mootness.  We can step back to Article

15    3 jurisdiction if you'd like.

16         MS. DUMAS:  Absolutely.  I don't know which order the

17    Court needs to hear them.  You just need to decide them in that

18    order.  But I am happy to talk about that.  The Constitutional

19    issues are pretty straightforward.  It is that these claims

20    that nondebtor abuse claimants have against nondebtor third

21    parties -- and when I talk about them, I primarily mean the

22    local councils of the Boy Scouts and the chartered

23    organizations that sponsored troops.  Those are the third

24    parties we're focusing on.  Well, our claims -- abuse

25    claimants' claims against those third parties are property

1  rights, their choses in action -- I'm not sure about the plural

2  of that one.  But -- and therefore, they cannot be extinguished

3  without the consent of these abuse claimants, and they, of

4  course, did not consent to their being taken away.  Well, you

5  can't extinguish somebody's cause of action without violating

6  procedural due process.  There's a tort system alternative in

7  the plan, but that doesn't nearly step in to satisfy the due

8  process requirements because --

9           JUDGE KRAUSE:  Yeah, that's --

10          MS. DUMAS:  Yeah.

11          JUDGE KRAUSE:  -- I think that that's a merits

12  argument.  I thought you were also making the argument that the

13  bankruptcy court didn't have related-to jurisdiction here.

14          MS. DUMAS:  I have that, and I can skip to that, too.

15  Yes, I believe that the bankruptcy court did not have related-

16  to jurisdiction, certainly didn't have arising-in or arising -

17  under jurisdiction.  But even for related-to jurisdiction, the

18  bases that the court used to find that jurisdiction simply

19  don't support it under this circuit's law, specifically the

20  Pacor test for indemnity and this Court's opinions in both

21  Continental and Combustion, talking about how shared insurance,

22  by itself, is not enough to permanently enjoin the third-party

23  claims.  But I can go through the four bases that the court

24  used.

25          JUDGE KRAUSE:  Here we have the debtors -- they are

1  sharing insurance coverage with the nondebtors, against whom
2  you wish to bring claims.  And we have a fairly low bar in
3  terms of conceivable effect.  So how do you get around that?
4       MS. DUMAS:  Conceivable -- I agree.  This is a tougher
5  argument for us, but it is still important.  That they shared
6  insurance, factually does not apply to all the claims here.  So
7  even if it was enough to give a basis for jurisdiction for some
8  of the claims, the shared insurance only came into existence
9  starting in about 1976.  So the plan makes a distinction
10 between post-'76 claims and pre-'76 claims.  If shared
11 insurance is the basis, that doesn't apply to either local
12 councils or chartered organizations prior to '76.  However, the
13 court used -- still exercised jurisdiction over all claims
14 against local councils but excluded claims against chartered
15 organizations that arose prior to '76.
16      That was the correct decision, because the court found
17 that there was no shared insurance prior to '76, so there was
18 no jurisdiction over those pre-'76 claims against chartered
19 organizations.  But then the court clawed back that exception
20 by saying that the court was exercising jurisdiction over pre-
21 1976 claims against chartered organizations, as long as the
22 policies they bought themselves, not shared with BSA but their
23 own policies, were issued by a settling insurance company.
24 Well, there is no jurisdiction over claims that don't involve
25 shared insurance, and the settling insurers desire for a global

1  resolution does not create that jurisdiction because it doesn't

2  create a shared asset.

3          JUDGE KRAUSE:  Even so, wouldn't the upshot just be

4  that the district court needed to make findings of fact and

5  conclusions of law?

6          MS. DUMAS:  Yes, but it did on that point.  And those

7  conclusions of law, that there was a shared asset that gave the

8  court jurisdiction, at least for those pre-'76 claims against

9  chartered organizations, that is simply wrong.  And of course,

10  jurisdiction is decided de novo, so.  But so that shared

11  insurance isn't enough, certainly for those claims not covered

12  by shared insurance, which I believe is also claims against the

13  local council prior to '76.  Definitely local -- definitely

14  chartered organizations before '76.  But I think it's more

15  important to focus on this Court's rulings in Combustion and

16  Continental that said that that shared insurance, it might be

17  enough to enjoin the claims while the Court is getting its arms

18  around what the bankruptcy estate is, but not enough to

19  permanently enjoin the claims.

20          And that makes absolute sense, because these chartered

21  organizations and local councils, prior to '76 when they didn't

22  have shared insurance, they had all their own assets, including

23  their own insurance, and those assets and insurance still

24  exist.  So it might be possible for the court to have exercised

25  jurisdiction over those shared policies, sufficient to

1    extinguish those policies and any claims that local councils or

2    chartered organizations could bring against the Debtor based on

3    those.  I think the court had jurisdiction over those, but the

4    court didn't have jurisdiction over the third-party claims that

5    were not covered by the shared insurance.

6            And I think those claims should have been allowed to

7    go forward.  And by exercising the jurisdiction over those

8    claims not covered by shared insurance, the court made the

9    wrong legal conclusion.

10            JUDGE SCIRICA:  Has there been substantial compliance?

11            MS. DUMAS:  No, I believe that -- no.  As for

12    equitable mootness, you mean?  The substantial consummation?

13            JUDGE SCIRICA:  Which is the better way to look at

14    this, the equitable mootness doctrine or the statutory

15    mootness?

16            MS. DUMAS:  Either way, I believe that neither of

17    those theories applies here.  There has not been substantial

18    consummation of the plan, because even though it went

19    effective, that three-part statutory test that the court uses

20    to decide if there is substantial consummation -- the elements

21    of that have not been met.  Because the first step is, have

22    all, or substantially all, of the assets been transferred?  And

23    so far, only forty percent of the assets have been transferred.

24    That's obviously not substantial; that isn't even the majority.

25            JUDGE SCIRICA:  Where does the escrow fit in?

1        MS. DUMAS:  And then the escrow.  There's -- the

2    11th -- 10th circuit case that the Appellees cited for that was

3    factually different than here, because in that case, money had

4    been put into escrow, but title had transferred to the Trustee.

5    Title to this escrow money has not transferred yet, because

6    it's subject to being returned to the settling insurers if the

7    case is modified on appeal -- or reversed -- modified or

8    reversed on appeal.  So therefore, that money that is in escrow

9    is not under the management control of the Trustee, the

10   successor.  So those are the first two steps of substantial

11   compliance that have not been met.  Even not meeting one of

12   those is enough to find no substantial consummation, but two of

13   them is certainly a death knell.  And then the third one,

14       JUDGE RENDELL:  Would you agree that, by definition,

15   transfer, under the Code, includes every mode direct, indirect,

16   absolute, or conditional, and that this transfer into escrow

17   was a conditional transfer, which satisfies the definition of

18   transfer.

19       MS. DUMAS:  Well, there's a lot of assets that simply

20   have not been transferred.  The money from the settling

21   insurers is the bulk of it.

22       JUDGE KRAUSE:  But I'm talking about the definition of

23   transfer.  You would agree, would you not, that the -- what's

24   in escrow has been transferred by -- under the Code.

25       MS. DUMAS:  I believe that because it's conditioned to

1  return, that it hasn't actually been transferred even under the

2  Code's definition because that money isn't -- the estate has no

3  control over that money in escrow.  And it is going to go back

4  to the settling insurers.  I think that by making it

5  conditional on the outcome of the appeal, the appellees have

6  waived any arguments about statutory or equitable mootness,

7  because they're going to get the money back.  The terms of the

8  plan are consistent with finding no substantial consummation,

9  because the money is not just going to be sitting there waiting

10  for the outcome, but is going to go back to the settling

11  insurers if the plan is modified.

12       JUDGE KRAUSE:  I want to make sure we're using the

13  same, consistent terminology, because we've talked about

14  equitable mootness as including substantial consummation, the

15  unscrambling, and the reliance interests.  But it sounds like

16  when you're talking about substantial consummation, you're

17  talking about that in terms equivalent to the application of

18  equitable mootness itself.  I mean --

19       MS. DUMAS:  Because I don't believe the substantial

20  consummation concept applies to statutory mootness.  The

21  statutory mootness, I think, is also not a good theory here.

22  Neither one of them are a good theory for the fundamental

23  reason that no case is moot if effective relief is possible,

24  and effective relief is possible here.  So I don't even think

25  we get to the, sort of, substance of the mootness arguments.

1  Or at least they are secondary to the fact that the cases still

2  shouldn't be dismissed, because relief is possible.  But for

3  the statutory mootness, I believe Section 363(m) does not apply

4  anyway, because the sale is not complete.

5      The sale is contingent to be reversed.  So again, the

6  terms of that sale contract are consistent with the appellate

7  process.  And then, of course, the sale was not a 363 sale,

8  because it was part of the confirmation process.  It was not

9  done under Section 363.  There was no notice.  There was no

10  separate sales order.  It was all -- and it wasn't to a third-

11  party.  The sale was done only in the confirmation process and

12  included -- incorporated into the confirmation order and the

13  plan itself.

14      JUDGE KRAUSE:  But we've already held, in cases like

15  Energy Future Holdings, that being part of the plan itself

16  doesn't take a sales order outside the context of 363, right?

17      MS. DUMAS:  That is the holding of Energy Futures.

18  But Energy Futures is factually different because that sale was

19  complete.  There was a separate 363 sales hearing and order,

20  that was later incorporated into the plan, but it was still a

21  separate 363 sale.  This one --

22      JUDGE KRAUSE:  Here, the confirmation order itself --

23  the bankruptcy court says that it's -- the settling insurers

24  are good faith purchasers for value under a 363(m).  It seems

25  to have thought it was authorizing the sale pursuant to 363(b),

1   right?

2           MS. DUMAS:  It did, but Section 363 is not that broad.

3   It can't be completely engrafted into plan confirmations and

4   used to protect any plan, no matter how unlawful, no matter how

5   much it contradicts something.  It can't be used that broadly

6   to insulate any bankruptcy plan from appellate relief just

7   because it includes a sale.  That would abrogate the appellate

8   court's Article 3 powers to effectively supervise bankruptcy

9   court decisions.

10          JUDGE KRAUSE:  Why do we have to talk here about its

11  effect on the plan?  Aren't we focusing -- can't we just focus

12  on the particular sale that's being challenged?  That is, the

13  buybacks, where the application on the merits of Purdue would

14  mean that the consideration in that transaction was voided,

15  which would necessarily affect the validity of the sale.  Why

16  isn't this much more narrow, talking about the sale itself

17  rather than opining about broad consequences?  Here, it happens

18  to be that that sale is the centerpiece of the plan, but why

19  would this be generalized to its effect on all plans?

20          MS. DUMAS:  Taken to its logical conclusion, that

21  would be the outcome.  But even here, again, we're not

22  appealing the sale.  We're appealing the plan.  The sale is

23  part of it.  There's a big argument.  Is it the nonconsensual

24  third-party releases that are the cornerstone of the plan?

25  Well, or -- I mean, the sale itself is not the cornerstone of

1    the plan.  It provides a great deal of funding for the plan,

2    but the key to the plan are these nonconsensual releases that

3    Purdue said are per se impermissible.  And I don't think you

4    can look to an incompleted, contingent sale, to then leapfrog

5    to the point of saying those incomplete, contingent sales can

6    somehow protect clearly unlawful, nonconsensual third-party

7    releases.  My red light is on.  Anything?  Okay.

8             JUDGE KRAUSE:  Thank you.

9             MS. LUJAN WOLFF:  May it please the Court.  I'm Delia

10   Lujan Wolff.  I'd like to reserve five minutes of rebuttal

11   time.  I represent the Lujan Claimants, who are seventy-five

12   individuals who brought pre-petition lawsuits against the Boy

13   Scouts of America, the Aloha Council, and other nondebtors,

14   including Doe insurers.  And under Purdue, this plan is clearly

15   unlawful.  Nobody can bargain away my clients' claims without

16   their consent.  Not even other survivors more interested in

17   achieving their own sense of finality at the expense of my

18   clients and other survivors.  This case is not equitably or

19   statutorily moot.  Purdue fully applies to the plan.  And

20   just -- if I could just start with equitable mootness.  That

21   doctrine does not apply.  Clearly, as stated earlier, most of

22   the property has not been transferred.  It's in escrow with --

23   it hasn't been transferred to the trust.  It's in escrow for a

24   purpose:  to allow for the return if the plan is reversed on

25   appeal or modified in some way.

1          JUDGE KRAUSE:  Well, a number of our cases seem to

2     look at that first step as, essentially, the definition of

3     substantial consummation within the statute.  And I mean,

4     granted, there are then other steps that we need to look at and

5     look at carefully, including third-party reliance and what that

6     means here.  But focusing just on that first step and what

7     substantial consummation means, haven't all, or substantially

8     all, of the assets been transferred under the definition of

9     these terms in the Bankruptcy Code?

10          MS. LUJAN WOLFF:  No, because there's a difference

11     between the 189 million dollars that was actually transferred

12     to the settlement trust, the ultimate destination of the

13     property, and the $1.4 billion that's been held in escrow.  And

14     that is not the ultimate destination.  So there is a difference

15     between --

16          JUDGE KRAUSE:  Where, in the statutory definition, is

17     there anything about the ultimate destination?  I mean, to the

18     contrary, doesn't it refer to interest being transferred when

19     it's still -- it's contingent, it's conditional, even partial?

20          MS. LUJAN WOLFF:  Well, I can't answer that now, Your

21     Honor, but the -- we've cited case law in our briefs, which

22     makes clear that even when it's in escrow, that is not a

23     transfer for substantial consummation purposes, when looking at

24     the equitable mootness doctrine.  And it also --

25          JUDGE RENDELL:  Isn't the common sense meaning of

1  transfer that you part with -- you are parting with the

2  property.  You are getting it away from you.  You're

3  transferring it.  As Judge Krause said, it doesn't really say

4  ultimate destination, they have parted with it.  They no longer

5  have it.  You have transferred it.  What is it that says

6  ultimate destination is required?

7       MS. LUJAN WOLFF:  It doesn't explicitly say that, but

8  there's a difference between what has been actually moved.  And

9  in this case, I mean, what's in escrow is -- to ignore the

10  purpose of escrow -- the point of it is so that the Trustee

11  doesn't get it.  That's why it's in escrow, so that the Trustee

12  doesn't get it.  And so we don't have that.  We don't have --

13  we obviously don't have control -- that's the second

14  requirement for substantial consummation by the Trustee of all

15  these assets, including those escrowed funds.

16       The equitable mootness doctrine conflicts with recent

17  Supreme Court case law, MOAC Mall.  We have the court there

18  looking at 363(m), a statute which explicitly limits relief on

19  appeal.  The court said there that judicial power over the

20  covered authorization still needs to proceed.  It takes it as a

21  given, even when you have an express statute limiting relief.

22  In order to limit adjudicatory capacity of appellate courts,

23  there has to be clear intent by Congress to make it a

24  jurisdictional limitation, which 363(m) is not.  With equitable

25  mootness, there's no statutory basis, or other legal basis, at

1   all to support limiting the court's adjudicatory capacity. It

2   also limits --

3        JUDGE RENDELL:  But that is our precedent.  Our

4   precedent recognizes equitable mootness doctrine, does it not,

5   in our Court?

6        MS. LUJAN WOLFF:  It recognizes it, but the Court has

7   the power to change precedent if it conflicts with Supreme

8   Court case law.  And it does.  It conflicts with MOAC Mall, as

9   well as Purdue Pharma.  In Purdue, the court stated that policy

10  is for Congress to decide and not for the courts.  The

11  arguments -- the prudential considerations that were raised in

12  Purdue mirror those that are raised by the appellees and amici

13  here.  And so in Purdue, those prudential considerations of

14  fairness were rejected as not overriding the statutory scheme,

15  that only a debtor gets a discharge.

16       JUDGE KRAUSE:  On the other hand, the Supreme Court

17  has had the opportunity to take up equitable mootness.  Maybe

18  it will again, but as of now, it hasn't squarely addressed it.

19  And we have our own circuit precedent on that doctrine,

20  notwithstanding some criticism on occasion, but since we have

21  to apply it absent en banc review, take us to the next piece of

22  the analysis.  That is, if we are looking at transfer and

23  substantial consummation as satisfied, given the low bar that

24  seems to be set by the terms of the statute, if we look to the

25  statutory definition.  What do we do when we get to third-party

1    reliance and whose reliance is relevant for those purposes?

2         MS. LUJAN WOLFF:  The Third Circuit has made clear

3    that it's primarily outside investors.  When securities have

4    been issued in the case -- and there has to be clear evidence.

5    There has to be evidence, on the record, of outsider reliance

6    and significant harm that would be suffered by these outsiders.

7    And in this case, we only have self-serving speculation offered

8    by the appellees.  We have some survivor amici who've come

9    forward, who are creditors.  They are parties in interest, who

10   had the opportunity to -- they participated in the process.

11   They're not outsiders.  The appellees have just -- they've

12   said, we've done these transactions, but they've not come up

13   with any declarations or affidavits from any outside investors,

14   or anyone other than their financial consultant, who is not an

15   outsider, to show that they relied on this plan and that they

16   would be harmed if there was some modification or reversal.

17        JUDGE KRAUSE:  What precludes consideration of the

18   extent of distribution that's already occurred?  If we look at

19   the number of claimants who have come forward for the expedited

20   distribution procedures, or under the matrix, or those who have

21   put in their questionnaires and their documentation, what role

22   should their reliance play?

23        MS. LUJAN WOLFF:  So the Debtors had the burden to

24   prove that funds that have been distributed cannot be

25   disgorged, that things could not be retracted, but they've

1    utterly failed to meet that burden.  Even the survivors who

2    have come forward have not stated that the funds that they

3    received could not be returned.  And so there's a complete lack

4    of evidence that funds given cannot be disgorged.  Nobody who's

5    received has said that they cannot give back.  And so it's

6    total speculation on the part of the appellees.  The Third

7    Circuit has looked at disgorgement of what's been given, even

8    to creditors, and found that that doesn't mean equitable

9    mootness applies.  I mean, it can be disgorged and --

10          MS. RENDELL:  Let's say, what would happen as a

11   practical matter if this plan were overturned?  There would be

12   a liquidation, would there not?  I mean, we now have a

13   reorganized debtor, with the Boy Scouts of America functioning.

14   We have new directors.  We have institutions that are

15   operating.  What would happen, as a practical matter, if this

16   plan were undone?

17          MS. LUJAN WOLFF:  So before I answer that, it's also

18   possible that the whole plan does not have to be undone.  But

19   in the event that the Court decides to undo --

20          JUDGE RENDELL:  What -- Wait.  What would that look

21   like?  What are you saying would happen?  What happens here?

22          MS. LUJAN WOLFF:  If the plan is not completely

23   undone?  Well, that would be granting limited relief to the

24   Lujan Claimants.  That could be in the form of striking certain

25   releases so that the Lujan claimants could proceed, for

1    example, against --

2         JUDGE RENDELL:  You're asking for partial relief or

3    are you asking for the plan to be undone?  I'm confused.  I

4    thought you wanted the plan to be undone, the confirmation

5    order to be reversed?

6         MS. LUJAN WOLFF:  We've asked for reversal, but we've

7    also asked for modification of the plan.  And we've identified

8         JUDGE RENDELL:  What would happen if it were reversed?

9    Your theory is that it should be reversed because the releases

10   are unconstitutional, et cetera.  So if that happens, what does

11   it look like?

12        MS. LUJAN WOLFF:  If the plan is reversed, then

13   there's already precedent -- I mean, the default -- I guess the

14   general rule is that when a judgment is reversed, you go back

15   to the prejudgment status and --

16        JUDGE KRAUSE:  So all the money gets returned.  And

17   now the -- there will be suits left and right against the

18   institutions, the local chapters, et cetera.  I mean, is that

19   really what's going to happen?  I mean, it's going to implode,

20   is it not?

21        MS. LUJAN WOLFF:  No, it's not going to implode.

22   Because even the Boy Scouts had testimony that a BSA-only plan,

23   where only the BSA, the Boy Scouts of America, gets a

24   discharge, is feasible, that it's something that remains on the

25   table.  And so if this plan is reversed, then the Third Circuit

1   has recognized that a so-called reorganized debtor can go

2   back -- goes back into being a debtor in bankruptcy, if it's

3   reversed, and they have to come up with, under Purdue, a BSA,

4   Boy Scouts-only, discharge plan.  And under Purdue, that's

5   appropriate.  And so yes, there may be lawsuits filed against

6   nondebtors, but that's not something for bankruptcy courts to

7   resolve.

8           And so the Boy Scouts went forward with this plan,

9   knowing since 2021 that these channeling injunctions barring

10  nondebtor claims were highly doubtful.  That's what Hartford,

11  in a letter, sent to the Boy Scouts.  That's what they said,

12  that it's highly doubtful that these channeling injunctions

13  will be granted, because the liability of the nondebtors

14  appeared to be direct and not derivative of the Boy Scouts'

15  liability.  And so we have the Debtor, we have these appellees,

16  everyone here participated in the process, knowing that there

17  was a high chance, not even just looking at the circuit split,

18  but that that these were direct claims and not derivative

19  claims.  And so they took a chance.  And that's why we're here

20  today.  This case progressed against the backdrop of Purdue

21  Pharma -- Judge McMahon in Purdue --

22          JUDGE RENDELL:  There was no -- but the cert petition

23  wasn't even filed at the time that the plan was confirmed.  And

24  I don't know, I mean, I was a bankruptcy practitioner.  Third-

25  party releases are really, really helpful in bankruptcy cases.

1     And sure, there's always been a question, but there's been a

2     question about a lot of things.  And Purdue really came down

3     pretty hard.  It's going to be interesting what it does in

4     bankruptcy practice.  But I don't think you can say that

5     everybody knew it was writing on the wall here.

6              MS. LUJAN WOLFF:  Well, even not looking to the

7     statutory authority, they knew from prior case law that when a

8     survivor of abuse files a lawsuit against the Boy Scouts, or a

9     local council, or a chartered organization, that oftentimes the

10    Boy Scouts -- there'd be a different result for the Boy Scouts

11    of America, the local councils, and the chartereds.  The

12    chartered organization could be found liable, but not the Boy

13    Scouts of America.  The local council could be found liable,

14    but not the Boy Scouts of America, and vice versa.  And so --

15             JUDGE KRAUSE:  Even so, why doesn't that just make

16    this appropriate for 363(m), where what we're looking to is a

17    narrow consideration of the particular sales, at issue here

18    with the buybacks, in exchange for the third-party releases?

19    And Congress has provided -- so we're not turning to a broad,

20    equitable mootness doctrine or expanding the realm of third-

21    party interests but just looking to the good faith of the

22    purchaser.  And we have a finding here, right, from the

23    bankruptcy court, that the insurers were good faith purchasers.

24             MS. LUJAN WOLFF:  At the outset, it's important to

25    note that the sales of the policies are only -- it's very

1    limited.  The sales of the policies are only of policies that

2    were bought by the Boy Scouts of America, the BSA abuse

3    insurance policies, and the policies that were bought by the

4    local councils, not any policies that were bought -- separate

5    policies that were bought by chartered organizations or Roman

6    Catholic entities that are not chartered organizations.

7             JUDGE KRAUSE:  Aren't they assigned?

8             MS. LUJAN WOLFF:  I'm sorry?

9             JUDGE KRAUSE:  Weren't the others assigned?

10            MS. LUJAN WOLFF:  They were not actually assigned.

11   There's no actual written assignment by anyone.  The insurance

12   settlements simply endowed settling insurers with injunctions,

13   so that survivors couldn't sue a chartered organization if the

14   settling insurer happened to have sold separate insurance

15   policies to the chartered organization, and the Boy Scouts

16   didn't share any interest or rights of coverage under that.

17   And so --

18            JUDGE KRAUSE:  I understand your argument that you

19   raised in your brief, because you assert, at page 30 of the

20   supplemental brief, that the local councils and chartered

21   organizations' insurance rights will be assigned to the trust

22   in the future.  But the plan seems to provide that that's part

23   of the -- that the interests that are vested in the trust as of

24   the effective date.

25            MS. LUJAN WOLFF:  So under the plan, if no one comes

1   forward to object, then it's somehow an assignment or a

2   transfer.  Actually, I wouldn't concede that, because actually,

3   it's an assignment, at most, of their interest in the policies

4   and not actually an assignment of their separate policies, the

5   chartered organizations' or the Roman Catholic entities'.  I

6   don't believe that those are being assigned.  But settling

7   insurers just gave themselves additional protections, including

8   when the Roman Catholics dropped their objection during the

9   confirmation hearing and then enjoyed the benefits of nobody

10  getting to sue them if a settling insurer happened to have

11  provided them with their separate insurance policy.  They

12  contributed nothing.  The money that was paid on the insurance

13  sales remained the same before the settlement and after.

14          And so what we have here -- it's important to remember

15  that these sales are only sales of Boy Scouts and local council

16  policies.  And yet, the insurance settlements go beyond that,

17  and they take away survivors' claims, based on the settling

18  insurers' provision of insurance to chartered organizations and

19  Roman Catholic entities.  Those are not being assigned.

20          And so if 363(m) does apply, which I would like to

21  argue that it does not.  But even if we were to assume that it

22  does apply, built into the insurance settlements, is that even

23  if the confirmation plan is reversed, or the plan doesn't go to

24  a final nonappealable order, they argued in their reply briefs,

25  in support of their motion to dismiss, that if that's the case,

1    then the sales remain valid, but they get back the $700 -- or

2    in Century's case, they get back the $750 million.  So they get

3    -- the settling insurers if the plan doesn't go to a final,

4    nonappealable order, they get back the escrowed funds, because

5    they say that they get less protection now, and because they're

6    getting the escrowed funds back and it's not going to the

7    trust, they do not become Protected Parties under the plan.

8            That means, under these insurance settlements, built

9    into it already is that the settling insurers do not become

10   Protected Parties.  They are exposed to suit.  They are

11   survivors.  Like, my clients would be able to directly sue

12   them, because we have rights of direct action.  Only if they

13   are Protected Parties are they protected by the injunctions.

14           JUDGE RENDELL:  Does – go ahead.

15           JUDGE SCIRICA:  And you said that Section 363(m)

16   doesn't apply.  Could you explain that?

17           MS. LUJAN WOLFF:  Yes.  So 363(m) does not apply,

18   because this is a plan sale.  The sales, the insurance

19   settlements, were completely dependent on one order and that

20   being a confirmation order.  Unlike Energy Future Holdings,

21   there was no separate pre-confirmation order that was tied to

22   the plan.  And so the Third Circuit, I believe it was ICL is

23   one of the cases, but the Third Circuit has stated, on more

24   than one occasion, that a 363(b) or (c) sale is a sale outside

25   of a plan of reorganization.  Section 363 itself

1    distinguishes -- if we were to interpret Section 363, it

2    distinguishes between a sale of property under Subsection (b)

3    or (c), and a sale of property under a Chapter 11 plan. And

4    Subsection (l) of Section 363, it specifically identifies these

5    as different transactions.

6          It says that a trustee can sell property under

7    Subsection (b) or (c), or a plan under Chapter 11 can provide

8    for the sale of property. And so the only way to interpret

9    this, and not render the language superfluous or insignificant,

10   is to interpret Section 363 as saying that these are two

11   different transactions. A plan sale, which is under Section

12   1123, is not a sale which is under Subsection (b) or (c). And

13   that interpretation is supported by the Ditech Holding case,

14   which is a Southern District of New York case. I believe that

15   was 2019. And in that case, the court interpreted Subsection

16   (o) of Section 363. And Subsection (o) -- what's important

17   about that, is that, originally, when Congress was adding

18   Subsection (o) to Section 363, the original language said that

19   this section would apply to a transfer by a trustee or a

20   transfer under a Chapter 11 plan. And Congress decided to

21   remove reference to transfer under a plan, and then kept only

22   that Subsection (o) applies to a sale under Subsection (b) or

23   (c). And the Ditech court interpreted that to mean that a sale

24   under Subsection (b) or (c) is not -- that Subsection (o) does

25   not apply to a plan sale but only to Subsection (b) or (c)

1  sales, which this is not.  The sales here are not outside a

2  plan.  They are squarely within the plan and dependent on plan

3  confirmation.

4          JUDGE KRAUSE:  In both Energy Future Holdings and

5  Cinacola v. Scharffenberger a sale within a plan can also

6  qualify under 363, right?  And we've already crossed that

7  bridge, haven't we?

8          MS. LUJAN WOLFF:  No, I don't think so.  First of all,

9  these statutory arguments have never been raised.  I think I'm

10  probably the first to raise it.  I've never -- I haven't seen

11  it.  And so the court didn't analyze the language of Section

12  363, in light of Subsection (l) or even of Subsection (o).  And

13  so I think from the statutory construction, it's clear that

14  these are different transactions.  If it's a plan, a sale under

15  a plan -- and it doesn't even say Section 1123 in Subsection

16  (l) or Subsection (o) in the original language of Subsection

17  (o).  It talks about plan transfers, plan sales.  And these are

18  different transactions, as Congress knew when to include

19  transfers or sales under a plan.  They knew when to include it.

20  They knew when to exclude it.  And with Subsection (m), they

21  decided to not include sales or transfers under a Chapter 11

22  plan.  Subsection (m) only applies, therefore, to sales outside

23  of a reorganization plan, Subsection (b) or (c).

24          JUDGE KRAUSE:  Thank you.

25          Do you have other questions Judge Scirica?

1          JUDGE SCIRICA:  No.

2          JUDGE KRAUSE:  Judge Rendell?

3          MS. LUJAN WOLFF:  I'm sorry.

4          JUDGE RENDELL:  I'm all set.

5          JUDGE KRAUSE:  Okay.

6          MS. LUJAN WOLFF:  My time is up?  Thank you.

7          JUDGE KRAUSE:  Yes.  We'll hear from you in rebuttal.

8          MR. BAIO:  Thank you.  May it please the Court,  I'm

9   Joseph Baio, arguing on behalf of the Certain Insurers.  And

10  Your Honor, with your permission, I will reserve two minutes

11  for rebuttal.

12          JUDGE KRAUSE:  Granted.

13          MR. BAIO:  Also, I will divide this presentation into

14  two parts:  the equitable and statutory mootness as to our

15  appeals first, and then the merits of our appeals second, if

16  that works.

17          JUDGE KRAUSE:  That's fine.  Go ahead.

18          MR. BAIO:  So on the equitable and statutory mootness,

19  Your Honor, I begin by focusing on the unique aspect of the

20  insurers' appeals in this case.  We are not seeking to

21  unscramble the plan.  We are not seeking to unwind existing

22  transactions that have already occurred.  We are simply asking

23  for specific relief that will address the fact that this plan

24  does not preserve, and in fact decreases, our contractual

25  rights and expands the Trustee's rights in violation of the

1  law.

2      JUDGE KRAUSE:  Can we look so narrowly at -- for just

3  the language you'd like to add, don't we need to look at the

4  effect on the plan as a whole and whether that's going to be

5  viewed as a modification of the plan?  What consequence would

6  that have, for example, for funds in escrow?

7      MR. BAIO:  Well, I think we have no impact on the

8  funds in escrow, Your Honor.  That is, if our relief is

9  granted, that does not trigger the return of the money.  In

10  fact, the settling insurers did not say that our relief will

11  adversely affect their right to proceed.  They don't say that

12  in their brief.  And there's a very good reason, because we are

13  not trying to, or seek, and there isn't a repercussion that

14  from our relief, there would be an unwinding of that

15  transaction.  That's just not in the cards.

16      Now Tribune teaches us that, really, you look at each

17  party's appeal, and you make an evaluation of whether, in one

18  case, it's equitably moot because they're seeking to scramble

19  the plan.  And they're interfering with third-party rights and

20  other consequences.  And at the same time, they look at another

21  appellant, who is not seeking that relief, to evaluate whether

22  equitable mootness is appropriate or not.

23      JUDGE RENDELL:  Mr. Baio?

24      MR. BAIO:  Yes, Your Honor.

25      JUDGE RENDELL:  It's my understanding that you want it

1 to be crystal clear that the obligations under the insurance

2 policies continue?

3         MR. BAIO:  Well, it's not, it's --

4         JUDGE RENDELL:  Doesn't the plan explicitly assign all

5 rights and obligations under the insurance policies at Appendix

6 1017 and 1033?  Isn't the relief you want really already in the

7 plan?

8         MR. BAIO:  Your Honor.

9         JUDGE RENDELL:  We need to understand -- maybe we need

10 to understand better exactly what you want.

11         MR. BAIO:  Very good.

12         JUDGE RENDELL:  If your appeal is granted, what will

13 happen?

14         MR. BAIO:  Yes.  Okay, Your Honor.  First of all, the

15 plan, in the definition of the insurance assignment, which is

16 plan -- paragraph 157 -- It only refers to the rights, claims,

17 benefits, or causes of action of the debtors, and it does not

18 talk about and does not include the word obligations that they

19 would have.  The point of that, and really the proof of the

20 pudding, is in the lawsuit that has already begun by the

21 Trustee.  The Trustee cites, at paragraph 110 of her complaint,

22 that this exact language:  the rights, claims, benefits, causes

23 of action have been assigned, and then, in a footnote, footnote

24 2, lays out the exact language.  Nowhere is there any

25 recognition in that pleading that the insurers have rights and

1    have defenses that are available to them.  In fact, there is a

2    later paragraph that affirmatively says that we don't have

3    those rights.

4         JUDGE KRAUSE:  Well, isn't that because that's just

5    the default background rules of bankruptcy law?  Why does that

6    need to be spelled out explicitly in the plan?

7         MR. BAIO:  Well, there are a couple of problems with

8    the language I just read.  First of all, it violates the cum

9    onere principle, which is set forth in Third Circuit case law.

10   That is, you may not transfer, from the debtor to the trustee,

11   anything other than the rights and the obligations that must be

12   transferred.  What the trial court did, what the bankruptcy

13   court did was say, well, I'm going to approve this transfer,

14   which doesn't talk about obligations, but I can't say, as a

15   matter of bankruptcy law, whether that's permissible.  That's

16   on pages 249 to 252 of the bankruptcy court decision.  She

17   says, that's not up to me.  Well, but we say, of course it is.

18   It is a bankruptcy provision that says that you may not

19   transfer.  That's the American Home case.  You cannot transfer

20   the rights without the obligations.  That's what we asked the

21   court to say.  What the Court said was, I can't address that.

22   I can't tell you what was actually assigned.  I'm going to

23   leave that to the coverage court.  But that's not a coverage

24   court issue.

25        JUDGE RENDELL:  I'm looking at Appendix 1017.

1          MR. BAIO:  Yes, Your Honor, let me get that if I can.

2          JUDGE RENDELL:  (c).

3          MR. BAIO:  1017(c)  Yes.

4          JUDGE RENDELL:  Yes.  And also 1033.

5          MR. BAIO:  And 1033.  Yes, Your Honor.

6          JUDGE RENDELL:  It says rights -- I'm down at about

7   halfway down (c), rights and obligations, and under 1033,

8   Article 10.  Rights and obligations.  Why is that not

9   sufficient?

