**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 23-1664, 23-1665, 23-1666, 23-1667, 23-1668, 23-1669,
23-1670, 23-1671, 23-1672, 23-1673, 23-1674, 23-1675,
23-1676, 23-1677, 23-1678 & 23-1780
_____


In re:  BOY SCOUTS OF AMERICA and DELAWARE
BSA LLC,
                                  Debtors

LUJAN CLAIMANTS,
                                  Appellants in No. 23-1664


LIBERTY MUTUAL INSURANCE COMPANY; THE
OHIO CASUALTY INSURANCE COMPANY; LIBERTY
INSURANCE UNDERWRITERS, INC.; LIBERTY
SURPLUS INSURANCE CORPORATION,
                                  Appellants in No. 23-1665


DUMAS & VAUGHN CLAIMANTS,
                                  Appellants in No. 23-1666


THE CONTINENTAL INSURANCE COMPANY;
COLUMBIA CASUALTY COMPANY,
                                  Appellants in No. 23-1667

NATIONAL UNION FIRE INSURANCE CO OF
PITTSBURGH PENNSYLVANIA; LEXINGTON
INSURANCE COMPANY; LANDMARK INSURANCE
COMPANY; THE INSURANCE COMPANY OF THE
STATE OF PENNSYLVANIA,
                        Appellants in No. 23-1668

INDIAN HARBOR INSURANCE COMPANY,
                        Appellant in No. 23-1669

OLD REPUBLIC INSURANCE COMPANY,
                        Appellant in No. 23-1670

TRAVELERS CASUALTY AND SURETY COMPANY,
INC.; ST. PAUL SURPLUS LINES INSURANCE
COMPAN; GULF INSURANCE COMPANY,
                        Appellants in No. 23-1671

GREAT AMERICAN ASSURANCE COMPANY; GREAT
AMERICAN E&S INSURANCE COMPANY,
                        Appellants in No. 23-1672

ALLIANZ GLOBAL RISKS US INSURANCE COMPANY;
NATIONAL SURETY CORPORATION; INTERSTATE
FIRE & CASUALTY COMPANY,
                        Appellants in No. 23-1673

ARGONAUT INSURANCE COMPANY; COLONY
INSURANCE COMPANY,
                        Appellants in No. 23-1674

GEMINI INSURANCE COMPANY,
                        Appellant in No. 23-1675

GENERAL STAR INDEMNITY COMPANY,
                    Appellant in No. 23-1676

ARROWOOD INDEMNITY COMPANY,
                    Appellant in No. 23-1677

TRADERS AND PACIFIC INSURANCE COMPANY;
ENDURANCE AMERICAN SPECIALTY INSURANCE
COMPANY; ENDURANCE AMERICA INSURANCE
COMPANY,
                    Appellants in No. 23-1678

ARCH INSURANCE COMPANY,
                    Appellant in No. 23-1780
                 _____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Nos. 1:22-cv-01237, 1:22-cv-01238, 1:22-cv-01239,
1:22-cv-01240, 1:22-cv-01241, 1:22-cv-01243, 1:22-cv-
01244, 1:22-cv-01245, 1:22-cv-01246, 1:22-cv-01247, 1:22-
cv-01249, 1:22-cv-01250, 1:22-cv-01251, 1:22-cv-01252,
1:22-cv-01258, 1:22-cv-01263)
District Judge: Honorable Richard G. Andrews
                 _____

Argued on November 6, 2024

Before: KRAUSE, SCIRICA, and RENDELL, *Circuit Judges*

(Opinion filed: May 13, 2025)

Gilion C. Dumas          **[ARGUED]**
Dumas & Vaughn, LLC
3835 NE Hancock St., Suite GLB
Portland, OR 97212

Charles J. Brown, III
Gellert Scali Busenkell & Brown LLC
1201 N. Orange St., 3rd Fl.
Wilmington, DE 19801

　　　　*Counsel for Appellants Dumas & Vaughn Claimants*

Delia Lujan Wolff          **[ARGUED]**
Lujan & Wolff LLP
Suite 300, DNA Bldg.
238 Archbishop Flores St.
Hagatna, Guam 96910

Christopher D. Loizides
Loizides, P.A.
1225 King St., Suite 800
Wilmington, DE 19801

　　　　*Counsel for Appellants Lujan Claimants*

Deirdre M. Richards
Fineman Krekstein & Harris PC
1300 N. King St.
Wilmington, DE 19801

Susan N. Gummow
Foran Glennon Palandech Ponzi & Rudloff P.C.
222 N. LaSalle St., Suite 1400

Chicago, IL 60601

Theodore J. Boutrous Jr.
Richard J. Doren
Blaine H. Evanson
Gibson, Dunn & Crutcher LLP
333 South Grand Ave.
Los Angeles, CA 90071

Michael A. Rosenthal
James Hallowell
Seth M. Rokosky
Gibson, Dunn & Crutcher LLP
200 Park Ave.
New York, NY 10166

Joseph T. Baio                **[ARGUED]**
Christopher J. St. Jeanos
Patricia O. Haynes
Willkie Farr & Gallagher LLP
787 Seventh Ave.
New York, NY 10019

> *Counsel for Appellants National Union Fire Insurance Company of Pittsburgh, Pa., Lexington Insurance Company, Landmark Insurance Company, and the Insurance Company of the State of Pennsylvania*

Ronald P. Schiller
Matthew A. Hamermesh
Hangley Aronchick Segal Pudlin & Schiller
One Logan Square, 27th Fl.
Philadelphia, PA 19103

Kathleen M. Miller
Smith, Katzenstein & Jenkins LLP
1000 West St., Suite 501
P.O. Box 410
Wilmington, DE 19899

  *Counsel for Appellant Arch Insurance Company*

Kathleen K. Kerns
Paul A. Logan
Post & Schell, P.C.
Four Penn Center, 13th Fl.
1600 John F. Kennedy Blvd.
Philadelphia, PA 19103

George R. Calhoun
Ifrah PLLC
1717 Pennsylvania Ave., N.W., Suite 650
Washington, DC 20006

  *Counsel for Appellants Argonaut Insurance Company*
  *and Colony Insurance Company*

Michael J. Joyce
Joyce, LLC
1225 King St., Suite 800
Wilmington, DE 19801

Lorraine Armenti
Michael Hrinewski
Coughlin Midlige & Garland, LLP
350 Mount Kemble Ave.

PO Box 1917
Morristown, NJ 07962

*Counsel for Appellant Arrowood Indemnity Company*

Maria A. Sawczuk
Goldstein & Mcclintock LLLP
501 Silverside Rd., Suite 65
Wilmington, DE 19809

David Christian
David Christian Attorneys LLC
105 W. Madison St., Suite 1400
Chicago, IL 60602

*Counsel for Appellants Continental Insurance Company and Columbia Casualty Company*

William H. White Jr.
Kiernan Trebach LLP
1233 20th St., NW, 8th Fl.
Washington, DC 20036

John E.W. Baay II
Gieger Laborde & Laperouose, LLC
701 Poydras St., Suite 4800
New Orleans, LA 70139

*Counsel for Appellant Gemini Insurance Company*

Kelly A. Green
Smith, Katzenstein & Jenkins LLP

1000 West St., Suite 501
P.O. Box 410
Wilmington, DE 19899

Mary E. Borja
Gary P. Seligman
Ashley L. Criss
Wiley Rein LLP
2050 M St. NW
Washington, DC 20036

*Counsel for Appellant General Star Indemnity Company*

Konrad R. Krebs
Clyde & Co US LLP
340 Mt. Kemble Ave., Suite 300
Morristown, NJ 07960

Alexander E. Potente
Bruce D. Celebrezze
Clyde & Co US LLP
150 California St., 15th Fl.
San Francisco, CA 94111

David Christian
David Christian Attorneys LLC
105 W. Madison St., Suite 1400
Chicago, IL 60602

Bruce W. McCullough
Bodell Bove, LLC

1225 N. King St., Suite 1000
Wilmington, DE 19801

*Counsel for Appellants Great American Assurance Company and Great American E&S Insurance Company*

Kathleen M. Miller
Smith, Katzenstein & Jenkins LLP
1000 West St., Suite 501
P.O. Box 410
Wilmington, DE 19899

Lloyd A. Gura
Pamela J. Minetto
Mound Cotton Wollan & Greengrass LLP
One New York Plaza 44th Fl.
New York, NY 10004

*Counsel for Appellant Indian Harbor Insurance Company*

Douglas R. Gooding
Jonathan D. Marshall
Bryana T. McGillycuddy
Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110

Kim V. Marrkand
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo PC
One Financial Center
Boston, MA 02111

R. Karl Hill
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Ave., Suite 1500
Wilmington, DE 19801

> *Counsel for Appellants Liberty Mutual Insurance Company, Ohio Casualty Insurance Company, Liberty Insurance Underwriters, Inc., and Liberty Surplus Insurance Corporation*

Marla S. Benedek
Cozen O'Connor
1201 N. Market St., Suite 1001
Wilmington, DE 19801

> *Counsel for Appellants Traders and Pacific Insurance Company, Endurance American Specialty Insurance Company, and Endurance American Insurance Company*

Louis J. Rizzo, Jr.
Reger Rizzo & Darnall LLP
1521 Concord Pike
Brandywine Plaza West Suite 305
Wilmington, DE 19803

> *Counsel for Appellants Travelers Casualty and Surety Company, Inc., St. Paul Surplus Lines Insurance Company and Gulf Insurance Company*

Stephen M. Miller
Carl N. Kunz, III

Morris James LLP
500 Delaware Ave., Suite 1500
Wilmington, DE 19801

*Counsel for Appellant Old Republic Insurance Company*

Margaret H. Warner
Ryan S. Smethurst
Alex M. Spisak
McDermott Will & Emery LLP
The McDermott Building
500 North Capital St., NW
Washington, DC 20001-1531

*Counsel for Appellant Allianz Global Risks US Insurance Company*

David M. Fournier
Troutman Pepper Locke LLP
1313 N. Market St., Suite 5100
P.O. Box 1709
Wilmington, DE 19899

Harris B. Winsberg            **[ARGUED]**
Matthew G. Roberts
Parker, Hudson, Rainer & Dobbs LLP
303 Peachtree St. NE, Suite 3600
Atlanta, GA 30308

Todd C. Jacobs
John E. Bucheit
Parker, Hudson, Rainer & Dobbs LLP

Two N. Riverside Plaza, Suite 1850
Chicago, IL 60606

> *Counsel for Appellants Allianz Global Risks US Insurance Company, Interstate Fire & Casualty Company, and National Surety Corporation*

David R. Kuney
9200 Cambridge Manor Ct.
Potomac, MD 20854

> *Counsel for Amici Curiae Honorable Eugene Wedoff (Ret.) And Law Professors Ralph Brubaker, David Epstein, George Kuney, David Kuney, Jonathan Lipson, Juliet Moringiello, Chrystin Ondersma and Lawrence Ponoroff in Support of Appellants Dumas & Vaughn Claimants*

Michael Huston                    **[ARGUED]**
Perkins Coie
2525 E Camelback Rd., Suite 500
Phoenix, AZ 85016

Jessica C. Lauria
Glenn M. Kurtz                    **[ARGUED]**
White & Case LLP
1221 Ave. of the Americas
New York, NY 10020

Matthew E. Linder
White & Case LLP
111 South Wacker Dr.
Chicago, IL 60606

Ronald K. Gorsich
White & Case LLP
555 South Flower St., Suite 2700
Los Angeles, CA 90071

Derek C. Abbott
Andrew R. Remming
Sophie Rogers Churchill
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market St., 16th Fl.
P.O. Box 1347
Wilmington, DE 19899

> *Counsel for Appellees Boy Scouts of America and Delaware BSA, LLC*

Philip D. Anker          **[ARGUED]**
Wilmer Cutler Pickering Hale & Dorr LLP
7 World Trade Center
250 Greenwich St.
New York, NY 10007

Daniel N. Brogan
Gregory J. Flasser
Bayard
600 N King St., Suite 400
Wilmington, DE 19801

> *Counsel for Appellees Hartford Accident and Indemnity Company, First State Insurance Company, Twin City Fire Insurance Company, and Navigators Specialty Insurance Company*

Stephen H. Warren
O'Melveny & Myers LLP
400 South Hope St.
Los Angeles, CA 90071-2899

Tancred Schiavoni
Nicole Molner
O'Melveny & Myers LLP
Seven Times Square
New York, NY 10036

Jonathan D. Hacker      **[ARGUED]**
O'Melveny & Myers LLP
1625 Eye St., N.W.
Washington, DC 20006

      *Counsel for Appellee Century Indemnity Company*

David Elbaum
Simpson Thacher & Barlett LLP
425 Lexington Ave.
New York, NY 10017

Stamatios Stamoulis
Stamoulis & Weinblatt
800 N West St., 3rd Fl.
Wilmington, DE 19801

      *Counsel for Appellees Federal Insurance Company and*
      *Westchester Fire Insurance Company*

Matthew G. Summers
Ballard Spahr LLP

919 N. Market St., 11th Fl.
Wilmington, DE 19801

> *Counsel for Appellees Clarendon National Insurance Company, River Thames Insurance Company Limited, and Zurich American Insurance Company*

Robert D. Cecil, Jr.
Tybout, Redfearn & Pell
501 Carr Rd., Suite 300
Wilmington, DE 19899

> *Counsel for Appellees American Zurich Insurance Company, American Guarantee Insurance Company, and Steadfast Insurance Company*

R. Craig Martin
DLA Piper, LLP (US)
1201 North Market St., Suite 2100
Wilmington, DE 19801

> *Counsel for Appellees Ad Hoc Committee of Local Councils*

Robert S. Brady
Edwin J. Harron
Kenneth J. Enos
Ashley E. Jacobs
Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King St.
Wilmington, DE 19801

Kami E. Quinn                **[ARGUED]**
Emily P. Grim
December L. Huddleston
Kyle Y. Dechant
Gilbert LLP
700 Pennsylvania Ave., SE, Suite 400
Washington, DC 20003

     *Counsel for Appellee Future Claimants' Representative*

Eric R. Goodman
David J. Molton
Brown Rudnick
7 Times Square, 47th Fl.
New York, NY 10036

Rachel B. Mersky
Monzack Mersky McLaughlin & Browder
1201 North Orange St., Suite 400
Wilmington, DE 19801

     *Counsel for Appellee Coalition of Abused Scouts for Justice*

David M. Klauder
Bielli & Klauder, LLC
1204 N. King St.
Wilmington, DE 19801

Thomas E. Patterson
Daniel J. Bussel
Klee Tuchin Bogdanoff & Stern
1801 Century Park East, 26th Fl.

Los Angeles, CA 90067

*Counsel for Appellees Pfau Cochran Vertetis Amala PLLC and Zalkin Law Firm, P.C.*

Gregory G. Garre
Eric J. Konopka
Latham & Watkins LLP
555 Eleventh St., NW, Suite 1000
Washington, DC 20004

*Counsel for Amici Curiae Certain Contributing and Participating Chartered Organization in Support of Appellees*

Adam J. Tragone
University of Pittsburgh School of Law
321 Barco Law Building
3900 Forbes Ave.
Pittsburgh, PA 15260

Evan Smola                    **[ARGUED]**
Hurley McKenna & Mertz, P.C.
20 S. Clark St. Ste. 2250
Chicago, IL 60603

*Counsel for Amici Curiae Boy Scout Claimants Florian Gorski, Estate of Harry Babcock, Douglas Kennedy, Robert Zillox, Craig Miller, Kristofer Pyorre, Theodore W., and Frank S. in Support of Appellees*

————————————

## OPINION OF THE COURT

————————————

KRAUSE, *Circuit Judge*.

These appeals arise from the horrific history of sexual abuse in the Boy Scouts of America's ranks. For decades, that abuse permeated scouting programs, ranging from single instances of harassment to serial offenses of sexual penetration. In recent years, more and more brave victims of this abuse have come forward and filed lawsuits against the Boy Scouts of America and others in the tort system to recover for the harm they suffered, prompting Debtors Boy Scouts of America and Delaware BSA, LLC (collectively BSA or the Debtors) in 2020 to declare bankruptcy and to commence years of negotiations with claimants, insurers, and other interested parties towards a global resolution for the thousands of tort claims against BSA and related entities. That plan (the Plan), confirmed by the Bankruptcy Court more than two years ago, among other things, provides for the creation of a trust (the Settlement Trust), funded by the sale of certain assets and contributions from BSA and other nondebtors, to pay out distributions to abuse claimants. The Plan became effective in April 2023 after the District Court affirmed the Bankruptcy Court's confirmation order (the Confirmation Order).