10          MR. BAIO:  Well, Your Honor, what (c) does -- it talks

11  about the bankruptcy court has authorized the insurance

12  assignment.  Okay.  Let's start with that.  The insurance

13  assignment is only about rights.  When you look at that term in

14  the plan, paragraph 157, it doesn't talk about obligations.  It

15  only talks about the rights of the --

16          JUDGE RENDELL:  Well --

17          MR. BAIO:  No, and I'll go on.

18          JUDGE RENDELL:  Yes.  "The rights and obligations, if

19  any, of any nonsettling insurance companies, relating to these

20  TDP, or any other, shall be determined pursuant to the terms

21  and provisions of the insurance policies and the applicable

22  law."

23          MR. BAIO:  Except it doesn't stop there, Your Honor.

24  It then goes and says, "and subject to the plan and

25  confirmation order."  So now all of the insurers --

1          JUDGE RENDELL:  Do we have anywhere, a proposed

2     modification of the plan --

3          MR. BAIO:  Yes.

4          JUDGE RENDELL:  -- that you want to put in here at

5     (c), or that you want to put in at Article 10?

6          MR. BAIO:  Yes.

7          JUDGE RENDELL:  Do we have a sentence or a statement,

8     or something that you want to insert?

9          MR. BAIO:  Absolutely, Your Honor, let's take first

10    the assignment of insurance rights.

11         JUDGE RENDELL:  Where do I find that?

12         MR. BAIO:  Let's -- oh, it's in our briefs.  We talk

13    about removing the language, "subject to the plan and

14    confirmation order."  It's simply striking that, because our

15    rights and obligations cannot be subject to the plan, which is

16    designed to do something else, which empowers the trustee to

17    pursue the insurance companies.  But the trustee, unlike the

18    policyholder, has a fiduciary duty to the claimants.  It must

19    decide what to give the claimants, and has a great deal of

20    discretion in doing that.  So "subject to the plan and

21    confirmation order" means that the trustee can argue, as she

22    has, that, well, I'm acting pursuant to the plan when I dole

23    out money to claimants, and I have a fiduciary duty to them.

24         So therefore, you insurance companies must pay,

25    irrespective of your defenses, irrespective of the conditions,

1    irrespective of whether the trustee has complied with its

2    obligations, where it's in the policy to cooperate, and

3    otherwise by making it subject to the plan and the confirmation

4    order, it has already diminished our rights.  Because now the

5    coverage court is told by the federal court, take these 600

6    pages of documents and evaluate the extent to which they

7    diminish the insurers' rights.  So all of the language that's

8    in here, that empowers the trustee, that says that the trustee

9    is being -- must be fair and equitable in dealing with the

10   claimants, to whom they have a fiduciary duty, well, that

11   should have no part whatsoever in the decision as to whether

12   there is coverage.  Those are two separate things.  And if the

13   coverage court has to start evaluating, what did the

14   confirmation order do?  Because I'm told, by the federal court,

15   that all of the rights of the insurers are subject to the

16   confirmation order and the plan.  Now, that's a burden that can

17   only redound to the insurers' detriment.  There's nothing in

18   here that actually gives the insurers rights.  It's all about

19   what the trustee can do.  So we have a diminution, as a matter

20   of fact, by that language, to then say that --

21        JUDGE RENDELL:  Excuse me, sir.  It sounds like you

22   have a dispute with the Trustee.

23        MR. BAIO:  No.

24        JUDGE RENDELL:  As to what this language means.  She's

25   taking a certain position as to that.  You have a different

1   position.  Sounds like a dispute that you have, as to the

2   meaning of the terms contained in the plan.

3           MR. BAIO:  Well, it's not a difference, Your Honor.

4   We're asking this Court to read the plan.  And this Court --

5   the language, just like it did in Combustion Engineering, where

6   the court looked at the language, and it talked about claims on

7   one hand, and it talked about rights on the other hand, and

8   said, claims are less than rights.  Therefore, you are not

9   preserving the insurers' entitlements and defenses.  So we, the

10  Third Circuit -- you, the Third Circuit, will tell the

11  bankruptcy court, you must change that language.  You must

12  revert to the broader language that affirmatively protects and

13  preserves, fully -- is what the Combustion Engineering court

14  said, preserve, fully, the rights of the insurance company.

15          This is the opposite of that.  You know, we've given

16  you lots of language, Your Honor, from other cases.  And by the

17  way, you asked about others -- I can talk about the other two

18  specific changes that appear in many, many plans that clearly

19  protect the insurers.  For example, our plan says that the

20  rights of the insurers are subject to the plan and the

21  confirmation order.  That means that our rights can be

22  diminished by whatever is in the plan and confirmation order.

23  The decisions that we cited, although they didn't address

24  whether it's appropriate or not, but they include the opposite

25  language, notwithstanding anything in the plan or confirmation

1  order comma, the insurers' rights remain preserved.  That's

2  what they said.  That's what they say in Global Industrial.

3  That's what was said in Federal-Mogul.  That's what was said in

4  Combustion Engineering.  And Combustion Engineering says that

5  there is a duty to preserve, fully, the rights of the insurers.

6  This has done exactly the opposite.

7       JUDGE KRAUSE:  That's just the state of the law.  I

8  mean, it's well-settled that bankruptcy law isn't altering the

9  parties' contractual rights.  It's not to the extent that it

10  would do something different than outside of the bankruptcy

11  plan for these purposes, right?  I mean, you seem to be --

12  Combustion Engineering, the Court was taking out language and

13  that had significance.  So our instruction to put language in

14  was to make clear that we were going back to the default

15  principle.  But why do you need a change in language in the

16  plan here to just have the default background principle of

17  bankruptcy law?

18       MR. BAIO:  Well, there is no -- the background

19  principle in Mission, the Supreme Court decision, is that

20  neither the debtor's rights under a contract expand, that the

21  rights of the other party decrease, that the estate suddenly

22  sits in a better position than the insured or the policyholder

23  was in, as a result of bankruptcy.  That's the principle.

24  There is no alteration other than what is expressly identified

25  in the Code, not in the plan, in the Code.  So when the

1   district court said that that you're not harmed by this

2   language -- you'll see that on page 74 of the district court's

3   decision -- because under the Code, you -- there is an

4   overcoming of the anti-assignment provisions, therefore -- and

5   says that's an example of one of the diminutions.  It's the

6   only diminution, in fact.

7        But it says then that -- and that's why we say that

8   the plan rules in determining what your rights are.  But that

9   makes no sense.  The reason that we -- that there is an

10  override of the anti-assignment provision, is because of the

11  Code, not because of the plan.  If they're simply trying to

12  preserve the right that we cannot stand in the way of

13  assignment of proper policies, naming the estate as a covered

14  party or as the counter party, then we don't adversely affect

15  the insurer.  But you don't need the plan for that.  That's a

16  matter of law.  That's a matter of Federal-Mogul.  That's a

17  matter of statute.

18       So why do we then foist upon the coverage court, 600

19  pages and 300 pages of decisional law where the court said, oh

20  no, their rights are all subject to the plan and the

21  confirmation order.  In addition, we have affirmative evidence

22  that there is a statement that we are bound, in the coverage

23  court, by whatever happened in the bankruptcy proceeding.

24  Well, that really isn't true.  And what we're asking for is

25  very narrow in terms of the relief involving the additional two

1    points that we want to add.  One of them is that anything that

2    happened in the bankruptcy court is not res judicata as to

3    whether there is coverage, period.  That's what that language

4    says.

5           Now, we know that the FCR says, oh, that's not true.

6    You're bound by what happened.  Res judicata, collateral

7    estoppel apply in the coverage action.  No, it does not.  We

8    did not litigate anything in coverage.  And all of the plans

9    that I've identified in our in our briefs -- they have a

10   provision that specifically says -- and Global Industrial lays

11   it out in purple -- that there is no res judicata on coverage

12   as a result of what happened.  We're not saying that res

13   judicata, in its entirety, disappears.

14          The other element that we're asking for is, because

15   the Trustee has actually awarded something to a claimant

16   pursuant to the plan, that itself does not adversely affect us

17   in the coverage court.

18          Those are the only two additional provisions that we

19   are asking for, and they were specifically proposed by the

20   Debtor in this proceeding before they had to get 75 percent of

21   the votes, or more, of the claimants who added this language.

22   Even the bankruptcy court recognized that this was done at the

23   request of the coalition of claimants.  So another thing I have

24   to mention, Your Honor, is the Truck Insurance decision, which

25   came down after our briefing by the Supreme Court of the United

1    States.  What that Court says, of course, is that you can't use

2    insurance neutrality adversely.  You can't make that a barrier

3    to recovery.

4         But what you must do -- and they tell the Fourth

5    Circuit -- you must do the following.  And this is language

6    directly from this court's finding, even though it was an

7    appeal from the Fourth Circuit.  When a debtor is reaching in

8    the pockets of another, that party has the right to be heard

9    and the right to have justified grievances addressed.  It's not

10   just being heard in the wilderness.  And what the Truck court

11   did was many things, but it said that there are a myriad ways

12   in which insurers at specific insurer case can have their

13   rights adversely affected, and they identify a bunch of them.

14   And what they did was -- and by the way, that's a good faith

15   case under 1129.  The Court remanded it to the Fourth Circuit

16   to reevaluate what they decided, based on the decision that was

17   written, which identifies the practical effect on insurers.

18   The reality that the motivations of the parties changed

19   dramatically as a result of a bankruptcy.  Before the

20   bankruptcy, the policyholder has only -- has no duty to the

21   claimants and only litigates adversely.  No fiduciary duty and

22   wants to minimize exposures. Once you go into bankruptcy, now,

23   in these mass tort cases, there is suddenly a duty that runs

24   from the trustee to the claimants.  The claimants, who are part

25   of the group -- and this is just a reality -- they want to

1    maximize whatever they can get from the insurance company.  The

2    Court recognizes the realities that is the Truck court in

3    evaluating what goes on.  And they specifically say, as a

4    result, you really have to pay attention to what this is doing

5    to the insurers, the myriad ways in which this can have an

6    adverse effect and evaluate that, and make a determination

7    consistent with what our opinion is telling you.

8           So we're not -- and that's -- to get back to equitable

9    and statutory mootness.  Statutory mootness, we're not doing

10   anything with that transaction.  The settling insurers

11   understand it, and that's that.  In terms of equitable

12   mootness, which is supposed to be rarely granted, is an extreme

13   exception to a court, an appellate court, addressing the merits

14   of an appeal.  The focus -- a good part of the focus, is what

15   impact does it have on third parties that relied?  Well, we

16   don't want -- we heard about real estate transactions, we heard

17   about donations, we don't want to touch any of that.

18          So what we want is that very limited focused relief.

19   And Judge Rendell, if I haven't made it clear what the language

20   is, it is in -- specifically in our reply brief.  Okay.  Laid

21   out.  So I don't want there to be any confusion about how

22   narrow it is, and how the language that we proposed actually

23   was proposed by BSA, originally.

24          JUDGE KRAUSE:  I think we understand the argument.

25          MR. BAIO:  Thank you, Your Honor.

1          MR. WINSBERG:  Good morning, Your Honors.  May it

2     please the Court.  Harris Winsberg on behalf of the Allianz

3     Insurers.  Our appeal concerns the Allianz Insurers' claims,

4     including claims that were pending as of the bankruptcy filing,

5     in an Illinois coverage case against other insurance companies,

6     that had settled in the bankruptcy case, and how these

7     inter-insurer claims are dealt with under the plan, and in

8     particular, the judgment reduction clause that's found in

9     paragraph 51 of the confirmation order.

10          JUDGE KRAUSE:  Can you tell us, to this point, how

11     much have the Allianz Insurers actually accrued in excess

12     claims --

13          MR. WINSBERG:  Your Honor --

14          JUDGE KRAUSE:  -- under the reduction clause?

15          MR. WINSBERG:  Yeah.  Your Honor, the excess claim

16     would be generated -- we wouldn't know what that would be until

17     a future coverage determination.  As far as defense costs are

18     concerned, we are incurring defense costs.  The settlement

19     trust filed a declaration, I think it's at docket 206, where

20     settlement trust deemed acknowledged that there are independent

21     review cases going on, and potentially responsible insurers are

22     participating -- actively participating in that, and the

23     Allianz Insurers are part of that.  So we absolutely are

24     incurring defense costs, underlying cases, in the independent

25     review process right now.

1        As far as I'm aware, Your Honor, there hasn't been an

2    opt out, under the TDP, to go to the tort system, but that

3    would be the other example we gave.  We're not aware of one of

4    those happening yet.  But the IRO, we are incurring defense

5    costs at this time, Your Honor.

6        JUDGE KRAUSE:  But as to the settlement trust, or

7    settling insurers, to this point, there's nothing quantifiable

8    in terms of them not covering the fair share of their costs?

9        MR. WINSBERG:  Your Honor, pre-bankruptcy in the

10   Illinois case, there was an insurance settlement of one of the

11   abuse claims that Allianz Global Risk funded.  I believe it's

12   called the Rahe settlement.  I'm not sure that's technically in

13   the record here, but you could take judicial notice of the

14   proceeding in the Illinois coverage case.  And there was a

15   settled claim that we contributed, and then we brought a

16   counterclaim, which is the subject of the Illinois case.  And

17   there's a competing case in Texas which Mr. Baio referred to.

18       JUDGE KRAUSE:  How do we know the magnitude of the

19   impact of what you're requesting?

20       MR. WINSBERG:  Your Honor, we don't know specifically.

21   We put evidence in the record below that 90 percent of the

22   aggregate liability resided with the settling insurers.  We

23   also have evidence in the record below that Century and

24   Hartford, which were the primary insurers, historically

25   defended these claims pre-bankruptcy.  Now, part of their

1    settlements, like -- they're no longer there.  So these claims,

2    otherwise, would be undefended.

3           So we have elected to associate in.  We don't have the

4    obligation to defend, but we have a right to associate in to

5    the defense, and we have exercised that.  But to Your Honor's

6    question, it's unknown at this time.  The Debtor has said that

7    it's speculative, hypothetical, unlikely.  The district court

8    made a finding -- that the bankruptcy court did not make --

9    made a finding that the likelihood of substantial defense costs

10   was reduced, therefore rendering the protection adequate -- not

11   full but adequate, under a framework which we believe has no

12   application here.

13          But to answer your question, Judge, we don't know the

14   magnitude of it.  The other thing I would point to, in the

15   response to our -- in the support of the Debtor's motion to

16   dismiss this case as equitably moot, they submitted a

17   declaration of Mr. Whittman.  and Mr. Whittman said in his

18   declaration that the trust will have to reserve for these

19   potential claims, and that was their harm.  But what Mr.

20   Whittman didn't say -- well, number one, Mr. Whittman doesn't

21   work for the trust, he works for BSA, so we had an objection to

22   that, that we put in our paper.

23          But what he doesn't say is how reserving for these

24   claims will fundamentally alter the economics of the trust.  He

25   doesn't say anything at all about it.  He also doesn't say

1    whether it's going to impact abuse claims at all.  And the

2    district court and bankruptcy courts have findings below that

3    it's more likely than not that abuse claims will be paid in

4    full.  And all we're asking for is to have the right to assert

5    a claim against the trust.

6         Now, what we did say, at the bankruptcy court level,

7    when we suggested the language, Your Honors, and we put that on

8    Exhibit A to our opening brief, the language we want, which we

9    had crafted from a decision called ASARCO.  We shortened it,

10   but that's where we got it from, for a trust backstop.  What we

11   did say, that if it turns out that the trust is only going to

12   give out, say, fifty cents on the dollar, that we would get the

13   same.  This isn't a situation like Plant, where the insurers

14   were asking for a hundred cents on the dollar, and the asbestos

15   claimants were getting ten cents on the dollar.

16        We're just looking for the  - we're looking to have

17   the right to access it.  And we would note that --  I can --

18    I'll stop, and we can talk about the merits, or I can -- I'm

19   happy to answer your questions on that point.

20        JUDGE KRAUSE:  To the extent we have the determination

21   that you refer to in the record, that because of the

22   availability of alternative dispute resolution, et cetera, that

23   it's not -- this is not going to be a meaningful problem, and

24   that that does not appear to be based on any particular

25   evidentiary findings, would the right step, for us, as a

1    remedy, if we agreed that there was an issue here, be simply to

2    remand?

3         MR. WINSBERG:  Your Honor, I think we -- when we filed

4    the appeal, we filed to do the least amount of damage to this

5    plan.  We do not want to unwind the plan.  This wouldn't impact

6    any of the plan transactions that have been proposed.  We did

7    cite -- to Your Honor's question, we cited the Gerber decision,

8    with Judge Sotomayor, before she went to the Supreme Court.

9    She blue penciled the bar order saying, this judgment reduction

10   is a bad -- it's a bad vehicle to pay these claims.  It just

11   doesn't work.  And Gerber says that, and Bendis says that, and

12   Greektown; all the circuit cases we say talk about those

13   points.

14        And to your question, we would submit, Your Honor,

15   under the Gerber decision, you could fix it on appeal and not

16   have to remand.  If you wanted to remand, that's certainly the

17   other way to handle it, but we think this could be cured with

18   you.  You have the power and the ability to just blue pencil

19   it, and I would cite to you to Gerber as the authority for

20   that.

21        JUDGE KRAUSE:  Yeah, the lower courts found that the

22   plan would result in reduced coverage costs overall, and your

23   proposed blue penciling of this clause really reduces costs

24   even further; isn't this kind of an unfair windfall on your

25   part?

1           MR. WINSBERG:  No, Your Honor, we don't believe it's a

2   windfall.  Number one, the district court -- unlike what the

3   FCR said in their brief, the district court never said we got a

4   windfall.  The district court never said we were being paid in

5   full.  All the district court said -- oh my time is up.  All

6   the district court said was that, your defense costs are likely

7   to be reduced, but there was nothing in the record for that.

8           But even if that's true, then he went to say, well,

9   the protection is adequate.  But that doesn't work here, and

10  it's not a windfall, because that was based on the decision on

11  Plant, which I've already said is factually distinguishable.

12  But Plant was strictly based on 524(g) and a specific statute

13  that said you could extinguish these claims because the

14  injunction did not require compensation for these extinguished

15  rights.  That statute, under 524(g) does not apply here.

16          And under Purdue -- Purdue's made very clear that

17  whatever the merits of 524(g) are, they're cabined to 524(g).

18  So in this case, which is not an asbestos case, we would submit

19  that it's not a windfall.  In fact, we're getting the relief

20  we're entitled to under the law.  Even the Bendis court talked

21  about -- even if you believe these claims aren't likely, you

22  shouldn't bar them.

23          They go on to say that you should preserve them, you

24  should modify the bar order to do so, and that's all we're

25  effectively doing here.  So we don't believe there's a

1    windfall.  There's nothing in the record to support that, and

2    all we're looking to do is to -- we didn't challenge the

3    injunction as to the settling insurers.  We're not attacking

4    their settlement.  We just want to have a backstop.  And I

5    think that Gerber, Bendis, and Greektown teach us that a

6    backstop is the appropriate way to handle in this case.

7         And of course, Purdue says these claims cannot be

8    released without our consent.  So this is the proposed fix we

9    have, for where we are in this appeal, to preserve our rights,

10   and do it in a way that does the least amount of violence to

11   the Boy Scouts.

12        JUDGE KRAUSE:  Okay.

13        MR. WINSBERG:  Thank you for your time, Your Honor.

14   Thank you.

15        MR. HUSTON:  May it please the Court.  I'm Michael

16   Huston on behalf of the reorganized Boy Scouts of America and

17   the plan supporters.  I'd like to begin by just laying out how

18   appellees are going to present to the Court this morning.  I'll

19   be addressing why this Court's equitable mootness doctrine and

20   Section 363(m) of the Bankruptcy Code preclude appellants'

21   requested relief.  Mr. Anker and Mr. Hacker will discuss

22   Section 363(m) from the standpoint of the insurers who bought

23   back their policies.

24        Mr. Kurtz will explain why, if the Court were to reach

25   the merits, it should conclude that Purdue does not disturb

1   this full satisfaction plan, and why the insurers' arguments

2   seeking to alter the terms of the plan now are meritless.  Ms.

3   Quinn will address any remaining insurance-related issues, and

4   Mr. Smola will conclude this morning by describing the

5   extraordinary reliance interests of thousands of survivors who

6   have participated in an agonizing claims process, based on the

7   promise of this plan's confirmation.

8        JUDGE KRAUSE:  I suspect we'd appreciate everyone

9   reminding us of their particular topic when you come up to

10  address the Court.

11       MR. HUSTON:  I'm sure they will, Your Honor.  As

12  mentioned, I'm going to be addressing equitable mootness and

13  statutory mootness.  This Court's equitable mootness

14  jurisprudence first looks to the specific relief that's being

15  proposed by the appellants, whether it can be entered without

16  fatally scrambling the plan and disturbing third-party reliance

17  interests.  For the claimant appellants, I think you've heard

18  already this morning that they're asking you to do one of two

19  things.

20       They either want you to throw out the plan entirely

21  and force BSA to start back at the beginning, which is contrary

22  to this Court's precedent in all of its equitable mootness

23  cases, and clearly contrary to Section 363(m), most notably

24  under Energy Futures, or else the appellants want you to just,

25  sort of, give them a carve-out.  They want you to give them

1   more money or special rights to proceed that are better and

2   more favorable than every other similarly situated survivor

3   claimant.  That relief is obviously foreclosed by the Code's

4   equal treatment principle.

5           JUDGE KRAUSE:  Let's go back to throwing out the plan.

6   If the plan was not within the Bankruptcy Court's power to

7   approve, and it doesn't meet our criteria for equitable

8   mootness, then it can be thrown out, right?

9           MR. HUSTON:  Well --

10          THE COURT:  You're saying it's contrary -- this would

11  be contrary to our precedent, but that's making a lot of

12  assumptions about whether those criteria are satisfied.

13          MR. HUSTON:  My point, Your Honor, is that I think the

14  criteria are satisfied, because the core inquiry that equitable

15  mootness looks to is, is there a means of relief that can be

16  provided at this late stage, eighteen months after Boy Scouts

17  emerged from bankruptcy and have been in operation, with all of

18  the thousands of transactions that have occurred under this

19  plan?  Is there relief that can be equitably entered at this

20  stage?  And I think our core point is that this Court's cases

21  teach that the answer is no.

22          JUDGE KRAUSE:  Where do we have a situation where

23  there's ninety-one percent of the funding that is sitting in

24  escrow?  It hasn't been distributed, it doesn't have to be

25  clawed back, so it's a small portion that would be -- need to

1    be clawed back if that were even necessary.  And it's not even

2    in the hands of the Trustee, it's sitting in escrow.  So what

3    analog can we look to in case law for that?

4          MR. HUSTON:  Sure, Your Honor.  So on the specific

5    point of the escrow, I think this Court dealt with that in the

6    Osram Sylvania case.  And it said that the fact that funds are

7    transferred pursuant to the plan, and placed in escrow, is no

8    barrier to a finding of equitable mootness, because title has

9    transferred.  Now, the Court's precedents say that you need --

10   the substantial consummation statutory standard in 1101 is not

11   exactly equivalent to what this Court looks to for equitable

12   mootness, but obviously it's a useful starting point.

13         The first prong of the statutory test is, have the

14   assets substantially -- all of the assets been transferred?

15   The assets of the Debtor are the insurance policies.  We have

16   sold them.  There's no dispute among any of the parties that

17   those assets have been transferred.  You can see this in the

18   plan at Appendix 975.  The plan is quite clear that the

19   policies, the assets of the Debtor, have been transferred.

20   Now, the consideration for that, some of it has gone to the

21   trust, some of it is in escrow.  But again, I think Osram dealt

22   with a situation very much like that where you had a partial

23   payment.

24         The other thing to note, I think, is the second -- or

25   actually, it's the third prong of the statutory substantial

1  consummation standard, looks to whether distributions have

2  commenced.  So I think the Code itself recognizes that

3  distributions do not need to be complete in order for a plan to

4  be substantially consummated.

5       JUDGE KRAUSE:  Does it matter what the percentage is?

6  I mean, here it's less than ten percent, at least of the

7  numbers that we have for mid-October, that has been

8  distributed.

9       MR. HUSTON:  I don't think it -- it doesn't matter --

10   it's not a question of volume by relation, Your Honor.  I

11  think it's a question of how many transactions have occurred.

12  You're talking about 10,000 survivors who have received a total

13  of forty million dollars, at this point, 10,000 transactions.

14  That, by the way, is just with respect to survivors.  There's

15  also hundreds, thousands of other transactions that have been

16  completed, pursuant to the plan, that I think affect this

17  Court's equitable mootness jurisprudence.

18       Most notably, the lenders to BSA have refinanced 260

19  million dollars in debt.  BSA is performing on that policy.

20  That type of new loans that have gone to the reorganized entity

21  by a third-party, the lenders, is exactly the kind of factors

22  that this Court looked to, to apply equitable mootness in

23  Millennium and in Tribune.

24       JUDGE KRAUSE:  I  mean, I understand your interest in

25  not unwinding the plan.  But if we were to find it unpalatable

1    to take equitable mootness to new heights by saying, in this

2    situation, where we've got the funds that are just being held

3    in limbo, and would be reverting back if we were not to affirm,

4    and the small percentage that has actually been distributed,

5    relative to the size of the trust that's intended here -- does

6    statutory mootness provide you with the same remedy?

7           MR. HUSTON:  It --

8           JUDGE RENDELL:  In a way that would be much narrower.

9           MR. HUSTON:  Statutory mootness certainly precludes

10   the appellants' requested remedy.  So the answer is yes, the

11   Court can dismiss the appeals.  It can reject the relief

12   requested by the appellants, on the basis of statutory

13   mootness.  I do want to just take a point -- a moment, if I

14   might, to, sort of, respectfully disagree with the suggestion

15   that this would be taking equitable mootness to new heights.

16          I've read every equitable mootness decision that this

17   Court has issued since Continental.  I think this is the single

18   strongest case for equitable mootness that has ever been

19   presented to the Court, because we are so far out of

20   bankruptcy, the time alone, eighteen months, the thousands of

21   transactions, it's not just about the money that's sitting in

22   escrow.  Thousands of donors have given money, more than $86

23   million since confirmation.  They've relied on the idea of

24   their contributions being used for the reorganized scouting

25   program.

1          You have local councils that have contributed more

2     than a hundred real properties, dozens of which have already

3     been sold.  There's no way to -- those are sales to people who

4     are entirely absent -- entirely strangers to the plan.  There

5     is no way for those camp properties to come back.

6          JUDGE RENDELL:  Can I ask you a question?  I asked one

7     of your colleagues, what would it look like?  Paint a picture.

8     I mean, we talk about returning funds, or something like that.

9     But paint a picture for me of what would happen if we reversed

10    the confirmation order?

11         MR. HUSTON:  Judge Rendell --

12         JUDGE RENDELL:  What's the practical effect of --

13     we're talking about unscrambling the eggs or whatever; is that

14    what we would try to be doing?  Paint me a picture.

15         MR. HUSTON:  Judge Rendell, this is not an attempt to

16    evade your question.  I sincerely don't know.  There's no

17    precedent for attempting to unwind a plan of this magnitude, of

18    this complexity, a case that the lower courts called

19    extraordinary by any measure.  I don't know how we could do it.

20    I don't know what instructions this Court could provide to a

21    bankruptcy court, to a district court, to sort through that.

22         The idea that it's as simple as taking funds out of

23    escrow is just, with respect, not correct.  You have thousands

24    of transactions from people who have no relationship with the

25    plan.  Again, the camp properties cannot be unsold.  The

1    donations that were received cannot be just given back.  By the

2    way, just with respect to the money that's in escrow, what

3    you'd be doing with that specifically, because the plan is

4    clear that the insurance policies have been sold, what you'd be

5    launching is an enormous dispute about what happens to the

6    value of the funds that are in escrow.

7           JUDGE KRAUSE:  There's the same consequence if we were

8    to look at this as a matter of statutory mootness.

9           MR. HUSTON:  Yes, there is.

10          JUDGE KRAUSE:  And so between the two, is there a

11    reason that we shouldn't go with -- if we think that the

12    criteria are satisfied, we assume, with both, that we shouldn't

13    look first to congress' bounding of the Court's jurisdiction

14    before a court-made doctrine about when we opt not to reach the

15    merits of a claim.

16          MR. HUSTON:  I certainly understand the question, Your

17    Honor.  I emphatically agree with you that Section 363(m)

18    precludes this relief, and I'm happy to talk about that in

19    detail.  I do want to -- I think there is one good reason why

20    you actually -- it would be important for the Court to rule on

21    equitable mootness.  Indeed, actually, I think what the Court

22    should say is that both Section 363(m) and the equitable

23    doctrine of equitable mootness preclude the appellants'

24    requested relief.

25          And the reason why I think you should do that in this

1    case is the human element.  That's what's so unique.  I think

2    that's what makes this case so extraordinarily compelling.  As

3    a matter of equitable mootness, you have thousands of survivors

4    who, as I mentioned at the outset, have relied on the promise

5    of this plan, and they have subjected themselves to an

6    agonizing claims process, an eighty-one-page questionnaire.

7    They've sat for depositions that lasted hours.

8           In some cases, they had to tell family members, for

9    the first times in their lives, about their abuse, the most

10   awful event that they've experienced in their lives, in order

11   to get verification of their participation in scouting.  That

12   retraumatization --

13          JUDGE RENDELL:  Let me ask you --

14          MR. HUSTON:  -- cannot go unnoticed.

15          JUDGE RENDELL:  Let me ask a question about the

16   statutory mootness piece.  That has to do with the -- I mean,

17   assuming that we would not find that 363 was more restrictive,

18   and it would apply to a sale within this plan, but then that

19   that is only that little sale aspect.  363 would bar that piece

20   of the plan.  The plan is not -- the whole plan is not a sale,

21   there's a lot of pieces; how does statutory mootness not get

22   you -- it's very messy.  How do you say, oh, okay, this is an

23   appeal from the sale.

24          But the plan is much more than the sale, so I don't

25   know how you could craft an opinion that would say 363 means,

1    we can't touch anything under this confirmation order.  Because

2    the only piece that we couldn't touch would be the sale piece.

3    So how does statutory mootness help you?

4        MR. HUSTON:  Certainly, Judge Rendell.  I think the

5    answer is that you look at the relief that the claimant

6    appellants are here asking the Court to issue.  Our point is

7    Section 363(m) is dispositive of that, because all of the

8    relief that they are seeking would require invalidating the

9    sale of the insurance policies.  That's what they want to do.

10       They either want the releases that are integral to the

11   sale to be entirely eliminated, or they want you to, sort of,

12   carve them out from the releases so that they can continue to

13   pursue the insurers, notwithstanding the fact that the insurers

14   sold back their policies free and clear of all claim.  So

15   you're absolutely right that the plan is much broader than just

16   the sale.  But as it comes to the Court, what the appellants

17   are here trying to do is invalidate the sale.

18       We know that's true because that was -- the case is

19   almost on all fours with Energy Futures.  Now, my friends have

20   been here at the podium saying, well, it matters that the sale

21   did not -- the sale occurred in the context of a plan, not

22   separately.  Energy Futures dealt with that.  It's also waived,

23   by the way.  There was no argument presented to the district

24   court.

25       When the plan documents that went in said, this is

1   going to be a sale pursuant to Section 363(m), and then just

2   for good measure, Article 5, S(4) says, "The plan shall

3   constitute a motion to approve the sale under Section 363,"

4   there was no objection raised by the claimants that this was an

5   improper use of Section 363.  Even if you thought it was -- not

6   notwithstanding Energy Futures, which I really think is

7   controlling on this point, but even if -- setting that case

8   aside, you were prepared to say Section 363 only applies

9   outside the context of a plan, well, we made a motion to treat

10  this as a sale under Section 363.  We know that the Bankruptcy

11  Court granted that motion.

12          JUDGE RENDELL:  Well, of course you want to do that,

13  so as to insulate it from review, but this isn't your classic

14  363 -- the classic situation that 363 addressed.  363 is

15  intended to allow debtors to sell property at their highest

16  value, without the purchasers fearing litigation that would

17  cause them to want to give a lesser cost.  This is an insurance

18  buyback.  This is not a sale to -- this is not Boeing deciding

19  to sell its assets to Lockheed Martin.  This is, kind of inside

20  the lodge, calling it a sale when it really isn't.

21          MR. HUSTON:  So Your Honor, I respectfully disagree,

22  again, because the plan says that this is a sale pursuant to

23  Section 363(m).  And what was literally sold were the insurance

24  policies.  The Debtor obviously had title to those policies.

25  We sold them back for consideration.  We did so to maximize the

1    value of the estate's property.

2         And in order to maximize that value, the plan

3    documents really couldn't be more clear that these policies

4    were sold free and clear of any claims.  That's what enabled

5    the plan to extract that value from the policies for the

6    benefit of the survivor claimants.  So I think -- again, Energy

7    Future says -- I really just couldn't say it better than they

8    do, allowing these new claims by the appellants, what they want

9    you to do in this appeal, the relief that they are here asking

10   for, is to recognize a right for them to increase the insurers'

11   purchase price by exposing them to new liability that they did

12   not bargain for.  They bargained for a complete and total

13   release.  The appellants want you to hold that they have

14   something less.

15        JUDGE RENDELL:  So in Purdue, they should have -- the

16   Sacklers should have purchased back the fraudulent conveyance

17   claims that the trustee would have had in return for releases,

18   and called it a 363 sale?

19        MR. HUSTON:  Well, I don't think Section --

20        JUDGE RENDELL:  There's a lot of mischief in this.

21        MR. HUSTON:  Respectfully, I don't think so at all,

22   Your Honor.  I think that this is standard bankruptcy practice.

23   You're selling back the value of your asset in order to

24   maximize it for the benefit of claimants.  The other thing to

25   note about Purdue, of course, is that the Purdue plan was

1   stayed by the Supreme Court before it ever took effect.  And of

2   course, that's the key condition that congress wrote into

3   Section 363(m).

4          So insofar as Your Honor is concerned about mischief,

5   I think Purdue provides an example of a situation where that

6   would be avoided because of the stay.  Very different than

7   here, of course, exactly the opposite.  The appellants

8   repeatedly requested a stay from this Court, from the district

9   court, from the Supreme Court of the United States.  They did

10  so before Purdue.  They did so after Purdue.  They asked

11  repeatedly.  They said, we need you to grant a stay, because if

12  you don't, the case is going to become even more equitably

13  moot.  And every court to consider that request, rejected it.

14         JUDGE KRAUSE:  Even if –

15         Go ahead.

16         JUDGE RENDELL:  Which principle would you prefer if we

17  were to have both options here?  And if we reach one, we don't

18  need to reach the other.  Which one do you seek as the more

19  applicable appropriate, from your standpoint?