Four groups of appellants now appeal that decision, seeking varied forms of relief. Two of these groups, the Lujan Claimants and the Dumas & Vaughn (D&V) Claimants, collectively represent 140 abuse victims and ask us to reverse the Confirmation Order and throw out BSA's Plan in its

entirety. That relief is warranted, they argue, because the Plan incorporated so-called "nonconsensual third-party releases"—releasing their claims against nondebtors without their consent—which the Supreme Court held are impermissible under the Bankruptcy Code last term. *See Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024). The other two groups, the Certain Insurers and Allianz Insurers, seek narrower relief. The former asks for the addition of language in the Plan and Confirmation Order to make clear that their rights and defenses under assigned insurance policies are preserved. The latter seeks amendment to the Confirmation Order, in essence, to ensure that they retain the rights they would have had outside of bankruptcy to collect on their defense costs and excess liability claims, though now drawn from the Settlement Trust.

As explained in more detail below, we will decline the Lujan Claimants' and D&V Claimants' invitation to reverse the Confirmation Order at this late stage and will dismiss their appeals because the Bankruptcy Code precludes us from reaching the merits of their claims. The narrow relief advanced by the Certain Insurers and Allianz Insurers, however, does not trigger the same statutory bar, so we reach the merits, but with different consequences for these two groups of appellants: The Certain Insurers' claims fail because the Confirmation Order and Plan already preserve their rights and defenses under their policies, while the Allianz Insurers are entitled to relief because the Confirmation Order impermissibly releases their claims under their policies.

Accordingly, we will dismiss the Lujan Claimants' and D&V Claimants' appeals, affirm as to the Certain Insurers' claims, and reverse as to the Allianz Insurers' claims.

## I.    **Background**

### A.    The Boy Scouts of America

These consolidated appeals come to us on an extensive procedural record, but the facts that precipitated BSA's bankruptcy long predate its filing. Chartered by Congress in 1916 as a non-profit corporation, BSA's charitable mission includes preparing young people for life by instilling in them values like trustworthiness, kindness, friendliness, and helpfulness. It carries out this mission and delivers scouting programs through a network of national, regional, and local entities. BSA sits atop this structure and "develops and disseminates the structure and content of the Scouting program, owns and licenses intellectual property, and establishes merit badge requirements and membership qualifications."[1] *In re Boy Scouts of Am. and Del. BSA, LLC*, 650 B.R. 87, 106 (D. Del. 2023). Below BSA lie approximately 250 Local Councils—each a distinct non-profit organization incorporated under state law—that cover various geographical regions throughout the country and that charter local organizations, recruit scouts and leaders, and enforce BSA policies. Finally, Local Councils operate in conjunction with Chartered Organizations—often schools, religious institutions, and civic associations—that provide facilities and support for scouting activities.

---

[1] BSA also wholly owns or controls seven nondebtor affiliates: BSA Asset Management, LLC; BSA Commingled Endowment Fund, LP; BSA Endowment Master Trust; National Boy Scouts of America Foundation; Learning for Life; Arrow WV, Inc.; and Atikaki Youth Ventures Inc. and Atikokan Youth Ventures Inc.

Since 1935, BSA had purchased insurance policies that covered a variety of potential liabilities, including abuse claims. Local Councils and Chartered Organizations, which were not covered as insureds under BSA's policies before 1971, purchased independent insurance policies. Beginning in the 1970s, however, BSA offered the option for Local Councils to pay a premium to be included as insureds under BSA's policies, which many Local Councils elected to do. And from 1975 onward, BSA included all Local Councils as insureds, with Chartered Organizations gaining coverage in 1976.

The need for that insurance became painfully apparent in the decades that ensued. What began as a trickle of seemingly isolated claims in the 2000s steadily increased as the degree and pervasiveness of the abuse came to light. Between 2017 and 2019, BSA resolved about 250 abuse claims for approximately $150 million. Meanwhile, many states enacted revival statutes enabling survivors to assert claims that were previously barred by statutes of limitation, and by 2019, it became apparent that BSA could not continue to defend individual abuse claims on a cases-by-case basis and would need to declare bankruptcy.

B.    BSA's Petition and the Plan

On February 18, 2020, BSA filed for bankruptcy protection in the District of Delaware. The Bankruptcy Court set a "bar date" of November 16, 2020, meaning all prepetition creditors (such as abuse claimants) had to file proofs of claim by that date to have an allowable claim. As of the bar date, creditors had filed over 100,000 proofs of claim, of which 82,209 were unique and timely abuse claims. The Bankruptcy

21

Court estimated the total value of abuse claims as between $2.4 and $3.6 billion.

To resolve this massive liability and achieve a global resolution of abuse claims, the Bankruptcy Court appointed mediators to facilitate discussions among the parties, and the Debtors "engaged in near-continuous mediation with every major constituency in the Chapter 11 Cases." BSA Answering Br. 17. These negotiations eventually yielded the Plan at issue in this appeal that establishes the Settlement Trust funded with approximately $2.48 billion in noncontingent assets contributed by BSA and various nondebtors. The vast majority of that funding—over $1.6 billion—derives from the proceeds of BSA's sale of its liability insurance policies back to a group of its pre-petition insurers (the Settling Insurers). This "Insurance Policy Buyback" is effectuated through a series of individual, but materially identical, settlement agreements between BSA and each of the Settling Insurers that provide for:

> (i) the payment by the insurer of an agreed amount on an agreed schedule to the Settlement Trust to be used to pay Abuse Claims; (ii) the assignment of the Local Council Insurance Policies to the estate and the sale of the Local Council Insurance Policies and the BSA Insurance Policies . . . to the insurer under § 363 free and clear of all claims and interests of all parties; and (iii) a complete release from all parties . . . of all causes of action arising out of their respective insurance policies and any liability for Abuse Claims.

*In re Boy Scouts of Am. and Del. BSA, LLC*, 642 B.R. 504, 562–63 (Bankr. D. Del. 2022). That third provision—contemplating nonconsensual third-party releases—enables the Settling Insurers to "obtain a complete release of liability for Abuse claims on behalf of themselves, the named insured(s) under their policies and any additional insureds (whether specifically named or categorically identified)." *Id.* at 563.

In addition to establishing the Settlement Trust, the Plan sets forth the Trust Distribution Procedures that govern distribution of trust assets to individual claimants. The Trust Distribution Procedures establish four mechanisms for distributing payments for allowed abuse claims: (a) the Expedited Distribution election, (b) evaluation under the Claims Matrix, (c) the Tort System Alternative, and (d) the Independent Review Option.

Claimants who choose the Expedited Distribution election must have submitted a timely proof of claim for scouting-related abuse and have personally signed the proof of claim, affirming its veracity. Upon meeting these criteria, a claimant is entitled to a distribution from the Settlement Trust of $3,500 as satisfaction for his claim.

The Claims Matrix election offers a more rigorous and individualized assessment of abuse claims. To make this election, a claimant must (1) make a Trust Claim Submission to the Settlement Trust, which includes a completed questionnaire signed under oath, producing all records in his possession related to the abuse (including records indicating monetary recoveries or expected recoveries on account of the abuse), and agreeing to produce further records as requested by

the Settlement Trustee; (2) consent to an interview (including by healthcare professions) conducted by the Settlement Trustee; and (3) consent to sworn written or oral examination. The Settlement Trustee screens these submissions for compliance and disallows those that do not meet these criteria.

Satisfactory submissions proceed to the second stage of evaluation where they are screened for compliance with the General Criteria defined in the Trust Distribution Procedures.[2] Satisfaction of the General Criteria results in an Allowed Abuse Claim, which is then run through the Claims Matrix and Scaling Factors that assign monetary values to claims involving particular types of abuse.[3] This calculation yields a

_____

[2] The General Criteria are: (1) identification of alleged acts of abuse; (2) identification of the abuser by name or information that enables the Settlement Trustee to determine whether the abuser was an employee, agent, or volunteer of a covered entity; (3) the alleged abuse relates to scouting and a Protected Party may "bear legal responsibility"; (4) identification of the date of abuse directly or indirectly; and (5) identification of the location the abuse took place.

[3] As laid out in the Debtors' disclosure statement, the Claims Matrix divides claims into six tiers and sets the range of values for Allowed Abuse Claims from $3,500 to $2.7 million. While the maximum matrix values for a given tier set the ceiling for that category of claim, the base matrix value is "merely a starting point for the calculation" of a claim's value. *In re Boy Scouts of Am. and Del. BSA, LLC*, 642 B.R. 504, 544 (Bankr. D. Del. 2022). The Scaling Factors determine where, within a given Claims Matrix tier value range, a claim falls "based on evidence regarding the BSA's . . . historical abuse settlements, litigation outcomes, and other evidence." App. 20723.

claimant's proposed allowed claim amount which, if the claimant is satisfied or takes no further action to contest, becomes the amount that a claimant is entitled to receive from the Settlement Trust.  Alternatively, a claimant may ask the Settlement Trustee to reconsider the calculation within thirty days of receipt.

A claimant dissatisfied with the Settlement Trustee's initial or reconsidered proposed allowed claim amount may elect to pursue the Tort System Alternative and have that amount reviewed "by a court of competent jurisdiction."  *In re Boy Scouts*, 642 B.R. at 544.  Under this election, the amount a claimant may receive from the Settlement Trust "is the final judgment less any payments actually received and retained by the [claimant], but if the claimant receives a judgment in excess of the Maximum Matrix Value for the applicable tier, that additional amount is subordinate in right of distribution to the prior payment in full" of all other allowed abuse claims.  *Id.*

Finally, a claimant may elect to pursue the Independent Review Option, which "contemplates recoveries above the values stated in the Claims Matrix and is designed to permit [claimants] with higher value claims to potentially receive a higher award and directly trigger excess insurance coverage." *Id.*  Within six months of the effective date of the Plan, a claimant could seek an individualized evaluation of his claim "by a neutral third party (a retired judge with tort experience on a panel maintained by the Settlement Trust)" who, after accounting for the "relative shares of fault and the standard of proof" under governing law, makes a settlement recommendation to the Settlement Trustee.  *Id.*

The Settlement Trustee, in turn, may accept or reject the neutral's settlement recommendation. If the Trustee accepts the recommendation, that amount becomes the allowed claim amount, and the Trustee must provide notice to any applicable non-consenting insurer.[4] If the Trustee rejects the neutral's recommendation, the claimant may sue the Settlement Trust in any court of competent jurisdiction to liquidate his claim. But this option is not without risk. If the neutral recommends, and the Trustee accepts, a settlement of zero, the claimant neither receives a distribution from the Settlement Trust nor can he pursue his claim in a separate action.

C.    Confirmation

On September 29, 2021, the Bankruptcy Court approved the Debtors' disclosure statement, permitting them to begin solicitation for the Plan. The Plan carried approval from each of the nine classes of creditors entitled to vote on it.[5] After their initial solicitation, the Debtors continued to work with interested parties to resolve remaining disputes. Through these efforts, BSA secured additional insurance settlements which resulted in greater contributions from BSA, Local Councils, and the Settling Insurers to the Settlement Trust. The Debtors

---

[4] If the insurer declines to provide coverage, the Settlement Trustee may sue the insurer under the insurance policy in a collateral proceeding.

[5] Classes 1 and 2 are unimpaired and, under the Bankruptcy Code, are conclusively deemed to accept the Plan without being entitled to vote. *See* 11 U.S.C. § 1126(f). Class 10 is fully impaired and therefore deemed to reject the Plan. *See id.* § 1126(g). The remaining nine classes of creditors enumerated in the Plan were authorized to and did vote on the Plan.

incorporated these post-solicitation settlements and modifications into the Plan, submitted and disseminated supplemental disclosures to affected creditors (those in Classes 8 and 9), and offered those creditors the opportunity to change their votes given the modifications. Following an extension of the voting period, Classes 8 and 9 voted to accept the Plan by an even greater margin.

But not all class members were so solicitous. Thirty-nine parties filed objections to the Plan's confirmation, with the objectors falling into two broad groups—non-settling insurance companies and direct abuse claimants. In commendably thorough and inclusive proceedings, the Bankruptcy Court held a twenty-two-day confirmation trial that featured fifteen days of testimony from twenty-six witnesses and over 1,000 exhibits, followed by seven days of oral argument. On July 29, 2022, that Court issued its 269-page confirmation opinion, meticulously analyzing the objections to the Plan and approving many of its key elements, but declining to confirm the Plan in its entirety. *See In re Boy Scouts*, 642 B.R. 504. It then proceeded to hold two more hearings and, on September 8, 2022, issued supplemental findings of fact and conclusions of law and entered the Confirmation Order confirming the Plan. *See In re Boy Scouts of Am. and Del. BSA, LLC*, No. 20-10343, 2022 WL 20541782 (Bankr. D. Del. Sep. 8, 2022).

D.    Procedural History

On appeal, the District Court, after reviewing the Plan and record and hearing two days of oral argument, affirmed the Confirmation Order in its own 155-page opinion. The Plan went effective on April 19, 2023 (the Effective Date).

Appellants then initiated these appeals.[6]  After opening briefs were filed, Appellees moved to dismiss all claims as equitably and statutorily moot.  The parties briefed these motions, as well as the effect of the Supreme Court's intervening decision in *Purdue*, and we now consider these issues along with the merits of these appeals.

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction over the appeal from the Confirmation Order pursuant to 28 U.S.C. § 158(a).  We have jurisdiction under 28 U.S.C. § 158(d)(1) and § 1291, and exercise "plenary review of an order from a district court sitting as an appellate court in review of a bankruptcy court."  *In re Exide Techs.*, 607 F.3d 957, 961–62 (3d Cir. 2010).  We thus employ the same standard of review as the District Court, "review[ing] the bankruptcy court's legal determinations *de*

---

[6] Appellants' motions for a stay of the Confirmation Order were denied by the District Court on April 11, 2023, and by this Court just over a week later.  Appellants renewed their application for a stay of confirmation and these appeals after the Supreme Court granted certiorari in *Harrington v. Purdue Pharma, L.P.*, 603 U.S. 204 (2024).  We again denied those applications, this time without prejudice to Appellants filing a renewed motion in the District Court, which they promptly did.  Three days after the District Court denied that renewed request on October 3, 2023,  Appellants again sought a stay from this Court, which we denied.  Appellants then filed an emergency stay application in the Supreme Court in light of its then-pending decision in *Purdue*.  After entering a brief administrative stay, the Supreme Court denied Appellants' application on February 22, 2024.

*novo,* its factual findings for clear error and its exercise of discretion for abuse thereof." *In re Trans World Airlines, Inc.*, 145 F.3d 124, 131 (3d Cir. 1998).

## III.   Discussion

While Appellants raise a number of different claims, most lie beyond our purview. We proceed below by addressing four issues: (A) the Bankruptcy Court's subject matter jurisdiction; (B) statutory mootness under § 363(m) of the Bankruptcy Code; (C) the application of equitable mootness to these appeals; and (D) the merits of the Certain Insurers' and Allianz Insurers' claims.

### A.    The Bankruptcy Court's Jurisdiction

We begin, as we must, with jurisdiction. *See George v. Rushmore Serv. Ctr., LLC*, 114 F.4th 226, 234 (3d Cir. 2024). The Lujan and D&V Claimants argue the Bankruptcy Court lacked jurisdiction over "claims against nondebtors local councils, chartered organizations, religious orders, and insurers . . . [because] any prepetition case against these nondebtors cannot bind BSA and therefore cannot determine any rights, liabilities, or course of action of BSA." Lujan Opening Br. 11. We agree with the District Court that, at a minimum, the Bankruptcy Court properly exercised related-to jurisdiction over these third-party claims.