20         MR. HUSTON:  Well --

21         JUDGE RENDELL:  And you've litigated these cases.

22         MR. HUSTON:  Well, Judge Rendell, I think the truthful

23  answer is that we firmly think both apply.  I would very much

24  like the Court's opinion to say that both doctrines -- both the

25  statute and the doctrine foreclose the request that

1    appellants -- but taking Your Honor's question, if I had to

2    choose, I appreciate the point that Section 363(m) is in the

3    text of the Code, and I can see how that makes it sort of

4    easier because -- and it's less discretionary.  Congress has

5    written the specific instructions.  It provides us everything

6    that we need.

7          The combination of the text of the Code in 363(m) and

8    Energy Futures is really sufficient, I think, to reject the

9    appellants' request to change the terms of that insurance

10   policy sale, in a way that would materially affect its purchase

11   price.

12          JUDGE RENDELL:  What about the textual argument that

13   your colleague notes about sections (b) and (c), sections (l)

14   and (o) of 363?

15          MR. HUSTON:  Sure, Your Honor.  So again, I think that

16   the plan deals with this by recognizing that this is a sale

17   pursuant to Section 363(m) that's built into how it was

18   presented to the Court.  It's also -- again, we submitted it.

19   The plan contains a term that says, if necessary, we are making

20   a motion for to sell this property under Section 363(m).  And

21   that motion was granted by the -- by implication of the

22   confirmation.  So I think that the conditions to Section 363(m)

23   have been -- have been satisfied here for the same reason why

24   they were satisfied in Energy Futures.

25         May I take just a moment and talk about the certain

1    insurers appeal?  We've been talking mostly about the -- about

2    the appellant's claims and why they're foreclosed.  When it

3    comes to the certain insurers --

4         And I think, Judge Krause, to return to an earlier

5    question that you asked, this is another reason why equitable

6    mootness is particularly relevant here because that's the

7    doctrine that forecloses those insurance claims.  You heard Mr.

8    Baio say this morning that the certain insurers are here trying

9    to gain an advantage in ongoing coverage litigation.  They

10   wouldn't be here investing so much if they didn't think that

11   what they're asking for is material to that.

12        I think the Court should be very wary about changing

13   the terms of what was bargained for in intense bargaining in

14   the district court or, excuse me, in the bankruptcy court

15   confirmed -- affirmed by the district court so long, so many

16   months after the fact, with implications for another ongoing

17   lawsuit.  The trustee has to be cognizant of the value of the

18   assets of the trust.  So I think that, you know, they want you

19   to believe that it's just so simple as blue penciling a few

20   lines in the plan.

21        I think this Court has repeatedly said this is a -- in

22   a closely integrated transaction, as the district court found,

23   we're not going to, after the fact, wade -- disturb it in a way

24   that raises difficult questions about what is the value of one

25   of the Trust's most important assets, more than $4 billion in

1    insurance rights.

2         JUDGE KRAUSE:  Questions?

3         JUDGE RENDELL:  Do you -- would you say that they're

4    adequately protected by the language of the plan?  They're

5    saying their rights are going to be constrained because there's

6    reference to confirmation?  What would be wrong with using the

7    language they proposed from other cases?  It says,

8    notwithstanding the plan, all of our rights and obligations are

9    preserved.

10         MR. HUSTON:  So Your Honor, I think, you know, my --

11    some of my colleagues will be better positioned to discuss with

12    you why that argument is incorrect, you know, on the law.  I

13    think what I would say from the standpoint of mootness is that

14    this is the plan that went to the survivors to vote on and who

15    overwhelmingly approved it, and it was presented to the

16    survivor community as a global resolution.

17         What they're seeking to do now, they clearly believe

18    that this is a material change that they're asking you to make.

19    And so I think it is contrary to the -- to the equitable

20    principles that underly equitable mootness to say, eighteen

21    months after confirmation, with ongoing coverage litigation

22    happening in a different court, we are going to change the

23    terms of the deal.  And again, my colleagues, I think, can

24    speak to why that's inappropriate as a matter of bankruptcy

25    law.

1          JUDGE RENDELL:  And they leveled this objection to --

2    at time of plan confirmation, I assume?

3          MR. HUSTON:  I'm sorry.  Who did, Your Honor?

4          JUDGE RENDELL:  The certain insurers.

5          MR. HUSTON:  So again, I think I'm going to leave

6    that, if I might, to my colleagues who are better positioned to

7    speak to that issue more directly.  Again, I think the key

8    point is they want you to think that it's simple, that, you

9    know, they are seeking to change the terms of the bargain in a

10   way that they certainly believe is material.  Thank you.

11         JUDGE RENDELL:  Thank you.

12         MR. ANKER:  May it please the Court, Philip Anker for

13   the Hartford Insurers.  I was about to say, good morning, but I

14   think good afternoon would be the rather more accurate way to

15   put it.

16         Judge Krause, I want to start where you were.  I think

17   it is appropriate to begin this analysis, and I think you can

18   finish the analysis, with statutory mootness.  I think the fact

19   that this case is being argued against the backdrop of Purdue

20   underscores the appropriateness of that.  After all, Purdue is

21   a plain meaning decision.  Justice Gorsuch, writing for the

22   majority, said, I may agree as a policy matter.  I don't think

23   he quite put it that way.

24         He said, I may agree or disagree as a policy matter

25   with the arguments made in Justice Kavanaugh's dissent, but

1    those are policy considerations for Congress.  My job, our job

2    as the Supreme Court, and respectfully, your job as a panel, is

3    to take the statute as it is.  Here, you have a statute that is

4    clear in creating mootness.  And I acknowledge mootness here is

5    not jurisdictional.  It goes to whether the relief can be

6    granted.  And the answer to the question is no effective relief

7    can be granted.

8          JUDGE KRAUSE:  You should -- 363(m), even if it would

9    otherwise apply, is it really appropriate for a situation where

10   the lack of authorization by the bankruptcy court goes to

11   something as fundamental as its lack of power, lack of

12   authority at all, to rely on these nonconsensual --

13         MR. ANKER:  In --

14         JUDGE KRAUSE:  -- third-party releases?

15         MR. ANKER:  In a word, yes.  If statutes of -- of

16   mootness -- statutes creating mootness, if statutes of

17   limitation are going to have any meaning, they have to have

18   application.  The only place where they do work is if the

19   merits argument is otherwise substantial.

20         And Judge Krause, I would point you to your own

21   decision as the author in the Energy Futures holding case.  The

22   principal argument made there was denial of due process.  If

23   anything is more fundamental than denial of due process, I'm at

24   a loss to know what it is.  You said, the panel said, there is

25   no exception to 363(m) for due process.  So too here, there is

1   no exception.

2          JUDGE KRAUSE:  But isn't that a distinction between

3   the merits of a claim and the authority of the bankruptcy court

4   itself?  I mean, what if we were -- what if we were looking at

5   Northern Pipeline?  What if the question were whether 363(m)

6   would come into play and preclude review where the bankruptcy

7   system itself had been --

8          MR. ANKER:  So I think --

9          JUDGE KRAUSE:  -- (indiscernible)?

10         MR. ANKER:  -- there's a distinction, Judge Krause,

11  between whether there's a lack of jurisdiction, which goes to

12  the Court's power to decide a question.  And I plainly say

13  there was jurisdiction here, both related to and core, if you

14  want me to go into it, versus whether the statute gives

15  authority for the plan to provide that.  That is a merits

16  question that goes to statutory authorization, not to

17  jurisdiction.  And so yes, if there's a lack of jurisdiction, I

18  think you may want to pause.  But there was jurisdiction here

19  under Title 28, Section 1334 of the U.S. Code.  That's the

20  distinction.

21         Let me try to address quickly the two arguments I've

22  heard on why 363(m) does not apply by its terms.  One is this

23  notion that the sale was done pursuant to a plan. First, I want

24  to underscore the point that Mr. Huston made. The plan said,

25  and I quote, that the sale, quote, constitutes a motion by the

1  debtors for the bankruptcy court to approve the proposed

2  compromise and settlement and assignment and or sale of the

3  applicable insurance policies pursuant to Section 363.  The

4  order said the same thing.

5       So you have here express authority in the plan, and

6  absolutely it was waived.  There was no argument made below to

7  Judge Silverstein, this can't be happening.  And think about

8  how, if I can use the term, silly, that would be.  You're

9  really going to say we need to have two separate documents, a

10  plan and a motion, and they each can be contingent on each

11  other.  We have to kill more trees.  We have to file more

12  paper.  Why?  It's simply putting it in one piece of paper.  So

13  on the merits, the argument fails, and it's waived.

14       The second argument I've heard is that, well, money

15  was put in escrow.  That is right.  But the focus is on the

16  wrong question.  The question is, when were the policies sold?

17  And again, the plan couldn't have been clearer and the

18  confirmation order.  The plan said, notwithstanding anything to

19  the contrary and for the avoidance of doubt, the abuse

20  insurance policies shall be sold by the debtors to the

21  applicable insurance companies, free and clear of all liens,

22  claims, encumbrances, interests or other rights, on the

23  effective date.  And so too did the confirmation order.

24       So that ought -- there the plan was crystal clear.

25  These policies have been sold.  And I see my light is on.  But

1    if I can have a moment --

2          JUDGE KRAUSE:  Okay.  Can you address, too, going back

3    to one of my earlier questions, this status of the assignments?

4          MR. ANKER:  The status -- I'm sorry, Your Honor?

5          JUDGE KRAUSE:  Of the assignments.

6          MR. ANKER:  The assignments all occurred on the

7    effective date as well.  The plan is quite clear in saying that

8    the participating charitable organizations assigned their

9    rights on the effective date to the trust vis-a-vis the -- vis-

10   a-vis the settling insurers, so that those claims could be

11   settled.  That occurred as well on the effective date.

12         So Judge Rendell, let me get to your question, which

13   is a couple of questions, if I have a minute.  One of which is

14   what are the consequences?  And is really this a sale or are we

15   allowing the tail -- the tail to wag the dog?  Respectfully, we

16   are not.  I would acknowledge there could be a plan in which

17   the sale is a little footnote of a total plan.  Here it was the

18   guts of the plan.  It was the core of the plan.  $2,300,000,000

19   in funding, $1,600,000,000 is coming out of the sale of the

20   policies.

21         But don't take my word on it.  Take what Judge

22   Silverstein found.  She found that without the sales, quote,

23   there is no plan, end quote.  She went on to find, quote,

24   without the scouting-related releases in favor of the settling

25   insurers, the nondebtor-related entities, local councils,

1   chartered organizations and their representatives, the settling

2   insurers and local councils would not make their monetary

3   contributions to the settlement trust and thus, quote, the

4   scouting-related releases and channeling  injunctions are the

5   cornerstone of the plan.

6          Those are findings of fact, findings of fact that not

7   only are not clearly erroneous, but are supported by every

8   shred of evidence.  The Dumas claimants and the Lujan claimants

9   called exactly zero witnesses at trial, zero witnesses.  Every

10  witness so testified.

11         JUDGE RENDELL:  But I just see a problem with removing

12  a plan of this magnitude, which does so much.  Sure, the sale

13  is -- it's a but for.  But it's a plan that's been confirmed

14  and a huge one -- an absolutely huge one with huge impact.  A

15  lot of people being affected by it.  It's removing it entirely

16  from this Court's capacity to look at it -- to look at it.  And

17  what if it were fundamentally unfair?  What if, as a part of

18  the sale, things, you know -- there are provisions here saying,

19  you know, insurance companies have no rights, et cetera, et

20  cetera.

21         The fact that it is a sale, I think, pales in

22  significance to the fact that this is a confirmed plan.  And at

23  least under the doctrine of equitable mootness, we have the

24  ability to say we're going to find it equitably moot or, on the

25  other hand, we're going to look at it and see there are some

1    glaring problems with this.  And we're going to find it's not

2    equitably moot.  I mean, it's in our discretion whether to

3    apply equitable mootness.  We don't even have to apply it.  And

4    we can have the ability, if this plan were fundamentally

5    unfair.

6         And I can't blame the bankruptcy court for saying

7    it -- it's 363(m).  If I were a bankruptcy court, I wouldn't

8    want a do over either.  But I just think taking the plan out of

9    the capacity of an Article III court, something this big and

10   say, oops, not -- you know, Congress intended that we don't

11   touch it.  And I think Congress intended when there is a sale

12   of assets, that is a strict -- strictly a sale of assets, we

13   don't touch it.

14        But when it's a plan, I can't imagine that Congress

15   would say, if there's a -- if there's a sale that's as part of

16   a plan, we can't review the confirmation order, which is what

17   we have.  We have a confirmation order that is on appeal.  And

18   the fact that there's a sale that is a but for, I have real

19   problems with saying, Congress intended that no Article III

20   court can look at a plan that contains a sale.  I just have --

21        MR. ANKER:  I --

22        JUDGE RENDELL:  I just have a -- have a real problem

23   with --

24        MR. ANKER:  Let me --

25        JUDGE RENDELL:  -- that as a -- as a jurisdictional

1  piece --

2          MR. ANKER:  I --

3          JUDGE RENDELL:  -- and as a matter of law and what we

4  do.  Article --

5          MR. ANKER:  What --

6          JUDGE RENDELL:  -- III courts are supposed to review.

7          MR. ANKER:  Sure.  Let me try to respond and try to

8  persuade you.  First, an Article III court did review.  This --

9          JUDGE RENDELL:  Well --

10          MR. ANKER:  -- the plan did not go effective.  It was

11  written so it could not go effective until the district court

12  issued its order.  Judge Andrews in the district court,

13  obviously an Article III court.

14          Second, 363(m) doesn't apply if there is a stay.

15  There was an opportunity, and indeed the claimants here sought

16  a stay.  And so this panel --

17          JUDGE RENDELL:  One of the reasons there wasn't a stay

18  is because this is such a big -- it's just such a big deal.

19  Nobody is going to --

20          MR. ANKER:  It also it --

21          JUDGE RENDELL:  (Indiscernible).

22          MR. ANKER:  Judge Rendell, there's a different reason

23  which goes to something you pointed out earlier, timing.  When

24  the -- when the question of the stay came before the motions

25  panel that considered it, the Supreme Court had not decided

1   Purdue.  And the law of this circuit was that third-party

2   releases were perfectly lawful.  I would suggest to you, the

3   case here, if you find statutory mootness, is a case that will

4   not repeat itself.  It will not repeat itself on these facts

5   because now we're in a post-Purdue land.

6         You are going to hear from other appellee counsel that

7   the plan, Mr. Kurtz in particular, would not and does not -- is

8   not inconsistent with Purdue because this was a payment in full

9   plan.  But let's put that aside.  If there was not a payment in

10  full here, this is a different outcome tomorrow.  But timing

11  does matter.  And so first there was an opportunity, and there

12  was an absolute review by a district court, an Article III

13  court.

14        Second, there was an opportunity for a stay.  Third,

15  look at the decision again of this Court in the Energy Futures

16  case.  That is a case that applied statutory mootness to a

17  confirmation of a plan order, a confirmation order that denied

18  latent asbestos claimants the ability to assert their claims

19  because those claims hadn't arose.  So this Court's precedent

20  goes there.

21        Finally, Judge Rendell, I would urge this Court to

22  look at what it has said in answer to the question, because I

23  think this goes to the question, can effective relief be

24  granted that separates out the sale from the rest of the plan.

25  First, the answer to your question in one word, what would

1    happen if the -- if the Court were to uphold the sales, but

2    otherwise reverse the plan, is I'll give you a one-word answer

3    to that, chaos.  Utter complete chaos.

4         Our position, as written in the terms of the -- of the

5    our underlying agreements, is that we then get back every penny

6    in escrow, but the policies have been sold.  The debtor and the

7    claimants are going to have to take a different position from

8    that.  So what you're going to have is chaos and years of

9    litigation.  And one of the things 363(m) is designed to do, as

10   this Court has repeatedly said, is to create finality.  It's

11   designed to do the opposite of create chaos.

12        This Court has said that the question -- when you ask

13   the question, can I grant the relief, even though you have an

14   unstayed sale order, is whether the relief being sought is

15   quote, so divorced, so divorced, that comes out of the Energy

16   Futures case and Pursuit Capital, from the sale, whether it

17   involves, quote, only collateral issues, not implicating a

18   central or integral element of a sale, comes out of the same

19   two cases.  I think Judge Krause, in both cases, you, in your

20   opinion, were quoting the panel's prior decision in Pursuit.

21   Here, no credible argument can be made that the third-party

22   releases were divorced or were collateral.  They were the guts

23   of the sale.

24        My client, Mr. Hacker's client, is going to follow me,

25   and the other settling insurers paid a $1,600,000,000.  That is

1  a lot of money even in an inflationary period we live in today.

2  And that kind of money gets paid when you get complete peace

3  and not under other conditions.  So it was integral to the

4  plan.  And if you try to separate the two, we're going to be in

5  years of litigation.

6         And Judge Rendell, I hope we don't get to what you are

7  suggesting, which is a liquidation of Boy Scouts.  But we may.

8  That litigation may be litigation in which I'm opposite a

9  Chapter 7 trustee, years from now, fighting over whether we get

10  that money back.  That can't be the right outcome.  It's not

11  consistent with 363(m) and its policy in favor of finality.

12         JUDGE SCIRICA:  I believe --

13         JUDGE RENDELL:  What about --

14         Excuse me.  Go ahead.

15         JUDGE SCIRICA:  I believe one of your colleagues said

16  a few moments ago that both 363(m) and equitable mootness

17  should be applied here.  If I misheard him --

18         MR. ANKER:  Your Honor, I agree that both can be a bar

19  here given that equitable mootness is obviously the law of this

20  circuit.  Whether someday the Supreme Court will examine the

21  question of whether it is an appropriate doctrine or not is

22  something that may happen, but it is the law of this circuit.

23  And I think that the very same sales that give rise to the

24  statutory mootness argument also give rise to equitable

25  mootness.

1          I was simply -- I am focusing on statutory mootness,

2     in part, because we decided to divide up time and attention.

3     And in part because I do think, given the statutory basis, I

4     think it's an easier place to ground a decision here, a safer

5     place, a simpler place, and one again, that is more faithful to

6     Purdue itself, which, as I began, is a plain meaning, read the

7     words of the statute case, at its core.

8          JUDGE RENDELL:  Can I ask -- can I ask you about the

9     gamesmanship that I mentioned, that hereafter they will frame

10    purchases of releases, if you will.  They will frame the use of

11    releases as part of a sale, selling fraudulent conveyance

12    claims, something in return for releases and escape scrutiny on

13    appeal under 363(m).  Is that -- am I being too -- is that out

14    of the realm of possibility?

15         MR. ANKER:  When I'm asked a question, is something

16    out of the realm of possibility, it's hard for me to answer the

17    question, no --

18         JUDGE RENDELL:  I --

19         MR. ANKER:  -- yes, it is completely --

20         JUDGE RENDELL:  --  bankruptcy practitioner.  And I

21    know --

22         MR. ANKER:  We are creative.  We are creative, those

23    of us who practice in bankruptcy court, and I do often.  I

24    think you're giving, respectfully Judge Rendell, too little

25    credit to the bankruptcy court and to the district court when

1    it reviews the decision.  Here, because there were third-party

2    releases, no one was comfortable with having this plan go

3    effective before an Article III court got to look at it.

4            Will there ever be an attempt to try to use 363 to

5    insulate an issue?  Maybe, but there -- but I do practice and I

6    do have a lot of confidence.  Judge Silverstein wrote a 200-

7    page decision, 180-page decision.  The amount of time and

8    energy and diligence she spent, this is not a rubber stamp, was

9    extraordinary.  The amount of time and energy Judge Andrews

10   spent was extraordinary.  I argued in front of him, and I saw

11   his opinion.

12           And then this went up, within it, with a motion for a

13   stay.  And I can only presume that the motions panel of this

14   Court also exhibited diligence and took its responsibilities

15   seriously.  So Judge Rendell, anything is possible.  But do I

16   think we are going to have a series of unlawful plans over and

17   over again?  No, I do not think that's the future.

18           JUDGE RENDELL:  Thank you.

19           MR. ANKER:  Thank you.

20           MR. HACKER:  Good afternoon, Your Honor.  Your Honor,

21   it's John Hacker for Century, another settling insurer, and its

22   affiliates.  I think that the Supreme Court's decision in

23   Purdue, and Judge Krause's opinion in Energy Future, together

24   establish what is an irrefutable case for affirmance under 363.

25   Now, Purdue, we know, doesn't itself address 363(m).  But it

1    matters because, as you've already heard from my colleagues

2    today, of its rigorous, rigorous emphasis on applying the

3    code's plain text as written.

4            And according to Energy Future, 363's plain text means

5    what it says.  When an estate asset has been sold to a good

6    faith purchaser, straight out of the text, and sustaining an

7    objection to the plan would affect the validity of that sale,

8    the objection must be rejected.  It's not necessarily a

9    jurisdictional kind of mootness.  It's simply a ruling that the

10   objection cannot be sustained because the statute, by its plain

11   terms, prohibits the Court from providing that kind of relief.

12   That rule compels affirmance here.

13           As the bankruptcy court explicitly found, based on

14   undisputed evidence, this wasn't just an observation.  If you

15   look at the Court's decision, the insurers' payments were made

16   in exchange for two essential integrated components of

17   consideration.  They get their policies back.

18           That's the asset that is transferred, Judge Rendell.

19   There's absolutely property asset transfer.  And they get the

20   releases of all scouting-related abuse claims.  If the Court

21   were to invalidate the releases, the insurers indisputably

22   would not get what they paid for.  The plain text of 363 could

23   not be more directly applicable.

24           Let me just address two points in the time that I

25   have.  One, I think, Mr. Anker addressed with you, Judge

1    Rendell, your concern that that's really not what Congress

2    meant by a sale.  And Mr. Anker, I think, had some answers to

3    that.  I just want to underscore the relevance of Purdue on

4    this.  What Purdue tells us, if nothing else, is that we don't

5    read the code and try to think about what Congress might have

6    meant, or also could have said, or other caveats that might

7    have written in, or exceptions that could have been grafted

8    onto the plain text.

9         You read the text and you apply it.  And 363(m) says,

10    when there's a sale, which there was here, to a good faith

11    purchaser, which there was here, as was found by the bankruptcy

12    court, then this Court can't do anything to affect the validity

13    of that sale.  The sale, clearly, it fits within the plain text

14    of the statutes.  It's an asset transferred for an

15    extraordinary amount of value to a good faith purchaser.

16         And as Mr. Anker emphasized, the code obviously has

17    many protections for the kind of mischief one might worry

18    about.  And I would just underscore the point that, at the end

19    of the day, Congress, we know from Purdue, is the source of

20    identifying and channeling and providing for those kinds of

21    protections that did so here, if there need to be more.  If it

22    turns out there are problems in the future, which I think is

23    clearly there won't be for the reasons Mr. Anker says, that's a

24    problem for Congress to address.  That's what Purdue tells us.

25         The other point I want to make is in response to the

1   claimants' argument, a couple of sort of related arguments.

2   First of all, that the sales are only conditional, they didn't

3   even happen.  It's just simply not correct.  The sales have

4   occurred.  Mr. Anker read you the phrase, they have closed.

5   There's nothing left to happen.

6        What's in escrow is not the policies.  They cite a

7   case from the Eighth Circuit.  I think it's the Olson case

8   where it says, property that's in escrow isn't really finally

9   transferred.  It's not about the -- with respect to the 363

10  argument, the escrow might be relevant to the equitable

11  mootness issue.  But as to 363, what matters is the policies

12  have been, to quote BSA, irrevocably transferred.  They've been

13  transferred.

14       The escrow is only about a post-sale, post-closing

15  provision for how the money will ultimately be distributed,

16  just like the Krebs case from this Court, where the payment had

17  only been ten percent up front and there was going to be a

18  payment down the road.  But what mattered is the asset had been

19  transferred.  Exactly the same -- is true exactly the same as

20  in your opinion, Judge Rendell, in the Osram Sylvania case.

21       The other issue I heard the claimants raise is that

22  because of the related point, because of the escrow, and I

23  think Judge Scirica asked about the sort of the status of the

24  escrow or why that matters, the releases can be invalidated

25  without affecting the sale of the policies, because the

1    policies will be gone, but the money will come back.  And so

2    the sale is complete because the policies are still

3    transferred.  That's a blinkered view of what the transaction

4    was.

5         I think Mr. Anker read you the key finding, and

6    there's actually a bunch of them sprinkled throughout the

7    bankruptcy court's decision about the multi -- the multiple

8    components of the sale.  The consideration for the sale of the

9    policies wasn't just the money.  The money was paid for the

10   transfer of the policies and the releases.  You cannot untangle

11   those.  If you invalidate the releases, you unambiguously

12   change the core, the integral elements of the sale, just as in

13   Energy Future, just as in Pursuit Capital, just as in decisions

14   by circuit courts around the country.

15        Because 363(m) on the merits disables the Court from

16   providing that relief, it can't provide that relief.  And

17   because that's the only relief they're seeking, to your point,

18   Judge Rendell, about, the Court needs to be able to review a

19   large plan.  That's, of course, true.  And if an appellant in a

20   given case has objections that are aside from, different from,

21   and don't affect the validity of the sale, they can raise those

22   objections.  Somebody might complain about the trust

23   distribution procedure.

24        Somebody might complain about the due process -- the

25   process as in Energy Futures.  This Court didn't say it was

1    unchallengeable in Energy Future.  The Court said you couldn't

2    challenge the validity of the sale.  But there was something

3    else that the Court -- relief the Court could provide because

4    it wouldn't affect the sale.  That's simply not true here with

5    respect to the request by the claimants, the dissenting

6    claimants, to invalidate the releases.

7         It's not relief the Court can provide.  And so the

8    objection has to be rejected.  And because that's all they

9    argue for, the plan has to be confirmed.  No further questions,

10   thank you.

11        THE COURT:  Thank you.

12        MR. KURTZ:  Good afternoon, Your Honors.  Glenn Kurtz,

13   on behalf of the Boy Scouts of America.  What I'm going to try

14   to do in my time is, first, briefly address the insurers'

15   arguments about the assignments of the obligations, correct one

16   jurisdictional fact that was mentioned today, and then spend

17   most of my time addressing why the Purdue decision does not

18   apply to the BSA plan because it provides for payment in full.

19        Judge Rendell correctly identified portions of the

20   record where the insurers' obligations were preserved and

21   assigned.  And I will add an additional one, Judge Rendell,

22   which is paragraph 48 of the confirmation order.  That is at

23   page 842 of the record.  And it provides, "Nothing in the plan

24   shall modify, amend, supplement, or be interpreted as

25   modifying, amending, or supplementing the terms of any

1  insurance policy or rights or obligations under such insurance

2  policies."  And I will note that Counsel spoke to modifications

3  relating to the confirmation -- I'm sorry, relating to the

4  plan.  That's not included in paragraph 48 of the confirmation

5  order.  There's no qualification that it's subject to the plan.

6        I will also point out that the confirmation order,

7  including in paragraphs 32 and 33, which is at 827 and 828 of

8  the record, explicitly preserves the insurers' coverage

9  defenses.  And both lower courts found that the documents

10  explicitly preserved the insurers' coverage defenses.

11        Now, I want to address the argument that the

12  settlement trustee has taken a different position in coverage

13  litigation.  I should start by noting that's not in the record,

14  that's outside the record.  But -- nor could allegations or

15  assertions made by an advocate in a case override the governing

16  documents here and the determinations and the findings of the

17  two lower courts.  But I also need to point out that the

18  allegation -- the arguments that have been made and the

19  allegations that have been made have been mischaracterized

20  badly by the insurers.

21        So if you do go outside the record, what you will

22  learn was that, contrary to the insurers' argument that

23  settlement -- that the settlement trustee argued that the

24  coverage defenses were considered and rejected by the Court.

25  If you look at what they cite to, what the Trustee argued was

1    exactly the opposite.  What the Trustee argued was that the

2    lower courts, quote, rejected the insurers' argument that the

3    plan unlawfully impaired their rights under the insurance

4    policies and then confirmed the plan over the insurers'

5    objections.

6          And that is exactly our point here, that there has not

7    been an impairment of the plan.  There has been a preservation

8    of those obligations.  And in fact, also inconsistently in that

9    same case, what the insurers say is that there is protective

10   language that was entered by the Court that's included in the

11   TDP.  And that, quote, preserves insurers' rights, which,

12   again, is our position here and the exact opposite of the

13   position they're taking before this Court.

14         The other allegation that comes out of the coverage

15   litigation is that, quote, that the Trustee argued that the

16   insurers, quote, must provide coverage for the abuse claims

17   without regard to the underlying obligations and defenses, the

18   insurance policies.  That, too, is included nowhere in the

19   coverage complaint.  If you look at the cited language, what it

20   says is there is an actual controversy for purposes of a

21   declaratory judgment because the Trustee believes that the

22   insurers have to provide coverage, and the insurers disagree

23   with that, which is a dispute that goes back long before the

24   bankruptcy case.

25         As to the changes that have been proposed, the only

1    effect of the language that's included in the TDP about

2    subjecting the obligations to the confirmation order, are that

3    the confirmation order provides for an assignment which is not

4    permitted under the insurance policies, but is permitted as a

5    matter of bankruptcy law.  That's why that's there.

6            In terms of res judicata, the insurers argued that the

7    Court made some sort of coverage ruling.  I don't know you

8    could find anything that could be further from the truth.  The

9    Court repeatedly not only preserved the insurers' defenses, the

10   coverage defenses, but argued that they were not justiciable

11   and they would be decided if there is a dispute in the future

12   by a coverage court in the future.

13           And then finally, the idea that there will be no

14   impact to the insurers, no adverse impact, I don't know what

15   that means.  It's too vague for inclusion.  But what was really

16   suggested was that the Court impose a provision that the awards

17   and the decision by the settlement trustee would be

18   inadmissible in hypothetical future litigation.  Any

19   evidentiary rulings that need to be made in future hypothetical

20   litigation should be made by a future coverage court, if there

21   ever is such a case.

22           It's not justiciable at this point, and frankly, I

23   don't think it's a correct ruling anyway.  I don't know how a

24   decision by a Trustee, which would presumably be the basis for

25   seeking indemnification, wouldn't be admissible.  It wouldn't

1    be binding, but it would certainly seem to me to be admissible.

2    That's for another day.

3         On the jurisdictional fact, Counsel argued, I think,

4    in response to the notion that there is shared insurance, which

5    would be sufficient to support the exercise of jurisdiction,

6    that there is not shared insurance pre-1976.  I want to correct

7    that in three ways.  One, there is contractual indemnity

8    obligations by BSA.  So they have that affinity of interest.

9         Two, there is -- in pre-1976 policies, there is

10   coverage for contractual obligations.  So there is shared

11   insurance for that reason as well.  And then third, and Your

12   Honor had asked about this, Judge Krause, was they've also

13   assigned policies, the pre-1976 policies which then become of

14   course, property of the estate.  The response was no, that

15   didn't happen.  It did happen.  The Settlement Trust Assets,

16   which is defined at 909 of the record, includes the pre-1976

17   policies by the local councils and the chartered organizations.

18   And those were transferred as of the effective date.  And that

19   is at page 931 of the record.

20        Now, with that, I do want to turn to the primary

21   purpose for me here today, which is to address that Purdue does

22   not apply to the BSA plan, not only because it's been

23   substantially consummated, but also because it provides for

24   payment in full.  And I start, of course, by pointing out that

25   BSA submitted an amicus brief, in the Purdue appeal, explicitly

1    arguing that any nonconsensual third-party releases limitation

2    that might be imposed by that Court should not apply if a plan

3    provides for payment in full.  And the Court's reaction to that

4    was to carve out from its decision, among other things, plans

5    that provide for payment in full.

6            JUDGE KRAUSE:  But it leaves for another --

7            JUDGE RENDELL:  What is the total --

8            JUDGE KRAUSE:  Go ahead, Judge Rendell.

9            JUDGE RENDELL:  Sorry.  What is the total amount of

10   claims that will be involved in this case?

11           MR. KURTZ:  So Your Honor, the proof of claims that

12   were filed at the time of the bankruptcy was approximately

13   82,500.  However, the claims that have been pursued timely,

14   including with respect to extensions, is approximately 60,000.

15           JUDGE RENDELL:  No, I mean, the total dollar amount

16   that's going to be distributed under this plan.

17           MR. KURTZ:  The dollar amount is -- so the -- is going

18   to be the $2.64 billion, the $200 million contingent funding,

19   and between $4.2 and $4.4 billion of value associated with the

20   unsettled insurance policies.

21           JUDGE RENDELL:  How do we know the total amount of

22   claims?  We don't have a final -- I don't mean claims, total

23   amount of money that's going to be distributed to claimants in

24   this case.  We do not know that, do we?

25           MR. KURTZ:  Your Honor, we can't possibly know.  And

1    in no case, this case included, can one know with absolute

2    certainty.  And that's not required under the Bankruptcy Code

3    or otherwise, precisely what everyone will get.  However, there

4    was --

5          JUDGE RENDELL:  But you -- for you to say it's a full

6    satisfaction plan, you need to know that there is the money

7    available to pay all of -- all of the claims that will be

8    filed.  And we can't tell that here, can we?

9          MR. KURTZ:  No, I think you can, Your Honor.  I'll

10   just -- before I point to the evidence, I would note that it

11   is, of course, routine in bankruptcy cases to have ongoing

12   obligations without a guarantee they'll be paid.  But based on

13   estimations, based on the evidence by a court, that they're

14   adequate for purposes of full payment, including the

15   reinstatement of debt.  That doesn't mean that all that debt

16   will be paid over the ten years.  It might be reinstated, but

17   it's -- but the estimation is binding and adequate.

18         Here, we had a very robust record on payment in full.

19   We had experts, three different experts testified.  I will note

20   they were the only experts on the subject.  They were not only

21   solid evidence, they're the only evidence.  We had the

22   testimony of Dr. Bates, a leading economist who has been

23   certified in other cases.  He's valued claims thousands of

24   times.  He valued these claims off of the databases available.

25   He pulled together trust distribution procedures designed to

1    replicate historical resolutions within the tort system.

2         He applied a frequency-severity approach, which is a

3    recognized approach in the scientific community, and no one

4    disputed that.  And he was able to determine, based on claim

5    characteristics, including the nature of the abuse, the

6    frequency of the abuse, the profile of the abuser, potentially

7    applicable statute of limitations, age of the survivor, and a

8    host of other matters, that the overall range was going to be

9    between $2.4 and $3.6 billion.

10        And Ms. Gutzler, who is an expert in mapping insurance

11   values to claims, was able to conclude -- again certified as an

12   expert, extremely experienced, has done this thousands of times

13   -- was able to conclude that the value of the unsettled

14   insurance was between $4.2 and $4.4 billion, resulting in trust

15   assets that provide almost twice the amount at the high end of

16   the expected range.  None of this was disputed.  The Court --

17   Dr. Bates, for example, was on the stand for eight hours.  The

18   Court found that he was credible, he was thorough, he was

19   methodical and made the same findings with respect to Ms.