Bankruptcy jurisdiction has four varieties: (1) cases under the Bankruptcy Code; (2) proceedings "arising under" the Code, meaning rights or remedies expressly provided by the statute; (3) proceedings "arising in" a bankruptcy case, meaning those that would not exist outside of bankruptcy; and

(4) proceedings "related to" a bankruptcy case, often causes of action under non-bankruptcy law. *See In re Resorts Int'l, Inc.*, 372 F.3d 154, 162 (3d Cir. 2004); *In re Essar Steel Minn., LLC*, 47 F.4th 193, 197 (3d Cir. 2022). The first three categories fall within bankruptcy courts' "core" statutory jurisdiction, *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 225 (3d Cir. 2004), which they may "hear and determine" without intervention from the district court, 28 U.S.C. § 157(b)(1). The fourth category, proceedings "related to" a bankruptcy case, is generally considered "non-core," *In re Combustion Eng'g*, 391 F.3d at 225, and bankruptcy courts have to "submit proposed findings of fact and conclusions of law to the district court" for plenary review and entry of a final judgment, 28 U.S.C. § 157(c)(1).

This case deals with proceedings "related to" a bankruptcy case. A proceeding relates to a bankruptcy case when "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (emphasis omitted), *abrogated on other grounds by Things Remembered, Inc. v. Petrarca*, 516 U.S. 124 (1995). We have defined a "conceivable effect" to mean "the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Id.*

Here, we address two bases for the Bankruptcy Court's related-to jurisdiction.[7]  First, shared insurance policies may serve as a basis for related-to jurisdiction.  *See In re Combustion Eng'g*, 391 F.3d at 232–33.  As the Bankruptcy Court found, and as the record supports, BSA and the nondebtor, would-be defendants shared liability insurance coverage since at least 1976.  Because these policies carry various per-occurrence and aggregate coverage limits, successful prosecution of Appellants' claims would result in "[a] dollar-for-dollar reduction of [BSA's] available insurance coverage."  *In re Boy Scouts*, 650 B.R. at 131.  Thus, an effect on the estate is likely, let alone conceivable, and that is more than sufficient to impose the requisite "specter of direct impact on the *res* of the bankrupt estate" to support related-to jurisdiction.  *In re Quigley Co.*, 676 F.3d 45, 58 (2d Cir. 2012).

Second, related-to jurisdiction may exist where there are "indemnity obligations between the debtor and non-debtor that automatically result[] in indemnification liability against the debtor."  *In re Combustion Eng'g*, 391 F.3d at 226; *see also In re W.R. Grace & Co.*, 900 F.3d 126, 139 (3d Cir. 2018).  As

---

[7] The Bankruptcy and District Courts concluded that the Lujan and D&V Claimants' claims had a conceivable effect on, and thus "related to," BSA's estate on four alternative bases: (1) shared insurance coverage among BSA and the nondebtors; (2) BSA's and Local Councils' obligation to indemnify Chartered Organizations; (3) an identity of interest among BSA and the nondebtors; and (4) BSA's residual interest in Local Council property.  Because we conclude that BSA's shared insurance and its indemnity obligations are sufficient to confirm the existence of related-to jurisdiction, we have no need to address the remaining two.

the Bankruptcy Court found and, again, as the record supports, BSA's contractual and corporate relations with Local Councils and Chartered Organizations give rise to non-contingent, automatic indemnity obligations, including those asserted through thousands of proofs of claim in BSA's bankruptcy. Appellants' claims against Local Councils and Chartered Organizations therefore conceivably affect the bankruptcy estate, and the Bankruptcy Court properly exercised related-to jurisdiction on that basis.

True, the Bankruptcy Court did not submit proposed findings of fact and conclusions of law to the District Court for final determination. *See* 28 U.S.C. § 157(c)(1). But doing so is not necessary where, as here, a bankruptcy court exercises its related-to jurisdiction as part of the plan confirmation process. *See In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 133 (3d Cir. 2019), *abrogated on other grounds by Harrington v. Purdue Pharma, L.P.*, 603 U.S. 204 (2024). As we have explained in applying *Stern v. Marshall*, 564 U.S. 462 (2011), in a similar scenario in *In re Millennium*, when a bankruptcy court "resolves a matter that is integral to the restructuring of the debtor-creditor relationship," it may constitutionally resolve third-party claims. *In re Millennium*, 945 F.3d at 135. And implicit in that holding is the recognition that bankruptcy courts have statutory authorization to finally determine third-party claims over which they have related-to jurisdiction during the plan confirmation process.

In short, because the Lujan and D&V Claimants' claims against nondebtors have a conceivable effect on BSA's estate, the Bankruptcy Court properly exercised related-to jurisdiction over those claims. And because the Bankruptcy Court resolved those claims in the context of confirming the Plan, it did not

need to submit proposed findings of fact and conclusions of law to the District Court.

B.    Statutory Mootness

Having concluded the Bankruptcy Court properly exercised jurisdiction, we turn to Appellees' first argument for dismissal of these appeals—that they are "statutorily moot" under § 363(m) of the Bankruptcy Code.  Importantly, not only is statutory mootness the primary argument the Settling Insurers advance on appeal—and one the Debtors join—but it is a protection for which the Bankruptcy Code expressly provides.  Thus, we decline to resort to the judge-made doctrine of equitable mootness before evaluating these appeals under the statutory mootness provision contained in the Bankruptcy Code.  *Cf. Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 603–04 (3d Cir. 2015) (considering statutory tolling before equitable tolling and concluding that, where statutory tolling disposed of the issue, the court "need not address" the judge-made equitable doctrine).

No doubt, that statutory bar to relief on appeal is applicable in limited circumstances and, as we caution below, is constrained by explicit statutory criteria and the careful scrutiny of the reviewing judge.  *See infra* Section III.B.2.  But even so, we agree with Appellees that it applies here, and the relief the Lujan Claimants and D&V Claimants seek is therefore precluded.

Below, we address, first, the mechanics of § 363(m) and, second, the statute's application to these appeals and the Lujan and D&V Claimants' arguments that § 363(m) does not bar the relief they request.

1. *Section 363(m)'s Mechanics*

We and our sister circuits have referred to § 363(m)'s bar as "statutory mootness" since it imposes "a constraint . . . on our capacity to fashion relief." *In re Energy Future Holdings Corp.*, 949 F.3d 806, 820 (3d Cir. 2020). That subsection provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

In other words, when confronted with a challenge to a § 363(b) sale, the reviewing court must first "ascertain[] that the appeal is from an authorization of a sale, that the purchase was made in good faith, and that the sale was not stayed." *In re Energy Future Holdings*, 949 F.3d at 821. If those circumstances are met, the court then must determine "whether a remedy can be fashioned that will not affect the validity of the sale." *Id.* (quoting *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 498–99 (3d Cir. 1998)). That determination requires close scrutiny. If the remedy does not affect the sale's validity, the court may entertain the appeal. But if it would necessarily affect the sale's validity, the relief is unavailable, so the appeal must be dismissed. The answer is

easy where the requested relief "would materially increase or decrease the purchase price," but other remedies, too, may fall into that category with "careful study[,] depending on the nature of the claim and the type of relief sought." *Id.*

In restricting appeals for this narrow category of appeals, Congress chose "to promote the policy of . . . finality." *Krebs Chrysler-Plymouth*, 141 F.3d at 500. And this policy serves an important role in the bankruptcy process. Debtors often enter bankruptcy in dire financial straits with the value of their assets depreciating rapidly—the proverbial "melting ice cube." Sometimes, in order to avoid a liquidation or risk further dissipation and losses to the estate, "it is more advantageous for the debtor to begin to sell as many assets as quickly as possible in order to [e]nsure that the assets do not lose value." *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 57 (2008) (Breyer, J., dissenting) (quotation omitted). Section 363(b) permits just that: a debtor may, with approval from the bankruptcy court, "use, sell, or lease . . . property of the estate" outside the ordinary course of business. 11 U.S.C. § 363(b)(1).

But without assurance that a § 363(b) sale is final, potential purchasers of estate assets would be chilled from dealing with the debtor, causing assets to languish idly while the bankruptcy progresses, all the while hemorrhaging value and undermining the very purpose § 363(b) aims to serve. Section 363(m) provides the protection that § 363(b) sales require. Indeed, absent its protections, "purchasers of bankruptcy estate assets could be dragged into endless rounds of litigation to determine who has what rights in the property," which not only would disrupt the efficient flow of commerce, "but would also substantially reduce the value of the estate."

*In re Rare Earth Mins.*, 445 F.3d 359, 363 (4th Cir. 2006) (quotation omitted). By sheltering unstayed sale authorizations to good-faith purchasers from "reversal or modification on appeal," § 363(m) serves Congress's goals of "attract[ing] investors and help[ing] effectuate debtor rehabilitation," *Cinicola v. Scharffenberger*, 248 F.3d 110, 122 (3d Cir. 2001)—goals we will not lightly discard.

To be sure, "while § 363(m) aims to make sales of estate property final and inject predictability into the sale process . . . it does [not do] so at all costs." *In re ICL Holding Co., Inc.*, 802 F.3d 547, 554 (3d Cir. 2015). By its terms, § 363(m) only prohibits "reversal or modification on appeal" of a § 363(b) "authorization." It does not prohibit all appeals, but only those in which the authorization was not "stayed pending appeal." And it does not prohibit the appeal of challenges to all sales and leases, but "only those challenges that would claw back the sale from a good-faith purchaser." *Id.* Plus, it bars only those challenges where the relief sought would affect the "validity of the sale." *In re Energy Future Holdings*, 949 F.3d at 821. So in the normal course, § 363(m) permits challenges "that are so divorced from the overall transaction that the challenged provision would have affected none of the considerations on which the purchaser relied" and to "collateral issues not implicating a central or integral element of a sale." *In re Pursuit Cap. Mgmt., LLC*, 874 F.3d 124, 139 (3d Cir. 2017) (quoting *In re Westpoint Stevens, Inc.*, 600 F.3d 231, 249 (2d Cir. 2010)).

In short, § 363(m) precludes judicial review of a narrow and well-defined category of cases, so we turn now to whether this is one of them.

### 2.  *Application to These Appeals*

We can quickly dispense with the application of § 363(m) to the Certain Insurers and Allianz Insurers, and so address those appeals before turning to the appeals of the Lujan and D&V Claimants.

### a.  The Certain Insurers and Allianz Insurers

The Certain Insurers and Allianz Insurers each seek a limited form of relief sufficiently collateral to the Insurance Policy Buyback and, therefore, their appeals avoid triggering § 363(m).

The Certain Insurers seek what they characterize as "minimal, but critical, modifications to the Plan to ensure that their rights are preserved" under their insurance policies assigned to the Settlement Trust.  Certain Insurers Opening Br. 7.  These changes include (1) elimination of language in the Plan that makes the Certain Insurers' rights "subject to the terms of the Plan and the Confirmation Order"; (2) inclusion of language in the Plan requiring the Settlement Trustee to balance the rights of the Certain Insurers along with other interested parties when administering the Settlement Trust; and (3) inclusion of a provision requiring the Settlement Trustee to "consider any further limitation on Abuse Claimants' recovery in the tort system" when determining a claimant's entitlement to compensation.  *Id.* at 7–8.

None of these requested changes to the Plan implicate the terms of the Insurance Policy Buyback; instead, they reduce primarily to modifications ensuring that the Certain

Insurers' interests are protected and considered in the administration of the Settlement Trust. So rather than seeking relief "implicating a central or integral element of a sale," the Certain Insurers' requested relief is sufficiently "divorced from the overall transaction" such that, if granted, it would "affect[] none of the considerations on which the purchaser relied." *In re Pursuit Cap. Mgmt.*, 874 F.3d at 139. Accordingly, § 363(m) poses no barrier to our consideration of the merits of their appeal.

The same goes for the Allianz Insurers. Like the Certain Insurers, the Allianz Insurers propose targeted changes that implicate neither the terms nor the validity of the Insurance Policy Buyback. Specifically, they contend that the Confirmation Order's "judgment reduction clause" impermissibly releases contribution and indemnity claims they would otherwise have against the Settling Insurers. As a fix, they propose modifications to the Confirmation Order to require the Settlement Trustee to pay these released claims to the extent they accrue. This change does not implicate any provision of the Insurance Policy Buyback—indeed, the Allianz Insurers' argument takes as a given the existence of the Settlement Trust, funded in part by the proceeds of the Insurance Policy Buyback and the release of their claims against the Settling Insurers. And in proposing that the Settlement Trust, rather than the Settling Insurers, cover the cost of satisfying their released claims, the Allianz Insurers have not asked for relief that "would materially increase . . . the purchase price" paid by the Settling Insurers. *In re Energy Future Holdings*, 949 F.3d at 821; *cf. In re ICL Holding Co.*, 802 F.3d at 554 (concluding that reallocation of escrowed funds to satisfy administrative expenses was not barred by

§ 363(m)).  For these reasons, the Allianz Insurers' appeal likewise does not implicate § 363(m).

                         b.         The Lujan and D&V Claimants

The Lujan Claimants and D&V Claimants, however, are differently situated, and we have little difficulty concluding that the relief they seek would affect the validity of the Insurance Policy Buyback authorized by the Confirmation Order.  These Claimants have steadfastly urged us to reverse the Confirmation Order and vacate the Plan in its entirety.  But the Confirmation Order contains the authorization for the sale of BSA's insurance policies.  *See In re Boy Scouts*, 2022 WL 20541782, at *10–11.  Granting these Claimants' requested relief would reverse on appeal an authorization made pursuant to § 363(b)—the very result § 363(m) prohibits.

Our concurring colleague disagrees, asserting that the buyback of some of the Settling Insurers' policies has yet to occur because it is "expressly condition[ed]" on the Confirmation Order becoming a "Final Order" as defined in the settlement agreements. Concurring Op. 12.  But this contention is doubly mistaken.

First, as counsel for the Settling Insurers represented to us at oral argument, and as is borne out in the Plan, the Insurance Policy Buyback was completed on the Effective Date, meaning "the policies have been sold."  Oral Arg. Tr. 76:6; *see also* App. 975 ("Notwithstanding anything to the contrary and for the avoidance of doubt, the Abuse Insurance Policies [including Hartford's and Zurich's policies] shall be sold by the Debtors to the applicable Settling Insurance Companies free and clear of all liens, claims, encumbrances,

interests or other rights on the Effective Date on the terms and as provided in the applicable Insurance Settlement Agreement.").

Second, even if that were not the case, § 363(m) speaks in terms of *unstayed authorizations* under § 363(b)—it does not include an inchoate requirement that a § 363(b) sale be consummated or otherwise effectuated. *See In re Rickel Home Ctrs., Inc.*, 209 F.3d 291, 298 (3d Cir. 2000) (recognizing that for § 363(m) to apply, "the underlying sale or lease must not have been *stayed pending appeal*" and "reversing or modifying the authorization to sell or lease would affect the validity of the sale or lease," and holding that "[appellant]'s appeal on this point, *absent a stay*, is moot" (emphasis added)); *Krebs Chrysler-Plymouth*, 141 F.3d at 493, 500 (holding appeal from § 363(b) sale was moot where purchaser had paid only 10% of purchase price "because [appellant] did not receive a stay of the sale pending appeal"); *Pittsburgh Food & Beverage, Inc. v. Ranallo*, 112 F.3d 645, 651 (3d Cir. 1997) (holding that § 363(m) barred appeal "because of [appellant]'s inability to obtain a *stay* of the bankruptcy court's *order* approving the sale" (emphasis added)).

As we have explained, § 363(m) kicks in when (1) "the appeal is from an authorization of a sale [under § 363(b)]"; (2) "the purchase was made in good faith"; and (3) "the sale was not stayed." *In re Energy Future Holdings*, 949 F.3d at 820. Those conditions are met here: (1) the Confirmation Order unambiguously authorizes "[t]he sale of the [Settling Insurers' policies] . . . pursuant to section[] 363," *In re Boy Scouts*, 2022 WL 20541782, at *10; (2) the Bankruptcy Court found that the Settling Insurers "are each good faith purchasers for value within the meaning of section 363(m)," *id.* at *8; and (3) the

Confirmation Order—including the Insurance Policy Buyback—was not stayed. So § 363(m) applies to this § 363(b) authorization.

As for the concurrence's contentions that "[s]ection 363(m) clearly contemplates not only an authorized sale, but a completed sale" and "an appeal cannot affect the validity of a sale that has not happened," Concurring Op. 14, both our precedent and common sense disagree. As explained above, we have identified three conditions to § 363(m)'s application, and all are satisfied here. *See In re Energy Future Holdings*, 949 F.3d at 820. And just as the fact that ongoing performance does not negate the existence of a contract, the fact that every last cent has not been handed over does not mean a sale has not occurred. So just as a party's breach would affect the contractual relationship, invalidation of the releases at this late stage would affect the validity of the sale to which BSA and the Settling Insurers agreed. By any measure, § 363(m) applies here.