20   Gutzler as well.

21        I will also point out, Your Honor, that the same

22   circumstances have come up in the first case, and the only

23   case, I think, that has addressed the Purdue full payment plan

24   issue since it was issued, which is the Bird Global case in the

25   Southern District of Florida.  The Court in that case likewise

1    reviewed expert testimony valuing claims, valuing trust assets,

2    and projecting that there would be sufficient assets to satisfy

3    claims in full, and found that, under Purdue, that was

4    permissible over the objections of nonconsenting claimants.

5         The --

6         JUDGE KRAUSE:  Why should it be permissible when we

7    look at the reasoning of the Court?  I mean, the Court, of

8    course, it did carve it out.  But if we're looking to its

9    rationale, why should it matter whether there's full payment or

10    not, if there was no authority on the part of the bankruptcy

11    court to do this?

12         MR. KURTZ:  So Your Honor, I think there was

13    authority.  Let me start with the authority and then move to

14    the one satisfaction rule.  But let me start with the authority

15    because you are correct that the Purdue court spoke in terms of

16    a lack of statutory authority.  That's because in Purdue, the

17    debtor had cited 1123(b)(6).  And the Court concluded that the

18    assets at issue that were being addressed, which was the

19    Sackler contribution, didn't fall with any of the statutory

20    provisions because it was nondebtor property and it was being

21    contributed in exchange for a release from a nondebtor.

22         And what the Court said on page 2082 is that the

23    statute, "permits the plan to address claims and property

24    belonging to the debtor or the estate."  In this case, we are

25    addressing property that belongs to the debtor, the estate.

1    It's their insurance assets, and there is statutory authority

2    in a number of places.  And I start with 1123(a)(5)(D), which

3    authorizes the debtor to sell any of its property, which

4    includes insurance assets.

5         I also look to 363(b) and (f), which authorizes a

6    debtor to sell its property free and clear of liens.  I look at

7    1123(b)(3)(A), which authorizes a debtor to settle its

8    interests in any property.  And I look to Section 1123(a)(5),

9    which specifies that, "notwithstanding any otherwise applicable

10   nonbankruptcy law" -- so we're talking about a senior provision

11   here -- "a plan shall provide adequate means for the plan's

12   implementation."

13        And in order for the BSA to exercise its statutory

14   authority to monetize its assets, to sell its insurance, to

15   settle its interests, which were disputed by the insurer, we

16   generate a $1.6 billion of value on disputed insurance, by

17   definition, the BSA had to provide releases because you needed

18   the participation of the other insurers, people who also had an

19   interest in those policies.  And the record is, and it can't be

20   disputed, because this is uniform practice, that none of those

21   co-insurers would agree to waive their rights to the insurance

22   policy covering them if the claims that were being so covered

23   by the policy were not released against them as well.

24        It is important to note here that the primary assets

25   for this estate are the insurance assets.  And if you don't

1    have the right to exercise your statutory authority, to sell

2    your assets, to monetize your insurance, through all the

3    attendant rights you would need, including the ability to get

4    the participation of other joint owners, in effect, then you

5    can't exercise that.  You can't reorganize.  The debtor has an

6    obligation to maximize the value of its estate to provide

7    compensation to creditors.  The only way to do it in

8    circumstances like this, where your primary asset is insurance,

9    is to get the participation of the other insurers.

10           Now, I'm sure you will hear that the statutory

11   authority that I'm citing -- and by the way, also cited and

12   relied on in the Bird Global case -- doesn't explicitly speak

13   to releases.  But I will also say that as far as I can tell,

14   and I've looked hard, there's not a single provision in the

15   Bankruptcy Code that authorizes, or specifically speaks to,

16   releases, consensual or nonconsensual.  And I think everybody

17   would be compelled to agree that consensual releases cannot

18   possibly be an issue, notwithstanding the fact of some specific

19   provision set forth in a Bankruptcy Code, because there is no

20   bankruptcy that doesn't have disputes that need to be settled.

21   And that settlement does have to include releases.  And by the

22   way, I should probably also add, as one of the authorities, and

23   it was in Bird Global.  It's 9019 -- rule 9019 as well.

24           Your Honor, the other authority-related issue here is

25   the one satisfaction rule.  And it, at bare minimum, really

1    sheds a lot of light on the equities here, because the one

2    satisfaction rule provides, that so long as a defendant

3    provides full satisfaction to a claimant for a single

4    indivisible injury, that the claimant loses, by operation of

5    law, the ability to sue other defendants that could have

6    liability.  Those claims are released, and they're barred.

7    They are barred from pursuing those claims.  This is a

8    settlement-in-full plan.  So that is another authority.  There

9    was no common law authority that was raised in Purdue.  And

10   this one really means, it's sort of at a bare minimum, no harm,

11   no foul.  You're looking at compromising the ability of a

12   debtor to reorganize.

13           And we're talking about a 120-year-old,

14   congressionally chartered not-for-profit that is built into the

15   fabric of this country, dedicated to the training of youth for

16   the betterment of society.  And you're talking about 60,000

17   plus survivors that have been waiting, sometimes, according to

18   the record, fifty years for compensation, that are literally

19   dying as we're getting through this case.  And to compromise

20   this plan -- because the claims will be paid expeditiously -- a

21   lot more expeditiously than in the tort system -- but haven't

22   been paid yet, I submit doesn't make any sense.

23           JUDGE KRAUSE:  Thank you.  Other questions?  Judge

24   Rendell?

25           JUDGE RENDELL:  No.

1        MR. KURTZ:  Thank you very much, Your Honors.

2        JUDGE KRAUSE:  Thank you.

3        MS. QUINN:  Good afternoon.  May it please the Court,

4   Kami Quinn here on behalf of the plan supporters, specifically

5   insurance coverage counsel to the FCR.  And my role here is to

6   address some of the insurance merits issues.

7        In particular, I'm going to, very briefly, so as not

8   to repeat any of the things that Mr. Kurtz just raised, talk a

9   little bit about the insurers' carve-out request and then go to

10  the judgment reduction provision.

11       Okay.  On the carve-out.  And this, I think, going

12  back to something that you raised with respect to this argument

13  before, there are certain background principles of law here

14  that none of us disagree with, which is that the insurers'

15  contract rights can't be expanded or contracted with

16  bankruptcy.  And indeed, as Mr. Kurtz read, that's express in

17  the documents.  That's laid out.

18       But what the insurers are asking for, although they

19  characterize it as something small, is something more than just

20  a preservation of their rights.  The actual language that

21  they're asking for you to put in says that they are exempt from

22  collateral and estoppel res judicata in any respect, not just

23  with respect to some certain finding.  They also -- the

24  language suggests that the facts of awards by the trust could

25  not be used in evidence in a coverage action.

1      None of this is just a preservation of contract

2   rights.  What they're asking for is not just to preserve their

3   rights, but they're asking to preserve pre-petition

4   circumstances, and they're just not entitled to that.

5      In contrast, all we're saying is that the coverage

6   court can apply the unchanged defenses of the policies to the

7   actual facts and circumstances, which are that there is a

8   confirmed plan and that the insurers litigated certain things

9   in that plan -- in connection with that plan and not others,

10  and that the confirmation order applies to them as it would

11  apply to anyone else.  And I think that that's a fairly

12  uncontroversial position, and that adding the language of the

13  insurers, that the insurers request, would be giving them far

14  more than just a preservation of their contract rights.

15     JUDGE KRAUSE:  So is there -- if you agree that

16  there's not impairment, and that it's really these background

17  principles that are coming into play, I gather there wouldn't

18  be an objection, then, even if the plan were not amended, to

19  this Court clarifying what those principles are?

20     MS. QUINN:  Sure.  I mean, we would agree.  I mean, I

21  think the district court did.  I think the district court's

22  decision said a number of things about the fact that defenses

23  are not impaired.  I think that language is already in the TDP.

24     What we're saying would be problematic would be saying

25  that somehow things like orders of the court don't apply to

1    them, that res judicata doesn't apply to them, that they are
2    somehow entitled to pre-petition circumstances rather than just
3    pre-petition contracts.  Their contracts apply, but they apply
4    to a world in which the bankruptcy case occurred.  And the
5    judge made certain rulings.  And the coverage court can apply
6    those rulings in context with the contracts that the insurers
7    wrote.

8           And I'm already getting close to the end of my time,
9    but I'm going to go to judgment reduction pretty quickly, and
10   I'm happy to answer any questions you all have on that as well.

11          On the judgment reduction point, the Allianz insurers
12   asked the court to rewrite the judgment reduction provisions,
13   which were part of the integrated whole of the deal that was
14   struck here, that ultimately got overwhelming support of the
15   creditors.  One of the things that was -- one of the pieces of
16   the deal here, and one of the reasons why this is important, is
17   the creditors were voting on a trust that paid survivors, not
18   one where insurers would be able to come back and invade the
19   corpus of that trust.  Doing so would have a real material
20   effect on the trust.  It would increase litigation.  It would
21   require the trust to consider that in her coverage litigation
22   sphere.  And it would create a situation which would make
23   difficult, as a district court found, that she might have to
24   project those claims -- take into account those claims in
25   paying insurers.  And I know --

1    JUDGE RENDELL:  But doesn't -- this violates Purdue,

2    though.  You're saying they don't have a claim, which they

3    rightly have, discharging a potential claim of theirs.  So how

4    could they?  Because I mean, it's Purdue, is it not?

5    MS. QUINN:  Well, I think what the district court --

6    the analysis that the district court did was basically a 363

7    sale adequate protection analysis.  And I don't know that 3 --

8    I don't know that Purdue eliminates that.  I mean, while it

9    didn't actually say that, we're talking about this settle --

10   it's a claim against the settling insurers, that is, the

11   contribution claim here.  And that's the asset that's sold.  So

12   essentially, insurers are asking for protection for their

13   contribution interest in that settled coverage.  And the

14   district court found that they were adequately protected for

15   that interest.

16   JUDGE RENDELL:  Well, but doesn't it say they can't go

17   against the trust for this amount that they're owed?

18   MS. QUINN:  It does.  But the court found that they're

19   adequately protected because they get paid in other ways, which

20   is the reduction of overall defense costs through the court,

21   through the trust's procedures, which massively reduces their

22   overall defense costs.

23   JUDGE KRAUSE:  What's that finding based on?  I mean,

24   there's no --

25   MS. QUINN:  You're right.

1          JUDGE KRAUSE:  -- evidentiary hearing on that point.

2          MS. QUINN:  You're right.  And the reason for that is

3      because the Allianz insurers didn't raise this objection at all

4      in any of its briefing at the bankruptcy court level.  They

5      proposed language that did this, but never actually requested

6      this relief until oral argument on the form of the confirmation

7      order.

8          And ultimately, what the bankruptcy court did is she

9      took two proposed orders under advisement and chose one.  She

10     did not make findings on this.  And that's true.  But the

11     reason for that was Allianz's failure to raise it in twenty-

12     nine days of trial or any of the confirmation briefing.

13         JUDGE KRAUSE:  But they proposed language.

14         MS. QUINN:  They did, but they never tried to justify

15     it.  And so the court simply did not -- they --

16         JUDGE RENDELL:  It was language that the BSA had

17     proposed originally.

18         MS. QUINN:  No, this language is different.  The

19     judgment reduction language is not language that the BSA

20     originally proposed.  This is language that was exclusively

21     proposed by the insurers in an exhibit to -- an objection to

22     the form of the confirmation order.

23         JUDGE KRAUSE:  So if we think that there is a Purdue

24     problem here --

25         MS. QUINN:  Um-hum.

1          JUDGE KRAUSE:  -- but it's not apparent that it's, in

2     reality, anything but speculative, wouldn't the right course be

3     to remand for fact finding on that point?

4          MS. QUINN:  I mean, it may be.  It may be.  I think

5     the fact that the trust procedures will massively reduce

6     defense costs -- I think there is ample record support for

7     that, including a variety of the purposes that the bankruptcy

8     court found.  I think she said a number of things in the intent

9     of the process being an efficient method of payment for

10    survivors.  There's a variety of facts about the purpose of the

11    trust being to streamline processes and the like.  So I think

12    that this Court could take a look at the fact findings she did

13    make, although they were not made in connection with this

14    argument, and find ample support for the fact that the trust

15    procedures will significantly reduce overall defense costs.

16         JUDGE KRAUSE:  Okay.

17         MS. QUINN:  Thank you.

18         JUDGE KRAUSE:  Thank you.

19         MR. SMOLA:  Good afternoon.  May it please the Court,

20    Evan Smola on behalf of some amici survivors, and I'm here to

21    give the Court some perspective from the vast majority, indeed,

22    the overwhelming majority of survivors that support this plan.

23         Survivors have relied upon the order of the bankruptcy

24    court, the affirmance of the district court, and the ongoing

25    administration by our Trustee.

1    Judge Krause, earlier, you were concerned with

2    bringing equitable mootness to new heights.  And I want to

3    touch upon exactly why this is an extraordinary case that does

4    not do that.

5          After the effective date, and during the eighteen-

6    month implementation of the plan, the processes outlined within

7    the plan inflicted real human costs upon survivors.  Those are

8    sunk costs.  They cannot be unwound.  They cannot be refunded

9    or remedied.

10         To start, survivors answered an eighty-one-page

11   questionnaire.  It asked that survivors focus on their abuse,

12   think about it, relive it.  It asked questions like, were you

13   penetrated?  And if so, how many times, when, and where?

14         The plan asks that survivors demonstrate that they

15   actually participated in scouting through extrinsic evidence.

16   Survivors scoured basements and attics and garages to find

17   their old scouting memorabilia to prove they had a claim.  When

18   they couldn't do that, the Trustee asked that they prove it

19   through a third-party affidavit, a friend, or a family member.

20   This required survivors to disclose their abuse, a secret

21   hidden for years, to friends or family in order to explain why

22   they needed such an affidavit.

23         Survivors with health problems over the last eighteen

24   months have hired probate attorneys to ensure that their claims

25   could be advanced by their family and that their family could

1  recover.  Once again, this required they disclose their abuse

2  to their family.

3          Sadly, our firm represents about five percent of the

4  total population of survivors.  We have had 250 of those

5  individuals pass away in the last four years.  Many of them

6  specifically instructed us not to tell their families about

7  their claim.  So when they died, their claim died, too.

8          Independent review claimants.  It's akin to a binding

9  arbitration.  Those claimants have subjected themselves to six-

10  hour depositions and eight-hour arbitration hearings.  They've

11  relived their abuse, heard attorneys talk about their abuse and

12  dissect their abuse.

13          And finally, thousands, indeed, more than 10,000

14  claimants, have finally reached something approximating the end

15  of this ordeal.  They've finally received acknowledgment.  You

16  were abused in scouting, and we believe you.  While the Court

17  may be concerned that not a huge, vast amount of money has gone

18  out the door, relevant to what is owed, this closure, this

19  acknowledgment that this happened and that our Trustee believes

20  them, is an enormous step towards closure for childhood sexual

21  abuse victims.  Those claimants signed a release.  They signed

22  away their rights in reliance upon the plan and in exchange for

23  continuing their claim within the trust.

24          The hard and painful work of childhood sexual abuse

25  survivors is done.  The deadline to complete that work passed

1   in July.  57,000 survivors tore away that scar tissue and faced

2   their abuse head on, because that's what the confirmation order

3   required of them.  They did so at a terribly steep personal

4   cost, costs for which there are no remedies.  A survivor cannot

5   untell a family member that he hid sexual abuse from them for

6   years.  A survivor cannot undo the nightmares experienced in

7   the days after going through this questionnaire.  A survivor

8   cannot mend the relationship with a family member who no longer

9   speaks to him after disclosing his abuse.  And a survivor

10   cannot unwind the damage done to a marriage when disclosing to

11   a spouse a secret hidden for decades.

12         The costs paid by tens of thousands of survivors in

13   reliance on this plan warrants affirmation and dismissal of

14   these appeals.  A remand or an unwinding of the plan would

15   devastate the survivor community, 0.02 percent of objectors

16   notwithstanding.  It would deprive hundreds, if not thousands,

17   of survivors from obtaining justice, as they will die waiting.

18         Judge Rendell, you've asked a number of attorneys, as

19   a practical matter, what would happen if this plan is unwound.

20   In the survivor community, it would be devastation.  I urge

21   this Court to allow the plan to go forward in its entireties.

22   And if the equities rest with anyone, in this case, it is with

23   the survivors that have done everything our justice system has

24   asked of them.  Those survivors now see an end in sight, and it

25   is an end they desperately need.

1    Unless you all have any questions, thank you for your

2    time.

3    JUDGE KRAUSE:  We thank you, counsel, for your

4    application to appear as amici today and to offer this

5    important perspective.

6    The Court is certainly aware, and all counsel, as we

7    talk about these interesting legal issues, that behind them are

8    real people.  And the horrific experiences that are what

9    brought all of us, at the end of the day, to court here to

10   discuss these issues are well within the consideration of the

11   Court, as well as the need for a timely resolution by this

12   Court.

13   MR. SMOLA:  Thank you, Judge.

14   JUDGE KRAUSE:  Thank you.

15   Thank you.  We'll hear from you in rebuttal.

16   MS. DUMAS:  Thank you.

17   Your Honor, I am Gilion Dumas, back.  I'd like to

18   address Judge Rendell's concerns about what relief might be

19   possible, and also the full satisfaction issue.  So I will go

20   quickly unless you interrupt me.

21   We have asked for lesser relief.  And as this Court

22   has made clear, it's the Court's obligation to consider lesser

23   relief.  This is a small number of claimants.  They're also

24   human beings.  They're also sexual abuse survivors.  And

25   they're not asking for special treatment.  They're asking for

1   the treatment pretty much laid down by the Supreme Court in

2   Purdue, and as claimants who preserved their appeals --

3   preserved their objections below, and have now filed appeals to

4   argue their objections.

5          But they are also entitled to relief, not special

6   relief, but we have suggested several types of relief that

7   could apply, including an opt out just for them from the third-

8   party releases.  That does not affect the sale of the insurance

9   policies, because the releases are separate from the insurance

10  policies.  They're part of the plan.  They're the keystone --

11  the releases are the cornerstone of the plan, not the sale.

12         And we could get a -- a release that simply allowed us

13  to pursue the claims against the local councils and chartered

14  organizations without that one asset of the shared insurance

15  rights in BSA's property, because these other entities have

16  their own assets.  That's only one form of relief that we asked

17  for.  We suggested several others.

18         JUDGE KRAUSE:  But to the extent that's part of the

19  consideration, and --

20         MS. DUMAS:  Sorry.

21         JUDGE KRAUSE:  You could anticipate being interrupted.

22  But to the extent that's part of the consideration that is

23  being paid, and the opt outs take that out of the picture, that

24  would seem to increase the costs to the settling insurers.  Why

25  doesn't that go straight to the validity of the plan?

1          MS. DUMAS:  I guess I'm not being clear.

2          JUDGE KRAUSE:  It wouldn't be the sale.  Sorry.

3          MS. DUMAS:  It wouldn't affect the consideration that

4     the settling insurers paid if the settling insurers are still

5     not on the hook under those policies that were sold.  As long

6     as the policies remain sold -- which we argue the sale is not

7     complete until the money gets transferred -- but we're saying

8     we can continue with -- I mean, the releases, as for the claims

9     just against the third parties, not against the insurance

10    companies. Those were not consideration for the sale.  Yes, the

11    insurance company wanted a release from their obligations under

12    those policies, but that does not mean that our claims on the

13    merits went away against those third-party local councils and

14    chartered organizations.

15         And so even if -- I mean, the claims of the chartered

16    organizations and the local councils for coverage under BSA's

17    policies -- those were potential claims against the Debtor for

18    the Debtor's assets, the coverage under those policies.  But

19    the claims by third-party sex abuse victims against the local

20    councils and the chartered organizations -- those are not vis-

21    a-vis those two parties.  That does not affect that

22    consideration that the settling insurers wanted.

23         Again, we could go forward with the claims against the

24    released parties without touching that shared insurance policy.

25    That's just possible relief, though.

1        This issue is in front of the Court for the first

2    time.  No lower court considered mootness, either statutory or

3    equitable, so as the Supreme Court said in MOAC Mall, the

4    appellate court doesn't decide what relief is possible as a

5    matter of first impression.  It would have to be -- this Court

6    need only decide that some kind of relief is possible, given

7    the wide scope of equitable relief.  And then it would be up to

8    the bankruptcy court to decide what particular relief would

9    work.  That makes this case, unlike the cases in Nordhoff or

10   Energy Future, where the appellants were tied into one very

11   specific type of relief -- we're open to any types of things

12   that might come up.

13        It was up to the appellees to say that absolutely no

14   possible relief was available, and all they said was, well, you

15   can't reverse the plan, and you can't strike the releases.  But

16   an opt out just for us, extra money from the local councils --

17   that's not special treatment within the class, because the

18   local councils aren't bankrupt.  They're non-parties.  They're

19   non-bankrupt debtors.  So the limitations on treating members

20   of a class differently don't apply.

21        If you give me one chance to address the full

22   satisfaction issue --

23        JUDGE KRAUSE:  Briefly.

24        MS. DUMAS:  -- the bankruptcy court only made findings

25   as to the likelihood of full payment of settlement value.

1  Settlement value is not full satisfaction.  Full satisfaction

2  is a term of art in bankruptcy that applies to claimants who

3  are in classes whose claims are unimpaired.  The abuse

4  claimants were in an impaired class.  Their rights for their

5  claims were impaired.  That's why they're entitled to vote.

6  And the treatment in the plan does not provide for full

7  satisfaction to abuse claimants, unlike the specific, express

8  treatment for unimpaired classes under the plan, who are

9  promised satisfaction in full by complete payment of their

10  claims.

11       JUDGE KRAUSE:  What do we make of the bankruptcy

12  court's finding that there would be full satisfaction and our

13  review for clear error?

14       MS. DUMAS:  No.  The bankruptcy court did not make any

15  findings about satisfaction in full or full satisfaction.  At

16  most, the bankruptcy court found that the plan was likely, for

17  purposes of confirmation, to pay full settlement value.

18       But settlement value is not the full value of the

19  claims because the claims have never been adjudicated.  So no

20  one knows the actual full amount it would take to satisfy the

21  claims.  They haven't been measured.

22       There are no findings that this plan provides for full

23  satisfaction of the claims, and there's nothing in the plan

24  about providing full satisfaction to abuse claimants.

25  Absolutely nothing.  At best, it's only full payment of

1  settlement value, and we know that that won't apply here

2  because the settlement Trustee, herself, has said that the

3  claimants are almost certainly not going to be paid full

4  settlement value.

5       Again, that's not full satisfaction.  And the one

6  satisfaction doctrine doesn't even come into play unless

7  there's full satisfaction, which there isn't here.  And there

8  were no findings about one satisfaction below.  That only

9  applies if states only have joint and several liability.  The

10  court never considered that.  And my clients are from, like,

11  Oregon and California -- states that have several-only

12  liability.

13       So the one satisfaction rule doesn't even apply.  But

14  it certainly doesn't apply where there's been no full

15  satisfaction.  Okay.

16       JUDGE KRAUSE:  Thank you.

17       MS. DUMAS:  Thank you.

18       MS. LUJAN WOLFF:  Hello.  Delia Lujan Wolff, again,

19  for Lujan claimants.  I would just like to hit on some points

20  and then end with effective relief.  I'll be quick and answer

21  any questions.

22       JUDGE RENDELL:  Ms. Wolff.  Ms. Wolff, can I ask you a

23  question?  You were talking about 363(l) and its impact on

24  whether this is a sale under (b) and (c) or a sale under a

25  plan.  And I'm assuming you're referencing -- under (l), the

1  trustee can use, sell or lease property under (b) or (c) of

2  this section, or a plan under 11 may provide for the use, sale,

3  or lease.  You draw the distinction that, when we come to

4  363(m), it has to be a sale under (b) or (c), not a sale under

5  a plan.  Is that your argument?

6         MS. LUJAN WOLFF:  That's exactly correct because

7  Section 363, as expressed in subsection (l), clarifies that

8  these are two different transactions.  And then in the

9  legislative history of subsection (o), Congress, again, did

10  that when it decided to take out subsection (o) applying to

11  plan sales, and just make it a sale under a subsection under

12  363.  And so, yes.

13         JUDGE RENDELL:  Is that in your briefing?  Is that in

14  your briefing?

15         MS. LUJAN WOLFF:  It is in our opposition to the

16  motion -- to the settling insurers' motion to dismiss.

17         Regarding 363(m), we've also made the argument that,

18  if it applies to bar direct actions, then it's reverse

19  preempted under the McCarran-Ferguson Act by Guam's Direct

20  Action Statute, which is a statute -- we explained how that

21  applies.  It's a statute -- every court that's looked at --

22  except for the lower courts, every court that's looked at a

23  direct-action statute has held that it is a statute that -- a

24  state law that applies, as defined under the McCarran-Ferguson

25  Act.  And so it reverse preempts 363.

1      363 doesn't even allow an injunction of nondebtor

2   claims anyway.  But if it's construed as such, then it would be

3   reverse preempted.

4      Regarding full satisfaction, there's no full

5   satisfaction.  The court made it clear that its estimate of the

6   aggregate value was only for purposes of confirmation,

7   specifically to meet the Master Mortgage factors, which are now

8   invalid under Purdue.  Those tests don't exist anymore.

9      And the court also made it clear that its estimate of

10  the aggregate value of claims did not establish the actual

11  value of any single claim or the actual aggregate value of

12  Direct Abuse Claims.  And so there has been no finding by the

13  court of actual value of the claims, or that they've actually

14  been fully paid or satisfied.  The one satisfaction rule cannot

15  apply.  And it also doesn't apply when there's direct

16  liability, as there is by the nondebtors.  There is --

17      JUDGE RENDELL:  Are you saying the court stated,

18  specifically, that it wasn't establishing actual value?

19      MS. LUJAN WOLFF:  Yes.  And that was specifically

20  stated in the confirmation order.  And we quoted that in our

21  brief regarding the effect of Purdue.

22      Also, there was mention that the Boy Scouts had

23  contractual indemnification liability.  That is not true.  They

24  disclosed in their disclosure statement, that the court

25  approved and sent out to everybody -- they did disclose that

1    they denied indemnification liability, but that if there was

2    any, that the chartered organizations would be paid by the

3    trust.

4           They also made a claim against the Archdiocese of

5    Agaña, which is a chartered organization.  They made a claim

6    for contribution and indemnification for the settlements that

7    they did in Guam for scouting abuse.

8           And we also explained that the annual unit charter

9    agreement, the BSA board resolution -- those are not contracts

10   for indemnification.  And even if they are, they have

11   conditions that they fail to -- that the court made no findings

12   that those conditions were met.  And so there is no contractual

13   indemnification liability.

14          Effective relief.  The plan, specifically the

15   confirmation order, specifically says that the settling

16   insurers could enter into a settlement with the Archbishop of

17   Agaña, its estate -- the Archbishop of Agaña is a bankrupt

18   chartered organization who my clients have claims against --

19   most of them.  And the plan specifically says, in the

20   confirmation order, that the settling insurers can reach a

21   settlement with the archdiocese, with the estate, or with the

22   creditors, which include Lujan claimants.  And so, built into

23   the plan and the confirmation order, is relief that can be

24   granted, regardless of the sales.  So that's relief that can be

25   granted.

1          There's also built into -- again, built into the

2     agreement, as cited by the settling insurers in their reply,

3     they said that they can't untangle the money that they paid for

4     two things, the policies and the releases, their complete

5     peace.  That is not true.  What they have just said in their

6     reply is that if the plan is reversed or modified, or changed

7     in some way, and the confirmation order isn't non-appealable,

8     then they keep the policies, but they get back the escrowed

9     money because they don't have protection anymore as Protected

10    Parties.

11         And so built into these agreements, the settlements,

12    is that yes, you can have a valid sale.  Okay.  363(m) is only

13    protecting that -- the validity of the sale.  You can have a

14    valid sale of the policies, or you can have a valid sale of

15    property.  But you can still -- what they're saying is you --

16    they're going to get their money back, because people can sue

17    them.  Because they're no longer Protected Parties.  And so the

18    insurance settlements untangle the policies from the money that

19    they paid into escrow and the releases themselves.

20         JUDGE KRAUSE:  I'll give you a minute to wind up.

21         MS. LUJAN WOLFF:  Yes.  And I just wanted to also add

22    that the contractual liability -- that is something that's

23    usually required, the automatic liability, in order for the

24    shared insurance to lead to a finding of subject matter

25    jurisdiction.  We don't have that here, so the shared insurance

1  is not enough.

2        We also argue that the proceeds, Your Honors, are not

3  part of the insurance -- I'm sorry, part of the estate.  Other

4  things that are not a part of the estate -- they can't make

5  local council policies a part of the estate, because they were

6  not obtained using a pre-petition estate property.  And so the

7  local council policies cannot be sold under 363 and enjoy the

8  benefits of 363(m) because they never became estate property.

9        JUDGE KRAUSE:  Okay.  Thank you.  We appreciate those

10 points from your brief as well.

11       MR. BAIO:  I will be brief.  We're not seeking an

12 advantage, Your Honor.  We're asking that this Court give us

13 language that preserves what this Court said in Combustion

14 Engineering, that we have contractual rights, which will be

15 decided based on the policies and not on anything else -- state

16 law, of course.

17       The problem is compounded by what both the district

18 court and the bankruptcy court said, which is, I will not tell

19 the coverage court how to interpret this brick of information.

20 So it now is up to the coverage court.  And that is improper.

21       The policies have not been transferred.  It's

22 interesting that the settling insurers transferred their

23 policies.  But the plan specifically says it's transferring

24 rights -- but not the policies themselves -- in parentheses,

25 but not the policies.  That flies in the face of the common

1    reuse principle and a bedrock principle that the assignee or

2    the transferee stands in the shoes of the party that

3    transferred.  That's what we're asking to be preserved.  And so

4    far as the language, we want the same language.

5         And I want to be very clear, where I don't believe

6    it's adding a new advantage to the insurers.  On page 2 of our

7    reply brief, we have two provisions.  Nothing in the TDPs shall

8    affect, impair, or prejudice the rights and defenses of the

9    non-settling insurance companies in any manner, period.  That's

10   the language that we're asking for.  It is comparable to the

11   language that is in all the plans that we brought to the

12   attention of the court, including those from the Third Circuit.

13        The other is this.  A decision by the settlement trust

14   to pay or not to pay any submitted abuse claim shall not be

15   used in, be admissible as evidence in binding, or have any res

16   judicata, collateral estoppel, or other preclusive effect in

17   any lawsuit or other proceeding against another entity, other

18   than the settlement trust.

19        All that we are asking is that whatever happened in

20   the bankruptcy court -- and this, again, is in the other plans

21   that we've identified -- is not res judicata or binding and not

22   anything.  The decision to pay a particular amount -- in other

23   words, the trustee cannot say -- should not be allowed to say,

24   because I followed what's in the plan, that's what you owe me.

25   That's what we do not want.  That's what we're trying to get at

1   with that language.

2          And Your Honors, we are very sensitive to the timing

3   issue.  And we understand what that means to the claimants.

4   That's why we proposed the specific language that BSA had

5   proposed.  And we think that it's appropriate to add it because

6   if you just send it back, or you just say that, oh, our rights

7   are preserved, we still have the problem of the plan.  And if

8   we simply go back without express language, there may be

9   litigation over what it has to be.  We are giving you this

10  language because we think that it will streamline anything that

11  happens thereafter.

12         And by the way, nothing in the Bankruptcy Code permits

13  an assignment of rights without obligations.  They simply don't

14  have that right.  And the jurisprudence of this circuit makes

15  it clear, I think, with respect to what the Trustee is doing --

16  and we did hear one comment that lawyers are very creative.

17  But by making 600 pages of documents and provisions, that are

18  designed not to impair or have any effect on insurers, somehow

19  imposed on the insurer, invites creativity that really has no

20  place in the coverage court.

21         I ask that you look at paragraphs 110 and footnote 2

22  and paragraphs 131 of the Trustee's complaint.  And we ask you

23  to take judicial notice of that.  We think that it is trying to

24  play and parlay the plan into an advantage for the Trustee.  We

25  are seeking to have the bedrock principle that our rights in

1    the insurance policies, our defenses, and the Trustees' rights

2    are unchanged by virtue of the bankruptcy law, except with

3    respect to the anti-assignment provision, where it is

4    applicable.  That's it.  And that's what our changes made

5    clear.

6              There was a reference -- and I'll spend fifteen

7    seconds if I can -- there's a reference to -- the fact that

8    this is a closely integrated transaction, and that somehow, if

9    we get what we're asking for, somehow the whole thing blows up.

10   It's just to say so.  It's not really demonstrated by anything

11   if these changes were made.  But we ask you to look at and take

12   notice of the fact that when the vote occurred on this plan,

13   there were a bunch of provisions, including some anti-insurer

14   provisions that were knocked out by the bankruptcy court.  And

15   we don't have a problem with what she knocked out.  We do have

16   a problem with what was retained.

17             After that, there was no revote.  There was no, oh my

18   goodness, we didn't get what we were asking for, so everything

19   goes away.  We think that that demonstrates that the relief

20   that we're seeking is, in many ways, harmless to the overall

21   effect of the plan.

22             Finally, just one last thing.  In our good faith

23   section -- which, by the way, Truck is a good faith case -- we

24   seek two changes that are very specific, and I invite the Court

25   to review the back end of our papers to see what our position

1    is on that language.

2         With that, unless you have anything for me, Your

3    Honors, I will sit down.

4         JUDGE KRAUSE:  Okay.

5         MR. BAIO:  Thank you.

6         JUDGE KRAUSE:  Thank you very much.

7         MR. WINSBERG:  Yes, it is afternoon.  Good afternoon,

8    Your Honors.  Harris Winsberg, on behalf of the Allianz

9    insurers.

10        Just real briefly, the FCR raised that we hadn't

11   raised our objections until the very end.  And that's just not

12   accurate.

13        When the plan was solicited out, there was no judgment

14   reduction clause.  We actually objected on that basis, that we

15   had these claims that are being enjoined.  And we objected.

16   They filed another plan.  We objected.  We got to the

17   confirmation hearing.  There's a transcript.  I argued that.

18   We objected again and asked for it.  So we repeatedly asked,

19   throughout the process, for relief from these injunctions.  And

20   I would submit to the Court, you could look at pages 17 through

21   20 of our opening brief.  We outline those record cites.

22   There's no need to -- I can cite them.  No reason to waste the

23   Court's time with that.

24        The other point, with respect to that, was there was a

25   concept this plan is integrated as a whole, kind of the Chicken

1  Little argument this Court has brought about over the years and

2  been not a basis for mootness.  And here the clause -- the

3  judgment reduction clause you're being asked to say is okay by

4  the appellees -- it wasn't solicited out for vote.  It came

5  after the fact.  So it's impossible for the claimants who voted

6  to have relied on what they're now claiming you should rely

7  upon.