In an effort to avoid this conclusion, the Claimants raise a bevy of arguments, but none is persuasive.[8] First, they argue

---

[8] At the outset, the Lujan and D&V Claimants assert that because they advance constitutional claims—namely due process claims—we must reach the merits before passing on statutory mootness. But "we cannot consider [those claims] if the appeal . . . is moot under 11 U.S.C. § 363(m)." *In re Pursuit Cap. Mgmt., LLC*, 874 F.3d 124, 133 (3d Cir. 2017). And as we have previously held, § 363(m) does not except certain types of claims from its appellate moratorium—even constitutional ones. *In re Energy Future Holdings Corp.*, 949

that, because the Insurance Policy Buyback is not a sale "outside a plan of reorganization," it is not a § 363(b) sale at all, making § 363(m) inapplicable by its own terms. Lujan Claimants Opp. Mot. to Dismiss 5; *see also* D&V Claimants Opp. Mot. to Dismiss 21. But we dispatched this argument years ago. In *Cinicola v. Scharffenberger*, we held that a second-in-time order authorizing the assignment of certain contracts that was "inextricably intertwined with" a prior authorization for the sale of assets under § 363(b) fell within the ambit of § 363(m) and, therefore, a challenge to the contract assignment was statutorily moot. 248 F.3d at 126. And in *In re Energy Future Holdings*, we held that a confirmation order that "authorized and directed" the consummation of a previously approved asset sale (styled as a "merger" and conditioned upon the eventual confirmation of a reorganization plan) qualified as an authorization of a sale for purposes of § 363(m).[9] 949 F.3d at 819–20; *accord In re Fieldwood*

---

F.3d 806, 818 (3d Cir. 2020) (rejecting argument "that there is a due process exception to § 363(m)").

[9] The concurrence attempts to distinguish *Cinicola* and *In re Energy Future Holdings* as cases involving "a separate Bankruptcy Court order . . . [that] preliminarily approved a § 363 sale, and the confirmation order had the effect" of making the sale final. Concurring Op. 6. True, those cases involved separate orders, but we explicitly rejected the suggestion that this fact was relevant to the § 363(m) analysis. Instead, we stated in *Cinicola* that successive orders "were inextricably intertwined," meaning the second-in-time order did not "represent[] an independent act" and an appeal from it affected the validity of the § 363(b) sale contained in the first order. *Cinicola v. Scharffenberger*, 248 F.3d 110, 126 (3d Cir.

*Energy LLC*, 93 F.4th 817, 825 (5th Cir. 2024) (applying § 363(m) to sale authorized by confirmation order); *In re Made in Detroit, Inc.*, 414 F.3d 576, 582–83 (6th Cir. 2005) (same). Here, the Confirmation Order, which authorized the sale of BSA's insurance policies, equally serves as an "authorization . . . of a sale" under § 363(m).[10]

Second, the Lujan Claimants argue that the Settling Insurers are not good faith purchasers because they purchased BSA's policies despite abuse claimants asserting rights in those policies and with the knowledge that the Lujan Claimants intended to challenge the Plan on appeal. But this argument ignores both the text of § 363(m) and the Bankruptcy Court's factual findings. Section 363(m) extends protection to purchasers "whether or not such entity knew of the pendency of [an] appeal" challenging the sale authorization. In other words, § 363(m) contemplates that sale authorizations under § 363(b) may be subject to dispute and nonetheless insulates

_____

2001). And in *In re Energy Future Holdings*, we emphatically "reject[ed] Appellants' argument that they are not appealing the 'authorization . . . of a sale' for purposes of § 363(m)" simply because the bankruptcy court there entered two orders instead of one. 949 F.3d at 820.

[10] At argument, the D&V Claimants suggested that the Insurance Policy Buyback is not a true § 363(b) sale because the Settling Insurers are not a "third-party," but rather insiders who stood to gain from the sale by receiving releases under the Plan. Oral Arg. Tr. 16:10–11. But this contention cannot be squared with the text of § 363(m), which "contains no exception for sales to creditors, or other parties to the bankruptcy proceedings." *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 500 (3d Cir. 1998).

those authorizations from reversal or modification on appeal. And that result aligns perfectly with the policy goal of § 363(m): to extinguish "the risk of litigation [that] would chill prospective bidders or push them to 'demand a steep discount.'" *In re ICL Holding Co.*, 802 F.3d at 554 (quoting *In re River West Plaza-Chi., LLC*, 664 F.3d 668, 671 (7th Cir. 2011)).

In this case, the Bankruptcy Court unequivocally determined that "[t]he Settling Insurance Companies are each good faith purchasers for value within the meaning of section 363(m) of the Bankruptcy Code." *In re Boy Scouts*, 2022 WL 20541782, at *8. And, for the reasons above, we agree with that determination.[11]

Third, Appellants contend that they do not seek to upset the Insurance Policy Buyback, but rather only take issue with the nonconsensual third-party releases contained in the Plan. But where, as here, the releases form a portion of the consideration for the Insurance Policy Buyback, that is a distinction without a difference. Under the Plan, the Settling Insurers paid over $1.6 billion in exchange for the return of their insurance policies from BSA, with liability cabined by the third-party releases. So without the releases, the Settling Insurers would receive less than they bargained for in exchange for their cash contribution to the Settlement Trust, which "would materially increase . . . the purchase price" and, thus,

---

[11] Thus, this case differs from those cited by the concurrence where the court did not make a good-faith determination for purposes of § 363(m). *See Miami Ctr. Ltd. P'ship v. Bank of N.Y.*, 838 F.2d 1547, 1550–51 (11th Cir. 1988).

"would plainly affect the validity of the sale." *In re Energy Future Holdings*, 949 F.3d at 821.

Perhaps recognizing the import of the relief they seek—relief that would send BSA and over 82,000 abuse claimants back to square one and would almost certainly unleash years of litigation in the wake of the vacated Plan—the Lujan and D&V Claimants suggest that more limited remedies are available that "do[] not touch the insurance sale or dismantle the plan." D&V Claimants Opp. Mot. to Dismiss 32. They offer two by way of "example." *Id.* But the Bankruptcy Code permits neither.

The proposal that "the third parties benefiting from the releases could pay more money," *id.*, is the quintessential example of relief that "would materially increase . . . the purchase price." *In re Energy Future Holdings*, 949 F.3d at 821. And permitting the Lujan and D&V Claimants to "opt out of the nonconsensual releases," D&V Claimants Opp. Mot. to Dismiss 32, effects the same result: the Settling Insurers would receive less in exchange for their cash contribution than they bargained for under the terms of the Insurance Policy Buyback. BSA and the Settling Insurers struck a deal for a global resolution, and blue-penciling a post-confirmation opt-out structure—even for a relatively small number of claimants—would fundamentally undermine that bargain. Allowing some claimants, but not others, to circumvent the releases and pursue claims against previously released parties would also violate the Bankruptcy Code's requirement that a plan "provide the same treatment for each claim or interest of a particular class" absent consent from a claimholder to less favorable treatment. 11 U.S.C. § 1123(a)(4). At bottom, the Lujan and D&V Claimants have not proposed relief that the Code permits.

At the same time the Claimants offer these two "examples" of limited relief, they seek to shift that onus to the Appellees, asserting "[i]t is not Appellants' burden to propose all available relief." D&V Claimants Opp. Mot. to Dismiss 32. But it is. As the challengers to an unstayed § 363(b) sale "seeking to avert § 363(m)'s bar," Appellants bear the burden of "demonstrat[ing] that the relief affects only 'collateral issues not implicating a central or integral element of a sale.'" *In re Energy Future Holdings*, 949 F.3d at 821 (quoting *In re Pursuit Cap. Mgmt.*, 874 F.3d at 139). Because they fail to clear that bar, we cannot grant effective relief.

Fourth, in a brief passage near the end of their opposition to the Settling Insurers' motion to dismiss, the Lujan Claimants contend that even if the releases of some of their claims were integral to the Insurance Policy Buyback, their other claims against "Limited Protected Parties," particularly Chartered Organizations like the Roman Catholic Entities (who were not insured under BSA's pre-1975 insurance policies), do not implicate the sale and thus can be pursued on appeal. But this final gesture at more limited relief also falls short for both pre- and post-1976 abuse claims. That is because the Plan provides releases for Limited Protected Parties for abuse claims after 1975 and for pre-1976 claims against Limited Protected Parties covered by policies provided by a Settling Insurer. And for pre-1976 claims against Limited Protected Parties that were not then insured with the Settling Insurers, the Plan and Confirmation Order neither release those claims nor enjoin their prosecution. *See In re Boy Scouts*, 2022 WL 20541782, at *28.

Additionally, throughout their briefs, the Lujan Claimants and D&V Claimants argue that embracing

Appellees' statutory mootness argument here would effectively "immuniz[e] the substantive terms of a plan from appellate review" anytime a plan involves a § 363(b) sale. D&V Claimants Opp. Mot. to Dismiss 20.  But our holding does no such thing, and we take this opportunity to emphasize the narrowness of our decision in two respects: the limited scope of § 363(m) and the boundaries of so-called "*sub rosa*" plans that fall beyond it.

As for § 363(m) itself, the statute prohibits the reversal or modification of § 363(b) *sales*; it does not moot appellate review of, and reversal or modification to, entire reorganization *plans*.  Our decision does not read § 363(m) to immunize from appellate review all facets of a plan whenever a § 363(b) sale is involved.  Put differently, a challenge to a § 363(b) sale that is "collateral" to or would not otherwise "affect the validity of the sale" falls outside the ambit of § 363(m), *In re Energy Future Holdings*, 949 F.3d at 821, and given the breadth of issues a reorganization plan may resolve that do not necessarily implicate the terms of a § 363(b) sale, *see* 11 U.S.C. § 1123(a)–(b), the vast majority of challenges, no doubt, will fall into this category.[12]

---

[12] We need not speculate as to what aspects of hypothetical plans may or may not be immunized from reversal or modification on appeal.  No doubt, those who practice in bankruptcy court "are creative," Oral Arg. Tr. 78:22, so any attempt to predict what transactions and plan provisions bankruptcy practitioners might engineer next would surely be a gross underestimation.  Today, it is enough to conclude that in the context of this Plan, the nonconsensual third-party releases challenged by the Lujan and D&V Claimants go to the

Nor does our application of § 363(m) to this § 363(b) sale countenance the use of § 363(b) during the course of bankruptcy proceedings to effectuate a *sub rosa* plan by "dictat[ing] the terms of a plan." 3 *Collier on Bankruptcy* ¶ 363.02[3] (16th ed. 2024). Our Court has not had occasion to opine on or define the boundaries of a *sub rosa* plan, but some of our sister circuits have done so. In *In re Braniff Airways, Inc.*, the Fifth Circuit reversed a § 363(b) sale authorization that the bankruptcy court approved before a plan had been proposed or a disclosure statement approved, and that included, as part of the sale agreement, terms that required the future plan to allocate certain assets to certain parties, required creditors to vote portions of their deficiency claims in favor of a future plan, and "provided for the release of claims by all parties against [the debtor], its secured creditors and its officers and directors." 700 F.2d 935, 940 (5th Cir. 1983). The court concluded that the putative § 363(b) sale was "in fact a reorganization" and held that a party "should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets." *Id.* Instead, when a debtor "attempts to specify the terms whereby a reorganization plan is to be adopted," it "must scale the hurdles erected in Chapter 11." *Id.* The Second Circuit reached a similar conclusion in *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983). There, the court rejected a pre-plan § 363(b) sale of the debtor's most important asset that effectively "swallow[ed] up Chapter 11's safeguards." *Id.* at 1069; *cf. Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 468 (2017) (holding that the Bankruptcy Code does not permit structured

---

heart of the Bankruptcy Court's § 363(b) authorization, so § 363(m) prevents us from disrupting them on appeal.

dismissals, which deviate from the absolute priority rule and "circumvent the Code's procedural safeguards").

The bankruptcy and district courts of this Circuit have also acknowledged and applied the doctrine in examining sales under § 363(b), authorizations for debtor-in-possession financing under § 364(d), and settlements under Bankruptcy Rule 9019 to ensure they do not impermissibly dictate the terms of eventual reorganization plans or bypass the Code's procedural safeguards. *See, e.g.*, *In re Shubh Hotels Pittsburgh, LLC*, 439 B.R. 637, 644–45 (Bankr. W.D. Pa. 2010); *In re Summit Global Logistics, Inc.*, No. 08-11566, 2008 WL 819934, at *13–14 (Bankr. D.N.J. Mar. 26, 2008); *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 513–14 (Bankr. D. Del. 2010).

We endorse this practice and join the Fifth and Second Circuits in applying the doctrine where warranted. No doubt, differentiating a permissible use of § 363(b) from an invalid one often requires consideration of the substance of proposed transactions. But judges already must conduct similar inquiries in a variety of other contexts,[13] and we are confident that bankruptcy and district court judges—and ultimately this

---

[13] *See, e.g.*, *In re Hertz Corp.*, 120 F.4th 1181, 1196 (3d Cir. 2024) (considering whether make-whole premiums are "the economic equivalent of interest" for purposes of claim allowance under 11 U.S.C. § 502(b)(2)); *In re Pillowtex, Inc.*, 349 F.3d 711, 719 (3d Cir. 2003) ("[C]ourts are to consider the economic reality of the transaction in order to determine, based on the particular facts of the case, whether the transaction is more fairly characterized as a lease or a secured financing arrangement.").

Court[14]—are eminently capable of policing the bounds of permissible § 363(b) sales and seeing cleverly disguised transactions for what they are. Debtors and powerful creditors do not qualify as good faith purchasers where they seek to "maximize [their] leverage," *In re Hertz Corp.*, 120 F.4th 1181, 1205 (3d Cir. 2024), by dictating the terms of Chapter 11 plans up front without "scal[ing] the hurdles erected" by the Bankruptcy Code, *In re Braniff Airways*, 700 F.2d at 940. Indeed, the good-faith determination, critically, "prevents a debtor-in-possession or trustee from effectively abrogating the creditor protections of Chapter 11." *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986). Nor are we convinced that an *intentional* attempt to transact by "means forbidden by law" constitutes good faith by a purchaser.[15] *Id.* at 150 (quoting 11 U.S.C. § 1129(a)(3)).

---

[14] When reviewing challenges to § 363(b) authorizations, "we are first required to ask whether the purchaser at the sale 'purchased . . . [the] property in good faith.'" *In re Pursuit Cap. Mgmt.*, 874 F.3d at 135 (alteration and omission in original) (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986)). We review a bankruptcy court's determination of a purchaser's good faith under a mixed standard of review, exercising plenary review of the legal standard applied, but reviewing findings of fact for clear error. *Id.* Therefore, where an appellant can demonstrate that a bankruptcy court erroneously concluded that the record facts are sufficient to establish good faith, or those factual findings are clearly erroneous, § 363(m) poses no barrier to appellate review of the merits of a § 363(b) authorization.

[15] Although the good-faith requirement of § 363(m) "mirrors" that in § 1129, *In re Abbotts Dairies*, 788 F.2d at 150, there are

This case raises none of those concerns.[16]  Here, the Insurance Policy Buyback was included in the Plan and subject to all of Chapter 11's procedural protections afforded to creditors:  The Insurance Policy Buyback was included in the

---

important distinctions.  The § 1129 good-faith inquiry does not look to the subjective intent of the debtor.  *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 247 (3d Cir. 2004); *cf. In re SGL Carbon Corp.*, 200 F.3d 154, 165 (3d Cir. 1999).  But the good-faith inquiry under 363(m) looks for "defects which would in equity affect the validity of any private transaction," which may include consideration of intent.  *In re Abbotts Dairies*, 788 F.2d at 148 (quoting *In re Cada Invs.*, 664 F.2d 1158, 1162 (9th Cir. 1981)); *see also In re Gucci*, 126 F.3d 380, 390–91 (2d Cir. 1997).