8           The other point I would make is, there was a comment

9  about, well, only abuse claims are in the trust.  But that's

10  not true either.  There are indirect abuse claims, claims that

11  are contribution, and other rights that are also channeled to

12  the trust.  So the idea that only abuse claims are in the trust

13  is just not accurate.

14          There was a comment about adequate protection.  Well,

15  if we were looking at adequate protection, in its truest sense,

16  under 363, that would be, our claims would attach to the

17  proceeds that are in the trust.  That gets to the same place

18  that we would be with the trust backstop.  So whether we get

19  looked at from adequate protection in a classic sense under

20  363, or whether the trust backstop, which we have proposed, it

21  gets us to the same place.

22          Your Honor had a question about that, well, maybe I

23  need a remand because there could be -- on a finding on the

24  reduction of defense costs.  We would submit that that whole

25  framework of a net benefit is inapplicable to this case.  Under

1    Purdue, we're entitled to be paid.

2         To the extent that there is a net benefit, that

3    analysis relied on Plant.  And the Plant decision -- and even

4    the Ninth Circuit, in Plant, specifically says, we are relying

5    on a specific statute under 524(g) to say we can do this.  And

6    then when the Ninth Circuit went on to distinguish that from

7    Dow Corning and other cases that talk about nondebtor releases,

8    where you needed to have a mechanism to pay the claims in full,

9    and said, those don't apply here.

10        So for all those reasons, we respectfully submit that

11   the Court should adopt the language we've attached to our

12   opening papers, our remand with instructions.

13        And thank you for the Court's patience and time.  It's

14   been tremendous.  Thank you.

15        JUDGE KRAUSE:  Well, we thank all counsel.  The extent

16   of work that's gone into the really superb briefing that we've

17   gotten from the parties and from amici in this case is very

18   helpful to the Court in working through this very important

19   case.  We'd ask that a brief [sic] be prepared, and the parties

20   can divide up costs -- I'm sorry, that a transcript be

21   prepared, and the parties can divide up the costs.  And we'll

22   take the case under advisement.  Thank you.

23        (Whereupon these proceedings were concluded at 3:00PM.)

24

25

1

2

C E R T I F I C A T I O N

4

5    We, Jennifer Ritchie and Valerie Baxter, certify that the

6    foregoing transcript is a true and accurate record of the

7    proceedings.

8

9

10

     /s/signature

11   _____

12   Jennifer Ritchie (CDLT-335)

13   TTA-Certified Digital Legal Transcriber

14

15

16

     /s/signature

17   _____

18   Valerie Baxter

19   Date: November 14, 2024

20

21

22

23

24

25   Date:  November 14, 2024

| & | | | |
|---|---|---|---|
| **&** 4:4,13,22 5:6 5:24 7:11,20 | **1201** 6:2 | **23-1664** 1:16 | **335** 122:12 |

**&**

**&** 4:4,13,22 5:6
5:24 7:11,20

**0**

**0.02** 104:15

**1**

**1,600,000,000**
71:19 76:25
**1.4** 19:13
**1.6** 93:16
**10** 36:8 37:5
**10,000** 55:12,13
103:13
**10007** 6:13
**10019** 4:25
**10020** 7:23
**1017** 34:6
35:25 36:3
**1033** 34:6 36:4
36:5,7
**10:00** 2:9
**10th** 14:2
**11** 30:3,7,20
31:21 111:2
**110** 34:21
117:21
**1101** 54:10
**1123** 30:12
31:15 92:17
93:2,7,8
**1129** 43:15
**11th** 14:2
**120** 95:13

**1201** 6:2
**1221** 7:22
**131** 117:22
**1334** 69:19
**14** 122:19,25
**157** 34:16
36:14
**1625** 6:20
**16th** 3:5 6:3
**17** 119:20
**180** 79:7
**189** 19:11
**1976** 11:9,21
88:6,9,13,16
**19899** 6:4

**2**

**2** 34:24 116:6
117:21
**2,300,000,000**
71:18
**2.4** 91:9
**2.64** 89:18
**20** 7:13 119:21
**200** 79:6 89:18
**20003** 7:6
**20006** 6:21
**2019** 30:15
**2021** 25:9
**2024** 2:8
122:19,25
**206** 45:19
**207** 3:5
**2082** 92:22
**2250** 7:14

**23-1664** 1:16
**23-1665** 1:16
**23-1666** 1:16
**23-1667** 1:16
**23-1668** 1:16
**23-1669** 1:16
**23-1670** 1:16
**23-1671** 1:17
**23-1672** 1:17
**23-1673** 1:17
**23-1674** 1:17
**23-1675** 1:17
**23-1676** 1:17
**23-1677** 1:17
**23-1678** 1:18
**23-1780** 1:18
**238** 4:15
**249** 35:16
**250** 6:12 103:4
**252** 35:16
**2525** 5:17
**257-0885** 3:7
**260** 55:18
**28** 69:19

**3**

**3** 9:15 17:8
93:7 99:7
**3.6** 91:9
**30** 27:19
**300** 4:16 41:19
**303** 5:8
**30308** 5:10
**32** 85:7
**33** 85:7

**335** 122:12
**3600** 5:9
**363** 16:3,7,9,16
16:19,21,24,25
17:2 20:18,24
26:16 28:20
29:15,17,24,25
30:1,4,10,16,18
31:6,12 51:20
51:22 52:23
58:17,22 59:17
59:19,25 60:7
61:1,3,5,8,10
61:14,14,14,23
62:18 63:3
64:2,7,14,17,20
64:22 68:8,25
69:5,22 70:3
73:7 74:14
76:9 77:11,16
78:13 79:4,24
79:25 80:22
81:9 82:9,11
83:15 93:5
99:6 110:23
111:4,7,12,17
111:25 112:1
114:12 115:7,8
120:16,20
**363's** 80:4
**3835** 4:6
**3:00pm** 121:23

| 4 | 8 |
|---|---|
| **4** 61:2 65:25 | **800** 3:7 |
| **4.2** 89:19 91:14 | **82,500** 89:13 |
| **4.4** 89:19 91:14 | **827** 85:7 |
| **400** 7:5 | **828** 85:7 |
| **48** 84:22 85:4 | **842** 84:23 |

| 5 | **85016** 5:19 |
|---|---|
| **5** 61:2 93:2,8 | **85020** 3:6 |
| **500** 5:18 | **86** 56:22 |
| **51** 45:9 | |

| | 9 |
|---|---|
| **524** 50:12,15,17 | **90** 46:21 |
| 50:17 121:5 | **9019** 94:23,23 |
| **57,000** 104:1 | **909** 88:16 |

| 6 | **931** 88:19 |
|---|---|
| **6** 2:8 92:17 | **96910** 4:17 |
| **60,000** 89:14 | **97212** 4:8 |
| 95:16 | **975** 54:18 |

| | a |
|---|---|
| **600** 38:5 41:18 | **ability** 49:18 |
| 117:17 | 72:24 73:4 |
| **601** 2:5 | 75:18 94:3 |
| **60603** 7:15 | 95:5,11 |

| 7 | **able** 29:11 |
|---|---|
| **7** 6:11 77:9 | 83:18 91:4,11 |
| **700** 7:4 29:1 | 91:13 98:18 |
| **7227** 3:5 | **abrogate** 17:7 |
| **74** 41:2 | **absent** 21:21 |
| **75** 42:20 | 57:4 |
| **750** 29:2 | **absolute** 12:20 |
| **76** 11:10,10,12 | 14:16 75:12 |
| 11:15,17,18 | 90:1 |
| 12:8,13,14,21 | **absolutely** 9:16 |
| **787** 4:24 | 37:9 45:23 |
| | 60:15 70:6 |

72:14 80:19
108:13 109:25
**abuse** 8:21 9:20
9:24 10:3 26:8
27:2 46:11
48:1,3 59:9
70:19 80:20
86:16 91:5,6
102:11,20
103:1,11,11,12
103:21,24
104:2,5,9
105:24 107:19
109:3,7,24
112:12 113:7
116:14 120:9
120:10,12
**abused** 103:16
**abuser** 91:6
**access** 48:17
**account** 98:24
**accrued** 45:11
**accurate** 67:14
119:12 120:13
122:6
**achieving**
18:17
**acknowledge**
68:4 71:16
**acknowledged**
45:20
**acknowledg...**
103:15,19
**act** 111:19,25

**acting** 37:22
**action** 10:1,5
29:12 34:17,23
42:7 96:25
111:20,23
**actions** 111:18
**actively** 45:22
**actual** 27:11
86:20 96:20
97:7 109:20
112:10,11,13
112:18
**actually** 8:20
15:1 19:11
20:8 27:10
28:2,2,4 35:22
38:18 42:15
44:22 45:11
54:25 56:4
58:20,21 83:6
99:9 100:5
102:15 112:13
119:14
**add** 33:3 42:1
84:21 94:22
114:21 117:5
**added** 42:21
**adding** 30:17
97:12 116:6
**addition** 41:21
**additional** 28:7
41:25 42:18
84:21
**address** 32:23
35:21 39:23

52:3,10 69:21
71:2 79:25
80:24 81:24
84:14 85:11
88:21 92:23
96:6 105:18
108:21
**addressed**
21:18 43:9
61:14 80:25
91:23 92:18
**addressing**
44:13 51:19
52:12 84:17
92:25
**adequate** 47:10
47:11 50:9
90:14,17 93:11
99:7 120:14,15
120:19
**adequately**
66:4 99:14,19
**adjudicated**
109:19
**adjudicatory**
20:22 21:1
**administration**
101:25
**admissible**
87:25 88:1
116:15
**adopt** 121:11
**advanced**
102:25

**advantage** 65:9
115:12 116:6
117:24
**adverse** 44:6
87:14
**adversely**
33:11 41:14
42:16 43:2,13
43:21
**advisement**
100:9 121:22
**advocate** 85:15
**affect** 17:15
33:11 41:14
42:16 55:16
64:10 80:7
81:12 83:21
84:4 106:8
107:3,21 116:8
**affected** 43:13
72:15
**affecting** 82:25
**affidavit**
102:19,22
**affidavits** 22:13
**affiliates** 79:22
**affinity** 88:8
**affirm** 56:3
**affirmance**
79:24 80:12
101:24
**affirmation**
104:13
**affirmative**
41:21

**affirmatively**
35:2 39:12
**affirmed** 65:15
**afternoon**
67:14 79:20
84:12 96:3
101:19 119:7,7
**agaña** 113:5,17
113:17
**age** 91:7
**aggregate**
46:22 112:6,10
112:11
**ago** 77:16
**agonizing** 52:6
59:6
**agree** 11:4
14:14,23 58:17
67:22,24 77:18
93:21 94:17
97:15,20
**agreed** 49:1
**agreement**
113:9 114:2
**agreements**
76:5 114:11
**ahead** 29:14
32:17 63:15
77:14 89:8
**akin** 103:8
**allegation**
85:18 86:14
**allegations**
85:14,19

**allianz** 45:2,3
45:11,23 46:11
98:11 100:3
119:8
**allianz's** 100:11
**allow** 18:24
61:15 104:21
112:1
**allowed** 13:6
106:12 116:23
**allowing** 62:8
71:15
**aloha** 18:13
**alter** 47:24 52:2
**alteration**
40:24
**altering** 40:8
**alternative**
10:6 48:22
**amend** 84:24
**amended** 97:18
**amending**
84:25
**america** 1:6 8:5
18:13 23:13
24:23 26:11,13
26:14 27:2
51:16 84:13
**american** 35:19
**americas** 7:22
**amici** 21:12
22:8 101:20
105:4 121:17
**amicus** 88:25

**amount** 49:4
51:10 79:7,9
81:15 89:9,15
89:17,21,23
91:15 99:17
103:17 109:20
116:22
**ample** 101:6,14
**analog** 54:3
**analysis** 9:6,7
21:22 67:17,18
99:6,7 121:3
**analyze** 31:11
**andrews** 74:12
79:9
**anker** 6:15
51:21 67:12,12
68:13,15 69:8
69:10 71:4,6
73:21,24 74:2
74:5,7,10,20,22
77:18 78:15,19
78:22 79:19
80:25 81:2,16
81:23 82:4
83:5
**annual** 113:8
**answer** 19:20
23:17 47:13
48:19 53:21
56:10 60:5
63:23 68:6
75:22,25 76:2
78:16 98:10
110:20

**answered**
102:10
**answers** 81:2
**anti** 41:4,10
118:3,13
**anticipate**
106:21
**anymore** 112:8
114:9
**anyway** 16:4
87:23 112:2
**apparent** 101:1
**appeal** 8:15,18
14:7,8 15:5
18:25 20:19
33:17 34:12
43:7 44:14
45:3 49:4,15
51:9 59:23
62:9 65:1
73:17 78:13
88:25
**appealable**
114:7
**appealing**
17:22,22
**appeals** 1:2 2:3
32:15,15,20
56:11 104:14
106:2,3
**appear** 39:18
48:24 105:4
**appeared** 25:14
**appellant** 33:21
83:19

**appellant's**
65:2
**appellants** 4:5
4:14,23 5:7 8:8
8:22 51:20
52:15,17,24
56:10,12 58:23
60:6,16 62:8
62:13 63:7
64:1,9 108:10
**appellate** 16:6
17:6,7 20:22
44:13 108:4
**appellee** 5:16
5:25 6:10,19
7:3,12,21 75:6
**appellees** 8:14
8:19 14:2 15:5
21:12 22:8,11
23:6 25:15
51:18 108:13
120:4
**appendix** 34:5
35:25 54:18
**applicable**
36:21 63:19
70:3,21 80:23
91:7 93:9
118:4
**application**
15:17 17:13
47:12 68:18
105:4
**applied** 75:16
77:17 91:2

**applies** 8:16
13:17 15:20
18:19 23:9
30:22 31:22
61:8 97:10
109:2 110:9
111:18,21,24
**apply** 11:6,11
16:3 18:21
21:21 28:20,22
29:16,17 30:19
30:25 42:7
50:15 55:22
59:18 63:23
68:9 69:22
73:3,3 74:14
81:9 84:18
88:22 89:2
97:6,11,25
98:1,3,3,5
106:7 108:20
110:1,13,14
112:15,15
121:9
**applying** 80:2
111:10
**appreciate** 52:8
64:2 115:9
**approach** 91:2
91:3
**appropriate**
25:5 26:16
33:22 39:24
51:6 63:19
67:17 68:9

77:21 117:5
**appropriaten...**
67:20
**approve** 35:13
53:7 61:3 70:1
**approved**
66:15 112:25
**approximately**
89:12,14
**approximating**
103:14
**arbitration**
103:9,10
**archbishop**
4:15 113:16,17
**archdiocese**
113:4,21
**argue** 8:15
28:21 37:21
84:9 106:4
107:6 115:2
**argued** 28:24
67:19 79:10
85:23,25 86:1
86:15 87:6,10
88:3 119:17
**arguing** 32:9
89:1
**argument**
10:12,12 11:5
17:23 27:18
44:24 60:23
64:12 66:12
68:19,22 70:6
70:13,14 76:21

77:24 82:1,10
85:11,22 86:2
96:12 100:6
101:14 111:5
111:17 120:1
**arguments**
15:6,25 21:11
31:9 52:1
67:25 69:21
82:1 84:15
85:18
**arising** 10:16
10:16
**arms** 12:17
**arose** 11:15
75:19
**arsht** 5:24
**art** 109:2
**article** 9:14
17:8 36:8 37:5
61:2 73:9,19
74:4,8,13
75:12 79:3
**asarco** 48:9
**asbestos** 48:14
50:18 75:18
**aside** 61:8 75:9
83:20
**asked** 24:6,7
35:20 39:17
57:6 63:10
65:5 78:15
82:23 88:12
98:12 102:11
102:12,18

104:18,24
105:21 106:16
119:18,18
120:3
**asking** 24:2,3
32:22 39:4
41:24 42:14,19
48:4,14 52:18
60:6 62:9
65:11 66:18
96:18,21 97:2
97:3 99:12
105:25,25
115:12 116:3
116:10,19
118:9,18
**asks** 102:14
**aspect** 32:19
59:19
**assert** 27:19
48:4 75:18
**assertions**
85:15
**asset** 12:2,7
62:23 80:5,18
80:19 81:14
82:18 94:8
99:11 106:14
**assets** 12:22,23
13:22,23 14:19
19:8 20:15
54:14,14,15,17
54:19 61:19
65:18,25 73:12
73:12 88:15

91:15 92:1,2
92:18 93:1,4
93:14,24,25
94:2 106:16
107:18
**assign** 34:4
**assigned** 27:7,9
27:10,21 28:6
28:19 34:23
35:22 71:8
84:21 88:13
**assignee** 116:1
**assignment**
27:11 28:1,3,4
34:15 36:12,13
37:10 41:4,10
41:13 70:2
87:3 117:13
118:3
**assignments**
71:3,5,6 84:15
**associate** 47:3,4
**associated**
89:19
**assume** 28:21
58:12 67:2
**assuming** 59:17
110:25
**assumptions**
53:12
**atlanta** 5:10
**attach** 120:16
**attached**
121:11

**attacking** 51:3
**attempt** 57:15
  79:4
**attempting**
  57:17
**attendant** 94:3
**attention** 44:4
  78:2 116:12
**attics** 102:16
**attorneys** 4:5
  4:14,23 5:7,16
  5:25 6:10,19
  7:3,12,21
  102:24 103:11
  104:18
**author** 68:21
**authorities**
  94:22
**authority** 26:7
  49:19 68:12
  69:3,15 70:5
  92:10,13,13,14
  92:16 93:1,14
  94:1,11,24
  95:8,9
**authorization**
  20:20 68:10
  69:16
**authorized**
  36:11
**authorizes** 93:3
  93:5,7 94:15
**authorizing**
  16:25

**automatic**
  114:23
**availability**
  48:22
**available** 35:1
  90:7,24 108:14
**avenue** 4:24 7:4
  7:22
**avoidance**
  70:19
**avoided** 63:6
**awarded** 42:15
**awards** 87:16
  96:24
**aware** 46:1,3
  105:6
**awful** 59:10
**az** 3:6 5:19

**b**

**b** 2:12 5:12
  16:25 29:24
  30:2,7,12,22,24
  30:25 31:23
  64:13 92:17
  93:5,7 110:24
  111:1,4
**back** 9:14
  11:19 15:3,7
  15:10 23:5
  24:14 25:2,2
  29:1,2,4,6
  40:14 44:8
  51:23 52:21
  53:5,25 54:1
  56:3 57:5 58:1

  60:14 61:25
  62:16,23 71:2
  76:5 77:10
  80:17 83:1
  86:23 96:12
  98:18 105:17
  114:8,16 117:6
  117:8 118:25
**backdrop**
  25:20 67:19
**background**
  35:5 40:16,18
  96:13 97:16
**backstop** 48:10
  51:4,6 120:18
  120:20
**bad** 49:10,10
**badly** 85:20
**baio** 5:3 32:8,9
  32:13,18 33:7
  33:23,24 34:3
  34:8,11,14
  35:7 36:1,3,5
  36:10,17,23
  37:3,6,9,12
  38:23 39:3
  40:18 44:25
  46:17 65:8
  115:11 119:5
**banc** 21:21
**bankrupt**
  108:18,19
  113:17
**bankruptcy**
  10:13,15 12:18

  16:23 17:6,8
  19:9 25:2,6,24
  25:25 26:4,23
  35:5,12,15,16
  35:18 36:11
  39:11 40:8,10
  40:17,23 41:23
  42:2,22 43:19
  43:20,22 45:4
  45:6 46:9,25
  47:8 48:2,6
  51:20 53:6,17
  56:20 57:21
  61:10 62:22
  65:14 66:24
  68:10 69:3,6
  70:1 73:6,7
  78:20,23,25
  80:13 81:11
  83:7 86:24
  87:5 89:12
  90:2,11 92:10
  94:15,19,20
  96:16 98:4
  100:4,8 101:7
  101:23 108:8
  108:24 109:2
  109:11,14,16
  115:18 116:20
  117:12 118:2
  118:14
**bar** 11:2 21:23
  49:9 50:22,24
  59:19 77:18
  111:18

**bare** 94:25
95:10
**bargain** 18:15
62:12 67:9
**bargained**
62:12 65:13
**bargaining**
65:13
**barred** 95:6,7
**barrier** 43:2
54:8
**barring** 25:9
**based** 13:2
28:17 43:16
48:24 50:10,12
52:6 80:13
90:12,13 91:4
99:23 115:15
**basements**
102:16
**bases** 10:18,23
**basically** 99:6
**basis** 11:7,11
20:25,25 56:12
78:3 87:24
119:14 120:2
**bates** 90:22
91:17
**baxter** 3:3
122:5,18
**bedrock** 116:1
117:25
**began** 78:6
**beginning**
52:21

**begun** 34:20
**behalf** 32:9
45:2 51:16
84:13 96:4
101:20 119:8
**beings** 105:24
**believe** 8:6 9:9
10:15 12:12
13:11,16 14:25
15:19 16:3
28:6 29:22
30:14 46:11
47:11 50:1,21
50:25 65:19
66:17 67:10
77:12,15
103:16 116:5
**believes** 86:21
103:19
**belonging**
92:24
**belongs** 92:25
**bendis** 49:11
50:20 51:5
**benefit** 62:6,24
120:25 121:2
**benefits** 28:9
34:17,22 115:8
**best** 109:25
**better** 13:13
34:10 40:22
53:1 62:7
66:11 67:6
**betterment**
95:16

**beyond** 28:16
**big** 17:23 73:9
74:18,18
**billion** 19:13
65:25 89:18,19
91:9,14 93:16
**binding** 88:1
90:17 103:8
116:15,21
**bird** 91:24
94:12,23
**bit** 96:9
**blame** 73:6
**blinkered** 83:3
**blows** 118:9
**blue** 49:9,18,23
65:19
**board** 113:9
**boeing** 61:18
**bought** 11:22
27:2,3,4,5
51:22
**bound** 41:22
42:6
**bounding**
58:13
**boy** 1:6 8:5
9:22 18:12
23:13 24:22,23
25:4,8,11,14
26:8,10,10,12
26:14 27:2,15
28:15 51:11,16
53:16 77:7
84:13 112:22

**brick** 115:19
**bridge** 31:7
**brief** 27:19,20
33:12 44:20
48:8 50:3
88:25 112:21
115:10,11
116:7 119:21
121:19
**briefing** 42:25
100:4,12
111:13,14
121:16
**briefly** 84:14
96:7 108:23
119:10
**briefs** 19:21
28:24 37:12
42:9
**bring** 11:2 13:2
**bringing** 102:2
**broad** 17:2,17
26:19
**broader** 39:12
60:15
**broadly** 17:5
**brought** 18:12
46:15 105:9
116:11 120:1
**bsa** 1:12 8:5
11:22 24:22,23
25:3 27:2
44:23 47:21
52:21 55:18,19
82:12 84:18

88:8,22,25
93:13,17
100:16,19
113:9 117:4
**bsa's** 106:15
107:16
**building** 4:16
**built** 28:22
29:8 64:17
95:14 113:22
114:1,1,11
**bulk** 14:21
**bunch** 43:13
83:6 118:13
**burden** 22:23
23:1 38:16
**buyback** 61:18
**buybacks**
17:13 26:18

**c**

**c** 4:3,10 8:3
29:24 30:3,7
30:12,23,24,25
31:23 36:2,3,7
36:10 37:5
64:13 110:24
111:1,4 122:3
122:3
**cabined** 50:17
**california**
110:11
**called** 25:1
46:12 48:9
57:18 62:18
72:9

**calling** 61:20
**camelback** 5:17
**camp** 57:5,25
**capacity** 20:22
21:1 72:16
73:9
**capital** 76:16
83:13
**cards** 33:15
**carefully** 19:5
**carve** 52:25
60:12 89:4
92:8 96:9,11
**case** 1:15 7:20
8:5,17 14:2,3,7
15:23 18:18
19:21 20:9,17
21:8 22:4,7
25:20 26:7
28:25 29:2
30:13,14,15
32:20 33:18
35:9,19 43:12
43:15 45:5,6
46:10,14,16,17
47:16 50:18,18
51:6 54:3,6
56:18 57:18
59:1,2 60:18
61:7 63:12
67:19 68:21
75:3,3,16,16
76:16 78:7
79:24 82:7,7
82:16,20 83:20

85:15 86:9,24
87:21 89:10,24
90:1,1 91:22
91:23,24,25
92:24 94:12
95:19 98:4
102:3 104:22
108:9 118:23
120:25 121:17
121:19,22
**cases** 16:1,14
19:1 25:25
29:23 39:16
43:23 45:21,24
49:12 52:23
53:20 59:8
63:21 66:7
76:19,19 90:11
90:23 108:9
121:7
**catholic** 27:6
28:5,19
**catholics** 28:8
**cause** 10:5
61:17
**causes** 34:17,22
**caveats** 81:6
**cdlt** 122:12
**center** 6:11
**centerpiece**
17:18
**central** 76:18
**cents** 48:12,14
48:15

**century** 46:23
79:21
**century's** 29:2
**cert** 25:22
**certain** 23:24
32:9 38:25
64:25 65:3,8
67:4 96:13,23
97:8 98:5
**certainly** 10:16
12:11 14:13
49:16 56:9
58:16 60:4
67:10 88:1
105:6 110:3,14
**certainty** 90:2
**certified** 90:23
91:11 122:13
**certify** 122:5
**cetera** 24:10,18
48:22 72:19,20
**challenge** 51:2
84:2
**challenged**
17:12
**chance** 25:17
25:19 108:21
**change** 21:7
39:11 40:15
64:9 66:18,22
67:9 83:12
**changed** 43:18
114:6
**changes** 39:18
86:25 118:4,11

118:24
**changing** 65:12
**channeled**
120:11
**channeling**
25:9,12 72:4
81:20
**chaos** 76:3,3,8
76:11
**chapter** 30:3,7
30:20 31:21
77:9
**chapters** 24:18
**characteristics**
91:5
**characterize**
96:19
**charitable** 71:8
**charter** 113:8
**chartered** 9:22
11:12,14,18,21
12:9,14,20
13:2 26:9,12
27:5,6,13,15,20
28:5,18 72:1
88:17 95:14
106:13 107:14
107:15,20
113:2,5,18
**chartereds**
26:11
**chicago** 7:15
**chicken** 119:25
**childhood**
103:20,24

**choose** 64:2
**chose** 100:9
**choses** 10:1
**churchill** 6:6
**cinacola** 31:5
**circuit** 1:2 2:4
2:14 14:2
21:19 22:2
23:7 24:25
25:17 29:22,23
35:9 39:10,10
43:5,7,15
49:12 75:1
77:20,22 82:7
83:14 116:12
117:14 121:4,6
**circuit's** 10:19
**circumstances**
91:22 94:8
97:4,7 98:2
**cite** 49:7,19
82:6 85:25
119:22
**cited** 14:2
19:21 39:23
49:7 86:19
92:17 94:11
114:2
**cites** 34:21
119:21
**citing** 94:11
**claim** 45:15
46:15 48:5
58:15 60:14
69:3 91:4 99:2

99:3,10,11
102:17 103:7,7
103:23 112:11
113:4,5 116:14
**claimant** 8:21
42:15 52:17
53:3 60:5 95:3
95:4
**claimants** 8:9
9:20,25 10:3
18:11 22:19
23:24,25 37:18
37:19,23 38:10
42:21,23 43:21
43:24,24 48:15
61:4 62:6,24
72:8,8 74:15
75:18 76:7
82:1,21 84:5,6
89:23 92:4
103:8,9,14,21
105:23 106:2
109:2,4,7,24
110:3,19
113:22 117:3
120:5
**claiming** 120:6
**claims** 9:19,24
9:25 10:23
11:2,6,8,10,10
11:13,14,18,21
11:24 12:8,11
12:12,17,19
13:1,4,6,8
18:15 25:10,18

25:19 28:17
34:16,22 39:6
39:8 45:3,4,7
45:12 46:11,25
47:1,19,24
48:1,3 49:10
50:13,21 51:7
52:6 59:6 62:4
62:8,17 65:2,7
70:22 71:10
75:18,19 78:12
80:20 86:16
89:10,11,13,22
89:22 90:7,23
90:24 91:11
92:1,3,23
93:22 95:6,7
95:20 98:24,24
102:24 106:13
107:8,12,15,17
107:19,23
109:3,5,10,19
109:19,21,23
112:2,10,12,13
113:18 119:15
120:9,10,10,12
120:16 121:8
**clarifies** 111:7
**clarifying**
97:19
**clark** 7:13
**class** 108:17,20
109:4
**classes** 109:3,8

classic 61:13,14
120:19
clause 45:8,14
49:23 119:14
120:2,3
clawed 11:19
53:25 54:1
clear 19:22
20:23 22:2,4
31:13 34:1
40:14 44:19
50:16 54:18
58:4 60:14
62:3,4 68:4
70:21,24 71:7
93:6 105:22
107:1 109:13
112:5,9 116:5
117:15 118:5
clearer 70:17
clearly 18:6,14
18:21 39:18
52:23 66:17
72:7 81:13,23
client 76:24,24
clients 18:15,18
29:11 110:10
113:18
close 98:8
closed 82:4
closely 65:22
118:8
closing 82:14
closure 103:18
103:20

coalition 42:23
code 14:15,24
19:9 40:25,25
41:3,11 51:20
55:2 64:3,7
69:19 81:5,16
90:2 94:15,19
117:12
code's 15:2
53:3 80:3
cognizant
65:17
coie 5:15
collateral 42:6
76:17,22 96:22
116:16
colleague 64:13
colleagues 57:7
66:11,23 67:6
77:15 80:1
combination
64:7
combustion
10:21 12:15
39:5,13 40:4,4
40:12 115:13
come 22:8,12
22:19 23:2
25:3 52:9 57:5
69:6 83:1
91:22 98:18
108:12 110:6
111:3
comes 27:25
60:16 65:3

76:15,18 86:14
comfortable
79:2
coming 71:19
97:17
comma 40:1
commenced
55:2
comment
117:16 120:8
120:14
common 19:25
95:9 115:25
community
66:16 91:3
104:15,20
companies
36:19 37:17,24
45:5 70:21
72:19 107:10
116:9
company 11:23
39:14 44:1
107:11
comparable
116:10
compelled
94:17
compelling
59:2
compels 80:12
compensation
50:14 94:7
95:18

competing
46:17
complain 83:22
83:24
complaint
34:21 86:19
117:22
complete 16:4
16:19 23:3
55:3 62:12
76:3 77:2 83:2
103:25 107:7
109:9 114:4
completed
55:16
completely
17:3 23:22
29:19 78:19
complexity
57:18
compliance
13:10 14:11
complied 38:1
components
80:16 83:8
compounded
115:17
compromise
70:2 95:19
compromising
95:11
concede 28:2
conceivable
11:3,4

concept 15:20
119:25
concern 81:1
concerned
45:18 63:4
102:1 103:17
concerns 45:3
105:18
conclude 51:25
52:4 91:11,13
concluded
92:17 121:23
conclusion 13:9
17:20
conclusions
12:5,7
condition 63:2
conditional
14:16,17 15:5
19:19 82:2
conditioned
14:25
conditions
37:25 64:22
77:3 113:11,12
conduct 9:6
confidence
79:6
confirmation
16:8,11,12,22
24:4 28:9,23
29:20,21 31:3
36:25 37:14,21
38:3,14,16
39:21,22,25

41:21 45:9
52:7 56:23
57:10 60:1
64:22 66:6,21
67:2 70:18,23
73:16,17 75:17
75:17 84:22
85:3,4,6 87:2,3
97:10 100:6,12
100:22 104:2
109:17 112:6
112:20 113:15
113:20,23
114:7 119:17
confirmations
17:3
confirmed
25:23 65:15
72:13,22 84:9
86:4 97:8
conflicts 20:16
21:7,8
confused 24:3
confusion
44:21
congress 20:23
21:10 26:19
30:17,20 31:18
58:13 63:2
64:4 68:1
73:10,11,14,19
81:1,5,19,24
111:9
congressiona...
95:14

connection
97:9 101:13
consensual
94:16,17
consent 10:3,4
18:16 51:8
consequence
33:5 58:7
consequences
17:17 33:20
71:14
consider 63:13
98:21 105:22
consideration
17:14 22:17
26:17 54:20
61:25 80:17
83:8 105:10
106:19,22
107:3,10,22
considerations
21:11,13 68:1
considered
74:25 85:24
108:2 110:10
consistent 15:8
15:13 16:6
44:7 77:11
constitute 61:3
constitutes
69:25
constitutional
9:9,18
constrained
66:5

construction
31:13
construed
112:2
consultant
22:14
consummated
55:4 88:23
consummation
13:12,18,20
14:12 15:8,14
15:16,20 19:3
19:7,23 20:14
21:23 54:10
55:1
contained 39:2
contains 64:19
73:20
context 16:16
60:21 61:9
98:6
continental
10:21 12:16
56:17
contingent 16:5
18:4,5 19:19
70:10 89:18
continue 34:2
60:12 107:8
continuing
103:23
contract 16:6
40:20 96:15
97:1,14

**contracted**
  96:15
**contracts**  98:3
  98:3,6 113:9
**contractual**
  32:24 40:9
  88:7,10 112:23
  113:12 114:22
  115:14
**contradicts**
  17:5
**contrary**  19:18
  52:21,23 53:10
  53:11 66:19
  70:19 85:22
**contrast**  97:5
**contributed**
  28:12 46:15
  57:1 92:21
**contribution**
  92:19 99:11,13
  113:6 120:11
**contributions**
  56:24 72:3
**control**  14:9
  15:3 20:13
**controlling**
  61:7
**controversy**
  86:20
**conveyance**
  62:16 78:11
**cooperate**  38:2
**core**  53:14,20
  69:13 71:18

  78:7 83:12
**cornerstone**
  17:24,25 72:5
  106:11
**corning**  121:7
**corpus**  98:19
**correct**  11:16
  57:23 82:3
  84:15 87:23
  88:6 92:15
  111:6
**correctly**  84:19
**cost**  61:17
  104:4
**costs**  45:17,18
  45:24 46:5,8
  47:9 49:22,23
  50:6 99:20,22
  101:6,15 102:7
  102:8 104:4,12
  106:24 120:24
  121:20,21
**council**  12:13
  18:13 26:9,13
  28:15 115:5,7
**councils**  9:22
  11:12,14 12:21
  13:1 26:11
  27:4,20 57:1
  71:25 72:2
  88:17 106:13
  107:13,16,20
  108:16,18
**counsel**  8:23
  75:6 85:2 88:3