[16] Courts have crafted various standards to determine what constitutes a *sub rosa* plan.  *See, e.g.*, *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007); *In re Cajun Elec. Power Co-op., Inc.*, 119 F.3d 349, 354–55 (5th Cir. 1997); *see also In re Latam Airlines Grp. S.A.*, 620 B.R. 722, 813 (Bankr. S.D.N.Y. 2020); *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 513 (Bankr. D. Del. 2010); *In re Tower Auto. Inc.*, 241 F.R.D. 162, 168–69 (S.D.N.Y. 2006).  We have no occasion here to endorse any of these standards or articulate one of our own.  Today, it is enough to recognize the *sub rosa* doctrine as an inherent limitation to authorizations under § 363(b).  At the same time, however, our holding should not be taken to cast doubt on the use of § 363(b) to conduct sales of all or substantially all of a debtor's assets—often accomplished through auctions using bidding procedures and stalking-horse bidders approved by the bankruptcy court—where doing so does not effectively dictate the terms of an eventual reorganization plan.

Debtors' solicitation and supplemental disclosure statements and subject to objection at the confirmation hearing. All creditors entitled to vote on the Plan—including the creditors in Classes 8 and 9, comprising direct and indirect abuse claimants—had adequate notice that the Plan, if confirmed, would authorize the Insurance Policy Buyback. BSA's creditors chose to vote in favor of the Plan anyway, including the class of creditors to which the Lujan and D&V Claimants belong.[17] After thirty-nine parties raised objections to the Plan, the Bankruptcy Court held a twenty-two-day-long confirmation hearing—devoting sixteen days to receiving evidence, consisting of testimony from twenty-six witnesses and over 1,000 exhibits, and six days to oral argument—before issuing a 269-page confirmation opinion, diligently stepping through § 1129's confirmation requirements and approving much, but not all, of the Debtors' Plan. The Bankruptcy Court then held two more hearings before issuing supplemental findings of fact and conclusions of law and the Confirmation Order confirming the Plan.

This abundance of process and conformity with the Code distinguishes this case from those where a debtor's use

---

[17] The plan the Debtors originally solicited won support from every class of creditors entitled to vote on it, including Classes 8 and 9, which approved the plan with 73.57% and 69.57% of creditors' votes, respectively. Following the initial solicitation, BSA amended the Plan—primarily in the form of additional insurance settlements—and offered affected creditors, i.e., direct and indirect abuse claimants, the opportunity to change their votes. The revised Plan won even greater support, with 85.72% and 82.41% of ballots from Classes 8 and 9, respectively, voting in favor of the Plan.

of § 363(b) constitutes a *sub rosa* plan.[18]  A debtor improperly invokes § 363(b) where it attempts to evade the Code's creditor

---

[18] Remarkably, the concurrence asserts that including a § 363(b) sale "as part of a globally-negotiated plan" "deprives the sale of any real scrutiny." Concurring Op. 8.  In reality, the opposite is true.  To approve a sale under § 363(b), courts require only that the debtor exact its sound business judgment in good faith.  *See, e.g.*, *In re Blitz U.S.A. Inc.*, 475 B.R. 209, 215 (Bankr. D. Del. 2012).  To confirm a consensual reorganization plan, on the other hand, the debtor must carry its burden of satisfying § 1129(a)'s sixteen statutory requirements by a preponderance of evidence.  *See, e.g.*, *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006); *cf. Grogan v. Garner*, 498 U.S. 279, 286 (1991).  And those requirements increase when a debtor seeks to "cram down" a plan over the objection of a nonconsenting impaired class.  *See* 11 U.S.C. § 1129(b).  The concurrence nonetheless warns that "[s]o long as Chapter 11's procedural requirements are met, substantively controversial, or even unlawful, plan provisions (like non-consensual third-party releases) can evade appellate review."  Concurring Op. 7.  But such a distortion of the plan-confirmation process depends on dismissing the Code's confirmation requirements as mere formalities.  Far from a set of simple "procedural requirements," we have described § 1129's confirmation criteria as "critical," *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993), and "an unambiguous check on a debtor's power" over the contents of a plan, *In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 371 n.23 (3d Cir. 2012).  And we have no doubt that our colleagues on the bankruptcy courts exercise great care in evaluating plans' conformity to the

protections, effectively "short circuit[ing] the requirements of Chapter 11 for confirmation of a reorganization plan." *In re Braniff Airways*, 700 F.2d at 940. Here, rather than attempting to skirt those protections, the Debtors faced them head-on and subjected the Insurance Policy Buyback to the Code's stringent confirmation requirements.

\*     \*     \*

In sum, the Settling Insurers qualify as good-faith purchasers, and the purported more-limited relief proposed by the Lujan and D&V Claimants would strike at the heart of the Insurance Policy Buyback. Because § 363(m) bars us from granting such relief, we will dismiss their appeals on that basis.[19] But as the Certain Insurers' and Allianz Insurers'

---

Code's requirements and holding debtors to their burden of proof. *Cf. Bullard v. Blue Hills Bank*, 575 U.S. 496, 507 (2015) ("[T]he [imperfect] appellate process . . . is made tolerable in part by our confidence that bankruptcy courts, like trial courts in ordinary litigation, rule correctly most of the time."). Thus, contrary to the concurrence's suggestion, a sale in a Chapter 11 plan both draws greater scrutiny and subjects the debtor to a more exacting standard to gain approval.

[19] By resting on § 363(m) to dismiss the Lujan and D&V Claimants' appeals, our decision does not portend an abdication of "appellate court[s'] Article [III] powers to effectively supervise bankruptcy court decisions," nor does it insulate § 363(b) sales, "no matter how unlawful," from judicial scrutiny. Oral Arg. Tr. 17:4, 7–8. As its procedural history demonstrates, this is an unusual case. At the time the Bankruptcy and District Courts reviewed the legality of the

claims are collateral to the Insurance Policy Buyback, § 363(m) does not prevent us from considering their appeals.

## C.   Equitable Mootness

Because we conclude that the appeals of the Certain Insurers and Allianz Insurers are not statutorily moot, we reach Appellees' alternative argument for dismissal that the doctrine of equitable mootness precludes relief. In light of the limited relief those Appellants seek, the success of their appeals does not threaten to fatally scramble the Plan. Thus, equitable mootness does not prevent us from reaching the merits of their claims.

As we explained when we first endorsed this "judge-made abstention doctrine," *In re Semcrude, L.P.*, 728 F.3d 314, 317 (3d Cir. 2013), by a slim margin in *In re Continental Airlines*, 91 F.3d 553 (3d Cir. 1996) (en banc), equitable mootness permits a federal court to dismiss and decline to consider the merits of a bankruptcy appeal following the consummation of a plan "when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable," *id.* at 559 (cleaned up). The doctrine is invoked when "requested relief is almost certain to produce a 'perverse' outcome—significant 'injury to third parties' and/or

---

Plan, nonconsensual third-party releases were permissible in this Circuit. Only during the pendency of these appeals did the Supreme Court decide *Purdue* and abrogate our precedent on that issue. So were the Plan proposed today, we harbor little doubt that the Bankruptcy Court would neither authorize the Insurance Policy Buyback nor confirm the Plan with its impermissible releases.

'chaos in the bankruptcy court' from a plan in tatters." *In re One2One Commc'ns, LLC*, 805 F.3d 428, 434 (3d Cir. 2015) (quoting *In re Phila. Newspapers, LLC*, 690 F.3d 161, 168 (3d Cir. 2012)). Thus, as put by the doctrine's proponents, equitable mootness serves as "an application of the age-old principle that in formulating equitable relief a court must consider the effects of the relief on innocent third parties." *In re Trib. Media Co.*, 799 F.3d 272, 287 (3d Cir. 2015) (Ambro, J., concurring) (quoting *In re Envirodyne Indus., Inc.*, 29 F.3d 301, 304 (7th Cir.1994)). In the normal course, "there is a 'virtually unflagging obligation' of federal courts to exercise the jurisdiction conferred on them." *In re Semcrude*, 728 F.3d at 320 (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). So only in these limited circumstances has our Circuit adopted equitable mootness as a "rare exception" where we "dismiss[] an appeal over which we have jurisdiction." *Id.* at 321.

The doctrine is not without its critics. *See, e.g.*, *In re One2One Commc'ns*, 805 F.3d at 438–54 (3d Cir. 2015) (Krause, J., concurring); *In re City of Detroit*, 838 F.3d 792, 805–814 (6th Cir. 2016) (Moore, J., dissenting). And this case highlights a potentially troubling aspect of adherence to the doctrine. As discussed above, Congress took great care to define the circumstances where appellate remedies are unavailable, *see* 11 U.S.C. §§ 363(m), 364(e), and the Supreme Court has repeatedly admonished that the inclusion of language in one section of a statute, but omission of it in another, generally "convey[s] a difference in meaning," counseling against the importation of the Code's limits on appellate remedies to sections in which they do not appear, *Bittner v. United States*, 598 U.S. 85, 94 (2023). Yet others have defended the doctrine's validity, *see In re Trib. Media*

*Co.*, 799 F.3d 272, 284–290 (3d Cir. 2015) (Ambro, J., concurring), and the Supreme Court has yet to consider the question—and not for lack of opportunity.[20]  Thus, equitable mootness remains the law of our Circuit.[21]

　　We have repeatedly admonished, however, that the doctrine is "limited in scope" and must be "cautiously applied." *In re Cont'l Airlines*, 91. F.3d at 559; *see also In re Phila. Newspapers, LLC*, 690 F.3d at 170; *In re Zenith Elecs. Corp.*, 329 F.3d 338, 343 (3d Cir. 2003); *Nordhoff Invs. Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 185 (3d Cir. 2001); *In re*

---

[20] *See, e.g.*, Petition for Writ of Certiorari, U.S. Bank Nat'l Ass'n v. Windstream Holdings, Inc. (No. 22-926), *cert. denied* 144 S. Ct. 71 (2023); Petition for Writ of Certiorari, KK-PB Fin., LLC v. 160 Royal Palm, LLC (No. 21-1197), *cert. denied* 142 S. Ct. 2778 (2022); Petition for Writ of Certiorari, Hargreaves v. Nuverra Envtl. Sols., Inc. (No. 21-17), *cert. denied* 142 S. Ct. 337 (2021); Petition for Writ of Certiorari, Aurelius Cap. Mgmt., L.P. v. Trib. Media Co. (No. 15-891), *cert. denied* 577 U.S. 1230 (2016).

[21] At oral argument, the Lujan Claimants urged us to overrule our prior cases adopting equitable mootness.  But absent en banc review, we cannot revisit our equitable mootness precedent.  *See* 3d Cir. I.O.P. 9.1.  The Lujan Claimants alternatively argue that the Supreme Court's recent decision in *MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288 (2023), makes adherence to our equitable mootness precedent untenable.  But that case merely held that § 363(m) does not deprive courts of subject matter jurisdiction, *see id.* at 297, and it did not address the validity of equitable mootness. We are thus bound to apply our equitable mootness precedent here.

*PWS Holding Corp.*, 228 F.3d 224, 236 (3d Cir. 2000); *In re Cont'l Airlines*, 203 F.3d 203, 209 (3d Cir. 2000). And, importantly, equitable mootness is only available in "complex bankruptc[ies]" "where the reorganization involves intricate transactions." *In re One2One Commc'ns*, 805 F.3d at 435–36 (first quoting *In re Phila. Newspapers*, 690 F.3d at 169; and then quoting *In re Cont'l Airlines*, 91 F.3d at 560–61). In those "very few cases," *In re Trib. Media*, 799 F.3d at 289 (Ambro, J., concurring), where the doctrine applies, courts deploy it "with a scalpel rather than an axe," *id.* at 278 (quoting *In re Blast Energy Servs., Inc.*, 593 F.3d 418, 425 (5th Cir. 2010)).

Our criteria for invoking the doctrine have shifted over time,[22] but as we encounter it today, the inquiry has two prongs. First, we ask "whether a confirmed plan has been substantially consummated." *In re Semcrude*, 728 F.3d at 321. Second, if it has, we consider "whether granting the relief requested in the appeal will (a) fatally scramble the plan and/or (b) significantly

---

[22] In *In re Continental Airlines*, we announced five factors for courts to consider "in determining whether it would be equitable or prudential to reach the merits of a bankruptcy appeal," including: "(1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments." 91 F.3d 553, 560 (3d Cir. 1996) (en banc). While we described the first factor as "the foremost consideration," *id.*, we declined to "specify[] whether those [other] factors are entitled to equal weight or whether any is necessary or sufficient," *In re Trib. Media Co.*, 799 F.3d 272, 278 (3d Cir. 2015).

harm third parties who have justifiably relied on plan confirmation." *Id.* The party seeking dismissal on equitable mootness grounds bears the heavy burden of proving its applicability "based on an evidentiary record, . . . not speculation." *Id.* Bare assertions of inequity and "'Chicken Little' statements" do not suffice. *Id.* at 324.

With these considerations in mind, we apply this two-pronged test to the evidentiary record before us.

### 1. *Substantial Consummation*

Appellees urge us to conclude, at this first prong, that the Plan has progressed to the point that it should be considered substantially consummated. We determine whether the threshold for "substantial consummation" has been met by reference to the three criteria set forth in the Bankruptcy Code's definition of the term. *See, e.g.*, *In re Semcrude*, 728 F.3d at 321. Under that definition, "substantial consummation" means:

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred;

> (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

> (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2).

Considering these three criteria—transfer, assumption, and commencement of distribution—we agree that BSA has carried its burden at this prong to show substantial consummation.  We address each in turn.

### a.    Transfer

The Bankruptcy Codes defines "transfer" in the "broadest possible terms," *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 211–12 (3d Cir. 2006), including "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property; or (ii) an interest in property," 11 U.S.C. § 101(54)(D).  Here, the Settlement Trust—funding for which constitutes the vast majority of property dealt with under the Plan—is funded by approximately $2.48 billion in noncontingent assets, as well as an estimated several billion dollars in insurance rights.  So the question we consider is whether "all or substantially all" of that property has been "dispos[ed] of or part[ed] with."  11 U.S.C. § 1101(2)(A).

No doubt, there has been *movement* of all of substantially all of that property.  Since the Effective Date, BSA has contributed to the Settlement Trust the BSA Settlement Trust Note in the principal amount of $80 million; $42.8 million of proceeds of a loan by the National Boy Scout Foundation; assignments of insurance rights; the right, title, and interest in and to artwork valued at approximately $59 million; and oil and gas interests valued at approximately $7.6 million.  The Settling Insurers have transferred all their contributions under the Plan, paying nearly $200 million directly to the Settlement Trust and placing approximately $1.4 billion into escrow.  Local Councils have transferred to the

Settlement Trust $439 million of their required $500 million; a promissory note worth up to $121 million; and insurance rights. They also have undertaken efforts to sell 96 real properties across the country, over a third of which have been successful. And the United Methodist Entities have contributed $2 million of their required $30 million, and they report that they have collected the remaining $28 million.

But does that movement qualify as "disposing of or parting with" the property? Some Appellants say not.[23] They point out, correctly, that the Settling Insurers have merely deposited $1.4661 billion—approximately 90% of their total contribution to the Settlement Trust—in escrow and not in the hands of the Settlement Trust. And on that basis, they argue that "conditionally transferring funds to escrow does not complete the transaction" and holding the funds in escrow, as opposed to diverting them directly to the Settlement Trust, "defeats the notion that there has been a 'completed' transfer." D&V Opp. Mot. to Dismiss 19–20.

The problem with this argument is that neither § 101(54) nor § 1101(2)(A) provide that a "transfer" must be "completed" or that funds need to reach their "ultimate destination." Oral Arg. Tr. 19:12. To the contrary, § 101(54)(D) defines "transfer" to include "indirect," "involuntary," and "conditional" means of parting with property or interests in property, belying the notion that a

---

[23] While we dispose of the Lujan and D&V Claimants' appeals on statutory mootness grounds, we consider the arguments they raise with respect to equitable mootness because whether the Plan has been substantially consummated equally affects the Certain Insurers' and Allianz Insurers' appeals.

transaction must arrive at its "ultimate destination" or be "completed" to constitute a "transfer."

Having dispatched this argument, we conclude that the Settling Insurers' placement of funds into escrow qualifies as a "transfer." At its most basic, escrow is a mechanism by which "property delivered by a promisor to a third party [the escrow agent] [is] held by the third party for a given amount of time or until the occurrence of a condition, at which time the third party is to hand over the document or property to the promisee." *Escrow*, *Black's Law Dictionary* (12th ed. 2024). Thus, once property is placed in escrow, an equitable interest in that property is transferred from promisor to the promisee. 28 Am. Jur. 2d Escrow § 16 (2025). The escrow agent acts as both an agent and fiduciary of the parties and "is under a duty not to deliver the escrow to anyone except upon strict compliance with the conditions imposed by escrow agreement." 30A C.J.S. *Escrows* § 19 (2024). So when a party places property in escrow, it relinquishes control of that property to the extent provided for in the escrow agreement.