  96:5 105:3,6
  121:15
**counter**  41:14
**counterclaim**
  46:16
**country**  83:14
  95:15
**couple**  35:7
  71:13 82:1
**course**  10:4
  12:9 16:7
  35:17 43:1
  51:7 61:12
  62:25 63:2,7
  83:19 88:14,24
  90:11 92:8
  101:2 115:16
**court**  1:2 2:3
  8:7,17 9:2,17
  10:13,15,18,23
  11:13,16,19,20
  12:4,8,17,24
  13:3,4,8,19
  16:23 17:9
  18:9 20:17,17
  20:19 21:5,6,8
  21:9,16 23:19
  26:23 30:15,23
  31:11 32:8
  35:12,13,16,21
  35:21,23,24
  36:11 38:5,5
  38:13,14 39:4
  39:4,6,11,13
  40:12,19 41:1

  41:18,19,23
  42:2,17,22,25
  43:1,10,15
  44:2,2,13,13
  45:2 47:7,8
  48:2,6 49:8
  50:2,3,4,5,6,20
  51:15,18,24
  52:10 53:10
  54:5,11 55:22
  56:11,17,19
  57:20,21,21
  58:14,20,21
  60:6,16,24
  61:11 63:1,8,9
  63:9,13 64:18
  65:12,14,14,15
  65:21,22 66:22
  67:12 68:2,10
  69:3 70:1 73:6
  73:7,9,20 74:8
  74:11,12,13,25
  75:12,13,15,21
  76:1,10,12
  77:20 78:23,25
  78:25 79:3,14
  80:11,13,20
  81:12,12 82:16
  83:15,18,25
  84:1,3,3,7,11
  85:24 86:10,13
  87:7,9,12,16,20
  89:2 90:13
  91:16,18,25
  92:7,7,11,15,17

92:22 96:3
97:6,19,21,25
98:5,12,23
99:5,6,14,18,20
100:4,8,15
101:8,12,19,21
101:24,24
103:16 104:21
105:6,9,11,12
105:21 106:1
108:1,2,3,4,5,8
108:24 109:14
109:16 110:10
111:21,22
112:5,9,13,17
112:24 113:11
115:12,13,18
115:18,19,20
116:12,20
117:20 118:14
118:24 119:20
120:1 121:11
121:18
**court's** 8:17 9:7
10:20 12:15
17:8 21:1 41:2
43:6 51:19
52:13,22 53:6
53:20 54:9
55:17 58:13
63:24 69:12
72:16 75:19
79:22 80:15
83:7 89:3
97:21 105:22

109:12 119:23
121:13
**courts** 20:22
21:10 25:6
48:2 49:21
57:18 74:6
83:14 85:9,17
86:2 111:22
**coverage** 11:1
27:16 35:23,23
38:5,12,13
41:18,22 42:3
42:7,8,11,17
45:5,17 46:14
49:22 65:9
66:21 85:8,10
85:12,24 86:14
86:16,19,22
87:7,10,12,20
88:10 96:5,25
97:5 98:5,21
99:13 107:16
107:18 115:19
115:20 117:20
**covered** 12:11
13:5,8 20:20
41:13 93:22
**covering** 46:8
93:22
**craft** 59:25
**crafted** 48:9
**create** 12:1,2
76:10,11 98:22
**creating** 68:4
68:16

**creative** 78:22
78:22 117:16
**creativity**
117:19
**credible** 76:21
91:18
**credit** 78:25
**creditors** 22:9
23:8 94:7
98:15,17
113:22
**criteria** 53:7,12
53:14 58:12
**criticism** 21:20
**crossed** 31:6
**crystal** 34:1
70:24
**cum** 35:8
**cured** 49:17

## d

**d** 6:15,23 8:3
93:2
**damage** 49:4
104:10
**databases**
90:24
**date** 27:24
70:23 71:7,9
71:11 88:18
102:5 122:19
122:25
**day** 81:19 88:2
105:9
**days** 100:12
104:7

**dc** 6:21 7:6
**de** 6:4 12:10
**deadline**
103:25
**deal** 18:1 37:19
66:23 74:18
98:13,16
**dealing** 38:9
**deals** 64:16
**dealt** 45:7 54:5
54:21 60:22
**death** 14:13
**debt** 55:19
90:15,15
**debtor** 1:7,13
13:2 21:15
23:13 25:1,2
25:15 35:10
42:20 43:7
47:6 54:15,19
61:24 76:6
92:17,24,25
93:3,6,7 94:5
95:12 107:17
**debtor's** 40:20
47:15 107:18
**debtors** 10:25
22:23 34:17
61:15 70:1,20
108:19
**decades** 104:11
**decide** 9:8,17
13:20 21:10
37:19 69:12
108:4,6,8

**decided** 12:10
30:20 31:21
43:16 74:25
78:2 87:11
111:10 115:15
**decides** 23:19
**deciding** 61:18
**decision** 11:16
35:16 38:11
40:19 41:3
42:24 43:16
48:9 49:7,15
50:10 56:16
67:21 68:21
75:15 76:20
78:4 79:1,7,7
79:22 80:15
83:7 84:17
87:17,24 89:4
97:22 116:13
116:22 121:3
**decisional**
41:19
**decisions** 8:18
17:9 39:23
83:13
**declaration**
45:19 47:17,18
**declarations**
22:13
**declaratory**
86:21
**decrease** 40:21
**decreases**
32:24

**dedicated**
95:15
**deemed** 45:20
**default** 24:13
35:5 40:14,16
**defend** 47:4
**defendant** 95:2
**defendants**
95:5
**defended** 46:25
**defense** 45:17
45:18,24 46:4
47:5,9 50:6
99:20,22 101:6
101:15 120:24
**defenses** 35:1
37:25 39:9
85:9,10,24
86:17 87:9,10
97:6,22 116:8
118:1
**defined** 88:16
111:24
**definitely** 12:13
12:13
**definition**
14:14,17,22
15:2 19:2,8,16
21:25 34:15
93:17
**delaware** 1:12
8:5
**delia** 4:19 18:9
110:18

**demonstrate**
102:14
**demonstrated**
118:10
**demonstrates**
118:19
**denial** 68:22,23
**denied** 75:17
113:1
**dependent**
29:19 31:2
**depositions**
59:7 103:10
**deprive** 104:16
**derivative**
25:14,18
**describing** 52:4
**designed** 37:16
76:9,11 90:25
117:18
**desire** 11:25
**desperately**
104:25
**destination**
19:12,14,17
20:4,6
**detail** 58:19
**determination**
44:6 45:17
48:20
**determinations**
85:16
**determine** 91:4
**determined**
36:20

**determining**
41:8
**detriment**
38:17
**devastate**
104:15
**devastation**
104:20
**die** 104:17
**died** 103:7,7
**difference**
19:10,14 20:8
39:3
**different** 8:24
14:3 16:18
26:10 30:5,11
31:14,18 38:25
40:10 63:6
66:22 74:22
75:10 76:7
83:20 85:12
90:19 100:18
111:8
**differently**
108:20
**difficult** 65:24
98:23
**digital** 122:13
**diligence** 79:8
79:14
**diminish** 38:7
**diminished**
38:4 39:22
**diminution**
38:19 41:6

**diminutions**
41:5
**direct** 14:15
25:14,18 29:12
111:18,19,23
112:12,15
**directly** 29:11
43:6 67:7
80:23
**directors** 23:14
**disables** 83:15
**disagree** 56:14
61:21 67:24
86:22 96:14
**disappears**
42:13
**discharge**
21:15 24:24
25:4
**discharging**
99:3
**disclose** 102:20
103:1 112:25
**disclosed**
112:24
**disclosing**
104:9,10
**disclosure**
112:24
**discretion**
37:20 73:2
**discretionary**
64:4
**discuss** 51:21
66:11 105:10

**disgorged**
22:25 23:4,9
**disgorgement**
23:7
**dismiss** 28:25
47:16 56:11
111:16
**dismissal**
104:13
**dismissed** 8:15
16:2
**dispositive** 60:7
**dispute** 38:22
39:1 48:22
54:16 58:5
86:23 87:11
**disputed** 91:4
91:16 93:15,16
93:20
**disputes** 94:20
**dissect** 103:12
**dissent** 67:25
**dissenting** 84:5
**distinction** 11:9
69:2,10,20
111:3
**distinguish**
121:6
**distinguishable**
50:11
**distinguishes**
30:1,2
**distributed**
22:24 53:24
55:8 56:4

82:15 89:16,23
**distribution**
22:18,20 83:23
90:25
**distributions**
55:1,3
**district** 12:4
30:14 41:1,2
47:7 48:2 50:2
50:3,4,5,6
57:21 60:23
63:8 65:14,15
65:22 74:11,12
75:12 78:25
91:25 97:21,21
98:23 99:5,6
99:14 101:24
115:17
**disturb** 51:25
65:23
**disturbing**
52:16
**ditech** 30:13,23
**divide** 32:13
78:2 121:20,21
**divorced** 76:15
76:15,22
**dna** 4:16
**dobbs** 5:6
**docket** 45:19
**doctrine** 13:14
18:21 19:24
20:16 21:4,19
26:20 51:19
58:14,23 63:25

65:7 72:23
77:21 110:6
**doctrines** 8:24
63:24
**documentation**
22:21
**documents**
38:6 60:25
62:3 70:9 85:9
85:16 96:17
117:17
**doe** 18:14
**dog** 71:15
**doing** 37:20
44:4,9 50:25
57:14 58:3
98:19 117:15
**dole** 37:22
**dollar** 48:12,14
48:15 89:15,17
**dollars** 19:11
55:13,19
**donations**
44:17 58:1
**donors** 56:22
**door** 103:18
**doubt** 70:19
**doubtful** 25:10
25:12
**dow** 121:7
**dozens** 57:2
**dr** 90:22 91:17
**dramatically**
43:19

draw 111:3
dropped 28:8
due 10:6,7
  68:22,23,25
  83:24
dumas 4:4,10
  8:6,7,8,8,12,25
  9:3,7,16 10:10
  10:14 11:4
  12:6 13:11,16
  14:1,19,25
  15:19 16:17
  17:2,20 72:8
  105:16,17
  106:20 107:1,3
  108:24 109:14
  110:17
duty 37:18,23
  38:10 40:5
  43:20,21,23
dying 95:19

**e**

e 2:12,12 4:3,3
  5:17 8:3,3
  122:3
earlier 18:21
  65:4 71:3
  74:23 102:1
easier 64:4 78:4
economics
  47:24
economist
  90:22
effect 11:3
  17:11,19 33:4

43:17 44:6
57:12 63:1
87:1 94:4
98:20 112:21
116:16 117:18
118:21
effective 8:18
  13:19 15:23,24
  27:24 68:6
  70:23 71:7,9
  71:11 74:10,11
  75:23 79:3
  88:18 102:5
  110:20 113:14
effectively 17:8
  50:25
efficient 101:9
eggs 57:13
eight 91:17
  103:10
eighteen 53:16
  56:20 66:20
  102:5,23
eighth 82:7
eighty 59:6
  102:10
either 9:10
  11:11 13:16
  52:20 60:10
  73:8 108:2
  120:10
elected 47:3
element 42:14
  59:1 76:18

elements 13:20
  83:12
eliminated
  60:11
eliminates 99:8
emerged 53:17
emphasis 80:2
emphasized
  81:16
emphatically
  58:17
empowers
  37:16 38:8
en 21:21
enabled 62:4
encumbrances
  70:22
endowed 27:12
energy 16:15
  16:17,18 29:20
  31:4 52:24
  60:19,22 61:6
  62:6 64:8,24
  68:21 75:15
  76:15 79:8,9
  79:23 80:4
  83:13,25 84:1
  108:10
engineering
  39:5,13 40:4,4
  40:12 115:14
engrafted 17:3
enjoin 10:22
  12:17,19

enjoined
  119:15
enjoy 115:7
enjoyed 28:9
enormous 58:5
  103:20
ensure 102:24
enter 113:16
entered 52:15
  53:19 86:10
entirely 52:20
  57:4,4 60:11
  72:15
entireties
  104:21
entirety 42:13
entities 27:6
  28:5,19 71:25
  106:15
entitled 50:20
  97:4 98:2
  106:5 109:5
  121:1
entitlements
  39:9
entity 55:20
  116:17
equal 53:4
equitable 9:5
  9:14 13:12,14
  15:6,14,18
  18:20 19:24
  20:16,24 21:4
  21:17 23:8
  26:20 32:14,18

33:22 38:9
44:8,11 51:19
52:12,13,22
53:7,14 54:8
54:11 55:17,22
56:1,15,16,18
58:21,22,23
59:3 65:5
66:19,20 72:23
73:3 77:16,19
77:24 82:10
102:2 108:3,7
**equitably** 8:16
18:18 33:18
47:16 53:19
63:12 72:24
73:2
**equities** 95:1
104:22
**equivalent**
15:17 54:11
**erroneous** 72:7
**error** 109:13
**escape** 78:12
**escribers** 3:4
**escribers.net**
3:8
**escrow** 13:25
14:1,4,5,8,16
14:24 15:3
18:22,23 19:13
19:22 20:9,10
20:11 33:6,8
53:24 54:2,5,7
54:21 56:22

57:23 58:2,6
70:15 76:6
82:6,8,10,14,22
82:24 114:19
**escrowed** 20:15
29:4,6 114:8
**esq** 4:10,19 5:3
5:12,21 6:6,15
6:23 7:8,17,25
**essential** 80:16
**essentially** 19:2
99:12
**establish** 79:24
112:10
**establishing**
112:18
**estate** 12:18
15:2 40:21
41:13 44:16
80:5 88:14
92:24,25 93:25
94:6 113:17,21
115:3,4,5,6,8
**estate's** 62:1
**estimate** 112:5
112:9
**estimation**
90:17
**estimations**
90:13
**estoppel** 42:7
96:22 116:16
**et** 24:10,18
48:22 72:19,19

**evade** 57:16
**evaluate** 33:21
38:6 44:6
**evaluating**
38:13 44:3
**evaluation**
33:17
**evan** 7:17
101:20
**event** 23:19
59:10
**everybody** 26:5
94:16 112:25
**evidence** 22:4,5
23:4 41:21
46:21,23 72:8
80:14 90:10,13
90:21,21 96:25
102:15 116:15
**evidentiary**
48:25 87:19
100:1
**exact** 34:22,24
86:12
**exactly** 34:10
40:6 54:11
55:21 63:7
72:9 82:19,19
86:1,6 102:3
111:6
**examine** 77:20
**example** 24:1
33:6 39:19
41:5 46:3 63:5
91:17

**except** 36:23
111:22 118:2
**exception**
11:19 44:13
68:25 69:1
**exceptions** 81:7
**excess** 45:11,15
**exchange** 26:18
80:16 92:21
103:22
**exclude** 31:20
**excluded** 11:14
**exclusively**
100:20
**excuse** 38:21
65:14 77:14
**exempt** 96:21
**exercise** 88:5
93:13 94:1,5
**exercised** 11:13
12:24 47:5
**exercising**
11:20 13:7
**exhibit** 48:8
100:21
**exhibited** 79:14
**exist** 9:10 12:24
112:8
**existence** 11:8
**existing** 32:21
**expand** 40:20
**expanded**
96:15
**expanding**
26:20

expands 32:25
expected 91:16
expedited
  22:19
expeditiously
  95:20,21
expense 18:17
experienced
  59:10 91:12
  104:6
experiences
  105:8
expert 91:10,12
  92:1
experts 90:19
  90:19,20
explain 29:16
  51:24 102:21
explained
  111:20 113:8
explicitly 20:7
  20:18 34:4
  35:6 80:13
  85:8,10 88:25
  94:12
exposed 29:10
exposing 62:11
exposures
  43:22
express 20:21
  70:5 96:16
  109:7 117:8
expressed
  111:7

expressly 40:24
extensions
  89:14
extent 22:18
  38:6 40:9
  48:20 106:18
  106:22 121:2
  121:15
extinguish 10:5
  13:1 50:13
extinguished
  10:2 50:14
extra 108:16
extract 62:5
extraordinarily
  59:2
extraordinary
  52:5 57:19
  79:9,10 81:15
  102:3
extreme 44:12
extremely
  91:12
extrinsic
  102:15
eye 6:20

**f**

f 2:12 93:5
  122:3
fabric 95:15
face 115:25
faced 104:1
fact 12:4 16:1
  32:23,24 33:10
  35:1 38:20

41:6 50:19
  54:6 60:13
  65:16,23 67:18
  72:6,6,21,22
  73:18 84:16
  86:8 88:3
  94:18 97:22
  101:3,5,12,14
  118:7,12 120:5
factors 55:21
  112:7
facts 75:4
  96:24 97:7
  101:10
factually 11:6
  14:3 16:18
  50:11
fail 113:11
failed 23:1
fails 70:13
failure 100:11
fair 38:9 46:8
fairly 11:2
  97:11
fairness 21:14
faith 16:24
  26:21,23 43:14
  80:6 81:10,15
  118:22,23
faithful 78:5
fall 92:19
families 103:6
family 59:8
  102:19,21,25
  102:25 103:2

104:5,8
far 13:23 45:17
  46:1 56:19
  94:13 97:13
  116:4
farr 4:22
fatally 52:16
favor 71:24
  77:11
favorable 53:2
fcr 42:5 50:3
  96:5 119:10
fearing 61:16
feasible 24:24
federal 9:2 38:5
  38:14 40:3
  41:16
ferguson
  111:19,24
fiduciary 37:18
  37:23 38:10
  43:21
fifteen 118:6
fifty 48:12
  95:18
fighting 77:9
file 70:11
filed 25:5,23
  45:19 49:3,4
  89:12 90:8
  106:3 119:16
files 26:8
filing 45:4
final 28:24 29:3
  89:22

**finality** 18:17
76:10 77:11
**finally** 75:21
82:8 87:13
103:13,14,15
118:22
**financial** 22:14
**find** 10:18
14:12 37:11
55:25 59:17
71:23 72:24
73:1 75:3 87:8
101:14 102:16
**finding** 15:8
26:22 43:6
47:8,9 54:8
83:5 96:23
99:23 101:3
109:12 112:12
114:24 120:23
**findings** 12:4
48:2,25 72:6,6
85:16 91:19
100:10 101:12
108:24 109:15
109:22 110:8
113:11
**fine** 32:17
**finish** 67:18
**firm** 103:3
**firmly** 63:23
**first** 9:8 13:21
14:10 19:2,6
31:8,10 32:15
34:14 35:8

37:9 52:14
54:13 58:13
59:9 69:23
74:8 75:11,25
82:2 84:14
91:22 108:1,5
**fit** 13:25
**fits** 81:13
**five** 18:10,11
103:3
**fix** 49:15 51:8
**flaws** 9:10
**flies** 115:25
**floor** 6:3
**flores** 4:15
**florida** 91:25
**focus** 9:13
12:15 17:11
44:14,14 70:15
102:11
**focused** 44:18
**focusing** 9:24
17:11 19:6
32:19 78:1
**foist** 41:18
**follow** 76:24
**followed**
116:24
**following** 43:5
**footnote** 34:23
34:23 71:17
117:21
**force** 52:21
**foreclose** 63:25

**foreclosed** 53:3
65:2
**forecloses** 65:7
**foregoing**
122:6
**form** 23:24
100:6,22
106:16
**forth** 35:9
94:19
**forty** 13:23
55:13
**forward** 13:7
22:9,19 23:2
25:8 28:1
104:21 107:23
**foul** 95:11
**found** 11:16
23:8 26:12,13
45:8 49:21
65:22 71:22,22
80:13 81:11
85:9 91:18
92:3 98:23
99:14,18 101:8
109:16
**four** 10:23
103:5
**fours** 60:19
**fourth** 43:4,7
43:15
**frame** 78:9,10
**framework**
47:11 120:25

**frankly** 87:22
**fraudulent**
62:16 78:11
**free** 60:14 62:4
70:21 93:6
**frequency** 91:2
91:6
**friend** 102:19
**friends** 60:19
102:21
**front** 79:10
82:17 108:1
**full** 47:11 48:4
50:5 52:1 75:8
75:10 84:18
88:24 89:3,5
90:5,14,18
91:23 92:3,9
95:3,8 105:19
108:21,25
109:1,1,6,9,12
109:15,15,17
109:18,20,22
109:24,25
110:3,5,7,14
112:4,4 121:8
**fully** 18:19
39:13,14 40:5
112:14
**functioning**
23:13
**fundamental**
15:22 68:11,23
**fundamentally**
47:24 72:17

73:4

**funded** 46:11

**funding** 18:1
53:23 71:19
89:18

**funds** 20:15
22:24 23:2,4
29:4,6 33:6,8
54:6 56:2 57:8
57:22 58:6

**further** 49:24
84:9 87:8

**future** 16:15
27:22 29:20
31:4 45:17
62:7 79:17,23
80:4 81:22
83:13 84:1
87:11,12,18,19
87:20 108:10

**futures** 16:17
16:18 52:24
60:19,22 61:6
64:8,24 68:21
75:15 76:16
83:25

**g**

**g** 8:3 50:12,15
50:17,17 121:5

**ga** 5:10

**gain** 65:9

**gallagher** 4:22

**gamesmanship**
78:9

**garages** 102:16

**gather** 97:17

**general** 24:14

**generalized**
17:19

**generate** 93:16

**generated**
45:16

**gerber** 49:7,11
49:15,19 51:5

**getting** 12:17
20:2 28:10
29:6 48:15
50:19 95:19
98:8

**gilbert** 7:2

**gilion** 4:10 8:8
105:17

**give** 11:7 23:5
37:19 48:12
52:25,25 61:17
76:2 77:23,24
101:21 108:21
114:20 115:12

**given** 20:21
21:23 23:4,7
39:15 56:22
58:1 77:19
78:3 83:20
108:6

**gives** 38:18
69:14

**giving** 78:24
97:13 117:9

**glaring** 73:1

**glb** 4:7

**glenn** 7:25
84:12

**global** 11:25
40:2 42:10
46:11 66:16
91:24 94:12,23

**go** 10:23 13:7
15:3,10 24:14
25:1 28:16,23
29:3,14 32:17
36:17 43:22
46:2 50:23
53:5 58:11
59:14 63:15
69:14 74:10,11
77:14 79:2
85:21 89:8
96:9 98:9
99:16 104:21
105:19 106:25
107:23 117:8

**goes** 9:1 25:2
36:24 44:3
68:5,10 69:11
69:16 74:23
75:20,23 86:23
118:19

**going** 15:3,7,9
15:10 24:19,19
24:21 26:3
29:6 33:4
35:13,22 40:14
45:21 48:1,11

48:23 51:18
52:12 61:1
63:12 65:23
66:5,22 67:5
68:17 70:9
71:2 72:24,25
73:1 74:19
75:6 76:7,8,24
77:4 79:16
82:17 84:13
89:16,17,23
91:8 96:7,11
98:9 104:7
110:3 114:16

**good** 8:4 15:21
15:22 16:24
26:21,23 33:12
34:11 43:14
44:14 45:1
58:19 61:2
67:13,14 79:20
80:5 81:10,15
84:12 96:3
101:19 118:22
118:23 119:7

**goodness**
118:18

**gorsuch** 67:21

**gotten** 121:17

**governing**
85:15

**grafted** 81:7

**grant** 63:11
76:13

| | | | |
|---|---|---|---|
| **granted** 8:11 19:4 25:13 32:12 33:9 34:12 44:12 61:11 64:21 68:6,7 75:24 113:24,25 | **hand** 8:20 21:16 39:7,7 72:25 | **harris** 5:12 45:2 119:8 | **highly** 25:10,12 |
| **granting** 23:23 | **handle** 49:17 51:6 | **hartford** 25:10 46:24 67:13 | **hired** 102:24 |
| **great** 18:1 37:19 | **hands** 54:2 | **head** 104:2 | **historical** 91:1 |
| **greektown** 49:12 51:5 | **happen** 23:10 23:15,21 24:8 24:19 34:13 57:9 76:1 77:22 82:3,5 88:15,15 104:19 | **health** 102:23 | **historically** 46:24 |

**granted** 8:11
19:4 25:13
32:12 33:9
34:12 44:12
61:11 64:21
68:6,7 75:24
113:24,25
**granting** 23:23
**great** 18:1
37:19
**greektown**
49:12 51:5
**greenwich** 6:12
**grievances** 43:9
**ground** 78:4
**group** 43:25
**gu** 4:17
**guam** 113:7
**guam's** 111:19
**guarantee**
90:12
**guess** 24:13
107:1
**guts** 71:18
76:22
**gutzler** 91:10
91:20

**h**

**hacker** 6:23
51:21 79:20,21
**hacker's** 76:24
**hagatna** 4:17
**halfway** 36:7
**hancock** 4:6

**hand** 8:20
21:16 39:7,7
72:25
**handle** 49:17
51:6
**hands** 54:2
**happen** 23:10
23:15,21 24:8
24:19 34:13
57:9 76:1
77:22 82:3,5
88:15,15
104:19
**happened**
27:14 28:10
41:23 42:2,6
42:12 103:19
116:19
**happening** 46:4
66:22 70:7
**happens** 17:17
23:21 24:10
58:5 117:11
**happy** 9:18
48:19 58:18
98:10
**hard** 26:3
78:16 94:14
103:24
**harm** 22:6
47:19 95:10
**harmed** 22:16
41:1
**harmless**
118:20

**harris** 5:12
45:2 119:8
**hartford** 25:10
46:24 67:13
**head** 104:2
**health** 102:23
**hear** 9:17 32:7
75:6 94:10
105:15 117:16
**heard** 43:8,10
44:16,16 52:17
65:7 69:22
70:14 80:1
82:21 103:11
**hearing** 16:19
28:9 100:1
119:17
**hearings**
103:10
**heights** 56:1,15
102:2
**held** 16:14
19:13 56:2
111:23
**hello** 110:18
**help** 60:3
**helpful** 25:25
121:18
**hid** 104:5
**hidden** 102:21
104:11
**high** 25:17
91:15
**highest** 61:15

**highly** 25:10,12
**hired** 102:24
**historical** 91:1
**historically**
46:24
**history** 111:9
**hit** 110:19
**hold** 62:13
**holding** 16:17
30:13 68:21
**holdings** 16:15
29:20 31:4
**home** 35:19
**hon** 2:13
**honor** 19:21
32:10,19 33:8
33:24 34:8,14
36:1,5,10,23
37:9 39:3,16
42:24 44:25
45:13,15 46:1
46:5,9,20 49:3
49:14 50:1
51:13 52:11
53:13 54:4
55:10 58:17
61:21 62:22
63:4 64:15
66:10 67:3
71:4 77:18
79:20,20 88:12
89:11,25 90:9
91:21 92:12
94:24 105:17
115:12 120:22

**honor's** 47:5
49:7 64:1
**honors** 45:1
48:7 84:12
96:1 115:2
117:2 119:3,8
**hook** 107:5
**hope** 77:6
**horrific** 105:8
**host** 91:8
**hour** 103:10,10
**hours** 59:7
91:17
**hudson** 5:6
**huge** 72:14,14
72:14 103:17
**hum** 100:25
**human** 59:1
102:7 105:24
**hundred** 48:14
57:2
**hundreds**
55:15 104:16
**hurley** 7:11
**huston** 5:21
51:15,16 52:11
53:9,13 54:4
55:9 56:7,9
57:11,15 58:9
58:16 59:14
60:4 61:21
62:19,21 63:20
63:22 64:15
66:10 67:3,5
69:24

**hypothetical**
47:7 87:18,19

**i**

**icl** 29:22
**idea** 56:23
57:22 87:13
120:12
**identified** 24:7
40:24 42:9
84:19 116:21
**identifies** 30:4
43:17
**identify** 43:13
**identifying**
81:20
**ignore** 20:9
**iii** 73:9,19 74:6
74:8,13 75:12
79:3
**il** 7:15
**illinois** 45:5
46:10,14,16
**imagine** 73:14
**impact** 33:7
44:15 46:19
48:1 49:5
72:14 87:14,14
110:23
**impair** 116:8
117:18
**impaired** 86:3
97:23 109:4,5
**impairment**
86:7 97:16

**impermissible**
8:14 18:3
**implementati...**
93:12 102:6
**implicating**
76:17
**implication**
64:21
**implications**
65:16
**implode** 24:19
24:21
**important** 8:12
8:17 11:5
12:15 26:24
28:14 30:16
58:20 65:25
93:24 98:16
105:5 121:18
**impose** 87:16
**imposed** 89:2
117:19
**impossible** 8:19
8:20 120:5
**impression**
108:5
**improper** 61:5
115:20
**inadmissible**
87:18
**inapplicable**
120:25
**inappropriate**
66:24

**include** 31:18
31:19,21 34:18
39:24 94:21
113:22
**included** 16:12
85:4 86:10,18
87:1 90:1
**includes** 14:15
17:7 88:16
93:4
**including** 12:22
15:14 18:14
19:5 20:15
28:7 45:4 85:7
89:14 90:14
91:5 94:3
101:7 106:7
116:12 118:13
**inclusion** 87:15
**incomplete**
18:5
**incompleted**
18:4
**inconsistent**
75:8
**inconsistently**
86:8
**incorporated**
16:12,20
**incorrect** 66:12
**increase** 62:10
98:20 106:24
**incurring**
45:18,24 46:4

**indemnificati...** 87:25 112:23 113:1,6,10,13

**indemnity** 10:20 88:7

**independent** 45:20,24 103:8

**indirect** 14:15 120:10

**indiscernible** 69:9 74:21

**indisputably** 80:21

**individuals** 18:12 103:5

**indivisible** 95:4

**industrial** 40:2 42:10

**inflationary** 77:1

**inflicted** 102:7

**information** 115:19

**injunction** 50:14 51:3 112:1

**injunctions** 25:9,12 27:12 29:13 72:4 119:19

**injury** 95:4

**inquiry** 53:14

**insert** 37:8

**inside** 61:19

**insignificant** 30:9

**insofar** 63:4

**institutions** 23:14 24:18

**instructed** 103:6

**instruction** 40:13

**instructions** 57:20 64:5 121:12

**insulate** 17:6 61:13 79:5

**insurance** 10:21 11:1,6,8 11:11,17,23,25 12:11,12,16,22 12:23,23 13:5 13:8 27:3,11 27:14,21 28:11 28:12,16,18,22 29:8,18 34:1,5 34:15 36:11,12 36:19,21 37:10 37:17,24 39:14 42:24 43:2 44:1 45:5 46:10 52:3 54:15 58:4 60:9 61:17,23 64:9 65:7 66:1 70:3,20,21 72:19 85:1,1 86:3,18 87:4

88:4,6,11 89:20 91:10,14 93:1,4,14,16,21 93:25 94:2,8 96:5,6 106:8,9 106:14 107:9 107:11,24 114:18,24,25 115:3 116:9 118:1

**insured** 40:22

**insurer** 27:14 28:10 41:15 43:12 45:7 79:21 93:15 117:19 118:13

**insurers** 11:25 14:6,21 15:4 15:11 16:23 18:14 26:23 27:12 28:7,18 29:3,9 32:9,20 33:10 34:25 36:25 38:7,15 38:17,18 39:9 39:19,20 40:1 40:5 43:12,17 44:5,10 45:3,3 45:11,21,23 46:7,22,24 48:13 51:3,22 52:1 60:13,13 62:10 65:1,3,8 67:4,13 71:10 71:25 72:2

76:25 80:15,21 84:14,20 85:8 85:10,20,22 86:2,4,9,11,16 86:22,22 87:6 87:9,14 93:18 93:21 94:9 96:9,14,18 97:8,13,13 98:6,11,18,25 99:10,12 100:3 100:21 106:24 107:4,4,22 111:16 113:16 113:20 114:2 115:22 116:6 117:18 119:9

**integral** 60:10 76:18 77:3 83:12

**integrated** 65:22 80:16 98:13 118:8 119:25

**intended** 56:5 61:15 73:10,11 73:19

**intense** 65:13

**intent** 20:23 101:8

**inter** 45:7

**interest** 19:18 22:9 27:16 28:3 55:24 88:8 93:19

99:13,15
**interested**
  18:16
**interesting**
  26:3 105:7
  115:22
**interests** 15:15
  26:21 27:23
  52:5,17 70:22
  93:8,15
**interfering**
  33:19
**interpret** 30:1
  30:8,10 115:19
**interpretation**
  30:13
**interpreted**
  30:15,23 84:24
**interrupt**
  105:20
**interrupted**
  106:21
**invade** 98:18
**invalid** 112:8
**invalidate**
  60:17 80:21
  83:11 84:6
**invalidated**
  82:24
**invalidating**
  60:8
**investing** 65:10
**investors** 22:3
  22:13

**invite** 118:24
**invites** 117:19
**involve** 11:24
**involved** 89:10
**involves** 76:17
**involving** 41:25
**iro** 46:4
**irrefutable**
  79:24
**irrelevant** 9:11
**irrespective**
  37:25,25 38:1
**irrevocably**
  82:12
**issue** 26:17
  35:24 49:1
  60:6 67:7 79:5
  82:11,21 91:24
  92:18 94:18,24
  105:19 108:1
  108:22 117:3
**issued** 11:23
  22:4 56:17
  74:12 91:24
**issues** 9:19 52:3
  76:17 96:6
  105:7,10

**j**

**jennifer** 3:3
  122:5,12
**job** 68:1,1,2
**john** 79:21
**joint** 94:4
  110:9

**jonathan** 6:23
**joseph** 5:3 32:9
**judge** 8:4,11,23
  9:1,4,13 10:9
  10:11,25 12:3
  13:10,13,25
  14:14,22 15:12
  16:14,22 17:10
  18:8 19:1,16
  19:25 20:3
  21:3,16 22:17
  23:20 24:2,8
  24:16 25:21,22
  26:15 27:7,9
  27:18 29:14,15
  31:4,24,25
  32:1,2,2,4,5,7
  32:12,17 33:2
  33:23,25 34:4
  34:9,12 35:4
  35:25 36:2,4,6
  36:16,18 37:1
  37:4,7,11
  38:21,24 40:7
  44:19,24 45:10
  45:14 46:6,18
  47:13 48:20
  49:8,21 51:12
  52:8 53:5,22
  55:5,24 56:8
  57:6,11,12,15
  58:7,10 59:13
  59:15 60:4
  61:12 62:15,20
  63:14,16,21,22

64:12 65:4
66:2,3 67:1,4
67:11,16 68:8
68:14,20 69:2
69:9,10 70:7
71:2,5,12,21
72:11 73:22,25
74:3,6,9,12,17
74:21,22 75:21
76:19 77:6,12
77:13,15 78:8
78:18,20,24
79:6,9,15,18,23
80:18,25 82:20
82:23 83:18
84:19,21 88:12
89:6,7,8,8,9,15
89:21 90:5
92:6 95:23,23
95:25 96:2
97:15 98:5
99:1,16,23
100:1,13,16,23
101:1,16,18
102:1 104:18
105:3,13,14,18
106:18,21
107:2 108:23
109:11 110:16
110:22 111:13
112:17 114:20
115:9 119:4,6
121:15
**judges** 2:14