Here, by placing a portion of their Settlement Trust contribution in escrow, the Settling Insurers conditionally parted with their property to be distributed upon satisfaction of the conditions precedent to their funding obligations under the Plan—i.e., among other things, when the Confirmation Order becomes a "Final Order." Such a "conditional" transaction satisfies the Code's definition of "transfer." And with the Settling Insurers having transferred their share, substantially all of the property dealt with under the Plan has been transferred.

b.    Assumption

As to the second criterion for "substantial consummation", § 1101(2)(B) requires the "assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan."  This provision is doubly disjunctive, setting out two sub-conditions, each of which may be satisfied two ways.  First there must be "assumption by" either (1) the debtor, or (2) the successor to the debtor.  Second, the debtor or its successor must have assumed (1) the business, or (2) management of all or substantially all of the property dealt with by the plan.  Therefore, either the debtor or its successor need only assume either "the business" or "management of all or substantially all of the property dealt with by the plan."

BSA has satisfied that condition.  No party disputes that "BSA has been operating as a recognized charitable non-profit . . . since emergence from bankruptcy in April 2023" and "has fully resumed its operations, including receiving charitable donations, implementing the robust supplemental youth protection measures outlined in the Plan, implementing new bylaws and rules and regulations, and electing new board members."  BSA Suppl. Br. 7, 13.  Thus, BSA has assumed control of the scouting program, satisfying § 1101(2)(B).

c.    Distribution

BSA has also satisfied the third criterion for substantial consummation: "commencement of distribution under the plan."  11 U.S.C. § 1101(2)(C).  As the leading bankruptcy treatise notes—and we agree—"[t]he plain language of

paragraph (C) does not require commencement of distributions to all or substantially all classes of creditors. It simply requires that distributions have begun." 7 *Collier on Bankruptcy* ¶ 1101.02[3][a] (16th ed. 2024).

In this case, all agree that the Settlement Trust has begun distributing settlement payments to abuse claimants. As of April 22, 2025, 5,552 abuse claimants have elected an Expedited Distribution under the Trust Distribution Procedures, resulting in over $18.3 million in distributions made under that election alone. Additionally, as of that same date, 12,807 claimants have received distributions under the Claims Matrix election in the aggregate amount of approximately $107.4 million. So distributions under the Plan have commenced, satisfying § 1101(2)(C).

\*       \*       \*

As the Debtors have demonstrated that the Plan has been substantially consummated, we proceed to consider the second prong of the equitable-mootness inquiry.

### 2. *Scrambling the Plan and Justified Reliance*

At this step, we assess "whether granting the relief requested in the appeal will (a) fatally scramble the plan and/or (b) significantly harm third parties who have justifiably relied on plan confirmation." *In re Semcrude*, 728 F.3d at 321. On the record before us, BSA and the Settling Insurers have not demonstrated that the relief the Certain Insurers and Allianz Insurers seek imperils the Plan's success. Unlike the Lujan and D&V Claimants, the Certain Insurers and Allianz Insurers do not seek invalidation of the releases; instead, they ask us to

grant them each narrow, cabined relief.  The Certain Insurers ask for minor modifications to three provisions of the Plan to ensure that they retain their rights and defenses under their assigned insurance policies.  The Allianz Insurers seek only one modification—that the judgment reduction clause in the Confirmation Order be amended to allow for recovery of excess claims they incur in subsequent coverage litigation.  We can hardly say that these minor changes—none of which disrupts the funding to the Settlement Trust or the bargain struck between BSA and the Settling Insurers, or requires clawing back distributions already made to abuse claimants— meets the high thresholding of "knock[ing] the props out from under" the Plan.  *In re Trib. Media*, 799 F.3d at 281 (quoting *In re Chateaugay Corp.*, 10 F.3d 944, 953 (2d Cir. 1993)).

Accordingly, we decline to dismiss these appeals as equitably moot and proceed to consider the merits of the Certain Insurers' and Allianz Insurers' claims.[24]

---

[24] To be clear, our omission of this analysis for the claims of the Lujan and D&V Claimants should not be read, by negative implication or otherwise, to suggest that those claims are equitably moot.  Under our precedent, equitable mootness requires a finding of "justifiable reliance," meaning "reliance on the *finality* of confirmation." *In re Trib. Media*, 799 F.3d at 280 (emphasis added).  Here, our concurring colleague believes that requirement is satisfied.  *See* Concurring Op. 1 & n.1.  Others, such as the Law Professor Amici, urge that it is not because the Settling Insurers placed nearly $1.5 billion of their total contribution to the Settlement Trust into escrow, thereby limiting their exposure to an adverse judgment and retaining an interest in the escrowed funds in case the

D.     The Remaining Appeals

As we noted at the outset, the Certain Insurers and
Allianz Insurers each advance arguments that the Plan
impermissibly infringes on their rights under their insurance
policies.  Below, we address each of those arguments in turn
and conclude the Certain Insurers' arguments fail because the
Plan and Confirmation Order already preserve all of the rights
and defenses required.  But the Confirmation Order's judgment
reduction clause impermissibly releases contribution and
indemnification claims the Allianz Insurers otherwise would
be able to assert, and we will reverse with respect to those
claims.

1.     *The Certain Insurers' Appeal*

The Certain Insurers levy objections to various
provisions of the Plan and Confirmation Order that, they argue,
impermissibly impair their rights and defenses under their
insurance policies.  Specifically, they ask us to excise the
language in the Trust Distribution Procedures that states the
Certain Insurers' rights and the Debtors' obligations are
"subject to the Plan and Confirmation Order" and preserved
"to the extent such rights and obligations are otherwise
available under applicable law."  App. 1017.  They also urge

───────────────

Confirmation Order is reversed.  According to Amici, this
"contingency means that the core funding for the Plan has
barely begun and . . . [t]he Settling Insurers can demand all of
the money back."  Law Professor Amici Suppl. Br. 22.  For our
part, having concluded the Lujan and D&V Claimants'
appeals are statutorily moot, we need not resolve whether they
are equitably moot.

us to blue-pencil the Plan for two purposes: (1) to restore what they call the "Purpose" provision that would require the Settlement Trustee to balance the interests of the Certain Insurers with those of BSA when administering the Settlement Trust; and (2) to require the Settlement Trustee to "consider any further limitations on Abuse Claimants' recovery in the tort system." *Id.* at 1029. Finally, in the alternative, they contend that the Plan was not proposed in good faith. *See* 11 U.S.C. § 1129(a)(3). We disagree on all fronts.

a.    Preservation of Rights and Defenses

Non-bankruptcy law generally defines parties' property rights. *See Butner v. United States*, 440 U.S. 48, 55 (1979). Thus, while the estate is comprised of "all legal or equitable interests of the debtor in property" "wherever located," 11 U.S.C. § 541(a)(1), it "cannot possess anything more than the debtor itself did outside bankruptcy," *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 381 (2019). Insurance policies are property of the estate, and bankruptcy law—save for exceptions not relevant here—does not alter rights under those contracts. *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531–32 (1984); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989). So, under § 363(b), a debtor may not sell property of the estate, such as insurance policies, with greater or fewer rights or obligations than it possessed outside of bankruptcy, and a plan cannot be confirmed when it incorporates provisions that impermissibly impair counterparts' rights. *See In re Combustion Eng'g*, 391 F.3d at 218.

The Plan and Confirmation Order, here, do neither and leave the Certain Insurers' contractual rights and defenses intact. For starters, the Confirmation Order provides that "nothing in the Plan shall modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy issued by a Non-Settling Insurance Company or rights or obligations under such Insurance Policy to the extent such rights and obligations are otherwise available under applicable law." *In re Boy Scouts*, 2022 WL 20541782, at *33. And the Plan further confirms that the Certain Insurers retain their rights and defenses under their policies: It clarifies that "the Settlement Trust has received the assignment and transfer of . . . all other rights or obligations under or with respect to the Insurance Policies (but not the policies themselves) in accordance with the Bankruptcy Code." App. 1017. The Plan goes on to state nothing in the Trust Distribution Procedures shall:

> modify, amend, or supplement, or be interpreted as modifying, amending, or supplementing, the terms of any Insurance Policy or rights *and obligations* under any Insurance Policy assigned to the Settlement Trust to the extent such rights *and obligations* are otherwise available under applicable law and subject to the Plan and Confirmation Order. The rights *and obligations*, if any, of any Non-Settling Insurance Company relating to these TPD[s], or any provision hereof, shall be determined *pursuant to the terms and provisions of the Insurance Policies and applicable law.*

*Id.* (emphasis added). Finally, in Article X, entitled "Rights of Settlement Trust Against Non-Settling Insurance Companies," the Plan again admonishes that the assignments to the Settlement Trust are subject to the "rights and obligations under the Insurance Policies." *Id.* at 1033.

Nonetheless, the Certain Insurers contend these provisions are inadequate. As evidence, they point to the Settlement Trustee's initiation of insurance coverage litigation against the Certain Insurers. There, they fault the Settlement Trustee for seeking "a declaration that the Certain Insurers have breached the insurance policies and are obligated to provide full coverage for the Abuse Claims" and complain that the Trustee "makes no mention of the Certain Insurers' rights or defenses under the policies or the Trustee's corresponding obligations, which the courts below said were preserved." Certain Insurers Opening Br. 43.

First, it should come as no surprise that the Settlement Trustee—who owes a fiduciary duty to abuse claimants— would seek to maximize the value of the Settlement Trust by advancing legal arguments that the Certain Insurers bear liability for abuse claims. Second, and relatedly, the position concerning the Certain Insurers' obligations taken by the Settlement Trustee in coverage litigation is just that: a litigating position. Contrary to the Certain Insurers' contention, the Settlement Trustee's litigating positions are not evidence of the meaning of the Plan or Confirmation Order, nor does the Settlement Trustee authoritatively interpret those documents and the provisions contained in them that preserve the Certain Insurers' rights and defenses.

At oral argument, the Certain Insurers insisted we should not "foist upon the coverage court" the burden of parsing "600 pages [of Plan documents] and 300 pages of decisional law" to determine the extent to which the Certain Insurers' rights and defenses are preserved.  Oral Arg. Tr. 41:18–19.  It would be better, they maintain, for the Plan to incant the magic words they propose in addition to the Plan's and Confirmation Order's existing language.  Having grappled with these appeals ourselves, we appreciate the complexity of the Plan and the transactions it sets in motion.  But we also do not doubt the competency and discerningness of our judicial colleagues tasked with resolving the intricate insurance coverage litigation that will come with administration of the Settlement Trust.  They, no less than we, can interpret the Plan in light of the background principles of bankruptcy law discussed above.

For these reasons, we decline to rewrite the Plan and fasten suspenders to this already well-secured belt.

#### b.    Good Faith

The Certain Insurers also assert that the Debtors failed to propose the Plan in good faith as required under 11 U.S.C. § 1129(a)(3).  But this contention, in reality, is just the flip side of their rights-preservation argument.  And for that reason, it meets the same fate.

Section 1129(a)(3) of the Bankruptcy Code requires that "[t]he plan has been proposed in good faith and not by any means forbidden by law."  We have explained that "[i]n analyzing whether a plan has been proposed in good faith under § 1129(a)(3), 'the important point of inquiry is the plan itself

and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) (quoting *In re Combustion Eng'g*, 391 F.3d at 247). "[T]wo 'recognized' policies, or objectives" we have previously identified "are 'preserving going concerns and maximizing property available to satisfy creditors.'"[25] *Id.* (quoting *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999)).

Importantly, the Certain Insurers do not challenge the Bankruptcy Court's factual findings supporting its good-faith determination. Instead, they "challenge only the Bankruptcy Court's 'culminating determination' that the totality of the circumstances and the language of the Plan support a finding of good faith." Certain Insurers Reply Br. 39. And in doing so, they reveal the real thrust of their argument. At bottom,

---

[25] The Certain Insurers contend that our decision in *In re LTL Management, LLC*, 64 F.4th 84 (3d Cir. 2023), governs the good-faith analysis. But that case concerned whether a bankruptcy petition was filed in good faith, not whether a plan was proposed in good faith. *See id.* at 93. And as we have held, "[t]he question of whether a Chapter 11 bankruptcy petition is filed in good faith is a judicial doctrine, distinct from the statutory good faith requirement for confirmation pursuant to § 1129(a)(3)." *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 157 (3d Cir. 2012). So while both inquiries concern the good faith of the debtor, the good-faith proposal of a plan implicates unique considerations about the treatment of creditors and the prospect of effectuating the Code's purposes. Accordingly, we decline to graft this "judicial doctrine" into § 1129(a)'s confirmation requirements.

they repackage their rights-preservation argument into a good-faith argument, averring that by not including the Certain Insurers' desired language in the Plan, the Debtors did not propose the Plan in good faith.  The remedy they seek lays this plain:  Rather than asserting the Plan is unconfirmable because BSA did not propose it in good faith, the Certain Insurers recycle the same relief they requested previously—"[r]estoring the 'Purpose' provision" in the Plan and "substitut[ing] the word 'may' with the word 'shall'" in the disputed Trust Distribution Procedures provision.  *Id.* at 39, 45.  But failure to include the Certain Insurers' desired language does not convert the Plan into a bad-faith proposal, especially when the Plan language is otherwise consistent with the Code and background principles of bankruptcy law.

Because the Certain Insurers provide no basis to conclude otherwise, we agree with the Bankruptcy and District Courts that the Debtors proposed the Plan in good faith.

## 2. *The Allianz Insurers' Appeal*

Finally, we consider the Allianz Insurers' argument that the Plan and Confirmation Order non-consensually release their claims and vitiate their ability to recover certain defense costs.  They rely on the Supreme Court's recent decision in *Purdue*, to which we now turn.

In *Purdue*, the Supreme Court held that the Bankruptcy Code "does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants."  *Purdue*, 603 U.S. at 227.  There, in examining § 1123(b)(6)—the putative statutory authorization

for nonconsensual third-party releases—the Court concluded section (b)(6) is limited by the preceding "five specific sorts of provisions, all of which concern the *debtor*—its rights and responsibilities, and its relationship with its creditors." *Id.* at 218 (emphasis in original). Thus, it explained, section (b)(6) "cannot be fairly read to endow a bankruptcy court with the 'radically different' power to discharge the debts of a nondebtor without the consent of affected nondebtor claimants." *Id.* (quoting *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 513 (2018)). The Supreme Court reserved the question, however, of whether its interpretation of § 1123(b)(6) extends to plans that include "*consensual* third-party releases" or plans that "provide[] for the full satisfaction of claims against a third-party nondebtor." *Id.* at 226 (emphasis in original).

The Allianz Insurers contend that *Purdue* makes the Confirmation Order's judgment reduction clause intolerable because it, coupled with the Plan, impermissibly releases and enjoins contribution and indemnity claims they could otherwise assert against the Settling Insurers. We agree.

To fully understand the Allianz Insurers' objection, some context proves helpful. When two insurance companies provide overlapping coverage—such as the Allianz Insurers' and the Settling Insurers here—the insurer who ends up paying more than its fair share of a claim may seek contribution from the other insurer to appropriately allocate their shares of liability. *See, e.g.*, *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 215 (1994). The Plan upsets this arrangement by enjoining claims against the Settling Insurers and channeling them to the Settlement Trust subject to the judgment reduction clause. That clause limits a non-settling insurer to recovery against the Settlement Trust in the form of a reduced judgment, i.e., after

the Settlement Trust obtains a judgment against a non-settling insurer, that non-settling insurer can obtain its own judgment that a Settling Insurer is liable for some (or all) of the Settlement Trust's judgment. The non-settling insurer can then offset that portion of liability attributable to the Settling Insurer against the Settlement Trust's judgment, thereby reducing the non-settling insurer's liability to the Settlement Trust.[26]

Usually, this arrangement will pose no problem because the Settlement Trust will pay claimants under the Plan and, if necessary, initiate a coverage action against the appropriate non-settling insurer. And if the non-settling insurer obtains a judgment against a Settling Insurer, its liability to the Settlement Trust offsets accordingly. But a non-settling insurer will not be fully compensated for defense costs if (1) abuse claimants pursue the Tort System election, (2) a Settling

---

[26] The Future Claimants Representative provides a helpful example of this mechanism:

> For example, if the Trust obtains a judgment from a Non-Settling Insurer for $1 million, and the Non-Settling Insurer obtains a ruling that a Settling Insurer was responsible [for] $250,000 of that liability, to prevent any potential prejudice to the Non-Settling Insurer, the Plan requires the Trust to reduce its judgment against the Non-Settling Insurer by the amount of the Settling Insurer's share of the liability. The result is that the Non-Settling Insurer only has to pay $750,000.