**judgment**
24:14 45:8
49:9 86:21
96:10 98:9,11
98:12 100:19
119:13 120:3
**judicata** 42:2,6
42:11,13 87:6
96:22 98:1
116:16,21
**judicial** 20:19
46:13 117:23
**july** 104:1
**jurisdiction** 9:2
9:15 10:13,16
10:17,17,18
11:7,13,18,20
11:24 12:1,8
12:10,25 13:3
13:4,7 58:13
69:11,13,17,17
69:18 88:5
114:25
**jurisdictional**
9:8 20:24 68:5
73:25 80:9
84:16 88:3
**jurisprudence**
52:14 55:17
117:14
**justice** 67:21,25
104:17,23
**justiciable**
87:10,22

**justified** 43:9
**justify** 100:14

**k**

**kami** 7:8 96:4
**kavanaugh's**
67:25
**keep** 114:8
**kept** 30:21
**key** 18:2 63:2
67:7 83:5
**keystone**
106:10
**kill** 70:11
**kind** 49:24
55:21 61:19
77:2 80:9,11
81:17 108:6
119:25
**kinds** 81:20
**knell** 14:13
**knew** 26:5,7
31:18,19,20
**knocked**
118:14,15
**know** 9:16
25:24 39:15
42:5 45:16
46:18,20 47:13
57:16,19,20
59:25 60:18
61:10 65:18
66:10,12 67:9
68:24 72:18,19
73:10 78:21
79:25 81:19

87:7,14,23
89:21,24,25
90:1,6 98:25
99:7,8 110:1
**knowing** 25:9
25:16
**knows** 109:20
**krause** 2:13 8:4
8:11,23 9:1,4
9:13 10:9,11
10:25 12:3
14:22 15:12
16:14,22 17:10
18:8 19:1,16
20:3 21:16
22:17 24:16
26:15 27:7,9
27:18 31:4,24
32:2,5,7,12,17
33:2 35:4 40:7
44:24 45:10,14
46:6,18 48:20
49:21 51:12
52:8 53:5,22
55:5,24 58:7
58:10 63:14
65:4 66:2
67:16 68:8,14
68:20 69:2,9
69:10 71:2,5
76:19 88:12
89:6,8 92:6
95:23 96:2
97:15 99:23
100:1,13,23

101:1,16,18
102:1 105:3,14
106:18,21
107:2 108:23
109:11 110:16
114:20 115:9
119:4,6 121:15
**krause's** 79:23
**krebs** 82:16
**kurtz** 7:25
51:24 75:7
84:12,12 89:11
89:17,25 90:9
92:12 96:1,8
96:16

**l**

**l** 30:4 31:12,16
64:13 110:23
110:25 111:7
**lack** 23:3 68:10
68:11,11 69:11
69:17 92:16
**laid** 44:20
96:17 106:1
**land** 75:5
**language** 30:9
30:18 31:11,16
33:3 34:22,24
35:8 37:13
38:7,20,24
39:5,6,11,12,16
39:25 40:12,13
40:15 41:2
42:3,21 43:5
44:19,22 48:7

48:8 66:4,7
86:10,19 87:1
96:20,24 97:12
97:23 100:5,13
100:16,18,19
100:19,20
115:13 116:4,4
116:10,11
117:1,4,8,10
119:1 121:11
**large** 83:19
**lasted** 59:7
**late** 53:16
**latent** 75:18
**launching** 58:5
**law** 10:19 12:5
12:7 19:21
20:17 21:8
26:7 33:1 35:5
35:9,15 36:22
40:7,8,17
41:16,19 50:20
54:3 66:12,25
74:3 75:1
77:19,22 87:5
93:10 95:5,9
96:13 111:24
115:16 118:2
**lawful** 75:2
**lawsuit** 26:8
34:20 65:17
116:17
**lawsuits** 18:12
25:5

**lawyers** 117:16
**laying** 51:17
**lays** 34:24
42:10
**lead** 114:24
**leading** 90:22
**leapfrog** 18:4
**learn** 85:22
**lease** 111:1,3
**leave** 35:23
67:5
**leaves** 89:6
**left** 24:17 82:5
**legal** 13:9
20:25 105:7
122:13
**legislative**
111:9
**lenders** 55:18
55:21
**lesser** 61:17
105:21,22
**letter** 25:11
**level** 48:6 100:4
**leveled** 67:1
**liability** 25:13
25:15 46:22
62:11 95:6
110:9,12
112:16,23
113:1,13
114:22,23
**liable** 26:12,13
**liens** 70:21 93:6

**light** 18:7 31:12
70:25 95:1
**likelihood** 47:9
108:25
**likely** 48:3 50:6
50:21 109:16
**likewise** 91:25
**limbo** 56:3
**limit** 20:22
**limitation**
20:24 68:17
89:1
**limitations**
91:7 108:19
**limited** 23:23
27:1 44:18
**limiting** 20:21
21:1
**limits** 20:18
21:2
**lines** 65:20
**liquidation**
23:12 77:7
**literally** 61:23
95:18
**litigate** 42:8
**litigated** 63:21
97:8
**litigates** 43:21
**litigation** 61:16
65:9 66:21
76:9 77:5,8,8
85:13 86:15
87:18,20 98:20
98:21 117:9

**little** 59:19
71:17 78:24
96:9 120:1
**live** 77:1
**lives** 59:9,10
**llc** 1:12 3:4
**llp** 4:13,22 7:2
7:20
**loans** 55:20
**local** 9:22
11:11,14 12:13
12:13,21 13:1
24:18 26:9,11
26:13 27:4,20
28:15 57:1
71:25 72:2
88:17 106:13
107:13,16,19
108:16,18
115:5,7
**lockheed** 61:19
**lodge** 61:20
**logical** 17:20
**long** 11:21
65:15 86:23
95:2 107:5
**longer** 20:4
47:1 104:8
114:17
**look** 13:13 18:4
19:2,4,5 21:24
22:18 23:20
24:11 33:2,3
33:16,20 36:13
54:3 57:7 58:8

58:13 60:5
72:16,16,25
73:20 75:15,22
79:3 80:15
85:25 86:19
92:7 93:5,6,8
101:12 117:21
118:11 119:20
**looked** 23:7
39:6 55:22
94:14 111:21
111:22 120:19
**looking** 19:23
20:18 21:22
25:17 26:6,16
26:21 35:25
48:16,16 51:2
69:4 92:8
95:11 120:15
**looks** 52:14
53:15 54:11
55:1
**loses** 95:4
**loss** 68:24
**lot** 14:19 26:2
53:11 59:21
62:20 72:15
77:1 79:6 95:1
95:21
**lots** 39:16
**low** 11:2 21:23
**lower** 49:21
57:18 85:9,17
86:2 108:2
111:22

**lujan** 4:13,19
18:9,10,11
19:10,20 20:7
21:6 22:2,23
23:17,22,24,25
24:6,12,21
26:6,24 27:8
27:10,25 29:17
31:8 32:3,6
72:8 110:18,18
110:19 111:6
111:15 112:19
113:22 114:21

---

**m**

**m** 7:17,25 16:3
16:24 20:18,24
26:16 28:20
29:15,17 31:20
31:22 51:20,22
52:23 58:17,22
60:7 61:1,23
63:3 64:2,7,17
64:20,22 68:8
68:25 69:5,22
73:7 74:14
76:9 77:11,16
78:13 79:25
81:9 83:15
111:4,17
114:12 115:8
**made** 13:8 22:2
44:19 47:8,9
50:16 58:14
61:9 67:25
68:22 69:24

70:6 76:21
80:15 85:15,18
85:19 87:7,19
87:20 91:19
98:5 101:13
105:22 108:24
111:17 112:5,9
113:4,5,11
118:4,11
**magnitude**
46:18 47:14
57:17 72:12
**majority** 13:24
67:22 101:21
101:22
**make** 8:13 12:4
15:12 20:23
26:15 33:17
40:14 43:2
44:6 47:8
66:18 72:2
81:25 95:22
98:22 100:10
101:13 109:11
109:14 111:11
115:4 120:8
**makes** 8:13
11:9 12:20
19:22 41:9
59:2 64:3
108:9 117:14
**making** 10:12
15:4 38:3
53:11 64:19
117:17

**mall** 20:17 21:8
108:3
**management**
14:9
**manner** 116:9
**mapping** 91:10
**market** 2:5 6:2
**marriage**
104:10
**martin** 61:19
**mass** 43:23
**massively**
99:21 101:5
**master** 112:7
**material** 65:11
66:18 67:10
98:19
**materially**
64:10
**matrix** 22:20
**matter** 1:5,11
17:4,4 23:11
23:15 35:15
38:19 41:16,16
41:17 55:5,9
58:8 59:3
66:24 67:22,24
74:3 75:11
87:5 92:9
104:19 108:5
114:24
**mattered** 82:18
**matters** 60:20
80:1 82:11,24
91:8

**maximize** 44:1
61:25 62:2,24
94:6
**mccarran**
111:19,24
**mckenna** 7:11
**mcmahon**
25:21
**mean** 9:21
13:12 15:18
17:14,25 19:3
19:17 20:9
23:8,9,12
24:13,18,19
25:24 30:23
40:8,11 55:6
55:24 57:8
59:16 69:4
73:2 89:15,22
90:15 92:7
97:20,20 99:4
99:8,23 101:4
107:8,12,15
**meaning** 19:25
39:2 67:21
68:17 78:6
**meaningful**
48:23
**means** 19:6,7
29:8 37:21
38:24 39:21
53:15 59:25
80:4 87:15
93:11 95:10
117:3

**meant** 81:2,6
**measure** 57:19
61:2
**measured**
109:21
**mechanism**
121:8
**meet** 23:1 53:7
112:7
**meeting** 14:11
**member** 102:19
104:5,8
**members** 59:8
108:19
**memorabilia**
102:17
**mend** 104:8
**mention** 42:24
112:22
**mentioned**
52:12 59:4
78:9 84:16
**meritless** 52:2
**merits** 10:11
17:13 32:15
44:13 48:18
50:17 51:25
58:15 68:19
69:3,15 70:13
83:15 96:6
107:13
**mertz** 7:11
**messy** 59:22
**met** 13:21
14:11 113:12

**method** 101:9
**methodical**
91:19
**michael** 5:21
51:15
**mid** 55:7
**millennium**
55:23
**million** 19:11
29:2 55:13,19
56:23 89:18
**minimize** 43:22
**minimum**
94:25 95:10
**minute** 71:13
114:20
**minutes** 8:9
18:10 32:10
**mirror** 21:12
**mischaracteri...**
85:19
**mischief** 62:20
63:4 81:17
**misheard** 77:17
**mission** 40:19
**moac** 20:17
21:8 108:3
**mode** 14:15
**modification**
22:16 24:7
33:5 37:2
**modifications**
85:2
**modified** 14:7,7
15:11 18:25

114:6
**modify** 50:24
84:24
**modifying**
84:25
**mogul** 40:3
41:16
**moment** 56:13
64:25 71:1
**moments** 77:16
**monetary** 72:2
**monetize** 93:14
94:2
**money** 14:3,5,8
14:20 15:2,3,7
15:9 24:16
28:12 33:9
37:23 53:1
56:21,22 58:2
70:14 77:1,2
77:10 82:15
83:1,9,9 89:23
90:6 103:17
107:7 108:16
114:3,9,16,18
**month** 102:6
**months** 53:16
56:20 65:16
66:21 102:24
**moot** 8:16,18
15:23 18:19
33:18 47:16
63:13 72:24
73:2

**mootness** 9:5
9:11,12,14
13:12,14,15
15:6,14,18,20
15:21,25 16:3
18:20 19:24
20:16,25 21:4
21:17 23:9
26:20 32:14,18
33:22 44:9,9
44:12 51:19
52:12,13,13,22
53:8,15 54:8
54:12 55:17,22
56:1,6,9,13,15
56:16,18 58:8
58:21,23 59:3
59:16,21 60:3
65:6 66:13,20
67:18 68:4,4
68:16,16 72:23
73:3 75:3,16
77:16,19,24,25
78:1 80:9
82:11 102:2
108:2 120:2
**morning** 8:4
45:1 51:18
52:4,18 65:8
67:13
**morris** 5:24
**mortgage**
112:7
**motion** 28:25
47:15 61:3,9

61:11 64:20,21
69:25 70:10
79:12 111:16
111:16
**motions** 74:24
79:13
**motivations**
43:18
**move** 92:13
**moved** 20:8
**multi** 83:7
**multiple** 83:7
**myriad** 43:11
44:5

**n**

**n** 4:3 6:2 8:3
122:3
**name** 8:8
**naming** 41:13
**narrow** 17:16
26:17 41:25
44:22
**narrower** 56:8
**narrowly** 33:2
**nature** 91:5
**ne** 5:8
**nearly** 10:7
**necessarily**
17:15 80:8
**necessary** 54:1
64:19
**need** 9:17 19:4
33:3 34:9,9
35:6 40:15
41:15 53:25

54:9 55:3
63:11,18 64:6
70:9 81:21
85:17 87:19
90:6 94:3,20
104:25 105:11
108:6 119:22
120:23
**needed** 12:4
93:17 102:22
121:8
**needs** 9:17
20:20 83:18
**neither** 8:16
9:1 13:16
15:22 40:20
**net** 120:25
121:2
**neutrality** 43:2
**never** 31:9,10
50:3,4 100:5
100:14 109:19
110:10 115:8
**new** 4:25 6:13
7:23 23:14
30:14 55:20
56:1,15 62:8
62:11 102:2
116:6
**nichols** 5:24
**nightmares**
104:6
**nine** 100:12
**ninety** 53:23

**ninth** 121:4,6
**non** 108:18,19
114:7 116:9
**nonappealable**
28:24 29:4
**nonbankruptcy**
93:10
**nonconsensual**
8:13 17:23
18:2,6 68:12
89:1 94:16
**nonconsenting**
92:4
**nondebtor** 9:20
9:20 25:10
71:25 92:20,21
112:1 121:7
**nondebtors**
11:1 18:13
25:6,13 112:16
**nonsettling**
36:19
**nordhoff** 108:9
**north** 3:5
**northern** 69:5
**nos** 1:15
**notably** 52:23
55:18
**note** 26:25
48:17 54:24
62:25 85:2
90:10,19 93:24
**notes** 64:13
**notice** 16:9
46:13 117:23

118:12
**noting** 85:13
**notion** 69:23
88:4
**notwithstandi...**
21:20 39:25
60:13 61:6
66:8 70:18
93:9 94:18
104:16
**november** 2:8
122:19,25
**novo** 12:10
**number** 8:21
19:1 22:19
47:20 50:2
93:2 97:22
101:8 104:18
105:23
**numbers** 55:7
**nw** 4:6 6:20
**ny** 4:25 6:13
7:23

**o**

**o** 2:12 8:3
30:16,16,18,22
30:24 31:12,16
31:17 64:14
111:9,10 122:3
**o'melveny** 6:18
**object** 28:1
**objected**
119:14,15,16
119:18

**objection** 28:8
47:21 61:4
67:1 80:7,8,10
84:8 97:18
100:3,21
**objections**
83:20,22 86:5
92:4 106:3,4
119:11
**objectors**
104:15
**obligation** 47:4
94:6 105:22
**obligations**
34:1,5,18
35:11,14,20
36:7,8,14,18
37:15 38:2
66:8 84:15,20
85:1 86:8,17
87:2 88:8,10
90:12 107:11
117:13
**observation**
80:14
**obtained** 115:6
**obtaining**
104:17
**obviously**
13:24 20:13
53:3 54:12
61:24 74:13
77:19 81:16
**occasion** 21:20
29:24

**occurred** 22:18
32:22 53:18
55:11 60:21
71:6,11 82:4
98:4 118:12
**october** 55:7
**offer** 105:4
**offered** 22:7
**oftentimes** 26:9
**oh** 37:12 41:19
42:5 50:5
59:22 117:6
118:17
**okay** 8:12 18:7
32:5 34:14
36:12 44:20
51:12 59:22
71:2 96:11
101:16 110:15
114:12 115:9
119:4 120:3
**old** 95:13
102:17
**olson** 82:7
**once** 43:22
103:1
**onere** 35:9
**ongoing** 65:9
65:16 66:21
90:11 101:24
**oops** 73:10
**open** 108:11
**opening** 48:8
119:21 121:12

**operating**
23:15
**operation**
53:17 95:4
**operations** 3:8
**opining** 17:17
**opinion** 44:7
59:25 63:24
76:20 79:11,23
82:20
**opinions** 10:20
**opportunity**
21:17 22:10
74:15 75:11,14
**opposite** 39:15
39:24 40:6
63:7 76:11
77:8 86:1,12
**opposition**
111:15
**opt** 46:2 58:14
106:7,23
108:16
**options** 63:17
**oral** 100:6
**ordeal** 103:15
**order** 9:6,16,18
16:10,12,16,19
16:22 20:22
24:5 28:24
29:4,19,20,21
36:25 37:14,21
38:4,14,16
39:21,22 40:1
41:21 45:9

49:9 50:24 55:3 57:10 59:10 60:1 62:2,23 70:4 70:18,23 73:16 73:17 74:12 75:17,17 76:14 84:22 85:5,6 87:2,3 93:13 97:10 100:7,22 101:23 102:21 104:2 112:20 113:15,20,23 114:7,23

**orders** 97:25 100:9

**oregon** 110:11

**organization** 26:9,12 27:13 27:15 113:5,18

**organizations** 9:23 11:12,15 11:19,21 12:9 12:14,21 13:2 27:5,6,21 28:5 28:18 71:8 72:1 88:17 106:14 107:14 107:16,20 113:2

**original** 30:18 31:16

**originally** 30:17 44:23 100:17,20

**osram** 54:6,21 82:20

**ought** 70:24

**outcome** 15:5 15:10 17:21 75:10 77:10

**outline** 119:21

**outlined** 102:6

**outs** 106:23

**outset** 26:24 59:4

**outside** 16:16 22:3,13 29:24 31:1,22 40:10 61:9 85:14,21

**outsider** 22:5 22:15

**outsiders** 22:6 22:11

**overall** 49:22 91:8 99:20,22 101:15 118:20

**overcoming** 41:4

**override** 41:10 85:15

**overriding** 21:14

**overturned** 23:11

**overwhelming** 98:14 101:22

**overwhelmin...** 66:15

**owe** 116:24

**owed** 99:17 103:18

**own** 11:23 12:22,23 18:17 21:19 68:20 106:16

**owners** 94:4

**p**

**p** 4:3,3 8:3

**p.c.** 7:11

**pacor** 10:20

**page** 27:19 41:2 59:6 79:7 79:7 84:23 88:19 92:22 102:10 116:6

**pages** 35:16 38:6 41:19,19 117:17 119:20

**paid** 28:12 48:3 50:4 76:25 77:2 80:22 83:9 90:12,16 95:20,22 98:17 99:19 104:12 106:23 107:4 110:3 112:14 113:2 114:3,19 121:1

**painful** 103:24

**paint** 57:7,9,14

**pales** 72:21

**panel** 68:2,24 74:16,25 79:13

**panel's** 76:20

**paper** 47:22 70:12,12

**papers** 118:25 121:12

**paragraph** 34:16,21 35:2 36:14 45:9 84:22 85:4

**paragraphs** 85:7 117:21,22

**parentheses** 115:24

**parker** 5:6

**parlay** 117:24

**part** 13:19 16:8 16:15 17:23 20:1 23:6 27:22 38:11 43:24 44:14 45:23 46:25 49:25 72:17 73:15 78:2,3 78:11 92:10 98:13 106:10 106:18,22 115:3,4,5

**parted** 20:4

**partial** 19:19 24:2 54:22

**participated** 22:10 25:16 52:6 102:15

**participating** 45:22,22 71:8

**participation**
  59:11 93:18
  94:4,9
**particular**
  17:12 26:17
  45:8 48:24
  52:9 75:7 96:7
  108:8 116:22
**particularly**
  65:6
**parties**  9:21,24
  9:25 22:9 29:7
  29:10,13 40:9
  43:18 44:15
  54:16 107:9,21
  107:24 108:18
  114:10,17
  121:17,19,21
**parting**  20:1
**parts**  32:14
**party**  8:13
  10:22 13:4
  16:11 17:24
  18:6 19:5
  21:25 25:25
  26:18,21 33:19
  40:21 41:14,14
  43:8 52:16
  55:21 68:14
  75:1 76:21
  79:1 89:1
  102:19 106:8
  107:13,19
  116:2

**party's**  33:17
**pass**  103:5
**passed**  103:25
**patience**
  121:13
**pause**  69:18
**pay**  37:24 44:4
  49:10 90:7
  109:17 116:14
  116:14,22
  121:8
**paying**  98:25
**payment**  54:23
  75:8,9 82:16
  82:18 84:18
  88:24 89:3,5
  90:14,18 91:23
  92:9 101:9
  108:25 109:9
  109:25
**payments**
  80:15
**peace**  77:2
  114:5
**peachtree**  5:8
**pencil**  49:18
**penciled**  49:9
**penciling**  49:23
  65:19
**pending**  45:4
**penetrated**
  102:13
**pennsylvania**
  2:6 7:4

**penny**  76:5
**people**  57:3,24
  72:15 93:18
  105:8 114:16
**percent**  13:23
  42:20 46:21
  53:23 55:6
  82:17 103:3
  104:15
**percentage**
  55:5 56:4
**perfectly**  75:2
**performing**
  55:19
**period**  42:3
  77:1 116:9
**perkins**  5:15
**permanently**
  10:22 12:19
**permissible**
  35:15 92:4,6
**permission**
  32:10
**permits**  92:23
  117:12
**permitted**  87:4
  87:4
**personal**  104:3
**perspective**
  101:21 105:5
**persuade**  74:8
**petition**  18:12
  25:22 97:3
  98:2,3 115:6

**pharma**  21:9
  25:21
**philadelphia**
  2:6
**philip**  67:12
**phillip**  6:15
**phoenix**  3:6
  5:19
**phrase**  82:4
**picture**  57:7,9
  57:14 106:23
**piece**  21:21
  59:16,19 60:2
  60:2 70:12
  74:1
**pieces**  59:21
  98:15
**pipeline**  69:5
**place**  68:18
  78:4,5,5
  117:20 120:17
  120:21
**placed**  54:7
**places**  93:2
**plain**  67:21
  78:6 80:3,4,10
  80:22 81:8,13
**plainly**  69:12
**plan**  9:9,11
  10:7 11:9
  13:18 15:8,11
  16:13,15,20
  17:3,4,6,11,18
  17:22,24 18:1
  18:1,2,14,19,24

22:15 23:11,16
23:18,22 24:3
24:4,7,12,22,25
25:4,8,23
27:22,25 28:23
28:23 29:3,7
29:18,22,25
30:3,7,11,20,21
30:25 31:2,2,2
31:5,14,15,17
31:17,19,22,23
32:21,23 33:4
33:5,19 34:4,7
34:15,16 35:6
36:14,24 37:2
37:13,15,20,22
38:3,16 39:2,4
39:19,20,22,25
40:11,16,25
41:8,11,15,20
42:16 45:7
49:5,5,6,22
51:17 52:1,2
52:16,20 53:5
53:6,19 54:7
54:18,18 55:3
55:16,25 57:4
57:17,25 58:3
59:5,18,20,20
59:20,24 60:15
60:21,25 61:2
61:9,22 62:2,5
62:25 64:16,19
65:20 66:4,8
66:14 67:2

69:15,23,24
70:5,10,17,18
70:24 71:7,16
71:17,18,18,23
72:5,12,13,22
73:4,8,14,16,20
74:10 75:7,9
75:17,24 76:2
77:4 79:2 80:7
83:19 84:9,18
84:23 85:4,5
86:3,4,7 88:22
89:2,16 90:6
91:23 92:23
93:11 95:8,20
96:4 97:8,9,9
97:18 101:22
102:6,7,14
103:22 104:13
104:14,19,21
106:10,11,25
108:15 109:6,8
109:16,22,23
110:25 111:2,5
111:11 113:14
113:19,23
114:6 115:23
116:24 117:7
117:24 118:12
118:21 119:13
119:16,25
**plan's** 52:7
93:11
**plans** 17:19
39:18 42:8

79:16 89:4
116:11,20
**plant** 48:13
50:11,12 121:3
121:3,4
**play** 22:22 69:6
97:17 110:6
117:24
**pleading** 34:25
**please** 8:7 18:9
32:8 45:2
51:15 67:12
96:3 101:19
**plural** 10:1
**plus** 95:17
**pockets** 43:8
**podium** 60:20
**point** 8:12 12:6
18:5 20:10
34:19 45:10
46:7 47:14
48:19 53:13,20
54:5,12 55:13
56:13 60:6
61:7 64:2 67:8
68:20 69:24
81:18,25 82:22
83:17 85:6,17
86:6 87:22
90:10 91:21
98:11 100:1
101:3 119:24
120:8
**pointed** 74:23

**pointing** 88:24
**points** 42:1
49:13 80:24
110:19 115:10
**policies** 11:22
11:23 12:25
13:1 26:25
27:1,1,3,3,4,5
27:15 28:3,4
28:16 34:2,5
36:21 41:13
51:23 54:15,19
58:4 60:9,14
61:24,24 62:3
62:5 70:3,16
70:20,25 71:20
76:6 80:17
82:6,11,25
83:1,2,9,10
85:2 86:4,18
87:4 88:9,13
88:13,17 89:20
93:19 97:6
106:9,10 107:5
107:6,12,17,18
114:4,8,14,18
115:5,7,15,21
115:23,24,25
118:1
**policy** 21:9
28:11 38:2
55:19 64:10
67:22,24 68:1
77:11 85:1
93:22,23

107:24
**policyholder**
37:18 40:22
43:20
**population**
103:4
**portion** 53:25
**portions** 84:19
**portland** 4:8
**position** 38:25
39:1 40:22
76:4,7 85:12
86:12,13 97:12
118:25
**positioned**
66:11 67:6
**possibility**
78:14,16
**possible** 8:21
12:24 15:23,24
16:2 23:18
79:15 105:19
107:25 108:4,6
108:14
**possibly** 89:25
94:18
**post** 11:10 75:5
82:14,14
**potential** 47:19
99:3 107:17
**potentially**
45:21 91:6
**power** 20:19
21:7 49:18
53:6 68:11

69:12
**powers** 17:8
**practical** 23:11
23:15 43:17
57:12 104:19
**practice** 26:4
62:22 78:23
79:5 93:20
**practitioner**
25:24 78:20
**pre** 11:10,18,20
12:8 18:12
29:21 46:9,25
88:6,9,13,16
97:3 98:2,3
115:6
**precedent** 21:3
21:4,7,19
24:13 52:22
53:11 57:17
75:19
**precedents**
54:9
**precisely** 90:3
**preclude** 51:20
58:23 69:6
**precludes**
22:17 56:9
58:18
**preclusive**
116:16
**preempted**
111:19 112:3
**preempts**
111:25

**prefer** 63:16
**prejudgment**
24:15
**prejudice**
116:8
**prepared** 61:8
121:19,21
**present** 51:18
**presentation**
32:13
**presented**
56:19 60:23
64:18 66:15
**preservation**
86:7 96:20
97:1,14
**preserve** 32:24
39:14 40:5
41:12 50:23
51:9 97:2,3
**preserved** 40:1
66:9 84:20
85:10 87:9
106:2,3 116:3
117:7
**preserves**
39:13 85:8
86:11 115:13
**preserving**
39:9
**presumably**
87:24
**presume** 79:13
**pretty** 9:19
26:3 98:9

106:1
**price** 62:11
64:11
**primarily** 9:21
22:3
**primary** 46:24
88:20 93:24
94:8
**principal** 68:22
**principle** 35:9
40:15,16,19,23
53:4 63:16
116:1,1 117:25
**principles**
66:20 96:13
97:17,19
**prior** 11:12,15
11:17 12:13,21
26:7 76:20
**probably** 31:10
94:22
**probate** 102:24
**problem** 48:23
72:11 73:22
81:24 100:24
115:17 117:7
118:15,16
**problematic**
97:24
**problems** 9:9
35:7 73:1,19
81:22 102:23
**procedural**
10:6

**procedure**
83:23
**procedures**
22:20 90:25
99:21 101:5,15
**proceed** 8:4
20:20 23:25
33:11 53:1
**proceeding**
41:23 42:20
46:14 116:17
**proceedings**
121:23 122:7
**proceeds** 115:2
120:17
**process** 10:6,8
16:7,8,11
22:10 25:16
45:25 52:6
59:6 68:22,23
68:25 83:24,25
101:9 119:19
**processes**
101:11 102:6
**profile** 91:6
**profit** 95:14
**program** 56:25
**progressed**
25:20
**prohibits** 80:11
**project** 98:24
**projecting** 92:2
**promise** 52:7
59:4

**promised** 109:9
**prong** 54:13,25
**proof** 34:19
89:11
**proper** 9:5
41:13
**properties** 57:2
57:5,25
**property** 9:25
18:22 19:13
20:2 30:2,3,6,8
61:15 62:1
64:20 80:19
82:8 88:14
92:20,23,25
93:3,6,8
106:15 111:1
114:15 115:6,8
**proposed** 37:1
42:19 44:22,23
49:6,23 51:8
52:15 66:7
70:1 86:25
100:5,9,13,17
100:20,21
117:4,5 120:20
**protect** 17:4
18:6 39:19
**protected** 29:7
29:10,13,13
66:4 99:14,19
114:9,17
**protecting**
114:13

**protection** 29:5
47:10 50:9
99:7,12 114:9
120:14,15,19
**protections**
28:7 81:17,21
**protective** 86:9
**protects** 39:12
**prove** 22:24
102:17,18
**provide** 27:22
30:7 56:6
57:20 69:15
83:16 84:3,7
86:16,22 89:5
91:15 93:11,17
94:6 109:6
111:2
**provided** 26:19
28:11 53:16
**provides** 18:1
63:5 64:5
84:18,23 87:3
88:23 89:3
95:2,3 109:22
**providing**
80:11 81:20
83:16 109:24
**provision** 9:5
28:18 35:18
41:10 42:10
82:15 87:16
93:10 94:14,19
96:10 118:3

**provisions**
36:21 41:4
42:18 72:18
92:20 98:12
116:7 117:17
118:13,14
**prudential**
21:11,13
**pudding** 34:20
**pulled** 90:25
**purchase** 62:11
64:10
**purchased**
62:16
**purchaser**
26:22 80:6
81:11,15
**purchasers**
16:24 26:23
61:16
**purchases**
78:10
**purdue** 8:13
17:13 18:3,14
18:19 21:9,9
21:12,13 25:3
25:4,20,21
26:2 50:16
51:7,25 62:15
62:25,25 63:5
63:10,10 67:19
67:20 75:1,5,8
78:6 79:23,25
81:3,4,19,24
84:17 88:21,25

91:23 92:3,15
92:16 95:9
99:1,4,8
100:23 106:2
112:8,21 121:1
**purdue's** 50:16
**purple** 42:11
**purpose** 18:24
20:10 88:21
101:10
**purposes** 19:23
22:1 40:11
86:20 90:14
101:7 109:17
112:6
**pursuant** 16:25
36:20 37:22
42:16 54:7
55:16 61:1,22
64:17 69:23
70:3
**pursue** 37:17
60:13 106:13
**pursued** 89:13
**pursuing** 95:7
**pursuit** 76:16
76:20 83:13
**put** 14:4 22:21
37:4,5 40:13
46:21 47:22
48:7 67:15,23
70:15 75:9
96:21
**putting** 70:12

**q**

**qualification**
85:5
**qualify** 31:6
**quantifiable**
46:7
**question** 26:1,2
47:6,13 49:7
49:14 55:10,11
57:6,16 58:16
59:15 64:1
65:5 68:6 69:5
69:12,16 70:16
70:16 71:12
74:24 75:22,23
75:25 76:12,13
77:21 78:15,17
110:23 120:22
**questionnaire**
59:6 102:11
104:7
**questionnaires**
22:21
**questions** 31:25
48:19 65:24
66:2 71:3,13
84:9 95:23
98:10 102:12
105:1 110:21
**quick** 110:20
**quickly** 69:21
98:9 105:20
**quinn** 7:8 52:3
96:3,4 97:20
99:5,18,25

100:2,14,18,25
101:4,17
**quite** 54:18
67:23 71:7
**quote** 69:25,25
71:22,23,23
72:3 76:15,17
82:12 86:2,11
86:15,16
**quoted** 112:20
**quoting** 76:20

**r**

**r** 2:12 4:3 5:21
8:3 122:3
**rahe** 46:12
**rainer** 5:6
**raise** 31:10
82:21 83:21
100:3,11
**raised** 21:11,12
27:19 31:9
61:4 95:9 96:8
96:12 119:10
119:11
**raises** 65:24
**range** 91:8,16
**rarely** 44:12
**rather** 17:17
67:14 98:2
**rationale** 92:9
**reach** 51:24
58:14 63:17,18
113:20
**reached** 103:14

**reaching** 43:7
**reaction** 89:3
**read** 35:8 39:4
56:16 78:6
81:5,9 82:4
83:5 96:16
**real** 44:16 57:2
73:18,22 98:19
102:7 105:8
119:10
**realities** 44:2
**reality** 43:18,25
101:2
**really** 9:1 20:3
24:19 25:25,25
26:2 33:16
34:6,19 41:24
44:4 49:23
61:6,20 62:3,7
64:8 68:9 70:9
71:14 81:1
82:8 87:15
94:25 95:10
97:16 117:19
118:10 121:16
**realm** 26:20
78:14,16
**reason** 15:23
33:12 41:9
58:11,19,25
64:23 65:5
74:22 88:11
100:2,11
119:22

reasoning 92:7
reasons 74:17
  81:23 98:16
  121:10
rebuttal 8:10
  18:10 32:7,11
  105:15
received 23:3,5
  55:12 58:1
  103:15
recent 20:16
recognition
  34:25
recognize
  62:10
recognized
  25:1 42:22
  91:3
recognizes 21:4
  21:6 44:2 55:2
recognizing
  64:16
record 22:5
  46:13,21,23
  48:21 50:7
  51:1 84:20,23
  85:8,13,14,21
  88:16,19 90:18
  93:19 95:18
  101:6 119:21
  122:6
recover 103:1
recovery 43:3
red 18:7

redound 38:17
reduce 101:5
  101:15
reduced 47:10
  49:22 50:7
reduces 49:23
  99:21
reduction 45:8
  45:14 49:9
  96:10 98:9,11
  98:12 99:20
  100:19 119:14
  120:3,24
reevaluate
  43:16
refer 19:18
  48:21
reference 30:21
  66:6 118:6,7
referencing
  110:25
referred 46:17
refers 34:16
refinanced
  55:18
refunded 102:8
regard 86:17
regarding
  111:17 112:4
  112:21
regardless
  113:24
reinstated
  90:16

reinstatement
  90:15
reject 56:11
  64:8
rejected 21:14
  63:13 80:8
  84:8 85:24
  86:2
related 10:13
  10:15,17 52:3
  69:13 71:24,25
  72:4 80:20
  82:1,22 94:24
relating 36:19
  85:3,3
relation 55:10
relationship
  57:24 104:8
relative 56:5
release 62:13
  92:21 103:21
  106:12 107:11
released 51:8
  93:23 95:6
  107:24
releases 8:14
  17:24 18:2,7
  23:25 24:9
  25:25 26:18
  60:10,12 62:17
  68:14 71:24
  72:4 75:2
  76:22 78:10,11
  78:12 79:2
  80:20,21 82:24