Future Claimants Representative Answering Br. 44–45.

Insurer is responsible for defending the claim, but (3) a non-settling insurer elects to defend the claim instead, and (4) obtains a judgment in coverage litigation that it is not liable for the claim. In such a scenario, there would be no judgment held by the Settlement Trust that the non-settling insurer could reduce, thereby denying it any recovery for those "excess claims" it would otherwise be entitled to recover absent the releases and injunctions in the Plan.

The Allianz Insurers argue that this result is impermissible under *Purdue* because the Plan effectively discharges claims they would have against the Settling Insurers. And to correct this flaw, they propose amending the judgment reduction clause to provide that "if [a] Non-Settling Insurance Company is not subject to any such claim, cause of action, or judgment held by the Settlement Trust . . . then after such determination in the Insurance Action, the Settlement Trust shall pay the amount to the Non-Settling Insurance Company." Allianz Insurers Opening Br. Ex. A.

Appellees recognize that *Purdue*'s "full satisfaction" language applies here and invokes "the bedrock common-law principle that a plaintiff is entitled to only one satisfaction for each injury." BSA Suppl. Br. 21. Often dubbed the "one-satisfaction rule," courts apply this principle to "bar[] a subsequent suit . . . where the prior proceedings can reasonably be construed to have resulted in full satisfaction of the plaintiff's claim." *United States v. Occidental Chem. Corp.*, 200 F.3d 143, 149–50 (3d Cir. 1999) (quoting *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 357 (3d Cir.1999)); *see also* Restatement (Second) of Judgments § 49 cmt. a (Am. L. Inst. 1982) ("Double recovery is foreclosed by the rule that only one satisfaction may be obtained for a loss."). But "[u]nless the

judgment ... provides for plaintiff to recover . . . all recoverable damages, no satisfaction of claim can occur." Restatement (Third) of Torts: Apportionment Liab. § 25 cmt. b (Am. L. Inst. 2000). And as evidence of its application, Appellees point us to the District Court's finding that "the [Trust Distribution Procedures] streamline and reduce defense costs by resolving claims consensually through an out-of-court process. Thus, the likelihood that an Insurer is saddled with significant costs of defending Abuse Claims in the tort system is small," thereby "rendering the protection provided at least 'adequate.'" *In re Boy Scouts*, 650 B.R. at 172–73.

We agree with the Allianz Insurers that *Purdue* makes the Confirmation Order's current judgment reduction mechanism inadequate. Here, the District Court did not find that non-settling insurers would be fully compensated for their extinguished claims.[27] It merely found that non-settling

---

[27] The District Court relied upon *In re Plant Insulation Co.*, 469 B.R. 843 (Bankr. N.D. Cal. 2012), to conclude that, where a bankruptcy court bars non-settling parties from asserting contribution claims against settling parties, the non-settling parties are entitled to "some protection" but "need not be compensated in full." *In re Boy Scouts of Am. and Del. BSA, LLC*, 650 B.R. 87, 172 (D. Del. 2023). However, *Plant Insulation* was an asbestos bankruptcy, and the bar order was imposed pursuant to § 524(g). In *Purdue*, the Court noted that § 524(g)'s authorization of "injunctions . . . barring any action directed against a third party" was "a notable exception to the code's general rules" and bolstered the Court's conclusion that § 1123(b)(6) did not likewise allow bankruptcy courts to bar

insurers would be "adequately protected . . . because the number of claims [they] must defend is reduced, reducing their defense costs overall." *In re Boy Scouts*, 650 B.R. at 172. Accordingly, the District Court's determination did not amount to a finding that non-settling insurers would "be compensated in full" and, thus, did not fully satisfy the claims at issue. *Id.* (quoting *In re Plant Insulation Co.*, 469 B.R. 842, 876 (Bankr. N.D. Cal. 2012)). We therefore conclude that *Purdue* controls, and the judgment reduction provision is unlawful insofar as it operates to extinguish the Allianz Insurers' claims without their consent.

Without factual findings about the extent of the Allianz Insurers' excess claim liability—including, given the various layers of contingency, whether it is real versus speculative[28]—the record does not support the conclusion that the judgment reduction clause is an adequate alternative to the Allianz

---

actions against a nondebtor without claimants' consent. 603 U.S. at 222 (cleaned up). Of course, we do not fault the District Court's reliance on *Plant Insulation* when it did not have the benefit of the Supreme Court's subsequent decision in *Purdue*. But while its reasoning may have been compelling before *Purdue*, it cannot survive the Court's subsequent decision.

[28] The Allianz Insurers acknowledge that the full magnitude of excess claims is currently uncertain and will not be ascertainable "until a future coverage determination," and they are unaware of a claimant choosing the Tort System election. Oral Arg. Tr. 45:16–17, 46:1–4. They do assert, though, that they have exercised their contractual right "to associate in," *id.* at 47:3, to defend various proceedings under the Independent Review Option and are "incurring defense costs" as a result, *id.* at 45:24.

Insurers retaining the right to full recovery on their excess claims.[29]  Thus, we will reverse the District Court's judgment as to the Allianz Insurers claims and modify the judgment reduction clause to impose a Settlement Trust backstop as set out in Exhibit A of the Allianz Insurers' Opening Brief.  *See In re Combustion Eng'g*, 391 F.3d at 218; *Gerber v. MTC Elec. Techs. Co., Ltd.*, 329 F.3d 297, 307 (2d Cir. 2003) (Sotomayor, J.).  The Bankruptcy Court shall enter an appropriate form of order on remand.[30]

---

[29] As we noted above, the Supreme Court in *Purdue* admonished that it was not deciding whether nonconsensual third-party releases are permissible in plans that (1) fully satisfy third-party claims, or (2) are "effective and . . . substantially consummated." *Purdue*, 603 U.S. at 226.  We need not decide when, in light of *Purdue*, nonconsensual third-party releases remain permissible in either scenario because this case presents neither.  For the reasons given above, there are inadequate factual findings for us to conclude that this is a full-satisfaction plan, at least with respect to the Allianz Insurers' claims.  And to the extent that the Court's substantial-consummation language refers to equitable mootness, as explained above, *supra* Section III.C.2, that doctrine does not apply to the Allianz Insurers' appeal.

[30] The impact of this holding is not far-reaching.  Courts generally permit provisions like the Plan's judgment reduction clause where the judgment is the equivalent of a contribution claim.  *See Eichenholtz v. Brennan*, 52 F.3d 478, 487 (3d Cir. 1995) (citing *TBG, Inc. v. Bendis*, 36 F.3d 916 (10th Cir. 1994)).  Thus, *Purdue* does not threaten the typical usage of judgment reduction in reorganization plans, as it expressly does not address plans that fully compensate third parties for the released claims.  *See Purdue*, 603 U.S. at 226.

**IV.**   <u>**Conclusion**</u>

As the Bankruptcy Court poignantly observed, "no compensation will ever be enough" for the abuse claimants have suffered. *In re Boy Scouts*, 642 B.R. at 518. The Plan nonetheless permits survivors to pursue their claims through the Trust Distribution Procedures and recover for at least some fraction of the suffering they have endured. That human reality must not be lost among the legal intricacies of these appeals.

Our decision today depends on the unique characteristics of this Plan, this § 363(b) sale, and the relief these Appellants seek. The Bankruptcy Code prevents us from disrupting the nonconsensual third-party releases in BSA's Plan at this late stage. If proposed today, the Plan would be unconfirmable in the wake of *Purdue* and the Lujan and D&V Claimants could not have their claims released without their consent. And that temporal happenstance, we recognize, is a bitter pill to swallow, "but bankruptcy inevitably creates harsh results for some players." *In re Weinstein Co. Holdings LLC*, 997 F.3d 497, 511 (3d Cir. 2021).

Accordingly, we will dismiss the Lujan Claimants' and D&V Claimants' appeals as statutorily moot under § 363(m), and affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

*In re: Boy Scouts of America and Delaware BSA LLC*

No. 23-1664 et al.

**RENDELL**, *Circuit Judge,* concurring:

      The majority's characterization of the instant appeal of the Lujan and D&V Claimants as an appeal from a § 363 sale order is fundamentally flawed, for reasons I detail below. We need not resort to this characterization—instead, we should dismiss the Lujan and D&V Claimants' appeals as equitably moot. Equitable mootness is firmly rooted in our precedent, and, as counsel for BSA urged at oral argument, if ever there were a case crying out for application of the doctrine, this is it.[1] Our Court and every Circuit Court with jurisdiction to hear bankruptcy appeals has adopted equitable mootness.[2] But

---

[1] I agree with the majority that the Plan has been substantially consummated. Maj. Op. 59–64. And striking the releases—as the Lujan and D&V Claimants urge—would "knock the props out from under the authorization for every transaction that has taken place," thereby "scrambling" the plan and "upsetting third parties' reliance on it." *In re Trib. Media Co.*, 799 F.3d 271, 281 (3d Cir. 2015) (quoting *In re Chateaugay Corp.*, 10 F.3d 944, 953 (2d Cir. 1993)). Thus, equitable mootness is a straightforward way to resolve the Lujan and D&V Claimants' appeals.

[2] *See In re Trib. Media Co.*, 799 F.3d 272, 277–78 & n.3 (3d Cir. 2015); *In re Cont' Airlines*, 91 F.3d 553, 559 (3d Cir. 1996) (en banc); *In re Healthco Int'l, Inc.*, 136 F.3d 45, 48

1

rather than hewing to this well-worn path, the majority "stretch[es] a statute" to offer a parallel route by which to avoid review of otherwise-justiciable appeals. *In re One2One Commc'ns, LLC*, 805 F.3d 428, 444 (3d Cir. 2015) (Krause, J., concurring). We should reject this stretch of § 363 and dispense with the Lujan and D&V Claimants' appeals as equitably moot.[3]

The first fundamental flaw in the majority's resort to § 363(m) lies in the statute's clear indication that it does not apply to sales in reorganization plans as well as the common-sense observation that the non-consensual third-party releases were not accomplished by way of the purported § 363 authorization,[4] but by way of plan confirmation. So this is an

_____

(1st Cir. 1998); *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 481 (2d Cir. 2012); *Behrmann v. Nat'l Heritage Found.*, 663 F.3d 704, 713–14 (4th Cir. 2011); *In re Scopac*, 624 F.3d 274, 281–82 (5th Cir. 2010); *In re Am. HomePatient, Inc.*, 420 F.3d 559, 563–65 (6th Cir. 2005); *In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994); *In re VeroBlue Farms USA, Inc.*, 6 F.4th 880, 890–91 (8th Cir. 2021); *In re Thorpe Insulation Co.*, 677 F.3d 869, 879–83 (9th Cir. 2012); *In re Paige*, 584 F.3d 1327, 1337–38 (10th Cir. 2009); *In re Lett*, 632 F.3d 1216, 1225–26 (11th Cir. 2011); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1147–48 (D.C. Cir. 1986).

[3] I agree with the majority as to the disposition of the Certain Insurers' and Allianz Insurers' appeals.

[4] In particular, the Local Councils and Chartered Organizations were not parties to the sale, so the release of claims against them could not have been accomplished via the sale.

appeal from the confirmation order, not the sale. Moreover, the majority's opinion endorses an end run around Chapter 11's requirements, including the Supreme Court's holding in *Harrington v. Purdue Pharma L.P.*, that the Bankruptcy Code does not permit non-consensual third-party releases in a chapter 11 plan. 603 U.S. 204, 227 (2024).[5] If that is not enough, as I discuss below, some of the Settling Insurers constructed the "sale" of their policies such that they will not occur until the Confirmation Order is affirmed on appeal, meaning that the majority's approach will not finally resolve this case.

While I agree with the majority that this is not a case in which a pre-confirmation sale made up a "*sub rosa*" plan, I see it as just as problematic, for nearly identical reasons. As the majority acknowledges, the *sub rosa* doctrine recognizes that "[t]he court may not . . . in the guise of authorizing a transaction out of the ordinary course of business [under § 363] in a chapter 11 case, authorize a transaction that is so extensive as to be tantamount to a plan." 3 *Collier on Bankruptcy* ¶ 363.02 (16th ed. 2025); *compare In re Boy Scouts of Am. & Delaware BSA, LLC*, 642 B.R. 504, 562 (Bankr. D. Del. 2022) ("Without these settlements, there is no Plan."). Accordingly, the *sub rosa* cases are concerned with § 363 being used to skirt Chapter 11's requirements and effectively insulate plans from review. *See In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983); *In re Lionel*, 722 F.2d at 1069. By using a § 363 sale to establish the terms of a plan *sub rosa*, a debtor can avoid Chapter 11's

---

[5] Recall that in *Purdue* the Court made clear that its holding did not apply to "plans that have already become effective and been substantially consummated," that is, to bankruptcy appeals that are equitably moot. 603 U.S. at 226.

requirements and ensure that "appellate review would effectively be precluded." *In re Lionel*, 722 F.2d at 1069. Likewise, where, as here, a sufficiently important facet of the plan makes up "consideration" for a portion of the debtors' property, a § 363 sale allows debtors to avoid complying with Chapter 11 (here, 11 U.S.C. § 1126(b)(6)) and insulates the plan from appellate review. Employing § 363(m) to remove this category of confirmed plans from judicial review is too sweeping and radical. We needn't and shouldn't go there, for a number of reasons.

First, § 363 itself distinguishes between sales under § 363(b) and (c) and sales under a plan. Subsection § 363(l) applies to the "use sale, or lease of property" that occurs "under subsection (b) or (c) of [§ 363] *or a plan under chapter 11 . . . of this title*." 11 U.S.C. § 363(l) (emphasis added). By contrast, § 363(m) applies only to a sale or lease authorized "under subsection (b) or (c) of [§ 363]." 11 U.S.C. § 363(m). Similarly, § 363(o) applies to "a sale under [§ 363]," and has been interpreted (albeit, in decisions that do not bind this Court) to apply to § 363 sales only, not plan sales. *In re Ditech Holding Corp.*, 606 B.R. 544, 595 (Bankr. S.D.N.Y. 2019). Tellingly, the drafters of subsection (o) originally considered language that would have made the provision applicable to a "sale by a trustee *or transfer under a plan of reorganization*." 147 Cong. Rec. 2018 at *2031–32 (March 8, 2001) (emphasis added). In the end, however, Congress adopted narrower language, such that the provision applies to only a "sale under this section," 11 U.S.C. § 363(o); 147 Cong. Rec. 2184 at *2191 (March 13, 2001), and not a "transfer under a plan of reorganization," 147 Cong. Rec. 2018 at *2031–32 (March 8, 2001). Similarly, the drafters of § 363(m) could have considered (and adopted) language that brought plan sales within its ambit. Instead, § 363(m) narrowly applies to § 363(b) and (c) sales, not plan

sales. As the majority notes, "the inclusion of language in one section of a statute, but omission of it in another, generally 'convey[s] a difference in meaning[.]'" Maj. Op. 56 (alteration in original) (quoting *Bittner v. United States*, 598 U.S. 85, 94 (2023)).