83:10,11 84:6
  89:1 93:17
  94:13,16,17,21
  106:8,9,11
  107:8 108:15
  114:4,19 121:7
relevance 81:3
relevant 22:1
  65:6 82:10
  103:18
reliance 15:15
  19:5 22:1,1,5
  22:22 52:5,16
  103:22 104:13
relied 22:15
  44:15 56:23
  59:4 94:12
  101:23 120:6
  121:3
relief 8:18,19
  8:21 15:23,24
  16:2 17:6
  20:18,21 23:23
  24:2 32:23
  33:8,10,14,21
  34:6 41:25
  44:18 50:19
  51:21 52:14
  53:3,15,19
  56:11 58:18,24
  60:5,8 62:9
  68:5,6 75:23
  76:13,14 80:11
  83:16,16,17
  84:3,7 100:6

105:18,21,23
106:5,6,6,16
107:25 108:4,6
108:7,8,11,14
110:20 113:14
113:23,24
118:19 119:19
**relive** 102:12
**relived** 103:11
**rely** 68:12
120:6
**relying** 121:4
**remain** 29:1
40:1 107:6
**remained** 28:13
**remaining** 52:3
**remains** 24:24
**remand** 49:2
49:16,16 101:3
104:14 120:23
121:12
**remanded**
43:15
**remedied** 102:9
**remedies** 104:4
**remedy** 49:1
56:6,10
**remember**
28:14
**reminding** 52:9
**remove** 30:21
**removing**
37:13 72:11,15
**rendell** 2:13
14:14 19:25

21:3 23:10,20
24:2,8 25:22
29:14 32:2,4
33:23,25 34:4
34:9,12 35:25
36:2,4,6,16,18
37:1,4,7,11
38:21,24 44:19
56:8 57:6,11
57:12,15 59:13
59:15 60:4
61:12 62:15,20
63:16,21,22
64:12 66:3
67:1,4,11
71:12 72:11
73:22,25 74:3
74:6,9,17,21,22
75:21 77:6,13
78:8,18,20,24
79:15,18 80:18
81:1 82:20
83:18 84:19,21
89:7,8,9,15,21
90:5 95:24,25
99:1,16 100:16
104:18 110:22
111:13 112:17
**rendell's**
105:18
**render** 30:9
**rendering**
47:10
**reorganization**
29:25 31:23

**reorganize**
94:5 95:12
**reorganized**
23:13 25:1
51:16 55:20
56:24
**repeat** 75:4,4
96:8
**repeatedly** 63:8
63:11 65:21
76:10 87:9
119:18
**repercussion**
33:13
**replicate** 91:1
**reply** 28:24
44:20 114:2,6
116:7
**represent**
18:11
**representatives**
72:1
**represents**
103:3
**request** 42:23
63:13,25 64:9
84:5 96:9
97:13
**requested**
51:21 56:10,12
58:24 63:8
100:5
**requesting**
46:19

**require** 50:14
60:8 98:21
**required** 20:6
90:2 102:20
103:1 104:3
114:23
**requirement**
20:14
**requirements**
10:8
**res** 42:2,6,11,12
87:6 96:22
98:1 116:15,21
**reserve** 8:9
18:10 32:10
47:18
**reserving** 47:23
**resided** 46:22
**resolution** 12:1
48:22 66:16
105:11 113:9
**resolutions**
91:1
**resolve** 25:7
**respect** 55:14
57:23 58:2
82:9 84:5
89:14 91:19
96:12,22,23
117:15 118:3
119:24
**respectfully**
56:14 61:21
62:21 68:2
71:15 78:24

121:10
**respond** 74:7
**response** 47:15
81:25 88:4,14
**responsibilities**
79:14
**responsible**
45:21
**rest** 75:24
104:22
**restrictive**
59:17
**result** 26:10
40:23 42:12
43:19 44:4
49:22
**resulting** 91:14
**retained**
118:16
**retracted** 22:25
**retraumatizat...**
59:12
**return** 15:1
18:24 33:9
62:17 65:4
78:12
**returned** 14:6
23:3 24:16
**returning** 57:8
**reuse** 116:1
**reversal** 22:16
24:6
**reverse** 76:2
108:15 111:18
111:25 112:3

**reversed** 14:7,8
16:5 18:24
24:5,8,9,12,14
24:25 25:3
28:23 57:9
114:6
**revert** 39:12
**reverting** 56:3
**review** 21:21
45:21,25 61:13
69:6 73:16
74:6,8 75:12
83:18 103:8
109:13 118:25
**reviewed** 92:1
**reviews** 79:1
**revote** 118:17
**rewrite** 98:12
**right** 16:16
17:1 24:17
26:22 31:6
33:11 40:11
41:12 43:8,9
45:25 47:4
48:4,17,25
53:8 60:15
62:10 70:15
77:10 94:1
99:25 100:2
101:2 117:14
**rightly** 99:3
**rights** 10:1
27:16,21 29:12
32:25,25 33:19
34:5,16,22,25

35:3,11,20
36:6,7,8,13,15
36:18 37:10,15
38:4,7,15,18
39:7,8,14,20,21
40:1,5,9,20,21
41:8,20 43:13
50:15 51:9
53:1 66:1,5,8
70:22 71:9
72:19 85:1
86:3,11 93:21
94:3 96:15,20
97:2,3,14
103:22 106:15
109:4 115:14
115:24 116:8
117:6,13,25
118:1 120:11
**rigorous** 80:2,2
**rise** 77:23,24
**risk** 46:11
**ritchie** 3:3
122:5,12
**road** 5:17
82:18
**robust** 90:18
**rogers** 6:6
**role** 22:21 96:5
**roman** 27:5
28:5,8,19
**routine** 90:11
**rubber** 79:8
**rule** 24:14
58:20 80:12

92:14 94:23,25
95:2 110:13
112:14
**rules** 35:5 41:8
**ruling** 80:9
87:7,23
**rulings** 12:15
87:19 98:5,6
**runs** 43:23

**s**

**s** 4:3,19 7:13
8:3 61:2
122:10,16
**sackler** 92:19
**sacklers** 62:16
**sadly** 103:3
**safer** 78:4
**sale** 16:4,5,6,7
16:7,11,18,21
16:25 17:7,12
17:15,16,18,22
17:22,25 18:4
29:18,24,24
30:2,3,8,11,12
30:22,23,25
31:5,14 59:18
59:19,20,23,24
60:2,9,11,16,17
60:20,21 61:1
61:3,10,18,20
61:22 62:18
64:10,16 69:23
69:25 70:2
71:14,17,19
72:12,18,21

73:11,12,15,18
73:20 75:24
76:14,16,18,23
78:11 80:7
81:2,10,13,13
82:14,25 83:2
83:8,8,12,21
84:2,4 99:7
106:8,11 107:2
107:6,10
110:24,24
111:2,4,4,11
114:12,13,14
114:14

**sales** 16:10,16
16:19 18:5
26:17,25 27:1
28:13,15,15
29:1,18 31:1,1
31:17,19,21,22
57:3 71:22
76:1 77:23
82:2,3 111:11
113:24

**sat** 59:7

**satisfaction**
52:1 90:6
92:14 94:25
95:2,3 105:19
108:22 109:1,1
109:7,9,12,15
109:15,23,24
110:5,6,7,8,13
110:15 112:4,5
112:14

**satisfied** 21:23
53:12,14 58:12
64:23,24
112:14

**satisfies** 14:17

**satisfy** 10:7
92:2 109:20

**saw** 79:10

**saying** 11:20
18:5 23:21
30:10 42:12
49:9 53:10
56:1 60:20
66:5 71:7
72:18 73:6,19
97:5,24,24
99:2 107:7
112:17 114:15

**says** 16:23 20:5
30:6 35:2,17
35:18 36:6,24
38:8 39:19
40:4 41:5,7
42:4,5,10 43:1
49:11,11 51:7
61:2,22 62:7
64:19 66:7
80:5 81:9,23
82:8 86:20
96:21 113:15
113:19 115:23
121:4

**scar** 104:1

**scharffenber...**
31:5

**scheme** 21:14

**scientific** 91:3

**scirica** 2:13
13:10,13,25
29:15 31:25
32:1 77:12,15
82:23

**scope** 108:7

**scoured** 102:16

**scouting** 56:24
59:11 71:24
72:4 80:20
102:15,17
103:16 113:7

**scouts** 1:6 8:5
9:22 18:13
23:13 24:22,23
25:4,8,11,14
26:8,10,10,13
26:14 27:2,15
28:15 51:11,16
53:16 77:7
84:13 112:22

**scramble** 33:18

**scrambling**
52:16

**scrutiny** 78:12

**se** 7:4 8:14 18:3

**second** 8:5
20:13 32:15
54:24 70:14
74:14 75:14

**secondary** 16:1

**seconds** 118:7

**secret** 102:20
104:11

**section** 16:3,9
17:2 29:15,25
30:1,4,10,11,16
30:18,19 31:11
31:15 51:20,22
52:23 58:17,22
60:7 61:1,3,5,8
61:10,23 62:19
63:3 64:2,17
64:20,22 69:19
70:3 93:8
111:2,7 118:23

**sections** 64:13
64:13

**securities** 22:3

**see** 41:2 54:17
64:3 70:25
72:11,25
104:24 118:25

**seek** 33:13
63:18 118:24

**seeking** 32:20
32:21 33:18,21
52:2 60:8
66:17 67:9
83:17 87:25
115:11 117:25
118:20

**seem** 19:1
40:11 88:1
106:24

**seems** 16:24
21:24 27:22

| | | | |
|---|---|---|---|
| **seen** 31:10 | **settled** 40:8 | 114:2 115:22 | **significance** |
| **self** 22:7 | 45:6 46:15 | 116:9 | 40:13 72:22 |
| **sell** 30:6 61:15 | 71:11 94:20 | **seventh** 4:24 | **significant** 22:6 |
| 61:19 64:20 | 99:13 | **seventy** 18:11 | **significantly** |
| 93:3,6,14 94:1 | **settlement** | **several** 106:6 | 101:15 |
| 111:1 | 19:12 28:13 | 106:17 110:9 | **silly** 70:8 |
| **selling** 62:23 | 45:18,20 46:6 | 110:11 | **silverstein** 70:7 |
| 78:11 | 46:10,12 51:4 | **severity** 91:2 | 71:22 79:6 |
| **send** 117:6 | 70:2 72:3 | **sex** 107:19 | **similarly** 53:2 |
| **senior** 93:10 | 85:12,23,23 | **sexual** 103:20 | **simple** 57:22 |
| **sense** 9:2 12:20 | 87:17 88:15 | 103:24 104:5 | 65:19 67:8 |
| 18:17 19:25 | 94:21 95:8 | 105:24 | **simpler** 78:5 |
| 41:9 95:22 | 108:25 109:1 | **share** 27:16 | **simply** 10:18 |
| 120:15,19 | 109:17,18 | 46:8 | 12:9 14:19 |
| **sensitive** 117:2 | 110:1,2,4 | **shared** 10:21 | 27:12 32:22 |
| **sent** 25:11 | 113:16,21 | 11:5,8,10,17,22 | 37:14 41:11 |
| 112:25 | 116:13,18 | 11:25 12:2,7 | 49:1 70:12 |
| **sentence** 37:7 | **settlements** | 12:10,12,16,22 | 78:1 80:9 82:3 |
| **separate** 16:10 | 27:12 28:16,22 | 12:25 13:5,8 | 84:4 100:15 |
| 16:19,21 27:4 | 29:8,19 47:1 | 88:4,6,10 | 106:12 117:8 |
| 27:14 28:4,11 | 113:6 114:11 | 106:14 107:24 | 117:13 |
| 29:21 38:12 | 114:18 | 114:24,25 | **sincerely** 57:16 |
| 70:9 77:4 | **settling** 11:23 | **sharing** 11:1 | **single** 56:17 |
| 106:9 | 11:25 14:6,20 | **sheds** 95:1 | 94:14 95:3 |
| **separately** | 15:4,10 16:23 | **shoes** 116:2 | 112:11 |
| 60:22 | 27:12,14 28:6 | **shortened** 48:9 | **sir** 38:21 |
| **separates** 75:24 | 28:10,17 29:3 | **show** 22:15 | **sit** 119:3 |
| **series** 79:16 | 29:9 33:10 | **shown** 8:19 | **sits** 40:22 |
| **seriously** 79:15 | 44:10 46:7,22 | **shred** 72:8 | **sitting** 15:9 |
| **serving** 22:7 | 51:3 71:10,24 | **sic** 121:19 | 53:23 54:2 |
| **set** 21:24 32:4 | 72:1 76:25 | **sight** 104:24 | 56:21 |
| 35:9 94:19 | 79:21 99:10 | **signature** | **situated** 53:2 |
| **setting** 61:7 | 106:24 107:4,4 | 122:10,16 | **situation** 48:13 |
| **settle** 93:7,15 | 107:22 111:16 | **signed** 103:21 | 53:22 54:22 |
| 99:9 | 113:15,20 | 103:21 | 56:2 61:14 |

63:5 68:9
98:22
**six** 103:9
**size** 56:5
**skip** 10:14
**small** 53:25
56:4 96:19
105:23
**smola** 7:17 52:4
101:19,20
105:13
**society** 95:16
**sold** 27:14
54:16 57:3
58:4 60:14
61:23,25 62:4
70:16,20,25
76:6 80:5
99:11 107:5,6
115:7
**solicited** 119:13
120:4
**solid** 90:21
**somebody**
83:22,24
**somebody's**
10:5
**someday** 77:20
**sophie** 6:6
**sorry** 27:8 32:3
67:3 71:4 85:3
89:9 106:20
107:2 115:3
121:20

**sort** 15:25
52:25 56:14
57:21 60:11
64:3 82:1,23
87:7 95:10
**sotomayor** 49:8
**sought** 74:15
76:14
**sounded** 9:13
**sounds** 15:15
38:21 39:1
**source** 81:19
**southern** 30:14
91:25
**speak** 66:24
67:7 94:12
**speaks** 94:15
104:9
**special** 53:1
105:25 106:5
108:17
**specific** 32:23
39:18 43:12
50:12 52:14
54:4 64:5
94:18 108:11
109:7 117:4
118:24 121:5
**specifically**
10:19 30:4
42:10,19 44:3
44:20 46:20
58:3 94:15
96:4 103:6
112:7,18,19

113:14,15,19
115:23 121:4
**specifies** 93:9
**speculation**
22:7 23:6
**speculative**
47:7 101:2
**spelled** 35:6
**spend** 84:16
118:6
**spent** 79:8,10
**sphere** 98:22
**split** 25:17
**spoke** 85:2
92:15
**sponsored** 9:23
**spouse** 104:11
**sprinkled** 83:6
**squarely** 21:18
31:2
**stage** 53:16,20
**stamp** 79:8
**stand** 41:12
91:17
**standard** 54:10
55:1 62:22
**standpoint**
51:22 63:19
66:13
**stands** 116:2
**start** 18:20
36:12 38:13
52:21 67:16
85:13 88:24
92:13,14 93:2

102:10
**starting** 11:9
54:12
**state** 40:7
111:24 115:15
**stated** 18:21
21:9 23:2
29:23 112:17
112:20
**statement** 37:7
41:22 112:24
**states** 1:2 2:3
43:1 63:9
110:9,11
**status** 24:15
71:3,4 82:23
**statute** 19:3
20:18,21 21:24
41:17 50:12,15
63:25 68:3,3
69:14 78:7
80:10 91:7
92:23 111:20
111:20,21,23
111:23 121:5
**statutes** 68:15
68:16,16 81:14
**statutorily** 8:15
18:19
**statutory** 9:4
9:14 13:14,19
15:6,20,21
16:3 19:16
20:25 21:14,25
26:7 31:9,13

32:14,18 44:9
44:9 52:13
54:10,13,25
56:6,9,12 58:8
59:16,21 60:3
67:18 69:16
75:3,16 77:24
78:1,3 92:16
92:19 93:1,13
94:1,10 108:2
**stay** 63:6,8,11
74:14,16,17,24
75:14 79:13
**stayed** 63:1
**steep** 104:3
**step** 9:14 10:7
13:21 19:2,6
48:25 103:20
**steps** 14:10
19:4
**stop** 36:23
48:18
**straight** 80:6
106:25
**straightforward**
9:19
**strangers** 57:4
**streamline**
101:11 117:10
**street** 2:5 3:5
4:6,15 5:8 6:2
6:12,20 7:13
**strict** 73:12
**strictly** 50:12
73:12

**strike** 108:15
**striking** 23:24
37:14
**strongest** 56:18
**struck** 98:14
**subject** 14:6
36:24 37:13,15
37:20 38:3,15
39:20 41:20
46:16 85:5
90:20 114:24
**subjected** 59:5
103:9
**subjecting** 87:2
**submit** 49:14
50:18 95:22
119:20 120:24
121:10
**submitted**
47:16 64:18
88:25 116:14
**subsection** 30:2
30:4,7,12,15,16
30:18,22,22,24
30:24,25 31:12
31:12,15,16,16
31:20,22,23
111:7,9,10,11
**substance**
15:25
**substantial**
13:10,12,17,20
13:24 14:10,12
15:8,14,16,19
19:3,7,23

20:14 21:23
47:9 54:10,25
68:19
**substantially**
13:22 19:7
54:14 55:4
88:23
**successor** 14:10
**suddenly** 40:21
43:23
**sue** 27:13 28:10
29:11 95:5
114:16
**suffered** 22:6
**sufficient** 12:25
36:9 64:8 88:5
92:2
**suggest** 75:2
**suggested** 8:20
48:7 87:16
106:6,17
**suggesting** 77:7
**suggestion**
56:14
**suggests** 96:24
**suit** 29:10
**suite** 3:5 4:7,16
5:9,18 7:5,14
**suits** 24:17
**sunk** 102:8
**superb** 121:16
**superfluous**
30:9
**supervise** 17:8

**supplement**
84:24
**supplemental**
27:20
**supplementing**
84:25
**support** 10:19
21:1 28:25
47:15 51:1
88:5 98:14
101:6,14,22
**supported**
30:13 72:7
**supporters**
51:17 96:4
**supposed** 44:12
74:6
**supreme** 8:17
20:17 21:7,16
40:19 42:25
49:8 63:1,9
68:2 74:25
77:20 79:22
106:1 108:3
**sure** 10:1 15:12
26:1 46:12
52:11 54:4
64:15 72:12
74:7 94:10
97:20
**survivor** 22:8
26:8 53:2 62:6
66:16 91:7
104:4,6,7,9,15
104:20

survivors 18:16
18:18 23:1
27:13 28:17
29:11 52:5
55:12,14 59:3
66:14 95:17
98:17 101:10
101:20,22,23
102:7,10,11,14
102:16,20,23
103:4,25 104:1
104:12,17,23
104:24 105:24
suspect 52:8
sustained 80:10
sustaining 80:6
sylvania 54:6
82:20
system 10:6
46:2 69:7 91:1
95:21 104:23

**t**

t 5:3 122:3,3
table 24:25
tail 71:15,15
take 16:16
21:17,21 28:17
37:9 38:5
46:13 56:1,13
64:25 68:3
71:21,21 76:7
98:24 101:12
106:23 109:20
111:10 117:23
118:11 121:22

taken 10:4
17:20 85:12
takes 20:20
talk 9:18,21
17:10 34:18
35:14 36:14
37:12 39:17
48:18 49:12
57:8 58:18
64:25 96:8
103:11 105:7
121:7
talked 15:13
39:6,7 50:20
talking 10:21
14:22 15:16,17
17:16 55:12
57:13 65:1
93:10 95:13,16
99:9 110:23
talks 31:17
36:10,15
tdp 36:20 46:2
86:11 87:1
97:23
tdps 116:7
teach 51:5
53:21
teaches 33:16
technical 9:2
technically
46:12
tell 35:22 39:10
43:4 45:10
59:8 90:8

94:13 103:6
115:18
telling 44:7
tells 81:4,24
ten 48:15 55:6
82:17 90:16
tens 104:12
term 36:13
64:19 70:8
109:2
terminology
15:13
terms 11:3 15:7
15:17 16:6
19:9 21:24
36:20 39:2
41:25 44:11
46:8 52:2 64:9
65:13 66:23
67:9 69:22
76:4 80:11
84:25 87:6
92:15
terribly 104:3
test 10:20
13:19 54:13
testified 72:10
90:19
testimony
24:22 90:22
92:1
tests 112:8
texas 46:17
text 64:3,7 80:3
80:4,6,22 81:8

81:9,13
textual 64:12
thank 8:7 18:8
31:24 32:6,8
44:25 51:13,14
67:10,11 79:18
79:19 84:10,11
95:23 96:1,2
101:17,18
105:1,3,13,14
105:15,16
110:16,17
115:9 119:5,6
121:13,14,15
121:22
theirs 99:3
theories 8:16
13:17
theory 15:21,22
24:9
thing 42:23
47:14 54:24
62:24 70:4
118:9,22
things 9:12
22:25 26:2
38:12 43:11
52:19 72:18
76:9 89:4 96:8
97:8,22,25
98:15 101:8
108:11 114:4
115:4
think 9:7 10:11
12:14 13:3,6

15:4,21,24
18:3 26:4 31:8
31:9,13 33:7
44:24 45:19
49:3,17 51:5
52:17 53:13,20
54:5,21,24
55:2,9,11,16
56:17 58:11,19
58:21,25 59:1
60:4 61:6 62:6
62:19,21,22
63:5,22,23
64:8,15,22
65:4,10,12,18
65:21 66:10,13
66:19,23 67:5
67:7,8,14,16,17
67:18,22 69:8
69:18 70:7
72:21 73:8,11
75:23 76:19
77:23 78:3,4
78:24 79:16,17
79:22 80:25
81:2,5,22 82:7
82:23 83:5
87:23 88:3
90:9 91:23
92:12 94:16
96:11 97:11,21
97:21,23 99:5
100:23 101:4,6
101:8,11
102:12 117:5

117:10,15,23
118:19
**third** 1:2 2:4
8:13 9:20,23
9:25 10:22
13:4 14:13
16:10 17:24
18:6 19:5
21:25 22:2
23:6 24:25
25:24 26:18,20
29:22,23 33:19
35:9 39:10,10
44:15 52:16
54:25 55:21
68:14 75:1,14
76:21 79:1
88:11 89:1
102:19 106:7
107:9,13,19
116:12
**thorough** 91:18
**thought** 10:12
16:25 24:4
61:5
**thousands** 52:5
53:18 55:15
56:20,22 57:23
59:3 90:23
91:12 103:13
104:12,16
**three** 13:19
88:7 90:19
**throw** 52:20

**throwing** 53:5
**thrown** 53:8
**tied** 29:21
108:10
**time** 18:11
25:23 32:6
33:20 46:5
47:6 50:5
51:13 56:20
67:2 78:2 79:7
79:9 80:24
84:14,17 89:12
98:8 105:2
108:2 119:23
121:13
**timely** 89:13
105:11
**times** 59:9
90:24 91:12
102:13
**timing** 74:23
75:10 117:2
**tiny** 8:21
**tissue** 104:1
**title** 14:4,5 54:8
61:24 69:19
**today** 8:13
25:20 77:1
80:2 84:16
88:21 105:4
**together** 79:23
90:25
**told** 38:5,14
**tomorrow**
75:10

**took** 25:19 63:1
79:14 100:9
**topic** 52:9
**tore** 104:1
**tort** 10:6 43:23
46:2 91:1
95:21
**total** 23:6 55:12
62:12 71:17
89:7,9,15,21,22
103:4
**touch** 44:17
60:1,2 73:11
73:13 102:3
**touching**
107:24
**tougher** 11:4
**towards** 103:20
**trade** 6:11
**training** 95:15
**transaction**
17:14 33:15
44:10 65:22
83:3 118:8
**transactions**
22:12 30:5,11
31:14,18 32:22
44:16 49:6
53:18 55:11,13
55:15 56:21
57:24 111:8
**transcribed** 3:3
**transcriber**
122:13

**transcript**
119:17 121:20
122:6
**transfer** 14:15
14:16,17,18,23
19:23 20:1
21:22 28:2
30:19,20,21
35:10,13,19,19
80:19 83:10
**transferee**
116:2
**transferred**
13:22,23 14:4
14:5,20,24
15:1 18:22,23
19:8,11,18
20:5 35:12
54:7,9,14,17,19
80:18 81:14
82:9,12,13,19
83:3 88:18
107:7 115:21
115:22 116:3
**transferring**
20:3 115:23
**transfers** 31:17
31:19,21
**treat** 61:9
**treating** 108:19
**treatment** 53:4
105:25 106:1
108:17 109:6,8
**trees** 70:11

**tremendous**
121:14
**trial** 35:12 72:9
100:12
**tribune** 33:16
55:23
**tried** 100:14
**trigger** 33:9
**troops** 9:23
**truck** 42:24
43:10 44:2
118:23
**true** 41:24 42:5
50:8 60:18
82:19 83:19
84:4 100:10
112:23 114:5
120:10 122:6
**truest** 120:15
**trump** 9:12
**trust** 18:23
19:12 27:21,23
29:7 45:19,20
46:6 47:18,21
47:24 48:5,10
48:11 54:21
56:5 65:18
71:9 72:3
83:22 88:15
90:25 91:14
92:1 96:24
98:17,19,20,21
99:17 101:5,11
101:14 103:23
113:3 116:13

116:18 120:9
120:12,12,17
120:18,20
**trust's** 65:25
99:21
**trustee** 14:4,9
20:10,11,14
30:6,19 34:21
34:21 35:10
37:16,17,21
38:1,8,8,19,22
42:15 43:24
54:2 62:17
65:17 77:9
85:12,23,25
86:1,15,21
87:17,24
101:25 102:18
103:19 110:2
111:1 116:23
117:15,24
**trustee's** 32:25
117:22
**trustees** 118:1
**truth** 87:8
**truthful** 63:22
**try** 57:14 69:21
74:7,7 77:4
79:4 81:5
84:13
**trying** 33:13
41:11 60:17
65:8 116:25
117:23

**tta** 122:13
**tunnell** 5:24
**turn** 88:20
**turning** 26:19
**turns** 48:11
81:22
**twenty** 100:11
**twice** 91:15
**two** 8:9,23 9:10
14:10,12 30:10
32:10,14 38:12
39:17 41:25
42:18 52:18
58:10 69:21
70:9 76:19
77:4 80:16,24
85:17 88:9
100:9 107:21
111:8 114:4
116:7 118:24
**type** 55:20
108:11
**types** 106:6
108:11

**u**

**u.s.** 69:19
**ultimate** 19:12
19:14,17 20:4
20:6
**ultimately**
82:15 98:14
100:8
**um** 100:25
**unambiguously**
83:11

**unchallengea...**
  84:1
**unchanged**
  97:6 118:2
**unconstitutio...**
  24:10
**uncontrovers...**
  97:12
**undefended**
  47:2
**under** 8:17
  10:17,19 14:9
  14:15,24 15:1
  16:9,24 18:14
  19:8 22:20
  25:3,4 27:16
  27:25 29:7,8
  30:2,3,6,7,11
  30:12,20,21,22
  30:24 31:6,14
  31:19,21 34:1
  34:5 36:7
  40:20 41:3
  43:15 45:7,14
  46:2 47:11
  49:15 50:15,16
  50:20 52:24
  53:18 60:1
  61:3,10 64:20
  69:19 72:23
  77:3 78:13
  79:24 85:1
  86:3 87:4
  89:16 90:2
  92:3 100:9

107:5,11,16,18
  109:8 110:24
  110:24,25
  111:1,2,4,4,11
  111:11,19,24
  112:8 115:7
  120:16,19,25
  121:5,22
**underly** 66:20
**underlying**
  45:24 76:5
  86:17
**underscore**
  69:24 81:3,18
**underscores**
  67:20
**understand**
  27:18 34:9,10
  44:11,24 55:24
  58:16 117:3
**understanding**
  33:25
**undisputed**
  80:14
**undo** 23:19
  104:6
**undone** 23:16
  23:18,23 24:3
  24:4
**unfair** 49:24
  72:17 73:5
**uniform** 93:20
**unimpaired**
  109:3,8

**unique** 32:19
  59:1
**unit** 113:8
**united** 1:2 2:3
  42:25 63:9
**unknown** 47:6
**unlawful** 17:4
  18:6,15 79:16
**unlawfully**
  86:3
**unnoticed**
  59:14
**unpalatable**
  55:25
**unscramble**
  32:21
**unscrambling**
  15:15 57:13
**unsettled** 89:20
  91:13
**unsold** 57:25
**unstayed** 76:14
**untangle** 83:10
  114:3,18
**untell** 104:5
**unwind** 32:21
  49:5 57:17
  104:10
**unwinding**
  33:14 55:25
  104:14
**unwound** 102:8
  104:19
**uphold** 76:1

**upshot** 12:3
**urge** 75:21
  104:20
**use** 43:1 61:5
  70:8 78:10
  79:4 111:1,2
**used** 10:18,24
  11:13 17:4,5
  56:24 96:25
  116:15
**useful** 54:12
**uses** 13:19
**using** 15:12
  66:6 115:6
**usually** 114:23
**utter** 76:3
**utterly** 23:1

**v**

**v** 31:5
**vague** 87:15
**valerie** 3:3
  122:5,18
**valid** 29:1
  114:12,14,14
**validity** 17:15
  80:7 81:12
  83:21 84:2
  106:25 114:13
**value** 16:24
  58:6 61:16
  62:1,2,5,23
  65:17,24 81:15
  89:19 91:13
  93:16 94:6
  108:25 109:1

109:17,18,18
110:1,4 112:6
112:10,11,11
112:13,18
**valued** 90:23
90:24
**values** 91:11
**valuing** 92:1,1
**variety** 101:7
101:10
**vast** 101:21
103:17
**vaughn** 4:4 8:9
**vehicle** 49:10
**verification**
59:11
**versa** 26:14
**versus** 69:14
**vested** 27:23
**vice** 26:14
**victims** 103:21
107:19
**view** 83:3
**viewed** 33:5
**violates** 35:8
99:1
**violating** 10:5
**violation** 32:25
**violence** 51:10
**virtue** 118:2
**vis** 71:9,9,9,10
107:20,21
**voided** 17:14
**volume** 55:10

**vote** 66:14
109:5 118:12
120:4
**voted** 120:5
**votes** 42:21
**voting** 98:17

**w**

**wade** 65:23
**wag** 71:15
**wait** 23:20
**waiting** 15:9
95:17 104:17
**waive** 93:21
**waived** 15:6
60:22 70:6,13
**wall** 26:5
**want** 8:12
15:12 33:25
34:6,10 37:4,5
37:8 42:1
43:25 44:16,17
44:18,21 48:8
49:5 51:4
52:20,24,25
56:13 58:19
60:9,10,11
61:12,17 62:8
62:13 65:18
67:8,16 69:14
69:18,23 73:8
81:3,25 85:11
88:6,20 102:2
116:4,5,25
**wanted** 9:13
24:4 49:16

107:11,22
114:21
**wants** 43:22
**warrants**
104:13
**wary** 65:12
**washington**
6:21 7:6
**waste** 119:22
**way** 13:13,16
18:25 30:8
39:17 41:12
43:14 49:17
51:6,10 55:14
56:8 57:3,5
58:2 60:23
64:10 65:23
67:10,14,23
94:7,11,22
114:7 117:12
118:23
**ways** 43:11
44:5 88:7
99:19 118:20
**we've** 15:13
16:14 19:21
22:12 24:6,6,7
31:6 39:15
56:2 65:1
111:17 116:21
121:11,16
**went** 13:18
25:8 49:8 50:8
60:25 66:14
71:23 79:12

107:13 121:6
**whatsoever**
38:11
**white** 7:20
**whittman**
47:17,17,20,20
**who've** 22:8
**wide** 108:7
**wilderness**
43:10
**willkie** 4:22
**wilmerhale** 6:9
**wilmington** 6:4
**wind** 114:20
**windfall** 49:24
50:2,4,10,19
51:1
**winsberg** 5:12
45:1,2,13,15
46:9,20 49:3
50:1 51:13
119:7,8
**wish** 11:2
**witness** 72:10
**witnesses** 72:9
72:9
**wolff** 4:13,19
18:9,10 19:10
19:20 20:7
21:6 22:2,23
23:17,22 24:6
24:12,21 26:6
26:24 27:8,10
27:25 29:17
31:8 32:3,6

| 110:18,18,22 | **x** |
|---|---|
| 110:22 111:6 | **x**   1:3,9,15 |
| 111:15 112:19 | **y** |
| 114:21 | **yeah**   10:9,10 |
| **word**   34:18 | 45:15 49:21 |
| 68:15 71:21 | **year**   95:13 |
| 75:25 76:2 | **years**   76:8 77:5 |
| **words**   78:7 | 77:9 90:16 |
| 116:23 | 95:18 102:21 |
| **work**   47:21 | 103:5 104:6 |
| 49:11 50:9 | 120:1 |
| 68:18 103:24 | **york**   4:25 6:13 |
| 103:25 108:9 | 7:23 30:14 |
| 121:16 | **youth**   95:15 |
| **working** | **z** |
| 121:18 | **zero**   72:9,9 |
| **works**   32:16 | |
| 47:21 | |
| **world**   6:11 | |
| 98:4 | |
| **worry**   81:17 | |
| **writing**   26:5 | |
| 67:21 | |
| **written**   27:11 | |
| 43:17 64:5 | |
| 74:11 76:4 | |
| 80:3 81:7 | |
| **wrong**   12:9 | |
| 13:9 66:6 | |
| 70:16 | |
| **wrote**   63:2 79:6 | |
| 98:7 | |

## Certificate of Accuracy

I am liaison counsel in this matter and hereby certify that, with the corrections submitted by all counsel made, the transcript of oral argument is accurate.

Dated: November 20, 2024
          Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Sophie Rogers Churchill*
Derek C. Abbott (Del. No. 3376)
Andrew R. Remming (Del. No. 5120)
Sophie Rogers Churchill (Del. No. 6905)
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Email: dabbott@morrisnichols.com
         aremming@ morrisnichols.com
         srchurchill@morrisnichols.com

*Attorneys for the Reorganized Debtor-Appellees, Boy Scouts of America and Delaware BSA LLC*