Perhaps for these reasons, several courts have suggested that sales accomplished under plans do not fall within § 363(m)'s ambit. *See Miami Ctr. Ltd. P'ship v. Bank of New York*, 838 F.2d 1547, 1553 (11th Cir. 1988) (holding that § 363(m) does not apply to sale under liquidation plan), *and In re Texas Extrusion Corp.*, 844 F.2d 1142, 1165 (5th Cir. 1988) (expressing doubt as to whether plan sales may invoke the "shield" of § 363(m) given the "definite implication that [§ 363(b), (c), and (m)] concern the trustee's authority during the administration of the estate and not at the final disposition of the property of the estate pursuant to a plan of reorganization").[6]

The majority urges that we have already resolved this question, as *In re Energy Future Holdings*, 949 F.3d 806 (3d

[6] *See also In re Bardos*, No. CC-13-1316, 2014 WL 3703923, at *9 (B.A.P. 9th Cir. July 25, 2014) (concluding that § 363(m) did not bar appeal involving plan sale, as plan sales are authorized under 11 U.S.C. § 1123(a)(5)(B), not § 363); *In re Smurfit-Stone Container Corp.*, No. 09-10235, 2010 WL 2403793, at *10 (Bankr. D. Del. June 11, 2010) (suggesting that § 363 does not apply to plan sales). *But see In re Fieldwood Energy LLC*, 93 F.4th 817, 825 (5th Cir. 2024) (applying § 363(m) to a sale authorized by a confirmation order); *In re Made in Detroit, Inc.*, 414 F.3d 576, 582–83 (6th Cir. 2005) (same).

Cir. 2020) and *Cinicola v. Scharffenberger*, 248 F.3d 110 (3d Cir. 2001) confirmed that § 363(m) may apply to sales authorized by a reorganization plan, rather than a separate sale order. Not so. In those cases, a separate Bankruptcy Court order—not a reorganization plan itself—preliminarily approved a § 363 sale, and the confirmation order "authorized and directed" it. *Energy Future Holdings*, 949 F.3d at 819–20; *Cinicola*, 248 F.3d at 122. While *Energy Future Holdings* does stand for the proposition that a sale order that is later authorized in a plan confirmation order does not lose or forfeit the protection of § 363(m), 949 F.3d at 819–20, that does nothing to displace the specific terms of the statute, which indicate that § 363(m) does not apply to sales that occur as part of a plan of reorganization. *Energy Future Holdings* does not govern this case, where the plan (not a separate order) purported to "constitute a motion by the Debtors for the Bankruptcy Court to approve the proposed compromises and settlements and assignment and/or sale of the applicable Insurance Policies . . . pursuant to sections 363, 503(b), 507(a)(2), 1123 and 1141 of the Bankruptcy Code, as applicable," and the Confirmation Order, in turn, approved the policy buybacks "pursuant to sections 363, 1123, and/or 1141 of the Bankruptcy Code" and stated that the Settling Insurers would be entitled to § 363(m)'s protections. App. 949, 799, 804–05. This arrangement was almost certainly crafted in an attempt to insulate the Plan and Confirmation Order from appellate review—otherwise, the buybacks of the insurance policies would have been confirmed, as is typical, by § 1123(a)(5)(D), which allows a plan to sell "all or any part of the property of the estate, either subject to or free of any lien." 11 U.S.C. § 1123(a)(5)(D).

This distinction between this case and *Energy Future Holdings* may, at first blush, appear needlessly formalistic. But there are important differences: First, where a § 363 sale

appears in a separate order, rather than the plan itself, the *sub rosa* doctrine gives courts leeway to reverse a § 363(b) authorization that effectively dictates the terms of a plan. Indeed, in *Energy Future Holdings*, this Court could have reversed the § 363(b) sale had the parties put substantial plan-like terms into the Merger Order.[7] But parties can skirt the *sub rosa* doctrine by including a § 363 sale in the plan itself. So long as Chapter 11's procedural requirements are met, substantively controversial, or even unlawful, plan provisions (like non-consensual third-party releases) can evade appellate review.[8] Next, § 363 contemplates courting of third-party

_____

[7] Of course, the Merger Order's terms were targeted to allowing a third party to purchase the debtor's valuable asset (a liability-free subsidiary) without taking on all of the debtor's asbestos liability—not at all a *sub rosa* plan and much more limited than the sweeping releases at issue here. *See Energy Future Holdings*, 949 F.3d at 813.

[8] The majority's prediction that "an *intentional* attempt to transact by 'means forbidden by law'" would not constitute good faith under § 363(b) or (m) does not stymie these concerns. Maj. Op. 50 (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 (3d Cir. 1986)). I do not read § 363's good-faith requirement to bar the sort of mischief today's holding risks creating. Our Court has interpreted §§ 363(b) and (m)'s good-faith requirements to ensure that the purchaser has "paid 'value' for the assets of a bankrupt," and has not engaged in "fraud[ or] collusion" with the "other bidders or the trustee" or "attempt[ed] to take grossly unfair advantage of other bidders." *Id.* at 149, 147 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978). This interpretation accords with § 363(m)'s general

investors, a robust bidding process, and a sale approval process. Realistically, when inserted as part of a globally-negotiated plan that is being confirmed, the vetting that would normally occur as part of a sale bidding and approval process and court order prior to plan confirmation will not occur. Using § 363(m) to avoid an appeal deprives the sale of any real scrutiny.

Separately, and even more critically, the Lujan and D&V Claimants' appeal does not challenge the sale of the insurance policies, it challenges a separate facet of the Confirmation Order—its approval of non-consensual third-

---

goal of maximizing the value of the estate. *See Cinicola*, 248 F.3d at 122.

I am doubtful that this requirement would strip § 363(m)'s protections from a purchaser who paid full value for the debtor's assets and also received non-consensual third-party releases. Can it really be said that a party who obtained a benefit the Supreme Court deemed unlawful, but who otherwise committed no fraud or collusion "in preparation for and during the sale itself," has shown a "lack of integrity" "during the course of the sale proceedings," *In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997), particularly in light of the fact that § 363(m) applies even where the purchaser "knew of the pendency of [an] appeal"? 11 U.S.C. § 363(m). Indeed, even after *Purdue*, courts have approved § 363 sales that include non-consensual third-party releases. *In re Hopeman Bros., Inc.*, 667 B.R. 101, 108 (Bankr. E.D. Va. 2025); *In re Roman Cath. Diocese of Rockville Ctr.*, 665 B.R. 71, 80, 89 (Bankr. S.D.N.Y. 2024); *Wright v. Bird Global*, Case No. 24-CV-23086, slip op. at 4–5 (S.D. Fla. Aug. 21, 2024).

party releases. The majority says that this is "a distinction without a difference," because "without the releases, the Settling Insurers would receive less than they bargained for in exchange for their cash contribution to the Settlement Trust." Maj. Op. 44. But the Local Councils and Chartered Organizations who transferred their policies to the Debtor before the sale have also been given releases pursuant to the plan. Taken to its logical conclusion, the majority's reasoning would allow § 363(m) to swallow Chapter 11's requirements, including those clarified in *Purdue*. More often than not, when a confirmation order authorizes a sale of assets in addition to various plan provisions, the purchasing party's cash contribution has been negotiated in tandem with other plan provisions. So as long as a court authorizes an intra-plan sale under § 363, the other plan provisions are shielded from review, as they may have conceivably affected the purchase price.[9]

Congress could not have intended for § 363(m) to sweep so broadly. As the majority acknowledges, the concept underlying § 363(m) is that sales to third parties should be

---

[9] This highlights another difference between *Energy Future Holdings* and this case: if a § 363 sale can appear in the plan itself, parties can later argue that any plan provision formed consideration for the sale and, under the majority's reasoning, must therefore be shielded from appellate review. That argument would be hard to refute given that money is fungible and virtually any term can be traded for any other term. Leaving *Energy Future Holdings* where it lies stymies this additional opportunity for mischief, and forces debtors and third-party purchasers to be transparent about what the consideration for the asset sales truly is.

immune from appeal to maximize the incentive for purchasers to buy the assets in an otherwise unstable environment, from a business as well as legal standpoint: "to promote the policy of the finality of bankruptcy court orders, and to prevent harmful effects on the bidding process resulting from the bidders' knowledge that the highest bid may not end up being the final sale price." *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 500 (3d Cir. 1998); *cf. In re Lionel Corp.*, 722 F.2d 1063, 1067 (2d Cir. 1983) (explaining that § 363's predecessor statutes aimed to govern leases or sales of goods with potentially deteriorating value "during the time lag between the filing of a petition for reorganization and the date when the plan was approved"). To those ends, § 363(m) "merely" offers "a targeted protection of [the purchaser's] newly acquired property interest" by leaving the sale intact even when an appeal of its authorization is successful. *MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288, 299–300 (2023). Thus, the strong shield of § 363(m) is meant to "attract[] investors and help[] effectuate debtor rehabilitation." *Cinicola*, 248 F.3d at 122.

What happened here goes far beyond what § 363 contemplates. Rather than merely protecting the purchaser's "newly acquired property interest," *MOAC Mall*, 598 U.S. at 300, the majority shields from review the non-consensual third-party releases that the Supreme Court invalidated in *Purdue*.[10] This sets a dangerous transactional precedent, one

---

[10] To be sure, at the time the buybacks took place, the Supreme Court had not yet granted certiorari or announced its decision in *Purdue*. *Compare* App. 11773 (Settlement Agreement executed February 14, 2022) *with Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 44 (2023) (granting petition for writ of certiorari August 10, 2023), *and Harrington v.*

that will result in Article III courts not having the capacity to review Confirmation Orders if the parties agree to call key intra-plan transactions "sales." Indeed, today's decision relegates the Supreme Court's holding in *Purdue* to a mere plan-drafting guide—perhaps the Sackler family should have purchased the estate's fraudulent conveyance claims in addition to the nonconsensual third-party releases and called it a § 363 sale. *See Hopeman Bros.*, 667 B.R. at 108.

We need not fear, the majority says, because the "vast majority of challenges, no doubt" will escape § 363(m)'s bar, as § 363(m) only applies to appeals that affect the validity of a sale, "a narrow and well-defined category of cases." Maj. Op. 47, 36. I cannot see how that could be so under the majority's own reasoning. An appeal escapes § 363(m)'s bar only if it is "so divorced from the overall transaction that the challenged provision would have affected none of the considerations on which the purchaser relied," *id.* at 36 (quoting *In re Pursuit Cap. Mgmt., LLC*, 874 F.3d 124, 139 (3d Cir. 2017)), which we have said will occur "only in . . . rare circumstances." *In re Pursuit Cap.*, 874 F.3d at 139.[11] In fact, any suggestion that the

_____

*Purdue Pharma L. P.*, 603 U.S. 204 (2024) (invalidating nonconsensual third-party releases June 27, 2024). But as counsel for Settling Insurers acknowledged at oral argument, all parties knew that non-consensual third-party releases were controversial. Accordingly, the Debtors crafted the Plan such that the Effective Date—including the insurance policy buybacks—would not occur until after the District Court affirmed the Confirmation Order.

[11] The picture the majority paints also proves illusory when one takes a holistic view of our precedent: when faced with the contention that a bankruptcy appeal is moot under

majority's ruling is "narrow," Maj. Op. 36, is belied by this very case. The majority is willing to extend § 363(m)'s protection to Local Councils and Chartered Organizations, who were not parties to any § 363 sale. This view flies in the face of *In re ICL Holding Co.*, where we said "while § 363(m) aims to make sales of estate property final and inject predictability into the sale process, we don't think it does so at all costs and *certainly not for non-purchasers*." 802 F.3d at 554 (emphasis added).

Finally, some of the Settling Insurers' agreements included provisions that their sales will not be completed unless and until there is a successful appeal. As such, the Lujan and D&V Claimants' appeals are not statutorily moot as applied to those sales. As the majority acknowledges, the Plan provides: "Notwithstanding anything to the contrary and for the avoidance of doubt, the Abuse Insurance Policies . . . shall be sold by the Debtors to the applicable Settling Insurance Companies . . . on the Effective Date *on the terms and as provided in the applicable Insurance Settlement Agreement*." Maj. Op. 39–40 (emphasis added) (quoting App. 975). While the Century and Chubb and Clarendon Insurers' settlement

---

§ 363(m), this Court has dismissed the appeal in all but four instances. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 151 (3d Cir. 1986) (remanding for district court to determine whether sale was made in good faith); *Cinicola*, 248 F.3d at 128 (remanding for district court to determine whether relief would affect validity of § 363 sales); *In re ICL Holding Co.*, 802 F.3d 547, 554 (3d Cir. 2015) (concluding that § 363(m) did not bar review); *Energy Future Holdings*, 949 F.3d at 821 (concluding that § 363(m) barred review of appellants' first argument, but not its second).

agreements provide that the sale of their policies shall occur on the Plan's Effective Date, the Hartford and Zurich Settling Insurers' settlement agreements *expressly condition* the Debtors' sale of their insurance policies on the Confirmation Order becoming a "Final Order."[12] App. 11231, 11760. The agreements refer, in turn, to the Confirmation Order's definition of Final Order, which means "an order or judgment of the Bankruptcy Court . . . that has not been reversed, vacated, stayed, modified, or amended, and as to which," if appealed, "such order . . . shall have been affirmed by the highest court to which such order was appealed . . . and the time to take any further appeal, petition for *certiorari* . . . shall have expired." App. 885. This has not occurred.

No matter, the majority says, because "§ 363(m) speaks in terms of *unstayed authorizations* under § 363(b)—it does not include an inchoate requirement that a § 363(b) sale be consummated or otherwise effectuated." Maj. Op. 40. The text of § 363(m) reads:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity *of a sale* or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the

---

[12] The majority's urging that the sales occurred on the Effective Date based on the Plan and counsels' statements at oral argument ignores this express condition and the language cited above: "as provided in the applicable Insurance Settlement Agreement." App. 975.

> appeal, unless such authorization *and such sale* or lease were stayed pending appeal.

11 U.S.C. § 363(m) (emphasis added).

The majority is right that § 363(m) comes into play when there is an appeal of a § 363(b) or (c) authorization. But it bars review of such appeals only to the extent that the appeal would "affect the validity of a sale or lease under such authorization. . . unless such authorization and such sale or lease were stayed pending appeal." *Id.* If § 363(m) focused only on sale authorizations, why separately mention the sale? Why not say simply that an appeal of an authorization "does not affect the validity of . . . such authorization . . . unless such authorization . . . were stayed pending appeal?" *Id.* Section 363(m) clearly contemplates not only an authorized sale, but a sale that has occurred.[13] An appeal cannot affect the validity of

---

[13] The majority reads this clear textual implication out of the statute when it suggests that § 363(m)'s requirements can be met without a consummated sale, so long as the sale has been authorized. Our § 363(m) caselaw presumes that the sale has occurred, not just that it has been authorized and may or may not occur in the future, depending on the success of an appeal (a very different situation than an installment sale or a contract providing for ongoing performance). *See, e.g.*, *In re Rickel Home Centers, Inc.*, 209 F.3d 291, 304 (3d Cir. 2000) ("The strength of these policies [of § 363(m)] is reflected in numerous other decisions of the courts of appeals rejecting as moot an appeal from an order authorizing a sale of estate property under section 363 *when the transaction has been completed*." (emphasis added)); *Pittsburgh Food & Beverage, Inc. v. Ranallo*, 112 F.3d 645, 651 (3d Cir. 1997) (explaining

a sale that has not happened. *Cf. In re CADA Invs., Inc.*, 664 F.2d 1158, 1160 (9th Cir. 1981) ("Because [the purchaser]'s interest is expressly conditioned on the outcome of this appeal, a reversal or modification of the appealed order by this court would not 'affect' the sale to [the purchaser] in the manner prohibited by [the predecessor to § 363]."). Because the sale of the Hartford and Zurich policies have not occurred, resorting to statutory mootness does not finally resolve this case. We can avoid these complications if we rely instead on equitable mootness.

Equitable mootness is a discretionary principle that the circuit courts have unanimously adopted. As it arises out of courts' discretion to fashion equitable relief, it is to be narrowly applied, or not applied, as the Article III reviewing court deems appropriate. *See* Maj. Op. 56 (citing *In re Trib. Media*, 799 F.3d at 287 (Ambro, J., concurring)). Even where it is applied, the reviewing court has discretion to address the merits of the appeal if it wishes. *See In re Trib. Media*, 799 F.3d at 290 n.2 (Ambro, J., concurring) (citing *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 144 (2d Cir. 2005)); *In re One2One*, 805 F.3d at 449–50 (Krause, J., concurring). By contrast, statutory mootness operates essentially as an "on-off" switch: if a party challenges a plan provision that affects the validity of a § 363 sale—however the parties have chosen to conceive of it—courts are stripped of any ability to review that provision.

For these reasons, I see not only error, but mischief, in the majority's approach. Accordingly, I concur in the result, but

---

that, under § 363(m), "where sale order not stayed *and sale consummated*, appeal is moot" (emphasis added)).

believe that equitable mootness is the way we should reason through the dismissal of the Lujan and D&V Claimants' appeals.